## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **STEVEN D. MURRAY,** | : | |
| *Plaintiff* | : | |
| **v.** | : | **C.A. No. 23-cv-** |
| | : | |
| **COMMUNITY COLLEGE OF** | : | **Jury trial demanded** |
| **RHODE ISLAND, alias, COUNCIL ON** | : | |
| **POST SECONDARY EDUCATION, alias,** | : | |
| **and ROSEMARY COSTIGAN, alias,** | : | |
| **in her individual and official capacities,** | : | |
| *Defendants* | : | |

## VERIFIED COMPLAINT

### I.    Introductory Statement

1.    This action is brought by the Plaintiff Steven D. Murray seeking declaratory and injunctive relief and compensatory, punitive, and treble damages for acts and/or omissions of Defendants in violation of Plaintiff's rights to freedom of speech, association, and due process guaranteed under the First, Fifth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983 and under Article 1, §§2, and 21 of the Rhode Island Constitution, and in violation of the Rhode Island Whistleblower Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1, *et seq*.

### II.    Parties

2.    Plaintiff Steven D. Murray ("Plaintiff" or "Murray") is a resident of the Town of Narragansett, County of Washington, State of Rhode Island.

3.    Defendant Community College of Rhode Island ("Defendant CCRI") is a quasi-state entity duly organized and established pursuant to R.I. Gen. Laws § 16-44-1, *et seq.,* as amended by R.I. Gen. Laws § 16-33.1-1, *et seq.* and R.I. Gen. Laws § 16-59-1, *et seq*., and is responsible for the operational management of the state community college system, including the

four main campuses in Warwick, Lincoln, Providence, and Newport, pursuant to authority delegated by the Defendant Council on Post Secondary Education.

4.      Defendant Council on Post Secondary Education ("Defendant Council") is a quasi-state entity duly organized and established pursuant R.I. Gen. Laws § 16-59-1, *et seq*. and is vested with legal title and control over all real and personal property of post-secondary education public institutions in the State of Rhode Island and is the employer of record of all faculty and staff thereof.

5.      Defendant Rosemary A. Costigan, ("Defendant Costigan") is the Interim President of Defendant CCRI, and was, during most of the period relevant to the matter at issue in this Complaint, Vice President of Academic Affairs at Defendant CCRI, and is sued in her individual and foregoing official capacities.

### III.    Jurisdiction

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1367, 2201 and 2202.

### IV.    Venue

6.      Venue is proper in this Court insofar as all the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. § 1391.

### V.    Materials Facts

#### A.    Employment History

7.      Plaintiff is a member of the Bar of the United States District Court for the District of Rhode Island, the State of Rhode Island, the Commonwealth of Massachusetts, and the Supreme Court of the United States as well as a former Assistant Attorney General for the State of Rhode Island.

8.      Plaintiff has taught courses on the law, legal studies, and criminal justice at Defendant CCRI for approximately thirty-two (32) years.

9.      In 1999, Plaintiff was awarded tenure and was promoted to Associate Professor and in 2005 he was promoted to Professor.

10.      Plaintiff was elected Chair of the Criminal Justice and Legal Studies Department in 2012 and was reelected unanimously on three subsequent occasions, most recently in February of 2023.

11.      Plaintiff also recently received an overall "outstanding evaluation" as a department Chair and teacher and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty." Record Appendix in Support of Plaintiff's Motion Emergency Motion for Injunctive Relief ("R.A.") Exhibit A (Dean Allyson Handley Annual Chair Evaluation Meeting: Professor Steve Murray, April 22, 2021) ("Ex. A.").

12.      During this long tenure as a teacher and as a department Chair, Plaintiff has earned a stellar record comprised largely of "exceeds expectations" annual reviews and has never been disciplined by Defendant CCRI.

**B.      Vocal Faculty Advocate and Defendant CCRI Administration Critic**

13.      During his time working at Defendant CCRI as a faculty member, Plaintiff has also been a highly active and engaged member of the faculty union, the Community College of Rhode Island Faculty Association ("CCRIFA").

14.      Indeed, Plaintiff was president of CCRIFA from April of 2016 until November of 2020, having been elected to two consecutive two-year terms in that office.

15.      Plaintiff is currently Vice President of CCRIFA, having been appointed on or about June 21, 2023, and serves as an alternate member to the CCRIFA Executive Committee.

16.      Plaintiff is also one of the twelve members of the Curriculum Review Committee who are elected by the faculty, with the thirteenth member being the CCRIFA President.

17.    The Curriculum Review Committee is an essential element of shared governance at Defendant CCRI regarding the management of the Curriculum of the College, including setting required courses, and approving or rejecting new proposed programs, courses, degrees, and certificates. R.A. Exhibit B, CCRIFA Collective Bargaining Agreement with Defendant CCRI ("CBA"), Article 2 §A CBA Curriculum Review Committee ("Ex. B").

18.    The CCRIFA is entitled to these Committee positions under the collective bargaining agreement between CCRIFA and Defendant CCRI ("CBA"). *Id.*

19.    Plaintiff is and has been a vocal and passionate advocate seeking to improve the terms and conditions of employment on behalf of his co-worker faculty union members and, as a consequence, has frequently been at odds with the Defendant CCRI administration.

20.    In his various capacities as a Faculty Association President, department Chair, elected Curriculum Review Committee member, and active and vocal CCRIFA member, Plaintiff has had severe disagreements over the years with the Defendant CCRI Administration, including Defendant Costigan.

21.    These disagreements have led to, among other things, faculty "No Confidence Votes," picketing, grievances, and Unfair Labor Practice charges and, at one point, Plaintiff filing a Violence in the Workplace Charge against Defendant Costigan.[1]

22.    Plaintiff also has had ongoing disagreements with the Administration of Defendant CCRI, including Defendant Costigan, over the failure of Defendant CCRI to act in accordance with the shared governance provisions of R.I. Gen. Laws §§16-33.1-2 and 16.33.1-3.

---

[1] It is noteworthy that Defendant Costigan had no restrictions placed on her during Defendant CCRI's investigation of Plaintiff's complaint, as compared to the banishment imposed on the Plaintiff in this case.

23.     Plaintiff has long contended that Defendant CCRI lacked the shared governance required by and were therefore in violation of R.I. Gen. Laws §§16-33.1-2 and 16.33.1-3 and has publicly criticized this deficiency.  R.A. Exhibit C, Shared Governance Emails.

24.     Plaintiff also reported Defendant CCRI's violation of R.I. Gen. Laws §§16-33.1-2 and 16.33.1-3 to the Defendant Council on Postsecondary Education and the Rhode Island Board of Education on or about January 30, 2019 and February 1, 2019.  R.A. Exhibit D, January 30, 2019 Letter to Council on Post-Secondary Education and February 1, 2019 Letter to Rhode Island Board of Education.

25.     Plaintiff's clashes over the years with the Defendant CCRI administration, including Defendant Costigan, were numerous, often public, and were frequently reported in the mass media, occasionally as lead stories.  R.A. Exhibit E, Timeline of Clashes Between Professor Murray and Defendants CCRI Administration and Rosemary Costigan.

26.     Despite Plaintiff's differences and conflicts with Defendant Costigan, she has in the past praised him for his "excellent Criminal Justice Program" and personally acknowledged and recognized him as a worthy adversary, despite their professional differences.  R.A. Exhibit F (Costigan email dated April 10, 2018, and Murray exhibit of gift/note from Costigan in April 2020).

27.     Over the years, Plaintiff has filed numerous grievances against Defendant CCRI, nearly all of which were successful, including one that was settled as recently as the last fall of 2022.

28.     In the period immediately leading up to the events and actions that are at the core of Plaintiff's Complaint, Plaintiff and Defendant Costigan also clashed over her proposal to add a "Law Enforcement Certificate of Readiness" to the Criminal Justice and Legal Studies Department of which Plaintiff was and is the elected chair.

29.     Plaintiff and the faculty of his department opposed Defendant Costigan's proposal.

30.     As the Criminal Justice and Legal Studies Department Chair, Plaintiff was the leader of this opposition, which included securing feedback from key figures in the Rhode Island law enforcement community who expressed the position that the proposed certificate would have no value and/or not meet the needs of the professional community.

31.     Defendant Costigan was displeased with Plaintiff's effective opposition to this proposal which culminated with the unanimous vote of the faculty of the Criminal Justice and Legal Studies Department on or about November of 2022 rejecting the proposal.

32.     As a consequence, Defendant Costigan withdrew her "Law Enforcement Certificate of Readiness" proposal.

### C.     Proposed Tentative Contract Agreement

33.     Perhaps most significantly, Plaintiff is and has been a vocal advocate critical of Tentative Contract Agreements ("T.A.") endorsed by the Defendant CCRI administration and then CCRIFA leadership, which were defeated by faculty votes in November of 2022 and April of 2023 and were and are the subject of intense and fervent debate among Defendant CCRI stakeholders that is still ongoing as a new CBA has yet to be agreed upon and approved by the faculty.

34.     Among other things, Plaintiff sent a number of emails to the 280 CCRIFA members on the CCRFA listserv in the fall of 2022 critiquing the T.A. originally proposed in October of 2022 and arguing that it should be rejected.

35.     In no small part due to Plaintiff's advocacy, the original T.A. was defeated overwhelmingly by the faculty union in November 2022.

36.     Plaintiff also opposed the subsequently revised T.A. and continued his vocal criticism by sending several emails to CCRIFA members on the CCRIFA listserv in the winter of 2023, the last of which was sent on February 28, 2023, the date Plaintiff was notified of his

banishment from CCRI discussed below, which is the subject of this Complaint. R.A. Exhibit G, February 28, 2023 Proposed T.A. Emails; R.A. Exhibit H, February 28, 2023 Banishment Letter from Sybil F. Baily ("Ex. H").

37.     During this above foregoing period, the faculty leadership included then CCRI Faculty Senate President Sandra L. Sneesby ("Sneesby") and then CCRIFA Faculty Association President Tara Abbascia ("Abbascia").

38.     Sneesby and Abbascia were strong supporters of both T.A.'s, and they were extremely displeased with Plaintiff's criticism and opposition to it.

**D.     Silencing and Banishment of Plaintiff by Defendants**

39.     On February 28, 2023, in the midst of a fierce debate and imminent second vote on the revised T.A. scheduled for March 8, 2023, Plaintiff was locked out of his office, denied access to his CCRI email account and therefore to the CCRIFA listserv, banned from campus, barred from teaching, prevented from discharging the duties of his elected positions, and directed not to communicate with Sneesby and Abbascia "through email, phone calls, messages communicated through others, or otherwise." R.A. Ex. H.

40.     Under the CBA, the CCRIFA listserv accessed through CCRI email accounts is the agreed upon means of CCRIFA member communications.  R.A. Ex. B, CBA Article II, §A. (recognizing a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions.").

41.     As such, the CCRIFA listserv accessed through CCRI email accounts is the primary means by which CCRIFA members exercise their right to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection as provided under R.I. Gen. Laws § 28-7-12.

*Sham Title IX Complaint*

42.    The basis for this action against Plaintiff by Defendants was an alleged Title IX violation arising out of three separate complaints ("Title IX Complaint"), one asserted by Elizabeth Del Sesto ("Del Sesto"), a then assistant to Defendant Costigan, which occurred over one month prior (and had already been informally addressed and resolved by Dean William Stargard), and one each asserted by Sneesby and Abbascia (collectively including Del Sesto "Complainants"), which occurred about two weeks prior to the issuance of the Title IX Complaint.

43.    Defendants improperly combined three complaints involving three totally unrelated communications/interactions in violation of CCRI Title IX Policy and applicable law in an apparent deliberate but misguided attempt to create a "pattern and practice" Title IX violation[2]— a type of violation that only applies to entities, not individuals.[3]

44.    Nevertheless, the allegations in the Title IX Complaint failed to establish even a colorable Title IX violation, insofar as it merely contained the personal perceptions and subjective feelings of the Complainants that the language, tone, and/or demeanor of Plaintiff in the communications/interactions at issue was offensive or upsetting to them.

45.    The sort of disagreement between coworkers complained of and which Defendants used to justify the silencing and banishment of Plaintiff is, as a matter of black letter law, not a

---

[2]    Presumably the motivation for this was because all three Complainants were female.  However, this is not surprising insofar as during the relevant period, over two-thirds of the CCRI leadership, including President Hughes and Vice President of Academic Affairs Costigan ("V.P. Costigan"), were women, https://www.ccri.edu/about/leadership.html, as well as over 60% of the faculty, including both the Senate President, Sneesby, and Faculty President, Abbascia.  https://www.ccri.edu/neasc/pdf/NEASCST5.pdf.

[3]    Joint Guidance on Federal Title IX Regulations: *Summary Analysis of Sections § 106.45(b)94): Consolidation of Complaints* ("[A] single investigatory and adjudicatory process may be used *where it arises from the same incident and parties.*")(emphasis added); Council on Postsecondary Education, *Title IX Sexual Harassment Policy and Procedures*, Sec. XIX (Consolidation of Formal Complaints)("The Covered Entity may consolidate Formal Complaints of Sexual Harassment *where the allegations arise out of the same facts or circumstances.*")(emphasis added).

**Page 8 of 39**

Title IX matter as Title IX was not designed to create a general civility code—conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law.

46.    The Complainants did not allege any vulgarity, unwanted touching, threats of violence, or criminal conduct nor did they allege fear for their physical safety.

47.    Nor did the Complainants allege any gender based or motivated conduct on the part of the Plaintiff that was so severe, pervasive, and objectively offensive as to effectively deny any of the Complainants access to any program or activity of CCRI.

48.    Even though the allegations of the Complainants failed to establish even a colorable Title IX violation, Defendant CCRI characterized the allegations of the Complainants as a Title IX violation presumably in order to rely on § XVII "Emergency Removal and Administrative Leave" provision of Defendants' Title IX Sexual Harassment Policy and Procedures, which purports to allow Defendants to place an accused faculty member "on administrative leave at any time after receiving a report of Sexual harassment."

49.    That this banishment was at the core of a conspiracy between Defendant CCRI administrators, particularly Defendant Costigan, along with Sneesby and Abbascia, to silence Plaintiff is evidenced by the fact that Sneesby and Abbascia both included in their complaints the requested remedy that Plaintiff's access to the CCRI listserv for the purpose of transmitting critical emails be curtailed.  R.A. Exhibit I, Sandra Sneesby Incident Report Form, February 15, 2023 ("Ex. I"); R.A. Exhibit J, Tara Abbascia Complaint Form, Incident Report, and E-mails ("Ex. J").

50.    Indeed, Abbascia expressly requested in her complaint that "that [Plaintiff be placed on] paid administrative leave pending investigation [as] an appropriate action.  Taking away his ability to use CCRI email to communicate with faculty until this complaint has been investigated, I feel is appropriate."  R.A. Ex. J at 3.

51.     Plaintiff was not only a vocal critic of the original and revised T.A. favored by Defendants, Sneesby, and Abbascia, but he was also a fierce critic of the lack of shared governance at CCRI in violation of state law.[4]

52.     As a consequence of the foregoing, Plaintiff clashed not only with the Defendants, but also with Sneesby, who was a primary participant in the organization and establishment of the Faculty Senate, whose enabling act lacks appropriate shared governance language.[5]

53.     Plaintiff was also at odds with Sneesby over what he viewed as CCRI administration manipulation of the Faculty Senate to pass polices and measures initiated and advocated by the CCRI administration and not the faculty, some of which violated the CBA.

54.     Plaintiff also clashed with Abbascia because he strongly believed and publicly advocated that as a lame duck President, who was resigning at the end of the academic year and leaving CCRI entirely, she lacked any stake in the outcome and could be perceived as a less than effective advocate on behalf of the faculty.

55.     Subsequent to Del Sesto filing a complaint against Plaintiff, she was appointed interim assistant dean Business, Science, Technology, and Math in June of 2023, which included a significant increase in annual salary (2023 $61,499.88 -- 2023 $75,000.12) from her previous

---

[4] The Senate created by Sneesby with the Administration has no authority -- it is purely advisory. All power ultimately rests with the President of the College. (*see* CCRI Senate Constitution, Article II www.ccri.edu/senate/S2022-001.pdf). Plaintiff has vigorously and publicly advocated that this is obviously not the required shared governance intended or required by statute, R.I. Gen. Laws §16-33.1-3 (providing that, among other things, "the president *and a committee of the faculty*" shall determine the academic standards and courses of study at the college) (emphasis added), or by the college's accrediting body, the New England Commission of Higher Education, *see, e.g.*, Standard 3.15. ("The institution places **primary responsibility** for the content, quality, and effectiveness of the curriculum with its faculty. Faculty have a substantive voice in matters of educational programs, faculty personnel, and other aspects of institutional policy that relate to their areas of responsibility and expertise." (emphasis added) www.neche.org/wp-content/uploads/2020/12/Standards-for-Accreditation-2021.pdf).

[5] Plaintiff has long contended that the only way to have a real Faculty Senate that has "shared governance" would be for the General Assembly to pass a law that give power/shared governance to the newly created Faculty Senate modeled on the URI Faculty Senate. Indeed, after Plaintiff suggested this above action, Sneesby in the Spring of 2023 made a failed attempted to increase the power of the Faculty Senate by changing the statute regarding shared governance at CCRI by inserting the "faculty senate" into the proposed statute House Bill 2023 -6138 in the RI House of Representatives.

position as academic affairs coordinator for which V.P. Costigan was her direct supervisor.  R.A. Exhibit K, State of Rhode Island Transparency Portal for Elizabeth Del Sesto (Capraro) Showing Salary in 2022 and 2023.

56.    Subsequent to Sneesby filing a complaint against Plaintiff, Defendant CCRI created a new department of "Communications" without going through the Curriculum Review Committee in violation of the CBA and, upon information and belief, unilaterally named Sneesby as department Chair.

57.    Sneesby had previously been Chair of the English Department with a much larger workload, including more faculty to supervise, required assessment activities, and courses to schedule.

58.    Sneesby, a candidate for union office Defendants clearly prefer to Plaintiff in upcoming elections and who had told Plaintiff that she plans on running for President of CCRIFA in the next election, has also benefited from the reputational harm Defendants have inflicted on Plaintiff and from the restrictions imposed on Plaintiff which hinder his ability to be involved in union business and to campaign for union office.

59.    Subsequent to her filing a complaint against Plaintiff, Abbascia resigned as President of CCRIFA and an assistant professor at CCRI effective the end of June 2023 and left CCRI entirely.

### *Del Sesto Complaint*

60.    Del Sesto alleged that she subjectively felt "uncomfortable" and was "caught off guard by [Plaintiff's] unexpected visit and demeanor" when he came to her office and "in summary was speaking negatively about the PTFA contract, administration and [Plaintiff's] role."  R.A. Exhibit L, Elisabeth Del Sesto Complaint Form, February 15, 2023.

61.    Del Sesto did not even subjectively claim that the conduct complained of was in any way related to gender.

62.    Plaintiff has interacted with Del Sesto on innumerable occasions during her approximately eight years as a support person in the Academic Affairs suite.

63.    Del Sesto claims in her complaint that this was the "first time" Plaintiff had directed any objectionable communications to or conduct toward her.

64.    The single interaction about which Del Sesto complained in her complaint, which took place on January 20, 2023, involved Plaintiff, both in his capacity as a faculty member and as Chair of the Criminal Justice and Legal Studies Department, communicating with Del Sesto, as a representative of the CCRI Administration, relative to an urgent and pressing issue impacting all faculty members.

65.    The subject of their communication was the intense confusion caused by a series of emails sent out by Del Sesto, which made the required submission of payroll and course assignments by department Chairs by the start of the semester in three days functionally impossible.

66.    Shortly after Plaintiff's interaction with Del Sesto, Defendant Costigan spoke with Del Sesto and then reached out to Dean Stargard and asserted that Plaintiff behaved in a very assertive and aggressive manner towards Del Sesto and that he needed to speak to Plaintiff.

67.    Apparently following the lead of Defendant Costigan, Del Sesto allegedly subsequently made a verbal complaint to Dean Stargard about the interaction.

68.    At the time, Dean Stargard expressly stated to Plaintiff in writing that the incident was being handled as a non-disciplinary matter and reiterated this when he met with Plaintiff and his union representative.  R.A. Exhibit M, E-mails between Willaim Stargard, Leslie Florio, and Steven Murray Re: Request for a Meeting, January 23-26, 2023.

69.     Accordingly, although the Title IX Complaint was issued on February 28, 2023, the events about which Del Sesto complained took place over a month prior, originally took the form of an informal verbal complaint, and was dealt with at a meeting between Plaintiff, his union representative, and Dean Stargard on January 23, 2023.

### *Sneesby Complaint*

70.     On or about February 15, 2023, Sneesby completed and filed an incident report directed against Plaintiff.  R.A. Ex. I.

71.     The email communications about which Sneesby complained therein involved allegations that Plaintiff "had emailed the faculty stating derogitory [sic] things about me or my performance in my work." *Id*.

72.     Sneesby also alleged Plaintiff was "condesending [sic] and dismissive and particularly targets females" without any factual basis or context for this self-serving, subjective opinion. *Id*.

73.     The email chain to which Sneesby refers and on which her allegations were based related to Plaintiff's criticism of the performance of her work in her capacity as President of the Faculty Senate.

74.     Sneesby identified as witnesses "[t]he entire faculty via email."

75.     The emails referenced were not produced until May of 2023, months into the subsequent investigation, and demonstrate nothing more than a disagreement between union members, about union business over a nearly ten (10) year period, rather than anything that should or could support any Title IX or other disciplinary matter.  R.A. Exhibit N, Sneesby Produced Emails.

76.     That these emails did not and could not support a Title IX or other disciplinary matter is clear from the emails on their face.

77.     On February 16, 2023, the day after she purportedly completed the incident report form, Sneesby called Plaintiff and screamed at him for over twenty-two (22) minutes relative to the Faculty Senate and Plaintiff's criticism of it and the call only ended when Plaintiff eventually hung up the phone. R.A. Exhibit O, Witness Statements from Lolita Villanueva, Tiffany Jones, and Lauren Nagel dated March 8, 2023.

78.     By way of additional context, for about ten years, Sneesby and Plaintiff, had been faculty colleagues at CCRI and, at times, worthy adversaries when he defeated her for Faculty Association President in 2016.

### *Abbascia Complaint*

79.     Abbascia complained about what she perceived as Plaintiff's "unprofessional, bullying, threatening, tone in emails." all of which were sent in the context of union business and arose out of her role as union president. R.A. Ex. J at 6.

80.     Abbascia alleged Plaintiff called her a "lame duck" president—in reference to her announcement that she was leaving the college and her role as President of the union in June of 2023, prior to the end of her term of office (an objectively accurate description in light of the definition of that term), called into question her ability to do her job as union president, called for her resignation, and "verbally told faculty members that [Plaintiff was] trying to oust [her] as CCRIFA President." *Id* at 3.

81.     While Abbascia asserted the obvious, that she was being targeted as union president, she subjectively opined that it was also because she was a woman, without any factual basis or context for this self-serving, subjective opinion.

82.     All but one of the email communications about which Abbascia complained in her complaint was sent to all faculty on the CCRI listserv and largely involved Plaintiff's criticism of

her continuing to serve as a "lame duck" President, particularly in the midst of contentious and vital negotiations relative to the second T.A.

83.    The private email exchange about which she complained involved an email from Plaintiff requesting he be appointed as lead negotiator for the second T.A. and that she clarify to whom she was referring in her email to the faculty claiming that lies were being spread regarding the T.A.

84.    Abbascia identified as witnesses Leslie Florio, the union representative for the CCRIFA, and the "CCRI Faculty Association."

85.    Plaintiff and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship and Plaintiff was a mentor and supporter of Abbascia when she declared to run for Faculty Association President in October of 2020.

### *Unlawful Interference with Legally Protected Concerted Conduct*

86.    Two of the three interactions that were the subject of the Title IX Complaint were between Plaintiff and other union members about union business, while the third involved Plaintiff's inquiries and advocacy as a member of the faculty union and department Chair on behalf of other faculty members.

87.    All of these interactions and communications that were the subject of the faulty Title IX Complaint against Plaintiff constituted protected concerted conduct under the Rhode Island Labor Relations Act, R.I. Gen. Laws §28-7-1, *et seq*. ("RILA"), which are not subject to regulation or sanction by Defendant CCRI in accordance with applicable law and CCRI's own policy.

88.    Specifically, when conduct which is the subject of a misconduct complaint involves union business, it is and always has been the policy of CCRI that such a dispute is not subject to

determination by the college.  R.A. Exhibit P, December 19, 2019 Email from Vice President Alix Ogden, Special Advisor to the President overseeing CCRI's labor relations and governance (explaining that where conduct which is the subject of a misconduct complaint involves union business, it is the policy of CCRI that the dispute is not subject to determination by the college.).

89.    Indeed, Defendants well knew that these communications/interactions were protected conduct and outside the purview of either a disciplinary or Title IX complaint, and they have refused in the past to process a complaint of this very type asserted by the Plaintiff.  R.A. Exhibit Q, November 20, 2019 Sybil Bailey re: Murray-Valicenti Complaint.

90.    Interpreting Title IX and Defendants' policies and procedures as authorizing the issuance of a complaint and imposing pre-determination sanctions based on contentious discussions among faculty union members which Defendants deem "uncivil" or "unprofessional" violates the rights of the Plaintiff and all other union members to engage in collective action and constitutes an unfair labor practice prohibited by R.I. Gen. Laws §28-7-13 (10).

91.    This is so because the actual, necessary, and intended effect of this practice is to impair and chill the exercise of collective action rights out of fear of being disciplined if Defendants disapprove of the tone or content of the communications between members regarding union matters. [6]

---

[6] R.I. Gen. Laws §28-7-13 (10) (making it is an unfair labor practice to "[d]o any acts . . . that interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by § 28-7-12."); *see also* N.L.R.B. v. Ne. Land Servs., Ltd., 645 F.3d 475, 481–83 (1st Cir. 2011) (The "mere maintenance" of a rule that "would reasonably tend to chill employees in the exercise of their Section 7 rights" is unlawful.).  "It is axiomatic that that an employees' right to discuss, debate, and communicate with each other regarding workplace terms and conditions of employment" is protected under the Act.  *See United States Postal Serv., & Roy Young, an Individual*, No. 14-CA-195011, 2021 WL 1087421 (Mar. 18, 2021) (interpreting and applying Section 7 of the NLRA).  The Supreme Court has acknowledged "the importance of freedom of communication to the free exercise of organization rights" under the NLRA.  *Cent. Hardware Co. v. N.L.R.B.*, 407 U.S. 539, 542–43 (1972).

**Page 16 of 39**

### E.    Investigation and Exoneration

#### *Investigation*

92.    Plaintiff received a letter dated February 28, 2023 from Kara DiPaola, Esq., CCRI's Assistant Director, Affirmative Action & Equal Opportunity Title IX & Section 504/ADA Coordinator notifying Plaintiff of, among other things, that the Title IX Complaint filed against him and that he would be contacted by an investigator. R.A. Exhibit R, Kara DiPaolo Investigation Letter, February 28, 2023.

93.    Plaintiff also received a letter dated February 28, 2023 from Sybil F. Bailey, Director of Institutional Equity and Human Resources, notifying Plaintiff that he was not to retaliate against or contact the Complainants and the he was being placed on administrative leave, a status effectively banishing him from the campus, barring him from teaching, and preventing him from discharging his duties as a member of the Curriculum Review Committee and union position as an alternate to the CCRIFA Executive Committee.  R.A. Ex. H.

94.    On March 29, 2023, Plaintiff's counsel transmitted a detailed letter to Ronald Cavallaro, Esq, CCRI General Counsel, requesting among other things, an immediate dismissal of the Title IX Complaint on the grounds that the allegations therein did not even amount to a colorable Title IX violation and that the complaint was both procedurally and substantively deficient and was merely a pretext motivated by a desire to silence the Plaintiff, and that CCRI's conduct deprived Plaintiff of his rights to concerted action, free speech, and freedom of association and violated his right to due process of law. R.A. Exhibit S, Letters and Motions by Richard A. Sinapi dated March 29, 2023, April 24, 2023, July 24, 2023, and September 21, 2023

95.    Despite subsequent phone communications and email exchanges between Plaintiff's counsel and CCRI General Counsel, Defendants refused to dismiss the Title IX Complaint or allow Plaintiff access to his CCRI email account or office except for two scheduled

windows of two-hours and eight hours on separate occasions to allow Plaintiff to obtain documentation and information for his defense of the Title IX Complaint.  *Id*.

96.     Plaintiff was not even contacted by the Title IX investigator until almost two months after his banishment, and he was not interviewed by the investigator until ten weeks after his banishment, May 12, 2023.

97.     Prior to the interview date, Plaintiff's counsel submitted a detailed letter to the Title IX investigator dated April 24, 2023, demanding summary dismissal of the Title IX Complaint for the same or similar reasons as set forth in his letter to the General Counsel.  *Id*.

98.     The final draft of the Title IX Investigator's report was not received by Plaintiff until September 22, 2023.

99.     A renewed written request seeking dismissal of the Title IX Complaint was forwarded to the Title IX Administrator, Kara DiPaola, and the General Counsel on September 26, 2023.  R.A. Exhibit T, Renewed Motion to Dismiss and Respondent's Written Response to the Investigator's Second Draft Findings Pursuant to Title IX Policy and Procedure § XXII D., Richard A. Sinapi. September 21, 2023.

### *Exoneration*

100.     By way of a letter dated October 2, 2023 from Kara DiPaola, Assistant Director and Title IX & Section 504/ADA Coordinator, Plaintiff was notified that the "conduct reported does not fall within the scope of or constitute a violation of either the Title IX Policy or the Nondiscrimination Policy" *and that the Title IX Complaint was "dismissed under these policies"* but was being referred to the Office of Human Resources because "the alleged behavior may violate another policy, code, and/or standard of conduct." R.A. Exhibit U, October 2, 2023 Notice of Dismissal from Kara DiPaolo.

101.    There is no reasonable explanation for why this determination took over seven (7) months other than the fact that the entire investigation and pre-determination banishment were the manifestation of a tacit or express conspiracy to silence Plaintiff and deprive him of his free speech and association rights, and thus remove him from the CCRI community as an effective critic of Defendant, while at the same time punishing him for previous effective criticism and union activity.

**F.    Defendants' Repression of and Retaliation Against Plaintiff Post-Exoneration**
***Extension and Increase in the Scope of Banishment and Restrictions on Speech***

102.    By way of a letter dated October 1, 2023 from Sybil F. Bailey, Director of Institutional Equity and Human Resources, Plaintiff was notified that his administrative leave would remain in effect and that he was "***expected to remain away from school property and have no contact with college employees or students during the period of your leave, excluding those communications connected to your union work.***" R.A. Exhibit V, October 1, 2023 Email from Sybil F. Baily.

103.    Accordingly, despite Defendants' admission that the conduct at issue did not fall within the scope of Title IX or Defendant CCRI's Nondiscrimination Policy, Defendants continued their baseless and self-serving banishment of Plaintiff and restrictions on his free speech and association.

104.    Defendants did this even though, without the pretext of the § XVII "Emergency Removal and Administrative Leave" provision of Defendants' Title IX Sexual Harassment Policy and Procedures, there was no legal justification or authority to support the continuation of his pre-disciplinary determination suspension and banishment from the college.

105.    Indeed, post Title IX Complaint exoneration, Defendants have increased the restrictions on Plaintiffs to include any communications with any ***"college employee or students,"*** except communications related to faculty union business. *Id*.

106.    The same October 1, 2023 email also declared that the basis for these continued restrictions on and punishment of Plaintiff was that Human Resource would now "need time to review whether your conduct rose to a manner that caused a substantial disruption to the operations of the Community College of Rhode Island, eroded the trust of the educational community you serve, violated the Standards of Conduct in conjunction of RIGL§ 36-14-1 and/or the Violence in the Workplace Policy." *Id*.

107.    No reason was provided why an additional investigation and/or review was required when all the facts had already been exhaustively determined and the conduct at issue is facially both innocuous and protected concerted activity beyond the scope of Defendant CCRI oversight, or why continued restrictions on Plaintiff were appropriate during this additional purported review.

108.    This preemptive punishment, based on conduct that is both facially innocuous and protected concerted activity, and had been imposed without any finding that Plaintiff presented any danger to anyone at CCRI, is not only inappropriate and premature, but it is also a harsher penalty than would apply even if Plaintiff's conduct had been found to be in violation of any policy.

109.    By way of additional context, it is notable that, at the time of the extension and increase in scope of Plaintiff's banishment, the T.A. had been defeated for a second time by a faculty vote in April of 2023—in no small part due to Plaintiff's advocacy—and was referred to mediation, which was and is ongoing at this time.

### *Reintroduction and Approval of Certificate of Readiness Opposed by*
### *Plaintiff and his Department.*

110.    During the period Plaintiff has been banished from campus, silenced, and unable to take part in committees and governance duties, including those of his elected positions, Defendant Costigan reintroduced her "Law Enforcement Readiness Certificate" proposal that had previously been rejected due in large part to Plaintiff's effective advocacy.

111.    The renewed proposal was brought before the Curriculum Review Committee in April of 2023 and approved while Plaintiff was unable to take part due to the restrictions Defendants imposed on him.

112.    This approval was partially based on Dean Stargard's representation to the Committee that the faculty of the Criminal Justice and Legal Studies Department had approved the proposal, which they had not—a misrepresentation that could not have been made if Plaintiff, the department Chair, had not been banned from the process.

113.    Plaintiff's enforced absence from the Curriculum Review Committee was essential for Defendant Costigan to secure approval of this proposal, which was strongly opposed by Plaintiff and the faculty of the Criminal Justice and Legal Studies Department.

### *Elimination of the Criminal Justice and Legal Studies Department and*
### *Plaintiff's Position as Chair*

114.    During the Spring of 2023, while Plaintiff was banished from campus and his communications with the CCRI community were restricted, Defendants also informed the members of the Criminal Justice and Legal Studies Department, but not Plaintiff who was still the elected Chair of the department, that Defendants would be absorbing the department into the Business Studies Department effective July 1, 2023.

115.    This decision was taken and imposed unilaterally, without any negotiation with the CCRIFA as required by the CBA.

116.    This action had the effect of eliminating Plaintiff's elective chair position and diminished the role and influence of the faculty of the department and the Plaintiff as Chair in CCRI governance.

117.    Defendants' purported basis for elimination of the department was that its complement of full-time faculty was going to fall below six (6) due to a retirement effective as of December 24, 2023 and also due to a purported reduction in demand.

118.    However, these grounds for elimination of the department were clearly contrived insofar as the only reason there were not going to be six (6) full time faculty was the Defendants' decision not to hire a full-time faculty replacement, while there was actually a 16% increase in department enrollment in the Fall of 2022 as compared to Fall of 2021.

119.    Moreover, the Criminal Justice and Legal Studies department had the fifth highest number of graduates among the twenty-four (24) programs at CCRI in the most recent graduation class in 2023.

120.    The Criminal Justice and Legal Studies Department had been in existence for approximately thirty (30) years and the demand for the education provided by the department among students, employers, and government continued to be high and was increasing.

### *Diminshing the Influence and Impact of Plaintiff's Advocacy*

121.    The intent, purpose, and effect of the elimination of the Criminal Justice and Legal Studies Department was to diminish Plaintiff's institutional stature and thereby reduce the impact of his advocacy and influence with respect to CCRI Administration policies and positions and academic initiatives, of which Plaintiff had often been a vocal and effective critic.

122.    Barring Plaintiff from campus and thereby reducing his ability to interact and communicate with faculty, students, and the CCRI Administration and the concomitant reduction in his role and involvement in institutional and academic affairs has similarly harmed his

reputation, diminished the Plaintiffs stature and ability to advocate on behalf of his co-worker union faculty members.

## G.     Impairment of Freedom of Speech and Association

### *Total Ban on Non-Union Communications and Interactions*

123.     For the past more than eight (8) months, Plaintiff, a faculty member and full Professor at CCRI for 32 years, has been banned from teaching, his faculty office, entering upon any of the four main campuses and numerous satellite locations of CCRI, and any faculty and student academic interactions and communications.

124.     Plaintiff has been expressly barred from any communications or interactions with any faculty, students, or the CCRI administration unless it is relating to union business according to the express terms of the extended administrative leave recently imposed on him after his exoneration from Title IX and Anti-Discrimination allegations.

### *Impairment of Protected Concerted Conduct*

125.     Although about a month after Plaintiff's banishment, the CCRIFA subsequently negotiated a compromise that permitted Plaintiff to access the CCRI listserv for union business with his private email, Plaintiff still cannot check or receive any emails in his CCRI email account.

126.     Plaintiff's ability to communicate and interact with faculty with respect to both union and academic matters has been seriously impaired, insofar as he cannot receive any email communications sent to this CCRI email or voice mail messages sent to his CCRI extension, as a result of which faculty can only reach out to him if they have his personal email address or phone number.

127.    Plaintiff's banishment has also prevented him from engaging in in-person on campus communications regarding union business, all of which has materially impaired his ability to effectively participate as a member of the faculty union.

128.    This has become even more pressing since Plaintiff was appointed CCRIFA Vice President on or about June 21, 2023.  R.A. Exhibit W, June 21, 2023 Email from Daniel O'Neill (on behalf of Adam Mazin) Re: Summer 2023 Update CCRIFA Leadership.

129.     One of the intents, purposes, and effects of the extended and increased terms of his banishment is to prevent Plaintiff from effectively performing his duties as Vice President of the faculty union.

130.    The Defendants' continued banishment of Plaintiff has also impaired his participation in the ongoing mediation and discussions between CCRIFA and Defendants relative to the still pending and controversial T.A..

131.    This continued and expanded banishment and imposition of severe restrictions on Plaintiff's ability to communicate with the CCRI community is also undermining his ability to campaign for the position of CCRIFA President, for which an election is upcoming on or about April 25, 2024, including barring in-person on campus campaigning.

### *Impairment of Ability to Participate in Academic Affairs and College Governance*

132.    In late September 2023, Plaintiff was notified that he could not participate as the appointed faculty union representative on the Seven (7) Week Class Implementation Team, which is part of the collective bargaining process to consider a compressed schedule teaching format at CCRI, because the meetings—which are currently ongoing—were being held at the CCRI Knight Campus in Warwick.  R.A. Exhibit X, E-mail Thread Re: 7 week Compressed Term September 15 to October 2, 2023.

133.    Defendants refused to allow Plaintiff to take part in these meetings despite his appointment by the CCRIFA and offers by the CCRIFA to host the meeting in alternative locales. *Id.*

134.    Plaintiff also has been unable to participate in and carry out his duties as an elected member of the Curriculum Review Committee, which meets monthly on the CCRI Knight Campus, and has thus far missed the meetings held on March 24, 2023, April 28, 2023, October 6, 2023, and November 3, 2023.  The next scheduled meeting is on December 1, 2023.

135.    The CCRIFA also designated Plaintiff to serve on the contractually mandated Stipend and Release Time Committee and as the CCRIFA representative on the Faculty Senate, but Plaintiff has not been allowed to serve on either since they also meet on the CCRI Knight Campus.

136.    On information and belief, Defendants are also motivated to continue the Plaintiff's banishment, in part, because they also do not want him involved in the upcoming ten (10) year evaluation of CCRI, slated to informally commence in December of 2023, by its accrediting agency, New England Commission of Higher Education, which has expressed concerns in the past with the lack of shared governance at the college—of which the Plaintiff has been a high profile and vocal critic.

### *Economic, Academic, and Reputational Harm*

137.    Plaintiff's banishment has also prevented him from teaching courses, prevented him from pursuing and completing professional and academic research, work, and advancement, and inflicted serious and substantial reputational harm on him.

138.    Defendants have used Plaintiff's banishment to abolish his department, strip him of his department Chair, including the substantial stipend he earned in that role, and reduce his

participation in college affairs in order to diminish the influence and impact of his academic and union related advocacy at the college.

139.    Defendants have recently begun the scheduling process for the Spring 2024 semester and are currently attempting to greatly reduce the number of courses offered in the field of Criminal Justice and Legal Studies.

140.    ***They have already listed Plaintiff as not teaching any courses for the upcoming semester, which does not even begin until late January 2024.***

141.    This demonstrates that Defendants have already decided, without any reference to the ongoing second investigation, to continue their banishment of and restrictions on Plaintiff through the second semester into 2024, revealing it to be a sham investigation initiated for the sole purpose of justifying their continued and expanded unlawful banishment of Plaintiff, just like the first investigation.

142.    Additionally, by keeping Plaintiff from teaching and decreasing the number of courses in his department, Defendants continue to reduce the income that Plaintiff would otherwise have earned.

143.    The lengthy pendency of disciplinary investigations against Plaintiff, the attempt to recast personal disputes as gender discrimination, and the increase in scope and extension of the term of his banishment have had the purpose and effect of casting dispersions and tarnishing Plaintiff's personal and professional reputation.

144.    Insofar as Defendants have successfully diminished if not neutralized Plaintiff as an impediment to their institutional objectives by initiating and then extending a meritless disciplinary investigation to justify banishing and thereby silencing Plaintiff, it is readily apparent that Defendants have no intention of ceasing their actions and will keep him silenced and banished from campus for as long as they are able to get away with it.

145.    Indeed, Plaintiff is aware of at least two other occasions wherein Defendants have employed this same scheme of bringing a disciplinary complaint and banishing a professor deemed troublesome or undesirable without any predetermination that there was any danger, disruption, or other basis on which to justify the professor's removal prehearing.

## VI.    <u>Legal Protections and Harm</u>

### A.    First Amendment Protections

#### *Public Employees*

146.    "It is well established that government employees are protected by the First Amendment."[7]

147.    The First Amendment also protects employees from retaliation for protected speech.[8]

148.    "The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so."[9]

149.    "The [First Amendment] right of association encompasses the right of public employees to join unions and the right of their unions to engage in advocacy and to petition government [o]n their behalf."[10]

150.    Government employers therefore may not take "action whose purpose is either to intimidate public employees from joining a union or from taking an active part in its affairs or to retaliate against those who do."[11]

---

[7] *Welch v. Ciampa*, 542 F.3d 927, 938 (1st Cir. 2008) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008).
[8] *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011)
[9] *Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463, 465 (1979).
[10] *Mote v. Walthall*, 902 F.3d 500, 507 (5th Cir. 2018) (quoting *Hitt v. Connell*, 301 F.3d 240, 249 (5th Cir. 2002)
[11] *Id.*

**Page 27 of 39**

### *Speaking as a Private Citizen Addressing Matters of Public Concern*

151.    All of Plaintiff's speech and conduct at issue herein took place in the context of his capacity as a union member.

152.    "It is axiomatic that an employee's job responsibilities do not include acting in the capacity of a union member, leader, or official."[12]

153.    Speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.' "[13]

154.    As a general matter speech and expressive conduct that is "union-related" weighs "heavily in the public concern calculus."[14]

155.    "[A]ctive participation in [a union or union faction], running for union office, and campaigning against a proposed collective bargaining agreement are likewise matters of public concern."[15]

156.    Union conflict with management, including factions within a union not just union leadership, raise matters of public concern. [16]

157.    "The objectives, purposes, and mission of a public university [or college] are undoubtedly matters of public concern."[17]

---

[12] *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015); *see also Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1060 (9th Cir. 2013) ("Given the inherent institutional conflict of interest between an employer and its employees' union, we conclude that a police office does not act in furtherance of his public duties when speaking as a representative of the police union."); *Mullen v. Tiverton Sch. Dist.*, 504 F. Supp. 3d 21, 28–29 (D.R.I. 2020).

[13] *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

[14] *Davignon v. Hodgson*, 524 F.3d 91, 101 (1st Cir. 2008).

[15] *Scott v. Goodman*, 961 F. Supp. 424, 441–42 (E.D.N.Y. 1997), *aff'd sub nom. Scott v. Meyers*, 191 F.3d 82 (2d Cir. 1999),

[16] *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999) ("activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern").

[17] *Gardetto v. Mason*, 100 F.3d 803, 813 (10th Cir. 1996).

158.    "Certainly, questions of academic standards are of 'apparent ... interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal.' "[18]

159.    Here, Plaintiff's speech and expressive conduct was and is predominantly union-related, directed toward disputes with management, involves debate and campaigning around a proposed collective bargaining agreement, and campaigning for union leadership.

160.    His speech and expressive conduct includes his contention that Defendants are not in compliance with the shared governance mandate of state law and Defendant CCRI's accreditation body and the related debate as to whether Defendant CCRI meets the minimum academic standards of a public college, the ability of Defendant CCRI to maintain its accreditation, and the ability of that college to meet its objectives, purposes, and mission.

### Balancing the Interests

161.    In the balancing step, "the burden shifts to the government employer to show that there were legitimate administrative interests involved that outweigh the employee's right to comment as a private citizen about matters of public concern."[19]

162.    "[T]o succeed in demonstrating its interest, the government must demonstrate, through evidence, 'harm or increased risks'; 'actual disruption' or, at the very least, the speech's potential to disrupt; or 'internal conflict' and that this was in fact caused by the employee's speech."[20]

---

[18] *Johnson v. Lincoln Univ. of Com. Sys. of Higher Educ.*, 776 F.2d 443, 452 (3d Cir. 1985) (quoting *Connick v. Myers*, 461 U.S. 138, 149 (1983))

[19] *Bakalar*, 580 F. Supp. at 684.

[20] *Brady v. Tamburini*, 518 F. Supp. 3d 570, 586 (D.R.I. 2021) (quoting *Davignon*, 524 F.3d at 104-05 and citing *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 54 (1st Cir. 2003); *O'Connor v. Steeves*, 994 F.2d 905, 916 (1st Cir. 1993)).

163.    "A generalized interest in doing business-as-usual does not constitute such a reason and cannot categorically outweigh an employee's interest in associating with a union," particularly "where, as here, the institution asserting such an interest has explicitly sanctioned the existence of the union and the grievance procedure it employs by entering into a collective bargaining agreement."[21]

164.    Plaintiff's speech and expressive conduct did not and would not have would have interfered with the efficient operations of Defendant CCRI.

165.    Rather, Plaintiff, a highly respected and important member of the CCRI community and the CCRIFA, merely took part in the normal processes of union activities and Defendant CCRI governance as he has for years.

166.    Plaintiff used the appropriate and relevant channels, including the CBA authorized Defendant CCRI email system, the faculty listserv, and the various bodies and committees of Defendant CCRI governance to express his positions.

167.    Plaintiff was no more strident than his opponents on the issues he was debating.

168.    Plaintiff was utilizing the agreed upon channels for union communications that had been bargained for and agreed to by Defendants.

169.    Defendant CCRI's only interest in Plaintiff's silence was putting its thumb firmly and inappropriately on the scale of an internal union dispute that Defendants wanted to be resolved in a manner which Plaintiff was and had been successfully advocating against.

170.    Such an interest is illegitimate and cannot support restrictions on or discipline for protected speech and violates the First Amendment.

---

[21] *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 757 (3d Cir. 2019) (citing *Shrum v. City of Coweta*, Okla., 449 F.3d 1132, 1139 (10th Cir. 2006) ((explaining that a public employer's interest in efficient operations does not outweigh an employee's interest in union association where the employer "already balanced those interests when it agreed to a collective bargaining agreement" and "presumably received the benefit of its bargain")).

*Protected Expression Was a Substantial or Motivating Factor*

171.    There can be no question that the Plaintiff's speech was *the sole and exclusive* motivating factor behind his banishment and bar on teaching courses and taking part in CCRI governance and the loss of job duties, prestige, and income resulting form Defendants' actions complained of herein.

172.    The basis of all three complaints against Plaintiff consist of nothing but protected First Amendment speech.

*First Amendment Retaliation for Association*

173.    Stripping Plaintiff of his department Chair, eliminating his department, denying him access to all the meaningful aspects of his job, preventing him from discharging his professional duties, slandering him with a totally spurious Title IX Complaint, and greatly damaging his prestige and professional standing is more than enough to deter a person of ordinary firmness from exercising their constitutional rights.

174.    The previous contentious history between the parties and the timing and impact of the actions taken against Plaintiff by Defendants alleged herein compel the inference that they were initiated in retaliation for protected speech.

**B.    Due Process Violation**

175.    Constitutional procedural due process protects those aspects of public employment recognized as property interests.[22]

176.    Defendants have banished Plaintiff from campus for over eight (8) months, with that banishment ongoing despite Defendants' admission that Plaintiff's conduct was not a Title IX violation.

---

[22] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).

177.    Defendants have similarly prevented Plaintiff from teaching classes and eliminated his chair position during this same period, resulting in, among other things, a reduction in Plaintiff's compensation.

178.    Defendants have limited Plaintiff's communication with the CCRI community, making it impossible for him to discharge his governance and administrative functions leading to changes in his department which have altered the nature and conditions of his position.

179.    All of these actions were taken without a pre-deprivation hearing in violation of Plaintiff's right to due process of law.

### C.    Retaliation Under the Whistleblower Protection Act

180.    The Rhode Island Whistleblowers' Protection Act prohibits an employer from taking adverse action against an employee "[b]ecause the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States […]."  R.I. Gen. Laws § 28-50-3(4).

181.    Plaintiff complained about Defendant CCRI's lack of compliance with shared governance requirements mandated by state law to the Defendant CCRI administration, to the Rhode Island Board of Education, and the Defendant Council on Post-Secondary Education.

182.    Defendants retaliated against Plaintiff, including, but not limited to, in the manner alleged herein, in violation of the Rhode Island Whistleblower Protection Act for these reports and/or complaints made by Plaintiff on behalf of himself, his fellow faculty, the CCRI community, and the people of Rhode Island generally relative to the failure of Defendants to comply with the statutory requirement of shared governance at Defendant CCRI.

### D.    Adverse Action

183.    Defendants took the following adverse action, without due process, against Plaintiff

on account of and/or in retaliation for his protected speech, conduct, and/or associations:

    a.    Defendants banished Plaintiff from campus for over eight (8) months and continue to impose this banishment.

    b.    Defendants prevented and continue to prevent Plaintiff from communicating with members of the CCRI community.

    c.    Defendants have barred Plaintiff from teaching, thus effectively demoting[23] him and reducing his pay.

    d.    Defendants have prevented and continue to prevent Plaintiff from exercising his administrative and governance functions at CCRI, also effectively demoting him.

    e.    Defendants have prevented and continue to prevent Plaintiff from performing duties of his elective offices, effectively invalidating union and faculty elections and silencing the speech related thereto.

    f.    Defendants have prevented and continue to prevent Plaintiff from actively campaigning for or against any future T.A. and for the office of CCRIFA president.

    g.    Defendants have prevented and continue to prevent Plaintiff from pursuing academic research, duties, and advance by banishing him and restricting his speech.

    h.    Defendants have inflicted and continue to inflict reputational harm on Plaintiff by framing innocuous and protected conduct as disciplinary infractions and misconduct, causing harm to his professional as well as personal reputation.

    i.    Defendants refuse to allow Plaintiff to return to work even after admitting that Plaintiff's actions and conduct did not constitute a Title IX violation.

### E.    Intentional Conduct

184.    At all relevant times, Defendants acted intentionally, willfully, maliciously, and/or

with reckless or callous indifference to Plaintiff's clearly established statutory and/or constitutional

rights.

185.    Furthermore, at all relevant times, Defendants knew or should have known that

their conduct would cause or contribute to the deprivation of Plaintiff's clearly established rights.

186.    At all relevant times, Defendants were motivated by malice, wantonness and/or

willfulness of such an extreme nature as to amount to criminality.

---

[23] It is well settled that "transfers to less prestigious or desirable work" alone constitutes actionable adverse employment action under applicable law. *EEOC: Questions and Answers: Enforcement Guidance on Retaliation and Related Issues*, https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues.

### F.    Irreparable Harm and Damages

187.    The Defendants' foregoing acts and/or omissions constitute a violation of the Plaintiff's right to freedom of speech protected under the First Fifth, and Fourteenth Amendments to the United States Constitution.

188.    As a direct and proximate result of the Defendants' acts and/or omissions, including, but not limited to, those described herein, the Plaintiffs have suffered deprivation of his First Amendment freedom of expression rights, and has thereby sustained and will continue to sustain irreparable harm.[24]

189.    "The loss of First Amendment freedoms, for even minimal periods of time," . . ."unquestionably constitutes irreparable injury."[25]

190.    As a direct and proximate result of the Defendants' acts and/or omissions, including, but not limited to, those described herein, Plaintiff has suffered, is now suffering, and will continue to suffer emotional and economic injury including, but not limited to, pecuniary losses, loss of income, inconvenience, mental anguish, loss of enjoyment of life, humiliation, damage to his professional and personal reputation, and has incurred and will continue to incur expenses for legal services, and other great harm.

---

[24] *Elrod v. Burns,* 427 U.S. 347, 373 (1976)(even temporary deprivation of First Amendment freedom of expression rights is sufficient to establish irreparable harm); *see also Citizens for a Better Environment v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir. 1975).
[25] *Swartzwelder v. McNeilly,* 297 F.3d 228, 241 (3d Cir. 2002*). (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).

## VII.　　Claims for Relief[26]

191.　　Plaintiff incorporates in the counts below the allegations contained in ¶¶1 through 190 above.

### COUNT ONE
### *Impairment of Freedom of Speech in Violation of 42 U.S.C. § 1983*

192.　　Defendants, acting under the color of state law, by their individual and/or acts and/or omissions, including but not limited to those described herein, have deprived Plaintiff of and placed unlawful restrictions on his freedom of expression in violation of Plaintiff's right to freedom of speech, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the First and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

### COUNT TWO
### *Retaliation Against Protected Speech in Violation of 42 U.S.C. § 1983*

193.　　Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have retaliated against Plaintiff for this protected speech and/or expressive conduct in violation of Plaintiff's right to freedom of speech, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the First and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

---

[26] In a complaint, a plaintiff is only required to plead facts, not legal theories. *See Johnson v. City of Shelby,* 574 U.S. 10 (2014) (Per Curiam) (reversing Fifth Circuit and holding that only facts need to be pled in a complaint, not legal theories). Plaintiff is only required to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U. S. 544, 569-70 (2007); *Ashcroft v. Iqbal*, 556 U. S. 662 (2009). Plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P 8(a)(2). "Each allegation must be simple, concise, and direct. No technical form is required." Fed.R.Civ.P. 8(d)(1).

## COUNT THREE
### *Retaliation for Association in Violation of 42 U.S.C. § 1983*

194.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have retaliated against Plaintiff for his associations in violation of Plaintiff's right to freedom of association, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the First and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

## COUNT FOUR
### *Impairment of Freedom of Speech in in Violation of Article 1, §21 of the Rhode Island Constitution*

195.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived Plaintiff of and placed unlawful restrictions on his freedom of expression in violation of Plaintiff's right to freedom of speech, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, § 21 of the Rhode Island Constitution actionable directly in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

## COUNT FIVE
### *Retaliation Against Protected Speech in Violation of Article 1, §21 of the Rhode Island Constitution*

196.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have retaliated against Plaintiff for this protected speech and/or expressive conduct in violation of Plaintiff's right to freedom of speech, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, § 21 of the Rhode Island Constitution directly actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

**COUNT SIX**
*Retaliation for Association in Violation of Article 1, §21 of the Rhode Island Constitution*

197.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have retaliated against Plaintiff for his associations in violation of Plaintiff's right to freedom of association, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, § 21 of the Rhode Island Constitution actionable directly in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

**COUNT SEVEN**
*Failure to Provide Due Process in Violation of 42 U.S.C. § 1983*

198.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived Plaintiff of a property interest without due process of law, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fifth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

**COUNT EIGHT**

*Failure to Provide Due Process in Violation of Article 1, §2 of the Rhode Island Constitution*

199.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived Plaintiff of a property interest without due process of law, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, § 2 of the Rhode Island Constitution, directly actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

## COUNT NINE

*Violation of Rhode Island Whistleblower Protection Act, R.I. Gen. Laws § 28-50-1, et seq.*

200.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, retaliated against Plaintiff in violation of the RIWPA, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the RIWPA.

## VIII.   Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1.    A declaratory judgment that the Defendants, in the manner described herein, violated the First, Fifth, and Fourteenth Amendments to the United States Constitution, Article 1 §§ 2 and 21 and the RIWPA, by prohibiting and/or restraining Plaintiff's protected speech, by retaliating against Plaintiff for his protected speech, his exercise of associational rights, and his whistleblower activity, all without pre-deprivation hearing or other due process, in violation of Plaintiffs' rights to freedom of speech and/or association, due process, and/or the RIWPA.

2.    A temporary restraining order, preliminary and permanent injunctions, and/or other equitable relief, including, but not limited to, an end to Plaintiff's banishment from campus, restrictions on communications, and bar from teaching, and an award of back pay and/or front pay.

3.    An award of compensatory damages.

4.    An award of punitive damages.

5.    An award of treble damages pursuant to R.I. Gen. Laws §28-50-4.

6.    An award of pre-and-post judgment interest.

7.    An award of reasonable counsel fees and costs of litigation to Plaintiff pursuant to 42 U.S.C. § 1988 and R.I. Gen. Laws §28-50-5.

8.    Such other and further relief as this Court deems just and proper.

## IX.   Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## X.   Designation of Trial Counsel

Plaintiff hereby designates Richard A. Sinapi, Esquire, as trial counsel.

**Plaintiff,**
By his attorneys,

Date:  November 9, 2023

/s/ **Richard A. Sinapi**
**Richard A. Sinapi, Esq.** (#2977)
**Chloe A. Davis, Esq.** (#9334)
Sinapi Law Associates, Ltd.
2374 Post Road, Suite 201
Warwick, RI 02886
Phone: (401) 739-9690; FAX: (401) 739-9040
Email: ras@sinapilaw.com; cad@sinapilaw.com

## VERIFICATION OF COMPLAINT

Now comes the Plaintiff, **Steven D. Murray**, being duly sworn, and does hereby depose and say as follows:

1.    That I am the Plaintiff in the within matter.

2.    That I have read the above Complaint and acknowledge the factual allegations alleged therein to be true and accurate to the best of my knowledge, information, and belief.

3.    That I have made this **Verification of Complaint** in support of my prayers therein for judgment and relief against the Defendants.

Steven D. Murray

Subscribed and sworn to before me in **Warwick** on this 9th day of November, 2023.

RICHARD A. SINAPI
Notary Public-State of Rhode Island
My Commission Expires
June 22, 2025

(name) Richard A. Sinapi
**NOTARY PUBLIC**
**My Commission Expires:** 6/22/25

**Page 39 of 39**