**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **STEVEN D. MURRAY,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **C.A. No. 23-cv-** |
| | : | |
| **COMMUNITY COLLEGE OF** | : | **Jury trial demanded** |
| **RHODE ISLAND, alias, COUNCIL ON** | : | |
| **POST SECONDARY EDUCATION, alias,** | : | |
| **and ROSEMARY COSTIGAN, alias,** | : | |
| **in her individual and official capacities,** | : | |
| **Defendants** | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF

### I.    INTRODUCTION

This action is brought by the Plaintiff Steven D. Murray ("Plaintiff" or "Professor Murray"), seeking declaratory and injunctive relief and compensatory, punitive, and treble damages for acts and/or omissions of Defendants in violation of Plaintiff's rights to freedom of speech, association, and due process guaranteed under the First, Fifth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983 and under Article 1, §§2, and 21 of the Rhode Island Constitution, and in violation of the Rhode Island Whistleblower Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1, et seq..

### II.    SUMMARY

The within matter arises out of actions and conduct of the Defendants implemented to silence a vocal and effective critic of numerous past administrative policies and initiatives of Defendants during a hotly debated contract negotiation between the Defendants and the Community College of Rhode Island Faculty Association ("CCRIFA") of which Professor Murray is a member, a vocal participant, and now vice president.

On February 28, 2023, in the midst of a heated debate and imminent second vote on a revised tentative contract agreement ("T.A.") with Defendant Community College of Rhode Island ("Defendant CCRI"), of which Professor Murray was and is a fierce and vocal critic, Professor Murray was locked out of his office, denied access to his CCRI email account—which, under the existing collective bargaining agreement ("CBA"), is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with the then CCRIFA and Faculty Senate Presidents.  The basis of this action against Professor Murray by CCRI was a purported Title IX violation arising out of three totally separate and unrelated communications/interactions ("Title IX Complaint").  One of the interactions occurred over *one month* prior and two occurred about two weeks prior to the issuance of the Title IX Complaint and all of which *undisputedly involved faculty association ("union") business.*  Such conduct is outside the purview of Defendant CCRI to regulate and police in accordance with applicable law and CCRI's own policy.

It was the concerted action of the Complainants, including CCRIFA President Tara Abbascia and President of the Faculty Senate Sandra L. Sneesby, of whose policies and positions Murray was critical, along with Defendant Vice President Costigan and the Defendant CCRI Administration (collectively "Defendants"), of which Professor Murray was a longtime and vocal critic, that succeeded in banishing him from campus and the listserv.  The intent purpose and effect of his banishment was to silence him in the midst of the ongoing and vigorously contested debate over a new CBA as well as Professor Murray's publicly stated claims that Defendant CCRI lacked the legally mandated faculty shared governance and that the CCRI Administration was manipulating the Faculty Senate.

The Defendants accomplished this by converting a month-old non-disciplinary complaint of Elizabeth Del Sesto, Defendant Costigan's assistant, which had already been administratively

addressed and resolved as a "non-disciplinary matter," into a purported Title IX complaint and then improperly combining it with the two other union leadership complaints asserted by Abbascia and Sneesby. The combining of these unrelated complaints was done as part of a deliberate, but misguided attempt to create a pattern and practice Title IX violation, which only applies to systemic, institutional conduct—not to an individual. The Defendants have since admitted that Plaintiff's conduct did not violate Title IX and dismissed the Title IX Complaint on October 2, 2023.

Defendants have nevertheless continued Plaintiff's banishment under the guise of further investigating his conduct as an apparent non-Title IX conduct violation—even though the only authority for predetermination administrative removal of a faculty member according to CCRI policies and procedures is the pendency of a Title IX Complaint. What is more, and again without hearing or any determination of necessity or need, Defendants continued and increased the scope of his banishment to include communications with ***any*** "college employee or students," except communications related to faculty union business.

As a consequence, for the past more than eight (8) months, the Plaintiff, who is currently Vice President of the faculty union, has been banned from: a) teaching, b) his CCRI email, c) the CCRIFA listsev, d) his faculty office, e) entering upon any of the four main campuses and numerous satellite locations of Defendant CCRI, f) in-person on campus communications regarding union business, g) in-person on campus faculty and student academic interactions and communications, and h) and in-person on campus campaigning for election as a union officer in the upcoming April 2024 election. ***For the past six weeks and also for the indefinite future, Professor Murray is and has also been banned from any communications with faculty, students, administration, or other college employees, except communications related to union business.***

Professor Murray has also incurred loss of income during his banishment. He was stripped of his paid, elected position as Chair of the Criminal Justice Department and the department itself was suddenly eliminated in his absence. He has also been barred from serving as an elected union representative on the Curriculum Review Committee, during which time Defendants forced a new Criminal Justice "Certificate of Readiness" program through that committee—a proposal that had previously been withdrawn due to the opposition of faculty and members of the criminal justice community spearheaded by Plaintiff. Currently, Plaintiff has not been scheduled to teach in the Spring semester, thereby extending his banishment from teaching and the campus to essentially three full semesters for conduct which, **at worst**, amounted to an impolite interaction with an assistant administrator and passionately zealous advocacy and criticism directed at two union colleagues. Defendants have continued to maintain Plaintiff's banishment despite Plaintiff's repeated pleas and best efforts to bring to the Defendants' attention that their conduct violates his rights to due process of law and freedom of speech and association, in particular his right to concerted action expressly protected under R.I.G.L. § 28-7-12.

The Plaintiff is and has been a dynamic and vocal critic of the CCRI Administration and an effective advocate for the CCRIFA faculty, with a long history of holding positions of union leadership, including as a past President and currently as Vice-President. He has a stellar thirty-two (32) year record as an educator with CCRI and has never been disciplined for misconduct or otherwise. Professor Murray was elected Chair of his department in 2012 by his peers and was reelected unanimously on three subsequent occasions, most recently in February of 2023, and has received rave reviews in his faculty performance evaluations. Without relief from this Court, this accomplished and capable educator will continue to be banished from his job and

interactions with his peers, students, and the CCRI Administration and his constitutionally protected rights to free speech and association will continue to be infringed.

The Defendants took this calculated and brazenly unlawful and unconstitutional action against the Plaintiff because they were desperate to silence him in order to garner faculty endorsement of the T.A. they favored and because they believed they could get away with it, since even if Plaintiff sought legal relief, they assumed that a court would be reluctant to interfere with the disciplinary processes of a public academic institution. Defendants have done the same thing in the past to faculty members they deem troublesome for one reason or another and they will do it again unless this Court issues immediate emergency injunctive relief to the Plaintiff restoring his constitutionally protected rights to free speech and association, thereby placing Defendants on clear notice that such conduct will not be tolerated.

### III.    MATERIAL FACTS

#### A.    Employment History

Professor Murray is a member of the Bar of the United States District Court for the District of Rhode Island, the State of Rhode Island, the Commonwealth of Massachusetts, and the Supreme Court of the United States as well as a former Assistant Attorney General for the State of Rhode Island.  Plaintiff's Verified Complaint ("V.Compl.") ¶7. He has taught courses on the law, legal studies, and criminal justice at Defendant CCRI for approximately thirty-two (32) years. V.Compl. ¶8. In 1999, he received tenure and was promoted to Associate Professor and in 2005 he was promoted to Professor.  V.Compl. ¶9.  He was elected Chair of the Criminal Justice and Legal Studies Department in 2012 and was reelected unanimously on three subsequent occasions, most recently in February of 2023.  V.Compl. ¶10.  During this long tenure as a teacher and as a department Chair, Plaintiff has earned a stellar record comprised largely of "exceeds expectations" annual reviews, has never been disciplined by Defendant CCRI and

recently received an overall "outstanding evaluation" as a department Chair and teacher and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty."  V.Compl. ¶¶11-12; Record Appendix in Support of Plaintiff's Motion Emergency Motion for Injunctive Relief ("R.A.") Exhibit A (Dean Allyson Handley Annual Chair Evaluation Meeting: Professor Steve Murray, April 22, 2021) ("Ex. A").

### B.    Vocal Faculty Advocate and Defendant CCRI Administration Critic

During his time working at Defendant CCRI as a faculty member, Plaintiff has also been a highly active and engaged member of the faculty union at CCRI, the CCRIFA including being president from April of 2016 until November of 2020, having been elected to two consecutive two-year terms in that office and currently serving as Vice President and an alternate member to the CCRIFA Executive Community, having been appointed Vice President on or about June 21, 2023. V.Compl. ¶¶13-15.

He is also one of the twelve members of the Curriculum Review Committee, who are elected by the faculty to the committee which is an essential element of shared governance at Defendant CCRI regarding the management of the Curriculum of the College, including setting required courses, and approving or rejecting new proposed programs, courses, degrees, and certificates.  V.Compl. ¶¶16-17; R.A. Exhibit B CCRIFA Collective Bargaining Agreement with Defendant CCRI ("CBA") Article 2 §A CBA Curriculum Review Committee.

In these roles and as a union member and engaged faculty member generally Professor Murray is and has been a vocal and passionate advocate seeking to improve the terms and conditions of employment on behalf of his co-worker faculty union members and, as a consequence, has frequently been at odds with the Defendant CCRI administration having had severe disagreements over the years with the Defendant CCRI Administration, including Defendant Costigan. V.Compl. ¶¶19-20.  These disagreements have led to, among other things,

faculty "No Confidence Votes," picketing, grievances, and Unfair Labor Practice charges and, at one point, Plaintiff filing a Violence in the Workplace Charge against Defendant Costigan.[1] V.Compl. ¶21.  He also has had ongoing disagreements with the Administration of Defendant CCRI, including Defendant Costigan, over the failure of Defendant CCRI to act in accordance with the shared governance provisions of R.I. Gen. Laws §§16-33.1-2 and 16.33.1-3, including whistleblower activities, such as reporting these issues both to Defendants and to the Rhode Island Board of Education and Counsel on Post-Secondary Education, related to the same. V.Compl. ¶¶22-24; R.A. Exhibit C, Shared Governance Emails; . R.A. Exhibit D, January 30, 2019 Letter to Council on Post-Secondary Education and February 1, 2019 Letter to Rhode Island Board of Education.

The clashes Plaintiff had with the Defendant CCRI administration, including Defendant Costigan, were numerous, often public, and were frequently reported in the mass media, occasionally as lead stories.  V.Compl. ¶25; R.A. Exhibit F, Timeline of Clashes Between Professor Murray and Defendants CCRI Administration and Rosemary Costigan. Similarly, over the years, Professor Murray has filed numerous grievances against Defendant CCRI, nearly all of which were successful, including one that was settled as recently as the last fall of 2022. V.Compl. ¶27.

In the period immediately leading up the events and actions that are at the core of Plaintiff's Complaint, Plaintiff and Defendant Costigan also clashed over her proposal to add a "Law Enforcement Certificate of Readiness" to the Criminal Justice and Legal Studies Department, of which Plaintiff was and is the elected chair, and which was opposed by the faculty of the department, including Professor Murray.  V.Compl. ¶¶28-29.  As the Criminal

---

[1] It is noteworthy that Defendant Costigan had no restrictions placed on her during the investigation of Plaintiff's complaint, as compared to the banishment imposed on the Plaintiff in this case.

Justice and Legal Studies Department Chair, Professor Murray was the leader of this opposition, which included securing feedback from key figures in the Rhode Island law enforcement community who expressed the position that the proposed certificate would have no value and/or not meet the needs of professional community.  V.Compl. ¶30.  Defendant Costigan was displeased with Plaintiff's effective opposition to this proposal which culminated with the unanimous vote of the faculty of the Criminal Justice and Legal Studies Department on or about November of 2022 rejecting the proposal as a consequence of which Defendant Costigan withdrew her "Law Enforcement Certificate of Readiness" proposal.  V.Compl. ¶¶31-32.

### C.    Proposed Tentative Contract Agreement

Perhaps most significantly, Plaintiff is and has been a vocal advocate critical of Tentative Contract Agreements ("T.A.") endorsed by the Defendant CCRI administration and then CCRIFA leadership, which were defeated by faculty votes in November of 2022 and April of 2023 and were and are the subject of intense and fervent debate among Defendant CCRI stakeholders that is still ongoing as a new CBA has yet to be agreed upon and approved by the faculty. V.Compl. ¶33.  Among other things, Plaintiff sent a number of emails to the 280 CCRIFA members on the CCRIFA listserv in the fall of 2022 critiquing the T.A. originally proposed in October of 2022 and arguing that it should be rejected, which it overwhelmingly was, in no small part due to Plaintiff's advocacy, by the faculty union in November 2022. V.Compl. ¶¶34-35.

Plaintiff also opposed the subsequently revised T.A. and continued his vocal criticism by sending several emails to CCRIFA members on the CCRFA listserv in the winter of 2023, the last of which was sent on February 28, 2023, the date he was notified of his banishment from CCRI discussed below, which is the subject of this Complaint. V.Compl. ¶36.  R.A. Exhibit G,

February 28, 2023 Proposed T.A. Emails; R.A. Exhibit H, February 28, 2023 Banishment Letter from Sybil F. Baily ("Ex. H.").

During this above foregoing period, the faculty leadership included then CCRI Faculty Senate President Sandra L. Sneesby ("Sneesby") and then CCRIFA Faculty Association President Tara Abbascia ("Abbascia") were strong supporters of both T.A.'s and were extremely displeased with Professor Murray due to criticism of and opposition to it.  V.Compl. ¶¶37-38

### D.      Silencing and Banishment of Plaintiff by Defendants

On February 28, 2023, in the midst of a fierce debate and imminent second vote on the revised T.A. scheduled for March 8, 2023, Professor Murrray was locked out of his office, denied access to his CCRI email account (and therefore to the CCRIFA listserv), banned from campus, barred from teaching, prevented from discharging the duties of his elected positions, and directed not to communicate with Sneesby and Abbascia "through email, phone calls, messages communicated through others, or otherwise." V.Compl. ¶39; R.A. Ex. H.  Under the CBA, the CCRIFA listserv accessed through CCRI email accounts is the agreed upon means of CCRIFA member communications and as such, the CCRIFA listserv, accessed through CCRI email accounts, is the primary means of CCRIFA members to exercise their right to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection as provided under R.I. Gen. Laws § 28-7-12.  V.Compl. ¶¶40-41; R.A. Exhibit B, CBA Article II, §A. (recognizing a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions.").

### *Sham Title IX Complaint*

The basis for this action against Professor Murray by Defendants was an alleged Title IX violation arising out of three totally separate and unrelated communication encounters ("Title IX Complaint"), one asserted by Elizabeth Del Sesto ("Del Sesto"), a then assistant to Defendant

Costigan, which occurred over one month prior (and had already been informally addressed and resolved by Dean William Stargard) and one each asserted by Sneesby and Abbascia (collectively including Del Sesto "Complainants") which occurred about two weeks prior to the issuance of the Title IX Complaint.  V.Compl. ¶42.  Defendants improperly combined three complaints involving three totally unrelated communications/interactions in violation of CCRI Title IX Policy and applicable law in an apparent deliberate but misguided attempt to create a "pattern and practice" Title IX violation—a type of violation that only applies to entities, not individuals.[2]  V.Compl. ¶43.  Nevertheless, the allegations in the Title IX Complaint failed to establish even a colorable Title IX violation, insofar as it merely contained the personal perceptions and subjective feelings of the Complainants that the language, tone, and/or demeanor of Plaintiff in the communications/interactions at issue was offensive or upsetting to them. V.Compl. ¶44.

The sort of disagreement between coworkers complained of and which Defendants used to justify the silencing and banishment of Professor Murray is, as a matter of black letter law, not a Title IX matter as Title IX was not designed to create a general civility code—conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law. V.Compl. ¶45.  Indeed, the Complainants did not allege any vulgarity, unwanted touching, threats of violence, or criminal conduct nor did they allege fear for their physical safety or any gender based or motivated conduct on the part of the Plaintiff that was so severe, pervasive, and objectively offensive as to effectively deny any of the Complainants access to any program or activity of CCRI.  V.Compl. ¶46-47.

---

[2]    Joint Guidance on Federal Title IX Regulations: *Summary Analysis of Sections § 106.45(b)94): Consolidation of Complaints* ("[A] single investigatory and adjudicatory process may be used **where it arises from the same incident and parties.**")(emphasis added); Council on Postsecondary Education, *Title IX Sexual Harassment Policy and Procedures*, Sec. XIX (Consolidation of Formal Complaints)("The Covered Entity may consolidate Formal Complaints of Sexual Harassment **where the allegations arise out of the same facts or circumstances**.")(emphasis added).

Even though the allegations of the Complainants failed to establish even a colorable Title IX violation, Defendant CCRI characterized the allegations of the Complainants as a Title IX violation in order to rely on § XVII "Emergency Removal and Administrative Leave" provision of Defendants' Title IX Sexual Harassment Policy and Procedures, which purports to allow Defendants to place an accused faculty member "on administrative leave at any time after receiving a report of Sexual harassment." V.Compl. ¶48.  That this banishment was at the core of a conspiracy between Defendant CCRI administrators, particularly Defendant Costigan, along with Sneesby and Abbascia, to silence Professor Murray is evidenced by the fact that Sneesby and Abbascia both included in their complaints the requested remedy that his access to the CCRI listserv for the purpose of transmitting critical emails be curtailed. V.Compl. ¶49; R.A. Exhibit I, Sandra Sneesby Incident Report Form, February 15, 2023 ("Ex. I"); R.A. Exhibit J, Tara Abbascia Complaint Form, Incident Report, and E-mails ("Ex. J").  Indeed, Abbascia expressly requested in her complaint that "that [Professor Murray be placed on] paid administrative leave pending investigation [as] an appropriate action.  Taking away his ability to use CCRI email to communicate with faculty until this complaint has been investigated, I feel is appropriate." V.Compl. ¶50; R.A. Ex. J.

Professor Murray was not only a vocal critic of the original and revised T.A. favored by Defendants, Sneesby, and Abbascia, but he was also a fierce critic of the lack of shared governance at CCRI in violation of state law, as a consequence of the which, he clashed not only with the Defendants, but also with Sneesby, who was a primary participant in the organization and establishment of the Faculty Senate, whose enabling act lacks appropriate shared governance language.[3]  V.Compl. ¶¶51-52.  He was also at odds with Sneesby over what he viewed as CCRI

---

[3] Plaintiff has long noted that the only way to have a real Faculty Senate that has 'shared governance' would be to go to the RI Legislature and get them to pass a law that give power/shared governance to a newly created Faculty Senate modeled on the URI Faculty Senate. Indeed, after Plaintiff suggested this above action,

administration manipulation of the Faculty Senate to pass polices and measures initiated and advocated by the CCRI administration and not the faculty, some of which violated the CBA. V.Compl. ¶53.  Likewise, he also clashed with Abbascia because he strongly believed and publicly advocated that as a lame duck President, who was resigning at the end of the academic year and leaving CCRI entirely, she lacked any stake in the outcome and could be perceived as a less than effective advocate on behalf of the faculty.  V.Compl. ¶54.

Subsequent to Del Sesto filing a complaint against Plaintiff, she was appointed interim assistant dean Business, Science, Technology, and Math in June of 2023, which included a significant increase in annual salary (2023 $61,499.88 -- 2023 $75,000.12) from her previous position as academic affairs coordinator for which V.P. Costigan was her direct supervisor. V.Compl. ¶55; R.A. Exhibit K, State of Rhode Island Transparency Portal for Elizabeth Del Sesto (Capraro) Showing Salary in 2022 and 2023.  Similarly, after Sneesby filed a complaint against Plaintiff, Defendant CCRI created a new department of "Communications" without going through the Curriculum Review Committee in violation of the CBA and, apparently also unilaterally named Sneesby as department Chair.[4]  V.Compl. ¶56.  Sneesby, a candidate for union office Defendants clearly prefer to Plaintiff in upcoming elections and who had told Professor Murray that she plans on running for President of CCRIFA Union in the next election, has also benefited from the reputational harm Defendants have inflicted on him and from the

---

Sneesby in the Spring of 2023 made a failed attempted to increase the power of the Faculty Senate by changing the statute regarding shared governance at CCRI by inserting the "faculty senate" into the proposed statute House Bill 2023 -6138 in the RI House of Representatives.

[4] Sneesby had previously been Chair of the English Department with a much larger workload, including more faculty to supervise, required assessment activities, and courses to schedule.  V.Compl. ¶56.

restrictions imposed on him which hinder his ability to be involved in union business and to campaign for union office.[5]  V.Compl. ¶58.

### Del Sesto Complaint

Del Sesto alleged that she subjectively felt "uncomfortable" and was "caught off guard by [Professor Murray's] unexpected visit and demeanor" when he came to her office and "in summary was speaking negatively about the PTFA contract, administration and [Plaintiff's] role" without, even subjectively, claiming that the conduct complained of was in any way related to gender.  V.Compl. ¶¶60-61; R.A. Exhibit L, Elisabeth Del Sesto Complaint Form, February 15, 2023.  Indeed, Professor Murray has interacted with Del Sesto on innumerable occasions during her approximately eight years as a support person in the Academic Affairs suite and Del Sesto claims in her complaint that this was the "first time" he had directed any objectionable communications to or conduct toward her.  V.Compl. ¶¶62-63.

The single interaction about which Del Sesto complained in her complaint, which took place on January 20, 2023, involved Plaintiff, both in his capacity as a faculty member and as Chair of the Criminal Justice and Legal Studies Department, communicating with Del Sesto, as a representative of the CCRI Administration, relative to an urgent and pressing issue impacting all faculty members.  V.Compl. ¶64.  The subject of their communication during the interaction was the intense confusion caused by a series of emails sent out by Del Sesto, which made the required submission of payroll and course assignments by department Chairs by the start of the semester in three days functionally impossible.  V.Compl. ¶65.

Shortly after this interaction, Defendant Costigan spoke with Del Sesto and then reached out to Dean Stargard and asserted that Professor Murray behaved in a very assertive and

---

[5] After filing her complaint, Abbascia resigned as President of CCRIFA and an assistant professor at CCRI effective the end of June 2023 and ended her relationship with CCRI entirely as previously and controversially indicated. V.Compl. ¶58.

aggressive manner towards Ms. Del Sesto and that he needed to speak to Professor Murray. V.Compl. ¶66.  Apparently following the lead of Defendant Costigan, Del Sesto allegedly made a verbal complaint to Dean Stargard about the interaction.  V.Compl. ¶67.  In response to this Dean Stargard expressly stated to Plaintiff in writing that the incident was being handled as a non-disciplinary matter and reiterated this when he met with Plaintiff and his union representative.  V.Compl. ¶68; R.A. Exhibit M, E-mails between Willaim Stargard, Leslie Florio, and Steven Murray Re: Request for a Meeting, January 23-26, 2023.

Accordingly, although the Title IX Complaint was issued on February 28, 2023, the events about which Del Sesto complained took place over a month prior, originally took the form of an informal verbal complaint, and was dealt with at a meeting between Plaintiff, his union representative, and Dean Stargard on January 23, 2023. V.Compl. ¶69.

### *Sneesby Complaint*

On or about February 15, 2023, Sneesby[6] completed and filed an incident report directed against Plaintiff.  V.Compl. ¶70; R.A. Ex. I.  The email communications about which Sneesby complained therein involved allegations that Plaintiff "had emailed the faculty stating derogitory [sic] things about me or my performance in my work" and also alleged Plaintiff was "condesending [sic] and dismissive and particularly targets females" without any factual basis or context for this self-serving, subjective opinion and identified as witnesses "[t]he entire faculty via email.".  *Id*.  V.Compl. ¶¶71-72, 74; R.A. Ex. I.  The email chain to which Sneesby refers and on which her allegations were based related to Professor Murray's criticism of the performance of her work in her capacity as President of the Faculty Senate.  V.Compl. ¶73.

---

[6] By way of additional context, for about ten years, Sneesby and Plaintiff, had been faculty colleagues at CCRI and, at times, worthy adversaries when he defeated her for Faculty Association President in 2016.  V.Compl. ¶78.

The emails referenced were not produced until May of 2023, months into the subsequent investigation, and demonstrate nothing more than a disagreement between union members, about union business over a nearly ten (10) year period, rather than anything that should or could support any Title IX or other disciplinary matter, something that was obvious from the emails on their face.  V.Compl. ¶¶75-76; .  R.A. Exhibit N, Sneesby Produced Emails.  Further, On February 16, 2023, the day after she purportedly completed the incident report form, Sneesby called Professor Murray and screamed at him for over twenty-two (22) minutes about issues involving the Faculty Senate and his criticism of it and only ended when he eventually hung up the phone.  V.Compl. ¶77; R.A. Exhibit O, Witness Statements from Lolita Villanueva, Tiffany Jones, and Lauren Nagel dated March 8, 2023.

### Abbascia Complaint

Abbascia[7] complained about what she perceived as Plaintiff's "unprofessional, bullying, threatening tone in emails."  all of which were sent in the context of union business and arose out of her role as union president, particularly alleging that Plaintiff called her a "lame duck" president—in reference to her announcement that she was leaving the college and her role as President of the union in June of 2023, prior to the end of her term of office (an objectively accurate description in light of the definition of that term), called into question her ability to do her job as union president, called for her resignation, and "verbally told faculty members that [Plaintiff was] trying to oust [her] as CCRIFA President" and identified as witnesses Leslie Florio, the union representative for the CCRIFA, and the "CCRI Faculty Association."  V.Compl. ¶79-80, 84; R.A. Ex. J at 3, 6.  While Abbascia asserted the obvious, that she was being targeted as union president, she subjectively opined that it was also because she was a

---

[7] Professor Murray and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship and Plaintiff was a mentor and supporter of Abbascia when she declared to run for Faculty Association President in October of 2020.  V.Compl. ¶85.

woman, without any factual basis or context for this self-serving, subjective opinion.  V.Compl. ¶81.

All but one of the email communications about which Abbascia complained in her complaint was sent to all faculty on the CCRI listserv and largely involved Plaintiff's criticism of her continuing to serve as a "lame duck" President, particularly in the midst of contentious and vital negotiations relative to the second T.A..  V.Compl. ¶82.  The private email exchange about which she complained involved an email from Professor Murray requesting he be appointed as lead negotiator for the second T.A. and that she clarify to whom she was referring in her email to the faculty claiming that lies were being spread regarding the T.A..  V.Compl. ¶83.

### Unlawful Interference with Legally Protected Concerted Conduct

Two of the three interactions that were the subject of the Title IX Complaint were between Professor Murray and other union members about union business, while the third involved his inquiries and advocacy as a member of the faculty union and department Chair on behalf of other faculty members.  V.Compl. ¶86.  As such, all of these interactions and communications that were the subject of the faulty Title IX Complaint against Professor Murray constituted protected concerted conduct under the Rhode Island Labor Relations Act, R.I. Gen. Laws §28-7-1, *et seq*. ("RILA"), which are not subject to regulation or sanction by Defendant CCRI in accordance with applicable law and CCRI's own policy. V.Compl. ¶87.  Specifically, when conduct which is the subject of a misconduct complaint involves union business, it is and always has been the policy of CCRI that such a dispute is not subject to determination by the college.  V.Compl. ¶88; R.A. Ex. Q, December 12, 2019 Email from Vice President Alix Ogden, Special Advisor to the President overseeing CCRI's labor relations and governance (explaining that where conduct which is the subject of a misconduct complaint involves union business, it is the policy of CCRI that the dispute is not subject to determination by the college.).  Indeed,

Defendants well knew that these communications/interactions were protected conduct and outside the purview of either a disciplinary or Title IX complaint, and they have refused in the past to process a complaint of this very type asserted Professor Murray.  V.Compl. ¶89; R.A. R.A. Exhibit Q, November 20, 2019 Sybil Bailey re: Murray-Valicenti Complaint.

### E.    Investigation and Exoneration

#### *Investigation*

Professor Murray received a letter dated February 28, 2023 from Kara DiPaola, Esq., CCRI's Assistant Director, Affirmative Action & Equal Opportunity Title IX & Section 504/ADA Coordinator notifying Plaintiff of, among other things, that the Title IX Complaint filed against him and that he would be contacted by an investigator.  V.Compl. ¶92; R.A. Exhibit R, Kara DiPaolo Investigation Letter, February 28, 2023.   He also received a letter dated February 28, 2023 from Sybil F. Bailey, Director of Institutional Equity and Human Resources, notifying him that he was not to retaliate against or contact the Complainants and the he was being placed on administrative leave, a status effectively banishing him from the campus, barring him from teaching, and preventing him from discharging his duties as a member of the Curriculum Review Committee and union position as an alternate to the CCRIFA Executive Committee.  V.Compl. ¶93; R.A. Ex. H.

On March 29, 2023, Plaintiff's counsel transmitted a detailed letter to Ronald Cavallaro, Esq, CCRI General Counsel, requesting among other things, an immediate dismissal of the Title IX Complaint on the grounds that the allegations therein did not even amount to a colorable Title IX violation and that the complaint was both procedurally and substantively deficient, a pretext motivated by a desire to silence the Plaintiff, and that CCRI's conduct deprived Plaintiff of his rights to concerted action, free speech, and freedom of association and violated his right to due process of law.  V.Compl. ¶94; R.A. Exhibit S, Letters and Motions by Richard A. Sinapi dated

March 29, 2023, April 24, 2023, July 24, 2023, and September 21, 2023.  Despite subsequent phone communications and email exchanges between Plaintiff's counsel and CCRI General Counsel, Defendants refused to dismiss the Title IX Complaint or allow Plaintiff access to his CCRI email account or office except for two scheduled windows of two-hours and eight hours on separate occasions to allow Plaintiff to obtain documentation and information for his defense of the Title IX Complaint.  V.Compl. ¶95; R.A. Ex. S.

Professor Murray was not even contacted by the Title IX investigator until almost two months after his banishment, and he was not interviewed by the investigator until ten weeks after his banishment, May 12, 2023.  V.Compl. ¶96.  Prior to the interview date, Plaintiff's counsel submitted a detailed letter to the Title IX investigator dated April 24, 2023, demanding summary dismissal of the Title IX Complaint for the same or similar reasons as set forth in his letter to the General Counsel.  V.Compl. ¶97; R,A, Ex. S.  The final draft of the Title IX Investigator's report was not received by Plaintiff and his counsel until September 22, 2023.  V.Compl. ¶98.  A renewed written request seeking dismissal of the Title IX Complaint was forwarded to the Title IX Administrator, Kara DiPaola, and the General Counsel on September 26, 2023.  V.Compl. ¶99; R.A. Exhibit T, Renewed Motion to Dismiss and Respondent's Written Response to the Investigator's Second Draft Findings Pursuant to Title IX Policy and Procedure § XXII D., Richard A. Sinapi. September 21, 2023.

*Exoneration*

By way of a letter dated October 2, 2023 from Kara DiPaola, Assistant Director and Title IX & Section 504/ADA Coordinator, Professor Murray was notified that the "conduct reported does not fall within the scope of or constitute a violation of either the Title IX Policy or the Nondiscrimination Policy" ***and that the Title IX Complaint was "dismissed under these policies"*** but was being referred to the Office of Human Resources because "the alleged behavior

may violate another policy, code, and/or standard of conduct." V.Compl. ¶100; R.A. Exhibit U, October 2, 2023 Notice of Dismissal from Kara DiPaolo.  There is no reasonable explanation for why this determination took over seven (7) months other than the fact that the entire investigation and pre-determination banishment were the manifestation of a tacit or express conspiracy to silence Professor Murray and deprive him of his free speech and association rights, and thus remove him from the CCRI community as an effective critic of Defendant, while at the same time punishing him for previous effective criticism and union activity.  V.Compl. ¶101.

      **F.**    **Defendants' Repression of and Retaliation Against Plaintiff Post-Exoneration**

**_Extension and Increase in the Scope of Banishment and Restrictions on Speech_**

By way of a letter dated October 1, 2023 from Sybil F. Bailey, Director of Institutional Equity and Human Resources, Professor Murray was notified that his administrative leave would remain in effect and that he was "***expected to remain away from school property and have no contact with college employees or students during the period of your leave, excluding those communications connected to your union work.***" V.Compl. ¶102; R.A. Exhibit V, October 1, 2023 Email from Sybil F. Baily.  Accordingly, despite Defendants' admission that the conduct at issue did not fall within the scope of Title IX or Defendant CCRI's Nondiscrimination Policy, Defendants continued their baseless and self-serving banishment of Professor Murray and restrictions on his free speech and association.  V.Compl. ¶103.  Defendants did this even though, without the pretext of the § XVII "Emergency Removal and Administrative Leave" provision of Defendants' Title IX Sexual Harassment Policy and Procedures, there was no legal justification or authority to support the continuation of his pre-disciplinary determination suspension and banishment from the college.  V.Compl. ¶104.

Indeed, post Title IX Complaint exoneration, Defendants have increased the restrictions on Professor Murray to include ***any communications with any "college employee or students,"*** except communications related to faculty union business. V.Compl. ¶105; R.A. Ex. V.  The same October 1, 2023 email also declared that the basis for these continued restrictions on and punishment of Plaintiff was that Human Resource would now "need time to review whether your conduct rose to a manner that caused a substantial disruption to the operations of the Community College of Rhode Island, eroded the trust of the educational community you serve, violated the Standards of Conduct in conjunction of RIGL§ 36-14-1 and/or the Violence in the Workplace Policy." V.Compl. ¶106; R.A. Ex. V.

No reason was provided why an additional investigation and/or review was required when all the facts had already been exhaustively determined and the conduct at issue is facially both innocuous and protected concerted activity beyond the scope of Defendant CCRI oversight, or why continued restrictions on Plaintiff were appropriate during this additional purported review.  V.Compl. ¶107.

This preemptive punishment, based on conduct that is both facially innocuous and protected concerted activity, and had been imposed without any finding that Plaintiff presented any danger to anyone at CCRI, is not only inappropriate and premature, but it is also a harsher penalty than would apply even if Plaintiff's conduct had been found to be in violation of any policy.  V.Compl. ¶108.

By way of additional context it is notable that, at the time of the extension and increase in scope of Plaintiff's banishment, the T.A. had been defeated for a second time by a faculty vote in April of 2023—in no small part due to Plaintiff's advocacy—and was referred to mediation, which was and is ongoing at this time.  V.Compl. ¶109.

### *Reintroduction and Approval of Certificate of Readiness Opposed by Plaintiff and his Department.*

During the period Plaintiff has been banished from campus, silenced, and unable to take part in committees and governance duties, including those of his elected positions, Defendant Costigan reintroduced her "Law Enforcement Readiness Certificate" proposal that had previously been rejected due in large part to Plaintiff's effective advocacy.  V.Compl. ¶110.

The renewed proposal was brought before the Curriculum Review Committee in April of 2023 and approved while Professor Murray was unable to take part due to the restrictions Defendants imposed on him.  V.Compl. ¶111.  This approval was partially based on Dean Stargard's representation to the Committee that the faculty of the Criminal Justice and Legal Studies Department had approved the proposal, which they had not—a misrepresentation that could not have been made if Plaintiff, the department Chair, had not been banned from the process.  V.Compl. ¶112.  Thus, Professor Murray's enforced absence from the Curriculum Review Committee was essential for Defendant Costigan to secure approval of this proposal, which was strongly opposed by Plaintiff and the faculty of the Criminal Justice and Legal Studies Department.  V.Compl. ¶113.

### *Elimination of the Criminal Justice and Legal Studies Department and Plaintiff's Position as Chair*

During the Spring of 2023, while Professor Murray was banished from campus and his communications with the CCRI community were restricted, Defendants also informed the members of the Criminal Justice and Legal Studies Department, but not Professor Murray, who was still the elected Chair of the department, that Defendants would be absorbing the department into the Business Studies Department effective July 1, 2023.  V.Compl. ¶114.  This decision was taken and imposed unilaterally, without any negotiation with the CCRIFA as required by the CBA.  V.Compl. ¶115.  This action had the effect of eliminating Plaintiff's elective chair

position and diminished the role and influence of the faculty of the department and the Plaintiff as Chair in CCRI governance.  V.Compl. ¶116.

Defendants' purported basis for elimination of the department was that its complement of full-time faculty was going to fall below six (6) due to a retirement effective as of December 24, 2023 and also due to a purported reduction in demand.  V.Compl. ¶117.  However, these grounds for elimination of the department were clearly contrived insofar as the only reason there were not going to be six (6) full time faculty was the Defendants' decision not to hire a full-time faculty replacement, while there was actually a 16% increase in department enrollment in the Fall of 2022 as compared to Fall of 2021.  V.Compl. ¶118.  Moreover, the Criminal Justice and Legal Studies department had the fifth highest number of graduates among the twenty-four (24) programs at CCRI in the most recent graduation class in 2023.  V.Compl. ¶119.  The Criminal Justice and Legal Studies Department had been in existence for approximately thirty (30) years and the demand for the education provided by the department among students, employers, and government continued to be high and was increasing.  V.Compl. ¶120.

### *Diminishing the Influence and Impact of Plaintiff's Advocacy*

The intent, purpose, and effect of the elimination of the Criminal Justice and Legal Studies Department was to diminish Professor Murray's institutional stature and thereby reduce the impact of his advocacy and influence with respect to CCRI Administration policies and positions and academic initiatives, of which he had often been a vocal and effective critic. V.Compl. ¶121.  Barring him from campus and thereby reducing his ability to interact and communicate with faculty, students, and the CCRI Administration and the concomitant reduction in his role and involvement in institutional and academic affairs has similarly harmed his reputation, diminished his stature and ability to advocate on behalf of his co-worker union faculty members. V.Compl. ¶122.

### G.    Impairment of Freedom of Speech and Association

#### *Total Ban on Non-Union Communications and Interactions*

For the past more than eight (8) months, Professor Murray, a faculty member and full Professor at CCRI for 32 years, has been banned from teaching, his faculty office, entering upon any of the four main campuses and numerous satellite locations of CCRI, and any faculty and student academic interactions and communications.  V.Compl. ¶123.  He has also been expressly barred from any communications or interactions with any faculty, students, or the CCRI administration unless it is relating to union business according to the express terms of the extended administrative leave recently imposed on him after his exoneration from Title IX and Anti-Discrimination allegations.  V.Compl. ¶124.

#### *Impairment of Protected Concerted Conduct*

Although about a month after Professor Murray's banishment, the CCRIFA subsequently negotiated a compromise that permitted Plaintiff to access the CCRI listserv for union business with his private email, he still cannot check or receive any emails in his CCRI email account. V.Compl. ¶125.  His ability to communicate and interact with faculty with respect to both union and academic matters has been seriously impaired, insofar as he cannot receive any email communications sent to this CCRI email or voice mail messages sent to his CCRI extension, as a result of which faculty can only reach out to him if they have his personal email address or phone number.  V.Compl. ¶126.

His banishment has also prevented him from engaging in in-person on campus communications regarding union business, all of which has materially impaired his ability to effectively participate as a member of the faculty union. V.Compl. ¶127.  This has become even more pressing since Professor Murray was appointed CCRIFA Vice President on or about June 21, 2023.  V.Compl. ¶128; R.A. Exhibit W, June 21, 2023 Email from Daniel O'Neill (on behalf

of Adam Mazin) Re: Summer 2023 Update CCRIFA Leadership.  One of the intents, purposes, and effects of the extended and increased terms of his banishment is to prevent Plaintiff from effectively performing his duties as Vice President of the faculty union.    V.Compl. ¶129.  Defendants' continued banishment has also impaired his participation in the ongoing mediation and discussions between CCRIFA and Defendants relative to the still pending and controversial T.A.. V.Compl. ¶130.   This continued and expanded banishment and imposition of severe restrictions on Plaintiff's ability to communicate with the CCRI community is also undermining his ability to campaign for the position of CCRIFA President, for which an election is upcoming on or about April 25, 2024, including barring in-person on campus campaigning. V.Compl. ¶131.

### Impairment of Ability to Participate in Academic Affairs and College Governance

In late September 2023, Professor Murray was notified that he could not participate as the appointed faculty union representative on the Seven (7) Week Class Implementation Team, which is part of the collective bargaining process to consider a compressed schedule teaching format at CCRI, because the meetings—which are currently ongoing—were being held at the CCRI Knight Campus in Warwick.  V.Compl. ¶132; R.A. Exhibit X, E-mail Thread Re: 7 week Compressed Term September 15 to October 2, 2023.  Defendants refused to allow Plaintiff to take part in these meetings despite his appointment by the CCRIFA and offers by the CCRIFA to host the meeting in alternative locales.  V.Compl. ¶133.  Professor Murray has likewise been unable to participate in and carry out his duties as an elected member of the Curriculum Review Committee, which meets monthly on the CCRI Knight Campus, and has thus far missed the meetings held on March 24, 2023, April 28, 2023, October 6, 2023, and November 3, 2023.  The next scheduled meeting is on December 1, 2023.  V.Compl. ¶134.  Similarly, the CCRIFA also designated Plaintiff to serve on the contractually mandated Stipend and Release Time Committee

and as the CCRIFA representative on the Faculty Senate, but Plaintiff has not been allowed to serve on either since they also meet on the CCRI Knight Campus.  V.Compl. ¶135.

Additionally, on information and belief, Defendants are also motivated to continue this banishment, in part, because they also do not want Professor Murray involved in the upcoming ten (10) year evaluation of CCRI, slated to informally commence in December of 2023, by its accrediting agency, New England Commission of Higher Education, which has expressed concerns in the past with the lack of shared governance at the college—of which Professor Murray has been a high profile and vocal critic.  V.Compl. ¶136.

### *Economic, Academic, and Reputational Harm*

Professor Murray's banishment has also prevented him from teaching courses, prevented him from pursuing and completing professional and academic research, work, and advancement, and inflicted serious and substantial reputational harm on him.  V.Compl. ¶137.  Defendants have used this banishment of Professor Murray to abolish his department, strip him of his department Chair, including the substantial stipend he earned in that role, and reduce his participation in college affairs in order to diminish the influence and impact of his academic and union related advocacy at the college.  V.Compl. ¶138.  Additionally, Defendants have recently begun the scheduling process for the Spring 2024 semester and are currently attempting to greatly reduce the number of courses offered in the field of Criminal Justice and Legal Studies and ***have already listed Professor Murray as not teaching any courses for the upcoming semester, which does not even begin until late January 2024.***  V.Compl. ¶¶139-40.  This demonstrates that Defendants have already decided, without any reference to the ongoing second investigation, to continue their banishment of and restrictions on Professor Murray through the second semester into 2024, revealing it to be a sham investigation initiated for the sole purpose of justifying their continued and expanded unlawful banishment of him, just like the first

investigation.  V.Compl. ¶141.  Additionally, by keeping Professor Murray from teaching and decreasing the number of courses in his department, Defendants continue to reduce the income that he would otherwise have earned.  V.Compl. ¶142.

The lengthy pendency of disciplinary investigations against him, the attempt to recast personal disputes as gender discrimination, and the increase in scope and extension of the term of his banishment have had the purpose and effect of casting dispersions and tarnishing Professor Murray's personal and professional reputation. V.Compl. ¶143.  Further, insofar as Defendants have successfully diminished if not neutralized him as an impediment to their institutional objectives by initiating and then extending a meritless disciplinary investigation to justify banishing and thereby silencing Professor Murray, it is readily apparent that Defendants have no intention of ceasing their actions and will keep him silenced and banished from campus for as long as they are able to get away with it.  V.Compl. ¶144.  Indeed, Professor Murray is aware of at least two other occasions wherein Defendants have employed this same scheme of bringing a disciplinary complaint and banishing a professor deemed troublesome or undesirable without any predetermination that there was any danger, disruption, or other basis on which to justify the professor's removal prehearing.   V.Compl. ¶145.

### *Summary of Unlawful Adverse Action in Violation of Plaintiff's Right to Due Process of Law and Rights to Free Speech and Association*

In short, Defendants took the following adverse action, without due process, against Professor Murray on account of and/or in retaliation for his protected speech, conduct, and/or associations:

      a.     Defendants banished Plaintiff from campus for over eight (8) months and continue to impose this banishment.

      b.     Defendants prevented and continue to prevent Plaintiff from communicating with members of the CCRI community.

      c.     Defendants have barred Plaintiff from teaching, thus effectively demoting him and reducing his pay.

    d.    Defendants have prevented and continue to prevent Plaintiff from exercising his administrative and governance functions at CCRI, also effectively demoting him.

    e.    Defendants have prevented and continue to prevent Plaintiff from performing duties of his elective offices, effectively invalidating union and faculty elections and silencing the speech related thereto.

    f.    Defendants have prevented and continue to prevent Plaintiff from actively campaigning for or against any future T.A. and for the office of CCRIFA president.

    g.    Defendants have prevented and continue to prevent Plaintiff from pursuing academic research, duties, and advance by banishing him and restricting his speech.

    h.    Defendants have inflicted and continue to inflict reputational harm on Plaintiff by framing innocuous and protected conduct as disciplinary infractions and misconduct, causing harm to his professional as well as personal reputation.

    i.    Defendants refuse to allow Plaintiff to return to work even after admitting that Plaintiff's actions and conduct did not constitute a Title IX violation.  V.Compl. ¶183.

## IV.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 allows a court to grant a temporary restraining order when a plaintiff demonstrates, through specific facts in an affidavit or a verified complaint, that the plaintiff would suffer "immediate and irreparable injury, loss, or damage" without injunctive relief. Fed. R. Civ. P. 65(b)(1).  The standard for granting a preliminary injunction is identical. *Harris v. Wall*, 217 F. Supp. 3d 541, 552 (D.R.I. 2016).

"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Dr. T. v. Alexander-Scott*, 579 F. Supp. 3d 271, 280 (D.R.I. 2022), *appeal dismissed sub nom. Dr. T. v. McKee*, No. 22-1073, 2022 WL 2962029 (1st Cir. Apr. 13, 2022 (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013)). The First Circuit evaluates these factors on a "sliding scale": "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-*

*Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 19 (1st Cir. 1996). "Of these factors, '[t]he movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus.' " *Dr. T.*, 579 F. Supp. 3d at 280. (quoting *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)).

"When the government is a party, the last two prongs of the injunction analysis merge." *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1215 (W.D. Wash. 2020) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014); *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "As to the balance of hardships, 'serious First Amendment questions compel[ ]' a finding that the 'balance of hardships tips sharply in [the plaintiffs'] favor.' " *Id.* (quoting *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (alteration in original)). "[A]s to public interest, 'it is always in the public interest to prevent the violation of a party's constitutional rights.' " *Id.* (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

A preliminary injunction is a powerful and essential tool to "preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).

## V.    ARGUMENT

Professor Murray's constitutional claims, as supported by his Verified Complaint and the exhibits attached hereto in his record appendix, more than satisfy all the requirements for this Court to grant a temporary restraining order and preliminary injunction. Indeed, this Court has recently determined that the sort of restrictions on and retaliation against protected speech and association in the context of disputes between members of educator unions and the administration of their schools plead by Plaintiff here is sufficient to support court action. *See*

*Mullen v. Tiverton Sch. Dist.,* 504 F. Supp. 3d 21 (D.R.I. 2020). Similarly, the sort of sham investigation at issue here has also recently been held by this Court to support emergency injunctive relief, albeit on contractual grounds between a student and a private educational institution. *See David Smith v. Brown Univ.*, No. CV 1:22-00329 (D.R.I. Sept. 19, 2022); *Doe v. Brown Univ.*, No. CV 16-017 S, 2016 WL 8786771 (D.R.I. Aug. 23, 2016). Here, where the fact of a sham investigation is similar, but the conduct at issue is far less serious and the investigation even more farcical, including the conduct being facially outside the ambit of Title IX, and the claims supporting injunctive relief are the more robust constitutional protections enjoyed by a tenured professor at a public college, injunctive relief is even more appropriate.

Indeed, colorable First Amendment claims generally support preliminary injunctive relief. While ["t]he first two factors" of the test for preliminary injunctive relief, (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld "are prerequisites that the moving party must establish," " '[i]n First Amendment cases the initial burden is flipped. The government bears the burden of proving that the law is constitutional; thus, the plaintiff must be deemed likely to prevail if the government fails to show the constitutionality of the law.' " *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102–03 (3d Cir. 2022) (*quoting Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020)). Further, if a plaintiff can demonstrate "[t]he loss of First Amendment freedoms, for even minimal periods of time," it "unquestionably constitutes irreparable injury." *Swartzwelder v. McNeilly,* 297 F.3d 228, 241 (3d Cir. 2002). (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, Defendants have engaged in a withering assault on Professor Murray's First Amendment and Due Process rights for a period of well over eight (8) months with no end in

sight.  They have done so by illegally and improperly interpreting Title IX and Defendants' own policies and procedures as authorizing the issuance of a complaint and imposing pre-determination sanctions based on heated discussions among faculty union members which Defendants deem "uncivil" or "unprofessional."  Such a practice violates the rights of the Plaintiff and all other union members to engage in collective action and constitutes an unfair labor practice prohibited by R.I. Gen. Laws §28-7-13 (10).  This is so because the actual, necessary, and intended effect of this practice is to impair and chill the exercise of collective action rights out of fear of being disciplined if Defendants disapprove of the tone or content of the communications between members regarding union matters.[8]

Indeed, even after exonerating Professor Murray from the sham Title IX allegations against him, Defendants, rather than relenting, doubled down and increased the scope of their banishment of and restrictions on his speech, now barring him from any communications at all with any and all employees or students of CCRI, except for communication related to his union work.  R.A. Ex. V.

A.    **Professor Murray Is Likely to Succeed on the Merits of His Various Constitutional Claims**

Professor Murray has brought a number of First Amendment claims as well as a Due Process claim against Defendants.  For the reasons discussed below he is likely to succeed on each of them.

---

[8] R.I. Gen. Laws §28-7-13 (10) (making it is an unfair labor practice to "[d]o any acts . . . that interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by § 28-7-12."); *see also* N.L.R.B. v. Ne. Land Servs., Ltd., 645 F.3d 475, 481–83 (1st Cir. 2011) (The "mere maintenance" of a rule that "would reasonably tend to chill employees in the exercise of their Section 7 rights" is unlawful.).  "It is axiomatic that that an employees' right to discuss, debate, and communicate with each other regarding workplace terms and conditions of employment" is protected under the Act.  *See United States Postal Serv., & Roy Young, an Individual*, No. 14-CA-195011, 2021 WL 1087421 (Mar. 18, 2021) (interpreting and applying Section 7 of the NLRA).  The Supreme Court has acknowledged "the importance of freedom of communication to the free exercise of organization rights" under the NLRA.  *Cent. Hardware Co. v. N.L.R.B.*, 407 U.S. 539, 542–43 (1972).

### 1.  First Amendment Claims

#### a.    *First Amendment Protections for Government Employees*

"The First Amendment applied to the states through the Fourteenth Amendment, prohibits government restrictions on the right of its citizens to speak freely: 'Congress shall make no law . . . abridging the freedom of speech.' " *Kessler v. City of Providence*, 167 F. Supp. 2d 482, 485 (D.R.I. 2001) (quoting U.S. CONST. amend. I.). "It is well established that government employees are protected by the First Amendment." *Welch v. Ciampa*, 542 F.3d 927, 938 (1st Cir. 2008) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008).

#### b.    *Unconstitutional Prior Restraint on Speech*

"A prior restraint rule 'is a government regulation that limits or conditions in advance the exercise of protected First Amendment activity.' " *Kessler*, 167 F. Supp. 2d at 485 (*quoting Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir.1993).  When a "directive bans . . . communication before it occurs, [it] constitute[s] a prior restraint on speech rather than *a post hoc* disciplinary decision." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999).

A prior restraint "rule that 'forces a person to ask permission to speak bears a heavier presumption against constitutionality than one that merely penalizes people who have already spoken.' " *Kessler,* 167 F. Supp. 2d at 485. (quoting *Providence Firefighters Local 799 v. City of Providence*, 26 F.Supp.2d 350, 355 (D.R.I.1998).  This is recognition that "a prior restraint on speech 'chills potential speech before it happens,' and thus 'gives rise to far more serious concerns than could any single supervisory decision.' " *Id.* (quoting *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995)) (hereinafter cited at "*NTEU*" in accord with the general practice of courts applying the test derived from that case).  The more stringent

*NTEU* test is applicable merely because the government action at issue restricts speech "before it occurs, rather than penalizing employee speech after the fact." *Swartzwelder*, 297 F.3d at 235.[9]

Here, Defendants imposed and continues to impose a prior restraint upon Plaintiff in banning him from communicating with members of the CCRI community. Such a blanket ban on speech to a vast audience is a black letter prior restraint.

### i.    *NTEU Test*

"In assessing the constitutionality of a prior restraint on government employee speech, the Court engages in a two-step analysis." *Brady v. Tamburini*, 518 F. Supp. 3d 570, 581 (D.R.I. 2021) "First, the Court determines whether the restriction regards matters of public concern; [i]f the prior restraint indeed inhibits speech on matters of public concern, the Court then considers whether the First Amendment interests of the plaintiff and the public outweigh the government's interest in functioning efficiently." *Id.* (citing *NTEU*, 513 U.S. at 468).

### ii.    *Plaintiff Spoke on a Matter of Public Concern*

"In determining the validity of a prior restraint on the speech of public employees, the Supreme Court directs courts to look at whether the restriction regards matters of public concern." *Kessler*, 167 F. Supp. 2d at 485–86 (citing *NTEU*, 513 U.S. at 466). "The 'inappropriate or controversial character of the statement is irrelevant to the questions of whether it deals with a matter of public concern' because 'debate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasant sharp attacks on government and public officials.' " *Smith v. Twp. of Aleppo*, No. 05CV0071,

---

[9] Although rarely at issue a prior restraint can apply to single employees as well as large groups.. *Mansoor v. Cnty. of Albemarle*, 189 F. Supp. 2d 426, 433–38 (W.D. Va. 2002) *aff'd sub nom. Mansoor v. Trank*, 319 F.3d 133 (4th Cir. 2003) (finding a prior restraint in a case involving a single employee); *see Latino Officers Ass'n v. City of New York,* 196 F.3d 458, 463 (2d Cir. 1999) ("But nothing in *NTEU* implies that the stricter standard applies only when a 'vast group' of employees is involved or when a regulation restricts a 'broad range' of expression.").

2005 WL 4984380, at *14 (W.D. Pa. July 13, 2005) quoting *New York Times Co. v. Sullivan*, 376

U.S. 254, 270 (1964); *Azzaro v. County of Allegheny*, 110 F.3d at 968, 977 (3d Cir.1997)).

Much like the union membership impact on that private citizen analysis above, "[l]abor

disputes, and discussions surrounding collective bargaining, are also matters of public concern."

*Int'l Ass'n of Firefighters Loc. 3233 v. Frenchtown Charter Twp.*, 246 F. Supp. 2d 734, 737

(E.D. Mich. 2003) (citing *Bartnicki v. Vopper*, 532 U.S. 514, 533–34 (2001)); *see Boddie v. City*

*of Columbus*, 989 F.2d 745, 750 (5th Cir.1993) (noting that "much more of the range of [union]

activity than the range of employee speech ... is not solely personal and is inevitably of public

concern"); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir.1999) (noting that union activities which

"necessarily entail a substantial criticism of management raise matters of public concern."). Put

in the context of a weighing analysis, speech and expressive conduct that is "union-related"

weighs "heavily in the public concern calculus." *Davignon*, 524 F.3d at 101.  Similarly, "active

participation in [union or union faction], running for union office, and ***campaigning against a***

***proposed collective bargaining agreement are likewise matters of public concern.***" *Scott v.*

*Goodman*, 961 F. Supp. 424, 441–42 (E.D.N.Y. 1997), *aff'd sub nom. Scott v. Meyers*, 191 F.3d

82 (2d Cir. 1999) (emphasis added).

This is true even in the case of many intraunion disputes and is certainly true when such

disputes are around issues at the heart of union activity.  *Clue*, 179 F.3d at 61 ("There may well

be intraunion disputes that do not raise enough of a public concern to trigger First Amendment

protection. And there undoubtedly exist intraunion conflicts that manifestly raise matters of

public concern because the faction's activity would be tantamount to core union activity.  For

example, if the union leadership was so much under the thumb of management that the union

was nothing more than a "company union," the activities of a minority union faction could

properly be viewed as representing the only genuine ongoing union activity.  Since retaliation

solely for union activity clearly raises a public concern under *Connick* [*v. Myers*, 461 U.S. 138, (1983)] *see, e.g., Boals* [*v. Gray*, 775 F.2d 686, 693 (6th Cir.1985)]").

Further, "[t]he objectives, purposes, and mission of a public university [or college] are undoubtedly matters of public concern." *Gardetto v. Mason*, 100 F.3d 803, 813 (10th Cir. 1996). "Certainly, questions of academic standards are of 'apparent ... interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal.' " *Johnson v. Lincoln Univ. of Com. Sys. of Higher Educ.*, 776 F.2d 443, 452 (3d Cir. 1985) (quoting *Connick v. Myers*, 461 U.S. 138, 149 (1983)).

Here, the speech and expressive conduct which is being prohibited is union-related, directed toward and related to disputes with management, involves debate and campaigning around a proposed collective bargaining agreement, campaigning for union leadership, raises issues of the legal requirements of the enabling legislation of Defendant CCRI and possible violations thereof, involves questions of academic standards at a public college, the ability of that college to maintain its accreditation, the ability of that college to meet its objectives, purposes, and mission, and even what precisely those objectives, purposes, and mission are. Each and every one of these bases on its own would be sufficient for the restricted speech to qualify as a matter of public concern. That the speech being restrained here involves all of these axiomatic matters of public concern makes it indisputable that Defendants' prior restraint prohibits speech on matters of public concern.

### iii.    *Balancing the Interests*

When restricted speech is on a matter of public concern the court must balance the employee's interest in engaging in that speech against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citing *Pickering v. Board of Education*, 391 U.S. 563,

568 (1968)).  In making this determination, the court should consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (citing *Pickering*, 391 U.S. at 570-73).

In this balancing step, "the burden shifts to the government employer to show that there were legitimate administrative interests involved that outweigh the employee's right to comment as a private citizen about matters of public concern." *Bakalar v. Dunleavy*, 580 F. Supp. 3d 667, 684 (D. Alaska 2022).  "[T]o succeed in demonstrating its interest, the government must demonstrate, through evidence, 'harm or increased risks'; 'actual disruption' or, at the very least, the speech's potential to disrupt; or 'internal conflict' and that this was in fact caused by the employee's speech." *Brady*, 518 F. Supp. 3d at 586 (quoting *Davignon*, 524 F.3d at 104-05 and citing *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 54 (1st Cir. 2003); *O'Connor v. Steeves*, 994 F.2d 905, 916 (1st Cir. 1993)).

General references by the government to *potential* interference with operations or insubordination are not sufficient to overcome an employee's First Amendment rights. *See Bakalar*, 580 F. Supp. 3d at 684 ("This burden is met with evidence of actual workplace disruption or evidence supporting a reasonable prediction of workplace disruption resulting from the speech."); *Mullen*, 504 F.Supp.3d at 29-30 (finding that insubordination that stemmed from attempts to engage in discussions about Tiverton's pandemic response, over email and before professional meetings, were minimally invasive and did "not outweigh the importance of allowing a more than twenty-year veteran teacher and Union President trying to ensure that teachers are adequately represented in discussions about how their fundamental jobs would change due to distance learning.").  "The closer the employee's speech reflects on matters of

public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." *Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.1995).

Here, as described above, the speech Defendants are restricting is sweeping and implicates much speech that is both axiomatically and deeply of public concern. This is balanced against a complete lack of legitimate administrative interests favoring the restriction of Professor Murray's speech which was protected union activity that took place within the channels Defendants had agreed to and was well within the bounds of normal, passionate advocacy. In short, Defendants have no legitimate interest in silencing, banishing, and otherwise restricting Professor Murray's speech. Their only interest is illegally and illegitimately silencing an effective critic and advocate against some of the polices and positions, an interest that the First Amendment balancing here not only does not weigh in their favor but expressly repudiates.

### c.    *Unconstitutional Retaliation for Protected Speech*

The First Amendment also protects employees from retaliation for protected speech. *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011). As such "[a]dverse employment actions for a public employee's 'protected speech offends the constitution [because] it threatens to inhibit exercise of the protected right, and ... the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out.' " *Mullen*, 504 F. Supp. 3d at 29 (quoting *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 25 (1st Cir. 2010); *Hartman v. Moore*, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441, (2006)).

"To decide whether a public employee is protected from retaliation for her speech, the Court should weigh three factors." *Mullen*, 504 F. Supp. 3d at 27 (citing *Decotiis*, 635 F.3d at 29-30. The first two factors track the *NTEU* test above, with the additional caveat that the employee spoke as a private citizen as well as on a matter of public, while the third requires the employee to show that the protected expression was a substantial or motivating factor in the

adverse employment decision." *Id*. [internal citations omitted].  This three-part balancing test is generally referred to as the *Pickering* balancing test.

### i.    *Spoke as a Private Citizen*

Here there can be no serious question that Plaintiff spoke as a private citizen while addressing matters of public concern and this factor weighs heavily in his favor.

First, "[i]t is axiomatic that an employee's job responsibilities do not include acting in the capacity of a union member, leader, or official."  *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015); *see also Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1060 (9th Cir. 2013) ("Given the inherent institutional conflict of interest between an employer and its employees' union, we conclude that a police office does not act in furtherance of his public duties when speaking as a representative of the police union."); *Mullen*, 504 F. Supp. 3d at  28–29.

Here, all of Professor Murray's speech that is at issue took place in his capacity as a union member.  Indeed, Plaintiff was not merely a member but was often a formal leader and always an informal leader of the CCRIFA with a long history of vocal advocacy for union interests to which Defendants were often hostile.  All of the speech at issue here was directly and indisputably related to Professor Murray's union activities, conduct, and speech and the clashes with Defendants that flowed from them.  As such there can be no dispute that Professor Murray was speaking as a private citizen.

Further, as explained above, Professor Murray's speech was indisputably related to a matter of public concern.  Thus, under both prongs of this factor there can be no doubt that he spoke as a private citizen on a matter of public concern and this part of the three factor test weighs heavily in his favor.

### ii.     *Balancing the Interests*

The next step of the *Pickering* test requires this Court to "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [. . .] employer, in promoting the efficiency of the public services it performs through its employees." *Mullen*, 504 F. Supp. 3d at 28 (quoting *Curran v. Cousins,* 509 F.3d 36, 44 (1st Cir. 2007), 509 F.3d at 44; *Pickering*, 391 U.S. at 568).  Employers have "discretion to restrict speech on its employees but such restrictions 'must be directed at speech that has some potential effect to the entity's operation.' " *Id.* (quoting *Garcetti* 547 U.S. at 418).  "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* (quoting  *Garcetti* 547 U.S. at 419).

This step mirrors step two of the *NTEU* test but looks to the speech being punished retroactively, rather than the speech being restricted prospectively.  In this context, to carry their burden Defendants must "present credible evidence that the discipline would have taken place in the absence of the alleged statements" or that the speech was not protected.  *Meyers v. City of Cincinnati*, 934 F.2d 726, 729 (6th Cir.1991); *Ratliff v. Wellington Exempted Vil. Sch. Bd. of Ed.*, 820 F.2d 792, 795 (6th Cir.1987).  "In assessing the government's interest in allaying disruption and inefficiencies in the workplace, a court should include in its considerations (1) the time, place, and manner of the employee's speech, and (2) the employer's motivation in making the adverse employment decision.' " *Id.* (quoting *Decotiis*, 635 F.3d at 35 (1st Cir. 2011).  That mere fact that the speech in question is strident, abrasive, or forceful does nothing to support government restrictions or punishments. *Trotman v. Bd. of Trustees of Lincoln Univ.*, 635 F.2d 216, 225 (3d Cir. 1980) ("The activity involved was essentially criticism of [university president] and his policies and methods, which is "core" speech squarely encompassed within the First

Amendment.  It is not deprived of the protection of the First Amendment merely because it was strident.")

Here, Plaintiff's speech and expressive conduct did not and would not have would have interfered with the efficient operations of Defendant CCRI.  Rather, Professor Murray, a highly respected and important member of the CCRI community and the CCRIFA merely took part in the same process of Defendant CCRI governance as he has for years.  He used the appropriate and relevant channels, the CBA mandated email list and various organs of CCRI governance to express his positions.  He was no more strident than his opponents on the issues he was debating. Defendants' only interest in silencing Professor Murray was putting their thumb firmly, inappropriately, and illegally on the scale of an internal union dispute which Defendants wanted to be resolved in the opposite manner that Plaintiff was, successfully, advocating for.  Such an interest is wholly illegitimate and cannot support the violation of Plaintiff's First Amendment rights.

Even if there were some legitimate administrative interests of Defendants to balance against Plaintiff here, which there is not, the balance would still favor Plaintiff.  This is further evidenced by the obvious reality that, absent the protected speech at issue, Plaintiff would not have been disciplined at all.  Indeed, the sole basis for all of Defendants' actions, as is clear from the face of the Title IX Complaint allegations and Defendants' own investigative materials, was indisputably protected speech involving union activity.

### d.    *First Amendment Retaliation for Association*

"The public employee surely can associate and speak freely and petition openly, and [she] is protected by the First Amendment from retaliation for doing so."  *Mullen*, 504 F. Supp. at 30–31(quoting *Smith v. Arkansas State Highway Empl., Local 1315*, 441 U.S. 463, 465 "[T]he Supreme Court [has] noted that a public employee possesses a First Amendment right to

associate with a union." *Id.* (quoting *Palardy v. Township of Millburn*, 906 F.3d 76, 84 (3d Cir. 2018). "To prevail on a retaliation claim, Plaintiffs must show 'retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights and ... a link between the constitutionally protected conduct and the retaliatory action.' " *Id.* (quoting *Palardy*, 606 F.3d at 84; *Thomas v Independence Township*, 463 F.3d 285, 296 (3d Cir. 2006)). " '[I]n instances where a government employee claims her employer has taken adverse action that is violative of associational rights[,]' Plaintiffs must also show that the protected expression was a substantial or motivating factor in the employment decision." *Id.* (quoting *Davignon*, 524 F.3d at 108. In the union context there is no private citizen, public concern element to this determination. *Palardy*, 606 F.3d at (Holding that private citizen/public concern requirement did not apply to police officer's First Amendment retaliation claim based on his freedom to associate with unions); *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1138 (10th Cir. 2006) ("reject[ing] the requirement that a worker demonstrate that his association with the union be a matter of public concern.") (citing *Butcher v. City of McAlester*, 956 F.2d 973 (10th Cir. 1992).

Here, there can be no doubt that the over eight (8) month and counting banishment inflicted on Professor Murray, along with the harm to his personal and professional reputation, the economic damage, and all the other adverse action he has suffered as a consequence of his having engaged in protected concerted activity and speech "shows retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights and a link between the constitutionally protected conduct and the retaliatory action." *Mullen* 906 F.3d 84 (internal citations omitted). Even a person of unusually stern stuff would likely swallow their speech rather than endure the harm Defendants have inflicted upon Professor Murray.

Similarly, there can be no debate that the balancing of the interests heavily favors him here. "A generalized interest in doing business-as-usual does not constitute such a reason and

cannot categorically outweigh an employee's interest in associating with a union" particularly "where, as here, the institution asserting such an interest has explicitly sanctioned the existence of the union and the grievance procedure it employs by entering into a collective bargaining agreement." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 757 (3d Cir. 2019). Indeed, in the situation at bar here, "[w]here a public employer has negotiated with an employee union and signed a collective-bargaining agreement, it has contractually agreed to the legitimacy of the union and of its employees' association with the union . . . [t]he public employer has presumably received the benefit of its bargain, and is estopped from claiming that its 'interests as an employer' are inconsistent with the freedom of its employees to associate with the union or to file grievances in accordance with its procedures." *Shrum*, 449 F.3d at 1139 (citing *Butcher,* 956 F.2d at 979 (once a public employer signs a collective bargaining agreement, it no longer can assert a "legitimate interest in whether its firefighters elected to join the union and participate in its activities"). "If a public employer retaliates against an employee for engaging in acts protected by the collective-bargaining agreement . . . then the employer cannot rely on the *Pickering* test to avoid First Amendment scrutiny. *Id.*

The facts at issue here, considered in the light of these legal principles, foreclose any possibility that Defendants actions can pass constitutional muster. Rather they must be held to have violated Professor Murray's First Amendment associational rights.

### e.    *Due Process Violations*

"Under the Due Process Clause of the Fourteenth Amendment, persons who possess a property interest in continued public employment cannot be deprived of that interest without due process of law." *Figueroa-Serrano v. Ramos-Alverio*, 221 F.3d 1, 5–6 (1st Cir. 2000). "At a minimum, due process rights entitle such individuals to 'notice and a meaningful opportunity to

respond' prior to termination." *Id.* (quoting *Kercado–Melendez v. Aponte–Roque,* 829 F.2d 255, 263 (1st Cir.1987)).

"It has long been clearly established that a tenured professor enjoys a property right sufficient to invoke procedural due process protections." *Cotnoir v. Univ. of Maine Sys.*, 35 F.3d 6, 10 (1st Cir. 1994) (citing *Perry v. Sindermann,* 408 U.S. 593, 601 (1972)).

Here, there has been an incredibly long, sham investigatory process that remains ongoing, during which Professor Murray was banished from campus, had his communications restricted, had his personal and professional reputation dragged through the mud, and he was and is categorically prevented from accessing the academic and professional community at CCRI in pursuit of the furtherance of his academic and professional career.  In addition, his banishment was extended and its scope increased, including the imposition of even more draconian restrictions on his speech, and he has sustained a loss of income due to the elimination of his paid, elected Chair position.  All of these deprivations occurred based on restrictions imposed ***before*** any kind of process has been afforded.

While Defendants frame these deprivations inflicted on Professor Murray as "paid administrative leave" the excessive and continued length, the severe and extreme restrictions on protected speech, the extensive reputational harm, and the economic losses he has suffered take this far beyond the garden variety paid suspension pending a speedy resolution to which no due process rights attach.  *Compare Collins v. Univ. of New Hampshire,* 746 F. Supp. 2d 358, 369 (D.N.H. 2010), *aff'd*, 664 F.3d 8 (1st Cir. 2011) (when a " 'paid suspension [. . .] cause[s] only a very temporary deprivation of job functions and no financial loss, [it does] not give rise to any constitutional entitlement to due process' " and such "a suspension with pay is not a deprivation of such serious magnitude as to require a pre-deprivation hearing.") *with Torres-Rosado v. Rotger-Sabat,* 335 F.3d 1, 10 n. 8 (1st Cir. 2003) ("it is conceivable that a very long or open-

ended paid suspension might function so much like a termination that some due process protection might attach.").

Here, the incredibly long and open-ended suspension alone places the deprivation suffered by Professor Murray outside the ambit of a paid suspension to which no due process attaches. The additional restrictions on speech, reputational harm, and economic losses only further demonstrate that the actions of Defendants against him amount to a deprivation for which he was and is entitled to due process in the form of a pre-deprivation hearing. Defendants did not provide such a hearing however, because the entire purpose and goal of their sham proceedings was to banish and silence Professor Murray without allowing the utterly ridiculous substance of the charges against him to be seriously examined and tested by a proceeding which comports with minimum due process, a proceeding which they know they could not withstand.[10]

### B.    Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Swartzwelder*, 297 F.3d at 241 (quoting *Elrod*, 427 U.S. at 373). "When a government employer's restrictions on employee speech tread on First Amendment interests, those restrictions work irreparable injury." *Amalgamated Transit Union Loc. 85*, 39 F.4th at 107–08. Here, over eight (8) months of the loss of First Amendment freedoms with no end in sight is doubtless irreparable harm.

Further, "it is well-established that 'reputational injury can be used to establish irreparable harm in certain circumstances.' " *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 30 (D.D.C. 2010) (quoting *Trudeau v. Fed. Trade Comm'n*, 384 F.Supp.2d 281, 297 (D.D.C.2005), *aff'd, 456 F.3d 178* (D.C.Cir.2006); 11A Wright, Miller & Kane, FED. PRAC. & PROC. § 2948.1).

---

[10] Indeed, Defendants have admitted as much in exonerating Professor Murray of the initial allegations against him, admitting that there was no substance to them under Title IX and Defendant CCRI's anti-discrimination policy.

Here Plaintiff's reputation has been and continues to be severely damaged by the actions of Defendants. as they strongly insinuate that Plaintiff may have engaged in serious misconduct based on what is, in actuality, conduct that is indisputably both protected and innocuous. Additionally, banishment and exile are historically meted out only as criminal punishments for those found guilty of serious criminal wrong-doing and as such inflict irreparable harm. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 474 (1977) (banishment and exile historically considered criminal punishment); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169 n.23 (1963) (same). Finally, Defendants draconic restrictions on Professor Murray's speech are greatly exacerbating this irreparable harm by preventing him from publicly or privately defending himself and his reputation, foreclosing not only his right to be heard within a process that comports with minimum due process, but effectively his right to be heard at all.

Accordingly, there can be no doubt that Professor Murray has and continues to suffer irreparable harm as required for the granting of the preliminary injunctive relief he now asks this Court to grant him.

### C.    Balancing the Hardships and Effect of Injunctive Relief on the Public Interest

"When the government is a party, the last two prongs of the injunction analysis merge." *Black Lives Matter Seattle-King Cnty*, 466 F. Supp. 3d at 1215 (citing *Drakes Bay Oyster Co.*, 747 F.3d at 1092; *Nken*, 556 U.S. at 435). "As to the balance of hardships, 'serious First Amendment questions compel[ ]' a finding that the 'balance of hardships tips sharply in [the plaintiffs'] favor.' " *Id.* (quoting *Cmty. House, Inc*, 490 F.3d at 1059 (alteration in original)). "[A]s to public interest, 'it is always in the public interest to prevent the violation of a party's constitutional rights.' " *Id.* (quoting *Melendres*, 695 F.3d at 1002).

In light of the particular manner in which these elements of the normal preliminary injunctive relief test are analyzed and weighted in a First Amendment case such as this, Plaintiff has certainly carried his burden. Even without the unique weighing in favor of granting preliminary injunctive relief in the First Amendment context, there is simply no hardship to Defendants in this case and injunctive relief is squarely in the interest of the public and the public good. Indeed "both parties also share an interest in speed and accuracy in the adjudication of charges" but no one has a legitimate interest in drawn out investigations and proceedings of facially innocuous behavior which unconstitutionally silence an effective and skilled teacher, administrator, and union advocate. *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 66 (1st Cir. 2019).

Allowing Professor Murray to return to work will have no deleterious effect on Defendant CCRI. Any interest in protecting the complainants is purely general and does not apply to the facts of this case. Abbascia is gone. Sneesby and Professor Murray have communicated indirectly through the CCRIFA listserv relative to union and governance matters and will need to continue to do so in light of his many duties as CCRIFA Vice President, more so if he is elected President. Del Sesto's complaint involved a one-off interaction, which at worst was impolite, that was previously resolved as a "non-disciplinary" matter. Nevertheless, to the extent that there is any legitimate interest in limiting communications, a limited no-contact order—which is the norm—is surely the proper solution rather than the sweeping banishment and restrictions on nearly all speech with the CCRI community Defendants have imposed. As such, the balance of the hardships, under any iteration of the test applied, strongly favor the issuance of preliminary injunctive relief here.

## VI.    CONCLUSION

**WHEREFORE**, for all the foregoing reasons, Plaintiff moves this Courts to grant his Motion for Temporary Restraining Order and Preliminary Injunctive Relief and award Plaintiff the relief as prayed for therein.

Plaintiff hereby designates Richard A. Sinapi, Esquire, as trial counsel.

**Plaintiff,**
By his attorneys,

Date:  **November 9, 2023**          /s/ **Richard A. Sinapi**
                                                     **Richard A. Sinapi, Esq**.  (#2977)
                                                     **Chloe A. Davis, Esq.** (#9334)
                                                     Sinapi Law Associates, Ltd.
                                                     2374 Post Road, Suite 201
                                                     Warwick, RI 02886
                                                     Phone:  (401) 739-9690; FAX:  (401) 739-9040
                                                     Email: ras@sinapilaw.com; cad@sinapilaw.com