# EXHIBIT S



Sinapi Law Associates Ltd.

2374 Post Rd Suite 201     20 Cabot Blvd Suite 300     (401) 739-9690
Warwick, RI 02886          Mansfield, MA 02048           sinapilaw.com

March 29, 2023

Ronald Cavallaro, Esq.
Office of the General Counsel
Community College of Rhode Island
400 East Avenue
Warwick, RI 02886
Email: rcavallaro@ccri.edu

RE:     **Client**:      **Prof. Steven D. Murray, Esq.**
        **Employer**:    **Council on Postsecondary Education and the Community College of Rhode Island**
        **Matter**:      *Immediate restoration of rights to concerted action under R.I. Gen. Laws §28-7-12 and rights to free speech and association and due process of law*

Dear Ron:

## I.     Introduction

Please be advised that the undersigned and this firm represent **Prof. Steven D. Murray, Esq.**, relative to the above cited matter. This letter constitutes notice to the **Council on Postsecondary Education and the Community College of Rhode Island** ("CCRI") of my client's demand that it forthwith restore and remove all impediments to his right to concerted action protected under R.I. Gen. Laws §28-7-12 and rights to free speech and association and due process under the State and Federal Constitutions, failing which my client will have no choice but to file an action in federal court seeking declaratory and injunctive relief and monetary damages.[1] My client's foregoing demand for relief arises out of CCRI's issuance of a baseless and frivolous purported Title IX complaint against my client to justify an administrative suspension without a hearing in order to justify barring him from campus, denying him access to the campus email system, and prohibiting him from communicating with the Presidents of the faculty Union and Senate, in order to silence him from participating in a closely contested debate over approval of a proposed tentative contract ("T.A."), with respect to which my client is the most vocal and ardent faculty opponent.

## II.    Summary and Background

### *Background to Dispute*

My client is a member of the Bars of the U.S. District Court in Rhode Island, Rhode Island, Massachusetts and the Supreme Court of the United States and a former Assistant Attorney General for the State of Rhode Island. He has taught law courses at CCRI for almost 32 years. He was President of the faculty union, CCRIFA, from April of 2018 until November of 2022. He is currently an alternate member to the CCRIFA executive committee. He has a stellar record of largely "exceeds expectations" annual reviews and has never been disciplined by CCRI. Has been Chair of the Criminal Justice department since on or about 2012 and recently received an overall "outstanding evaluation" and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty." However, as a vocal and passionate advocate seeking to improve the terms and conditions of employment of and on behalf of his co-worker union faculty members, he is and has been frequently at odds with CCRI management. He has also been a vocal critic of the lack of meaningful shared management between the faculty and CCRI. Over the years he has filed numerous grievances against CCRI, nearly all of which have been

---

[1] ***All representations contained herein*** are conveyed to you on the express condition that the same shall neither be construed nor considered an admission against interest and are offered for settlement purposes only. Likewise all documentary materials herewith and heretofore provided to you are for settlement purposes only and have been sent on the express condition that the same shall not be construed as nor considered an admission against interest of my client. Accordingly, this letter is a privileged settlement communication pursuant to Federal Rule of Evidence 408 and similar applicable state rules, and therefore may not be used against my client in any subsequent litigation.

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 2 of 12

successful, including one that was settled last fall. Perhaps most significantly, he currently is also a vocal advocate critical of the proposed T.A. endorsed both by union leadership and CCRI, which is the subject of recent intense and fervent debate among the CCRI stakeholders. It is against this backdrop, that calculated and clearly concerted adverse action has been taken against him by CCRI in an attempt to silence him, and as a consequence have seriously impaired and deprived him of his right to engage in concerted action and his rights to free speech and assembly and due process.

### *Unlawful Conduct by CCRI*

On February 28, 2023, on the midst of a fierce debate and imminent vote on the above mentioned T.A., my client was locked out of his office, denied access to his CCRI email account—which ,under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others the current CCRIFA and Faculty Senate presidents.. The basis of this action against my client by CCRI was purported Title IX gender and/or non-discrimination violations arising out of three totally separate and unrelated communications ("Complaint"), one of which occurred over *one month* prior and two of which occurred about two weeks prior to the issuance of the Complaint. A copy of the Complaint and notice of placement on administrative leave is attached. ***All of the communications involved concerted union activity protected under R.I. Gen. Laws §28-7-12 —collective bargaining or union governance.*** The substance of the allegations of all three of the complainants at issue is the subjective belief or "perception" of each that my client was apparently critical of their conduct and that his demeanor and tone was offensive to them—invoking the mantra "bullying," with two of them opining that they believed they were targeted because they were women.

### III.    Violations of Law and Regulations

#### A.    The Complaint is Substantive and Procedurally Deficient

##### *Substantive Deficiency*

Aside from being clearly pretextual and retaliatory, the Complaint is substantively deficient. Neither Title IX nor any other "nondiscrimination" law enforceable under CCRI policies and procedures were designed to create a general civility code.[2] Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope

---

[2]    ***Title IX***. *Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.,* 947 F.3d 342, 350 (6th Cir. 2020) ("Plaintiffs cannot be faulted for finding Frye's use of the term "pussy" offensive, even in a football setting. But crude or vulgar language alone does not rise to the level of a Title IX violation. After all, Title IX, like Title VII, is not a "general civility code."); *Wolfe v. Fayetteville, Arkansas Sch. Dist*., 648 F.3d 860, 867 (8th Cir. 2011)("[T]to recover [under] Title IX . . ., Wolfe had to prove the harassment complained of amounted to more than mere name-calling; he was legally required to show the harasser intended to discriminate against him "on the basis of sex," meaning the harassment was motivated by either Wolfe's gender or failure to conform with gender stereotypes."); *Moeck v. Pleasant Valley Sch. Dist*., 179 F. Supp. 3d 442, 447–48 (M.D. Pa. 2016) ("According to the plaintiff the sexual harassment she endured is as follows: Coach Getz 'would call people a pussy, a faggot. Heard once, string bean arms. He would curse almost every single letter in the alphabet. He would say fuck. He would call people assholes.' He additionally used the word 'bitch'. He used these words, however, to the boys not to plaintiff or her sister. Additionally, plaintiff notes that Coach Getz told teammate J.J. to 'penetrate all the way through like he was having sex with a girl.' These statements were not made to the plaintiff and are mere vulgarity, thus, we will not consider them sexual harassment of the plaintiff.")(internal citations to record omitted).

***Title VII***. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) ("Title VII, we have said, does not set forth "a general civility code for the American workplace.") (citing *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *Rios-Jimenez v. Princi*pi, 520 F.3d 31, 44 (1st Cir. 2008) ("[T]he federal employment discrimination laws do not establish a 'general civility code' for the workplace."); *Lee-Crespo v. Schering-Plough Del Caribe Inc.,* 354 F.3d 34, 37 (1ˢᵗ Cir. 2003) ("A jury could easily find that Lee–Crespo was subjected to

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 3 of 12

of the law.[3]  To support a claim, the conduct must be extreme and not merely rude or unpleasant.[4]  Nor does conduct come within the scope of the law because the complainant invoked the mantra "bullying."[5]  Moreover, conduct is not

---

incivility.  But Title VII is neither a civility code nor a general anti-harassment code.  Title VII requires, rather, that the level of incivility or harassment must amount to either a tangible or a constructive employment action."); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003)("On the other hand, we have repeatedly emphasized that anti-discrimination laws do not create a general civility code."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not create a claim for all unpleasant or abusive behavior in the workplace; it is not a general civility code and does not apply to the normal tribulations of the workplace, such as the sporadic use of abusive language, race-related jokes and occasional teasing.  The conduct must be extreme to amount to a change in the terms and conditions of employment."); *Montalvo-Figueroa v. DNA Auto Corp*., 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019)(Nevertheless, the harassment must pass a certain threshold of severity.  Mere discomfort is insufficient.  Title VII was not intended to be a "general civility code" for the workplace, so "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.")(internal citations and quotations omitted); *Thompson v. McDonald*, No. 16-80811-CIV, 2019 WL 11314995, at *6 (S.D. Fla. Mar. 25, 2019), aff'd sub nom. *Thompson v. Sec'y, U.S. Dep't of Veterans Affs.*, 801 F. App'x 688 (11th Cir. 2020) ("[T]itle VII is not a general "code of civility," and its prohibition against workplace harassment is limited to situations where the abusive workplace behavior is related to a protected classification, such as sex, race, or national origin.").

[3]  *Shaver v. Indep. Stave Co*., 350 F.3d 716, 721 (8th Cir. 2003) ("Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law."); *accord*; *May v. Delta Air Lines*, No. CV 21-710 ADM/ECW, 2022 WL 2835123, at *7 (D. Minn. July 20, 2022), appeal dismissed sub nom. *May v. Delta Air Lines, Inc*., No. 22-2763, 2022 WL 18779768 (8th Cir. Nov. 2, 2022);  Elghoul v. United States, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. *Elghoul v. McDonough*, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022); *Thompson v. McDonald*, No. 16-80811-CIV, 2019 WL 11314995, at *6 (S.D. Fla. Mar. 25, 2019), aff'd sub nom. *Thompson v. Sec'y, U.S. Dep't of Veterans Affs*., 801 F. App'x 688 (11th Cir. 2020)*Andrews v. Green Bay Packaging, Inc.,* No. 4:17CV00788 JM, 2019 WL 1053612, at *7 (E.D. Ark. Mar. 5, 2019); *Guimaraes v. SuperValu, Inc*., No. CIV. 10-366 RHK JSM, 2010 WL 5099648, at *9 (D. Minn. Dec. 8, 2010), aff'd, 674 F.3d 962 (8th Cir. 2012); ); *Kent v. Iowa*, 651 F. Supp. 2d 910, 937 (S.D. Iowa 2009); *Miles v. Wal-Mart Stores, Inc*., No. 06-5162, 2008 WL 222694, at *4 (W.D. Ark. Jan. 25, 2008); *Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006); *Munoz v. Adventure Lands of Am., Inc*., 957 N.W.2d 324 (Iowa Ct. App. 2021); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing [do not rise to the level of a Title VII violation].."); *Suarez v. Pueblo Int'l, Inc*., 229 F.3d 49, 54 (1st Cir.2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins.").

[4]  *Stoddard v. BE & K, Inc*., 993 F. Supp. 2d 991, 1002 (S.D. Iowa 2014); *accord Munoz v. Adventure Lands of Am., Inc.,* 957 N.W.2d 324 (Iowa Ct. App. 2021); *see Wilkie v. Dep't. of Health & Human Servs.,* 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be *extreme*," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace.") (emphasis added) (citation omitted); *accord Barron v. Decare Dental, LLC*, No. CIV. 12-699 RHK/SER, 2013 WL 3989786, at *6 (D. Minn. Aug. 2, 2013);  *LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir. 2001) ("Moreover, "[not] everything that makes an employee unhappy is an actionable adverse employment action [instead] an adverse employment action is exhibited by a material disadvantage, such as a change in salary, benefits, or responsibilities."); *accord Elghoul v. United States*, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. *Elghoul v. McDonough*, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022).

[5]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended and does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Whitley v. Indep. Sch. Dist. No. 10 of Dewey Cnty., Oklahoma*, No. CIV-18-331-SLP, 2019 WL 7667329, at *5 (W.D. Okla. Apr. 22, 2019) ("Under Title IX, the prohibited discrimination does not include bullying, but the prohibited discrimination does include sexual harassment. The harassment must be "gender-oriented," and it must be more than mere name-calling."); *see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs*., 327 F.3d 771, 782 (8th Cir. 2003)("Each Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient. Whether . .

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 4 of 12

subject to sanction under Title IX merely because it was directed at someone of the opposite sex—in this case women.[6]  In addition, mere subjective feelings or perceptions are insufficient; the conduct complained of must also satisfy an objective standard that meets all of the foregoing elements of a claim.[7]  The Complaint clearly does not even meet the broad definition gender related adverse conduct prohibited under CCRI's policies and procedures.[8]  Finally, if that was not enough,

### *Procedural Deficiency*

The complaint is also procedurally deficient, because it unlawfully combines three totally separate and distinct interactions/communications in an attempt to "pile on" and prejudice my client—and for that reason also violates due process of law.  The only real similarity between the three situations that is noteworthy is that they all arise out of and relate to conduct protected under R.I. Gen. Laws §28-7-12 as discussed in detail below.  Combining such separate and distinct complaints violates applicable law regarding the Title IX complaint procedure.[9]

---

. . harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well-being of employees is a question to be determined in light of the totality of the circumstances.")

[6]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.*, No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended . . .  to provide them recourse for mistreatment that is not based on sex."); .); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016) ("A review of all these statements reveals fewer than ten sexually-tinged comments over the course of two or three years.  Such sporadic incidents are not sufficiently pervasive to establish a sexual harassment claim, the statements are mere offensive utterances.  While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way.  Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner."); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations.  The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (internal quotations omitted); *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011)( "[A]cts of name-calling do not amount to sex-based harassment, even if the words used are gender-specific, unless the underlying motivation for the harassment is hostility toward the person's gender."); *Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir.2011) (stating harassment is actionable under Title IX only if it is "based on sex, per the words of Title IX, and not merely tinged with offensive sexual connotations" and affirming summary judgment where record fails to suggest the harasser "was motivated by anything other than personal animus.").

[7]  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.. . . We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."); *accord  Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006).

[8]   Council on Postsecondary Education, *Title IX Sexual Harassment Policy and Procedures*, Sec. VIII (Definitions)(describing prohibited conduct under the policy).

[9]   Joint Guidance on Federal Title IX Regulations: *Summary Analysis of Sections § 106.45(b)94): Consolidation of Complaints* ("[A] single investigatory and adjudicatory process may be used where it arises from the same incident and parties."); Council on Postsecondary Education, *Title IX Sexual Harassment Policy and Procedures*, Sec. XIX (Consolidation of Formal Complaints)("The Covered Entity may consolidate Formal Complaints of Sexual Harassment where the allegations arise out of the same facts or circumstances.").

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 5 of 12

**B.      The Complaint Process was Utilized as a Pretext Designed to Prevent the Exercise of Protected Rights to Concerted Action and Free Speech and Association**

The allegations in the Complaint fail to establish even a colorable Title IX violation.  In addition, the subject matter of all the communications at issue were all related either to the union, collective bargaining/terms and conditions of employment, or the CCRI administration.  As such, the communications were, therefore, clearly and indisputably protected from adverse action by CCRI under applicable labor and constitutional law.  CCRI nevertheless issued a facially and obviously deficient Title IX complaint on the basis thereof and utilized it as a pretext to silence my client by placing him on administrative leave and banning him from campus, barring his access to his school email and sole means of communicating with his fellow union faculty members, and prohibiting him from communicating with the CCRIFA and Faculty Senate presidents.

*Allegations in the Complaint Fail to Establish Even a Colorable Title IX Complaint*

None of the three communications/interactions in the Complaint come remotely close to amounting to even a *prima facie* claim of discrimination prohibited under Title IX.[10]   The conduct complained of in the Complaint is nothing more than personal perceptions and subjective feelings of the complainants that the language, tone, and/or demeanor of my client in the communications was offensive or upsetting to them.  There are no allegations in the Complaint of any vulgarity, unwanted touching, threats of violence, or criminal conduct.  None of the complainants claimed they were in fear for their physical safety.  As discussed in Section III.A. above, Title IX is neither a civility code nor a general anti-harassment code.

**Complainant Del Sesto** alleges that she subjectively felt "uncomfortable" and was "caught off guard by [my client's] unexpected visit and demeanor" when he came to her office and "in summary was *speaking negatively about the PTFA, contract, administration and his role*."  She does not even subjectively claim that the conduct complained of was in any way related to gender.

**Complainant Sneesby** alleges that my client "emailed the faculty stating derogatory things about me or my performance at work."   Ms. Sneesby is *President of the Faculty Senate and the email chain to which she refers and on which her allegations were based related to my client's criticism of her performance in that capacity*.  She also alleges my client is "condescending and dismissive and particularly targets females," without any factual basis or context for this self-serving,  subjective opinion.

**Complainant Abbascia** complains about what she perceives as my client's "unprofessional, bullying, threatening tone in emails."  *The context of these communications is all union related and arise out of her role as union president*.  She alleges that my client called her a "lame duck" president—apparently arising out of announcement that she is leaving the college and her role as President of the union in June, prior to the end of her

---

[10]   Individual employee are not liable under Title VII; therefore, it is inapplicable here.  42 U.S.C. § 2000e–2(a)(1) (Section 703(a) of Title VII forbids *an employer*—"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or *752* privileges of employment, because of such individual's ... sex.") (emphasis added); *Fantini v. Salem State Coll*., 557 F.3d 22, 30 (1st Cir. 2009) ("After reviewing the analysis fashioned by all of our sister circuits, we are persuaded by their analysis and therefore take this opportunity to determine as they have that there is no individual employee liability under Title VII.");  *Mancini v. City of Providence*, 155 A.3d 159, 168 (R.I. 2017) (Rhode Island Fair Employment Practices Act "does not provide for the individual liability of an employee of a defendant employer.").

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 6 of 12

term of office (an objectively accurate description in light of the definition of that term)[11], called into question her ability to do her job as union president, called for her resignation, and "verbally told faculty members that [my client] is trying to oust [her] as CCRIFA President."  While she asserts the obvious, that she is being targeted as union president, she subjectively opines that it is also because she is a woman.

### *Inference of Pretext is Compelling and Undeniable*

**Content**.  The Complaint is so obviously devoid of any facts sufficient to establish a cognizable claim, that no reasonable college administrator could believe otherwise or would issue a Title IX complaint based thereon.  First, at worst, the communications are "rude, abrasive, or unkind," which is not actionable according to black letter law.  Second, Title IX is not a general civility code, it does not prohibit conduct merely because a complainant alleges "bullying."  Moreover, the email threads that form the basis of the allegations by two complainants, of which CCRI was clearly well aware, document that these were no more than passionate discussions among people in an emotionally charged debate.  Third, the conduct clearly does not pass the high bar necessary to establish a Title IX violation in this context established in *Harris v. Forklift Sys., Inc*.:  conduct that is so severe and pervasive to create an objectively hostile or abusive work environment based on "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  510 U.S. 17, 21-23.  Fourth, and finally, despite self-serving, subjective perception opinions, there is no "gender" nexus to the communications/conduct complained of, as it is undisputable that even if "offensive and inappropriate, the statements do not address [the complainants] in a sexual way.  Significantly, [they were] not sexually propositioned, physically threatened or touched in a sexual manner."  *Moeck v. Pleasant Valley Sch. Dist*., 179 F. Supp. 3d 442, 447–48 (M.D. Pa. 2016).

**Timing.**  The issuance of the Title IX complaint on February 28, 2021, during the midst of a heated debate and on the eve of a vote on the T.A. on which the faculty was closely divided, was clearly calculated to silence my client.  The T.A. had been endorsed by union leadership and CCRI, and it was modified already at least once due to my client's criticisms and vigorous appeals to his fellow faculty members, which were communicated almost exclusively through the CCRI email system.  The issuance of the Complaint at that time had the obvious purpose and the undeniable effect of silencing the most vocal and ardent opponent of the T.A.  Notably, although the Complaint was issued at the end of February, the events about which DeSesto complained took place on January 19, 2023, originally took the form of an oral complaint, and was dealt with at a meeting between my client, his union representative, and Dean Stargard on ***January 23, 2023***.  Similarly, the email chains which formed the basis of the Sneesby and Abbascia allegations took place almost two weeks prior to the issuance of the Complaint.

**Motivation**.  Both CCRI and the complainants were motivated by a desire to ensure passage of the T.A. by gagging my client.  All the agents of CCRI involved in the issuance of the Title IX complaint—Sybil Bailey, Director of Human Resources, Kara DiPaola, Esq, Assistant Director, Affirmative Action & Equal Opportunity Title IX & Section 504/ADA Coordinator, and Rosemary Costigan, Vice President for Academic Affairs, based on their knowledge and experience, *well knew that the complaint was baseless and frivolous and were motivated to take affirmative action to ensure the T.A. passed*.  The desire of Ms. Sneesby, as Faculty Senate president, and Ms. Abasscia, as CCRIFA president, to pass the T.A. was equally strong.  The motivation of Ms. DelSesto, as the assistant to Ms. Costigan, second in command at CCRI, is self-evident.

**Protected Communications**.  Insofar as the subject matter of all the communications at issue were all related either to the union, collective bargaining/terms and conditions of employment, or the CCRI administration and were,

---

[11]  *The Britannica Dictionary*: "1 . . .  an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help."  https://www.britannica.com/dictionary/lame-duck

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 7 of 12

therefore, clearly and indisputably protected from adverse action by CCRI under applicable labor and constitutional law (as discussed in detail below), that CCRI would nevertheless issue a facially and obviously deficient Title IX complaint on the basis thereof, provides further compelling evidence that the complaint was issued as a pretext to silence my client. Moreover, taking adverse action against my client on the basis of these protected communications, under the circumstances presented, constitutes an unfair labor practice in violation of R.I. Gen. Laws §28-7-13 (10).

### *Deprivation of Right to Concerted Action*

**Concerted Action**. It is beyond doubt that my client was involved in concerted activity protected under the Rhode Island Labor Relations Act, R.I. Gen. Laws §28-7-1, *et seq*. ("Act") when he was engaged in the communications with Ms. Sneesby and Ms. Abbascia referenced in the Complaint and when using the CCRI email system to communicate with other union faculty members regarding the TA..[12] The right to concerted action lies at the heart of the protections under the Act and National Labor Relations Act ("NLRB") on which it was patterned.[13] Additionally, his communications and interactions with Ms. DelSesto referenced in the Complaint arose out of and were related to his attempt to speak to Dean Stargard regarding confusing emails being sent out by DelSesto related to prorated adjunct pay issue—conduct arguably protected under the Act in his capacity as an alternate to the CCRIFA executive board. Moreover, CCRI well knew that the interaction/communications were protected conduct and outside the purview of either a disciplinary or Title IX complaint, and it has refused to process complaints of this very type on my client's behalf.[14]

---

[12] The Rhode Island Labor Relations Act, R.I. Gen. Laws §28-7-1, *et seq*. ("Act"), was designed to, among other things, "protect employees in the exercise of full freedom of association, self-organization, and designation of representatives of their own choosing for the purposes of collective bargaining, or other mutual aid and protection, free from the interference, restraint, or coercion of their employers." R.I. Gen. Laws §28-2-(d). R.I. Gen. Laws §28-7-12 ensures the right of employees to "engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection free from interference, restraint, or coercion from any source." The Act closely mirrors the federal National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169, in particular, § 7 of the NLRA, 29 U.S.C. § 157. Section 7 guarantees employees the right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

[13] *McLaren Macomb and Local 40 RN Staff Council, Office and Professional Employees, International Union (OPEIU) AFL-CIO*, Case 07-CA- 263041 (decided August 31, 2021) ("The broad scope and the wide protection afforded employees by Section 7 of the Act bear repeating. 'It is axiomatic that discussing terms and conditions of employment with coworkers lies at the heart of protected Section 7 activity." *St. Margaret Mercy Healthcare Centers*,350 NLRB 203, 205 (2007), enfd. 519 F.3d 373 (7th Cir. 2008). Section 7 rights are not limited to discussions with coworkers, as they do not depend on the existence of an employment relationship between the employee and the employer, and the Board has repeatedly affirmed that such rights extend to former employees. It is further long-established that Section 7 protections extend to employee efforts to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). These channels include administrative, judicial, legislative, and political forums, newspapers, the media, social media, and communications to the public that are part of and related to an ongoing labor dispute.").

[14] Sometime on or about 2018-2019, a female faculty member, Soudabeh Valicenti (Chair of the CCRI Math Department), was in a meeting with NEARI regarding a complaint that a staff member in the Math department had brought against Valicenti. My client was the Faculty Association president at the time and his office was near the conference room and he could hear people yelling. Valicenti exited the conference room and charged over to and pointed a finger in my client's face and stated, among other things, words to the effect of "you tell that 'cocksucker motherfucker' John Leidecker" (the NEARI representative at that meeting) and proceeded to vent her complaints to him. My client filed a complaint with CCRI HR for the manner in which Valicenti addressed and spoke to him. Sybill A. Baily, Director of H.R., responded by email that it was none of HR's concern since it was a "Union matter."

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 8 of 12

**Unfair Labor Practices**.  Regardless of whether his communications underlying the frivolous Complaint was protected, his being banned from campus, barred from using his CCRI email, and prohibited (at least initially) from communicating with Ms. Sneesby, Faculty Senate president, and Ms. Abbascia, CCRIFA president, about any matters, violated his right to engage in concerted conduct and constituted an unfair labor practice.[15]

    *Banning communications*. First, "[i]t is axiomatic that that an employees' right to discuss, debate, and communicate with each other regarding workplace terms and conditions of employment" is protected under the Act.  *See United States Postal Serv., & Roy Young, an Individual,,* No. 14-CA-195011, 2021 WL 1087421 (Mar. 18, 2021) (interpreting and applying Section 7 of the NLRA). Barring my client from communicating with Ms. Sneesby and Abbascia violated this right. Second, the Supreme Court has acknowledged "the importance of freedom of communication to the free exercise of organization rights" under the *NLRA. Cent. Hardware Co. v. N.L.R.B.*, 407 U.S. 539, 542–43 (1972).

    *Barring access to CCRI email*.  The Court has also recognized that this right "necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hosp. v. N.L.R.B.*, 437 U.S. 483 (1978).  CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions."  In a similar context, the NLRB has ruled that it is an unfair labor practice to bar or restrict access to company email, where "an employer's e-mail system provides the only reasonable means for employees to communicate with one another." *United States Postal Serv., & Roy Young, an Individual,,* No. 14-CA-195011, 2021 WL 1087421 (Mar. 18, 2021).  It is undisputed that mass email via the CCRI email was the primary if not sole means of communications regarding union business, including the proposed T.A., used by the CCRI faculty.  Barring my client from use of CCRI email undisputably "interfere[d] with [and] restrain[ed]" my client's exercise of his right to concerted action protected under R.I. Gen. Laws §28-7-12 and therefore constituted and unfair labor practice prohibited by R.I. Gen. Laws §28-7-13 (10).

    *Pretextual Title IX Complaint*.  Interpreting Title IX and its own policies and procedures as authorizing the issuance of a Complaint and imposing pre-determination sanctions based on heated discussions among union faculty members which CCRI deems "uncivil" or "unprofessional" also violates my client's and all other union members' right to collective action and constitutes an unfair labor practice prohibited by R.I. Gen. Laws §28-7-13 (10).  This is so because the actual, necessary, and intended effect of this practice is to impair and chill the exercise of collective action rights out of fear of being disciplined if CCRI disapproves of the tone or content of the communications between members.  *See N.L.R.B. v. Ne. Land Servs., Ltd.*, 645 F.3d 475, 481–83 (1st Cir. 2011) (The "mere maintenance" of a rule that "would reasonably tend to chill employees in the exercise of their Section 7 rights" is unlawful.).

### Deprivation of Rights to Free Speech and Association

    Insofar as CCRI is a public college and employer, in addition to the statutory protection for concerted action, my client's communications and his ability to communicate are also protected by the First Amendment.[16]  Freedom

---

    [15]  R.I. Gen. Laws §28-7-13 (10) provides that it is an unfair labor practice to "[d]o any acts . . . that interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by § 28-7-12."

    [16]  *Healy v. James*, 408 U.S. 169, 171, 92 S. Ct. 2338, 2341, 33 L. Ed. 2d 266 (1972) (We also are mindful of the equally significant interest in the widest latitude for free expression and debate [on a state college campus] consonant with the maintenance of order.  Where these interests appear to compete, the First Amendment, made binding on the States by the Fourteenth Amendment, strikes the required balance.").  Accordingly, my client's rights to freedom of speech and association

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 9 of 12

of speech and that of the press are fundamental personal rights and liberties, and the exercise of these rights lies at the foundation of free government by free people.[17]  The Supreme Court has recognized that the First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open," and has consistently commented on the central importance of protecting speech on public issues.[18] Moreover, if anything, the need for the free exchange of ideas in this context is even more crucial.[19]  Where, as here, a public college has made its facilities available[20] as a forum generally open for use by students and/or teachers, "[t]he Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place."[21]  "[D]enial of access to the customary media for communicating with the administration, faculty members, and other students . . . must be subjected to the level of scrutiny appropriate to any form of prior restraint."  *Widmar v. Vincent*, 454 U.S. 263, 268 n.5.  Accordingly, only a "compelling governmental interest" can justify barring access to customary means of communication at a public college.  *Id.* at 278.

My client was banned from campus, locked out of his office, barred from access to his school email account, and prohibited from contacting, among others, the Presidents of the CCRIFA and Faculty Senate—originally, for any purposes.  The purported basis of this action was the baseless and frivolous Title IX complaint.  Even accepting the allegations in the Complaint as true, there was no compelling governmental justification for this sweeping ban on my client's right to free speech and association.  At best, the Complaint may be a basis for restricting communications with the complainants—but even then, subject to my client's right to communicate with them for purposes of protected concerted activity.[22]

---

are protected under the First and Fourteenth Amendments to the United States Constitution and under Article 1, §§20 and 21 of the Rhode Island Constitution.  He is entitled to relief for violation of her federal constitutional rights pursuant to 42 U.S.C. §1983 and seeks relief directly under the Rhode Island Constitution for violation of her state constitutional rights, *Jones v. State of Rhode Island*, 724 F. Supp. 25, 34-36 (D.R.I. 1989).

[17]  *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 161 (1939).

[18]  *Boos v. Barry*, 485 U.S. 312, 318 (1988)(quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

[19]  *Healy v. James*, 408 U.S. 169, 180–81 (1972) ("[T]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The college classroom with its surrounding environs is peculiarly the "marketplace of ideas," and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom.")(citations and internal quotations omitted).

[20]  *Healy v. James*, 408 U.S. 169, 180–81 (1972) (recognizing meeting facilities, bulletin boards, and school newspaper as public forums); *Giebel v. Sylvester*, 244 F.3d 1182 (9th Cir. 2001) (bulletin boards).

[21]  *Widmar v. Vincent*, 454 U.S. 263, 267–68 (1981) ("Through its policy of accommodating their meetings, the University has created a forum generally open for use by student groups.  Having done so, the University has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms.").

[22]  *See St. Margaret Mercy Healthcare Centers*,350 NLRB 203, 205 (2007), enforced 519 F.3d 373 (7th Cir. 2008) ("It is axiomatic that discussing terms and conditions of employment with coworkers lies at the heart of protected Section 7 activity."). The fact that employers, including public employers, routinely ban employees from company facilities or from communicating with co-workers when investigating internal complaints of discrimination or misconduct does not justify the practice or immunize it from legal challenge or remediation.  Sweeping bans such as this almost always violate the right to concerted action protected under the Act and the NLRB.  In the public employment context, particularly a public college where teachers are engaged in a heated contract debate, these protections apply in full force along with an employee's right to free speech and association as discussed in detail in the text above.

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 10 of 12

## C.    The Complaint Process Violates Due process of Law

"'[T]he root requirement'" of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing *before* [a person] is deprived of any significant property interest.'"[23]  This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment.[24]  This same rule applies, where, as here, a public employee is suspended under the circumstances presented.[25]  Although suspended with pay, my client was nevertheless deprived of his concerted action rights,[26] denied his free speech rights,[27] and stigmatized by the sanctions imposed, including being banished from campus,[28] barred from teaching, and denied access to his school email, which is the primary means of communication among faculty, students, and the administration.  The obvious and significant stigma here is that, in light of his sudden and immediate suspension and cessation of communications, both faculty and students are left to speculate why he is suddenly no longer there and why.  Nor were there any exigent circumstances presented that would justify the need for immediate suspension without hearing—such as criminal conduct, violent behavior, or the treat thereof.  Indeed, all the communications complained of occurred weeks before my client's suspension—one nearly a month prior.[29]  The impairment of his foregoing rights as a consequence of his suspension without a pre-deprivation hearing or any

---

[23]    *Cleveland Bd. of Educ. v. Louder*mill, 470 U.S. 532, 542–43 (1985)(emphasis in original)(quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)); *see Bell v. Burson,* 402 U.S. 535, 542 (1971).

[24]    *Board of Regents v. Roth,* 408 U.S. 564, 569=570 (1972); *Perry v. Sindermann,* 408 U.S. 593, 599 (1972).

[25]    *Ayio v. Par. of W. Baton Rouge Sch. Bd.,* 569 So. 2d 234, 236–37 (La. Ct. App. 1990) (suspension of tenured school bus driver without pre-deprivation hearing violated due process of law where school board interest in immediate suspension was outweighed by driver's property interest in continuing to receive his salary); *see also Gilbert v. Homar,* 520 U.S. 924, 928–29 (1997) (accepting that a suspension infringed the protected property interest of a publicly employed police officer, but recognizing that "[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.") (citation omitted).

[26]    *See, supra*, footnotes 12-15, 22.

[27]    *See, supra*, footnotes 16-21.

[28]    Banishment is an ancient and "harsh punishment" and in this context cannot be considered other than as a *substantial* infringement on a protected property interest.  *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 170 n.23 (1963) ("[T]he forfeiture of citizenship and the related devices of banishment and exile have throughout history been used as punishment.  In ancient Rome, 'There were many ways in which a man might lose his freedom, and with his freedom he necessarily lost his citizenship also.. . . Banishment was a weapon in the English legal arsenal for centuries, 4 Bl.Comm. *377, but it was always 'adjudged a harsh punishment even by men who were accustomed to brutality in the administration of criminal justice.' Maxey, Loss of Nationality: Individual Choice or Government Flat? 26 Albany L.Rev. 151, 164 (1962).") (internal citation omitted).  It was a form of punishment particularly appropriate and effective in situations, where, as here, the individual is deemed disloyal to the sovereign.  *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 474 (1977) ("Generally addressed to persons considered disloyal to the Crown or State, 'pains and penalties' historically consisted of a wide array of punishments: commonly included were imprisonment, banishment,and the punitive confiscation of property by the sovereign.").

[29]    *Ayio v. Par. of W. Baton Rouge Sch. Bd.*, 569 So. 2d 234, 236-237 (La. Ct. App. 1990)(no public interest outweighing right to pre-deprivation hearing, where "at least some of the instances of incompetence with which [the school bus driver] was charged occurred several months before he was suspended, which indicates no exigency was felt to exist by the superintendent or the [school b]oard").

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 11 of 12

circumstance to justify the same or even a prompt post deprivation hearing constitutes a violation of my client's right to due process of law.[30]

## IV.    Conclusion, Remedies Demanded, and Consequences

For the reasons, and in the manner set forth above, CCRI has issued a baseless and frivolous purported Title IX complaint against my client to justify an administrative suspension without a hearing in order to bar him from campus, deny him access to the campus email system, and prohibit him from communicating with the Presidents of the CCRIFA and Senate, and as a consequence have thereby impaired his right to engage in protected concerted activity, infringed on his right to free speech and association, and violated his right to due process of law.

Option 1, my client hereby demands the following immediate relief and in so doing is offering to forego any claim for damages or equitable relief or unfair labor practice on account of the foregoing violations of his rights:

1.    Dismissal of the Title IX complaint.
2.    Termination of his suspension and restoration of all rights and rank of his position.

This is a one-time offer to release all claims in return for the foregoing immediate relief.

Option 2, if CCRI nevertheless insists on pursuing the Complaint, my client demands:

1.    Full restoration of his access to and use of the school email system to allow him to fully exercise his concerted action rights and to access and prepare a defense to the Complaint.
2.    The separation of the Complaint into three separate complaints as they involve different parties, occurred at different times, and are otherwise totally unrelated.
3.    The appointment of separate, unbiased and independent investigators to investigate and issue a report on each of the three complaints, who have no ties or relationship to CCRI or the complainants.[31]

---

[30] *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) ("[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest.. . . In the public employment context, the "stigma-plus" test has been applied to mean that when an employer "creates and disseminates a false and defamatory impression about the employee in connection with his termination," it deprives the employee of a protected liberty interest."); *Cf Goss v. Lopez*, 419 U.S. 565, 578–84 (1975)("We do not believe that school authorities must be totally free from notice and hearing requirements if their schools are to operate with acceptable efficiency. Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.").

[31] Given the subject matter and individuals involved, including the assistant to the second in command at CCRI, as well as my client's historical adverse relationship with CCRI, including as recent, former CCRIFA President, CCRI could not *internally* conduct an independent and unbiased investigation as required by applicable law. *See, e.g., O'Kell v. Haaland*, 2:18-CV-00279-SAB, 2022 WL 1102631, at *7 (E.D. Wash. Apr. 12, 2022) (holding employer unlawfully discriminated/retaliated against employee and finding Human Resources had a conflict of interest, employer should have hired a "a neutral, third-party investigator, given that allegations [of age discrimination and retaliation] were leveled against managers who were working with HR to discipline and ultimately terminate [plaintiff]," and 2) the HR investigator was not impartial because he was assisting management in preparing proposed disciplinary action against the Plaintiff and was "a fact witness and should not have been selected to serve as the investigator.").

Ronald Cavallaro, Esq.
Office of the General Counsel, Community College of Rhode Island
March 29, 2023
Page 12 of 12

In the event CCRI fails to provide the relief as requested in Option 1, then my client will pursue any and all means of relief and redress available for the injuries he has sustained including an unfair labor practices claim, a grievance under the CBA, and a civil action in federal court for declaratory and injunctive relief and damages for violation of his right to free speech and association and due process of law and defamation.  If it is necessary to file such a civil action, my client intends to name as individual defendants, Rosemary Costigan, Sybil F. Bailey, and Kara DiPaola—the individuals responsible for and/or with knowledge of the issuance of the Complaint, each of whom was well aware that the Complaint was baseless, but issued it nevertheless with the intent, purpose, and/or effect of depriving my client of his rights to engage in collective action, free speech and association, and due process of law.[32]

If my client does not receive a favorable response on or before April 4, 2023 by 5:00 p.m., he will assume his offer has been rejected, and he will proceed accordingly.

Very truly yours,

Richard A. Sinapi, Esq.
ras@sinapilaw.com

RAS/ras
Enclosures
cc:     David A. Caprio, Esq., Chairperson, Council on Postsecondary Education, (email only) media@riopc.edu
        Meghan L. Hughes, President, (email only) meghanhughes@ccri.edu; thepresident@ccri.edu
        Rosemary Costigan, Vice President for Academic Affairs, (email only) Rcostigan@ccri.edu
        Sybil F. Bailey, Dir. of Institutional Equity & Human Resources, (email only) Sfbailey@ccri.edu
        Kara DiPaola, Esq., Ass. Dir., Affirmative Action & Equal Oppor., (email only) kddipaola@ccri.edu
        Leslie Florio, NEARI, Assistant Executive Director/UniServ (email only) Lflorio@neari.org
        John E. DeCubellis, Jr. Esq., NEARI, General Counsel, (email only) jdecubellis@nea.org

---

[32]  For all the reasons discussed in detail above, no reasonable college administrator could have believed 1) that the circumstances described in the Complaint amounted to a Title IX violation, 2) that the communications/interactions were not protected concerted conduct beyond the purview of CCRI to regulate, 4) that summary suspension without hearing, under the circumstances, was permissible, and/or 4) that the banishment from campus, denial of access to the school email system, and/or the prohibition on communication for any reason with the presidents of the CCRIFA and Faculty Senate were permissible.  *Perez v. Rodriguez Bou*, 575 F.2d 21, 23–24 (1st Cir. 1978) (In the present case the district court specifically found that none of the defendants participated in any disruptive behavior, that the University campus was calm and tranquil on the day of the march, and that Dr. Rodriguez Bou did not receive any information which would indicate that plaintiffs posed a threat to property, persons, or the orderly carrying out of academic and administrative affairs at the University.  Given these facts and the relevant constitutional standards requiring hearings prior to suspensions, Dr. Rodriguez Bou should have known that summarily suspending plaintiffs would violate their constitutional rights.  Thus . . . [he] "is not immune from liability for damages under s 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected . . ..").  (citations omitted).



**Sinapi Law Associates** Ltd.

2374 Post Rd Suite 201        20 Cabot Blvd Suite 300        (401) 739-9690
Warwick, RI 02886            Mansfield, MA 02048            sinapilaw.com

April 24, 2023

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
30 Romano Vineyard Way, Suite 109
North Kingstown, RI 02852-
Phone:  (401) 861-2900; FAX:  (401) 861-2922
Email: RAM@om-rilaw.com

RE:    **Client/Respondent:**    **Prof. Steven D. Murray, Esq.**
       **Employer/Institution:**  **Council on Postsecondary Education and the Community College of R.I.**
       **Matter:**                **Notice of Formal Complaint & Investigation Dated February 28, 2023**[1]

Dear Ray:

I.    **Introduction**

Please be advised that the undersigned and this firm represent **Prof. Steven D. Murray, Esq.** ("client"), relative to the above cited matter.  This letter has been directed to you as my client has been notified that you have been appointed by the **Council on Postsecondary Education and the Community College of Rhode Island** ("CCRI"), specifically, Kara DiPaola, Esq., Assistant Director, Affirmative Action & Equal Opportunity Title IX & Section 504/ADA Coordinator, to investigate the above-cited matter.  This purpose of this letter is threefold:

1.    To demand that, based on your review of the formal complaints, interview of the Complainants and investigation *to date,* you immediately issue a Final Report concluding that no violation of either CCRI's Council on Postsecondary Education Title IX Sexual Harassment Policy and Procedures ("Title IX") and/or CCRI's Council on Postsecondary Education Nondiscrimination Policy and Complaint Procedures ("Title VII") has occurred because the interactions/disputes in question merely involve interpersonal conflicts and disagreements between faculty members and/or staff and do not constitute prohibited conduct merely because of the subjective beliefs or perceptions of the complainants or because the parties are of different genders and because, in any event, the communications in question involved protected concerted conduct under R.I. Gen. Laws §28-7-1, *et seq.* which is not subject to regulation or sanction by CCRI.

2.    In lieu of paragraph 1 above, to demand that you identify which policies my client is alleged to have violated and which procedures apply to your investigation as the Title IX and Title VII complaint procedures, though similar, are different and neither CCRI nor the parties to this dispute can comply with both, and due process mandates that my client be apprised of the actual procedures under which this process will proceed and the specific policy or policies allegedly violated and the manner he is alleged to have violated the same.

3.    In lieu of paragraph 1 above, to demand that you provide my client in advance of his interview by you with access to all the evidence gathered to date, including copies of complete, signed complaints and any statements in support of or relative thereto, to which he is entitled regardless of whether the Title IX or Title VII complaint procedures apply, as both require disclosure of the same.

4.    In lieu of paragraph 1 above, to facilitate the scheduling of a mutually convenient time, date, and place for an interview of my client and to request that you disclose the manner in which the same will be conducted and documented.

---

[1]  The notice of Formal Complaint letter appears to have been erroneously dated "February 28, 202**2**."

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
April 24, 2023
Page 2 of 10

II.      **The Complaints Must be Dismissed as the Conduct in Question Does not Constitute a Violation of Either the Title IX or Title VII Policies and Procedures of CCRI**

*Background to Dispute*

My client is a member of the Bars of the U.S. District Court for the District of Rhode Island, State of Rhode Island, Commonwealth of Massachusetts, and the Supreme Court of the United States. He is also a former Assistant Attorney General for the State of Rhode Island. He has taught law courses at CCRI for almost 32 years. He was President of the faculty union, CCRIFA, from April of 2018 until November of 2022. He is currently an alternate member to the CCRIFA executive committee. He has a stellar record of largely "exceeds expectations" annual reviews and has never been disciplined by CCRI. He has been Chair of the Criminal Justice department since on or about 2012 and recently received an overall "outstanding evaluation" and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty." However, as a vocal and passionate advocate seeking to improve the terms and conditions of employment of and on behalf of his co-worker union faculty members, he is and has been frequently at odds with CCRI management. He has also been a vocal critic of the lack of meaningful shared management between the faculty and CCRI. Over the years he has filed numerous grievances against CCRI, nearly all of which have been successful, including one that was settled last fall. Perhaps most significantly, he currently is also a vocal advocate critical of the proposed T.A. endorsed both by union leadership and CCRI, which is the subject of recent and ongoing intense and fervent debate among the CCRI stakeholders. It is against this backdrop, that calculated and clearly coordinated adverse action has been taken against him by CCRI in an attempt to silence him and, as a consequence, have seriously impaired and deprived him of his right to engage in concerted action and his rights to free speech and assembly and due process, including the issuance of the Formal Complaint at issue, which you have been appointed to investigate.[2]

On February 28, 2023, in the midst of a fierce debate and imminent vote on the above mentioned T.A., my client was locked out of his office, denied access to his CCRI email account—which, under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others, the current CCRIFA and Faculty Senate presidents (both of whom are complainants). The basis of this action against my client by CCRI was purported Title IX gender and/or non-discrimination violations arising out of three totally separate and unrelated communications ("Complaint"), one of which occurred over *one month* prior (and had already been informally addressed by Dean Stargard) and two of which occurred about two weeks prior to the issuance of the Complaint.

As you are probably well aware from your review of the complaints and investigation to date, the substance of the allegations of all three of the complainants at issue is the subjective belief or "perception" of each that my client was apparently critical of their conduct and that his demeanor and tone was offensive to them—invoking the mantra "bullying," with two of them opining that they believed they were targeted because they were women. *All of the communications involved concerted union activity protected under R.I. Gen. Laws §28-7-12, collective bargaining or union governance, to one degree or another, which, as a matter of law, is not subject to regulation or sanction by CCRI.*

---

[2]  You should and are entitled to be aware that my client has previously placed CCRI on notice of his claims that his right to concerted action protected under R.I. Gen. Laws §28-7-12 and rights to free speech and association and due process under the State and Federal Constitutions have been violated by CCRI's conduct described herein. My client's claims arise out of CCRI's issuance of the pending baseless and frivolous purported Title IX complaint against my client to justify an administrative suspension without a hearing in order bar him from campus, deny him access to the campus email system, and prohibit him from communicating with the Presidents of the faculty Union and Senate, in order to silence him from participating in a closely contested debate over approval of a proposed tentative contract ("T.A."), with respect to which my client is the most vocal and ardent faculty opponent.

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
April 24, 2023
Page 3 of 10

## A.    The Factual Basis of the Complaint is Substantively Deficient[3]

Aside from being clearly pretextual and retaliatory, the factual basis of the Complaint is substantively deficient.  Neither Title IX nor any other "nondiscrimination" law enforceable under CCRI policies and procedures were designed to create a general civility code.[4]  Conduct that is merely rude, abrasive, unkind, or insensitive does

---

[3]  The Complaint is also procedurally deficient, because it unlawfully combines three totally separate and distinct interactions/communications in an attempt to "pile on" and prejudice my client—and for that reason also violates due process of law.  The only real similarity between the three situations that is noteworthy is that they all arise out of and relate to conduct protected under R.I. Gen. Laws §28-7-12 as discussed in detail below.  Combining such separate and distinct complaints violates applicable law regarding the Title IX complaint procedure.  Joint Guidance on Federal Title IX Regulations: *Summary Analysis of Sections § 106.45(b)94): Consolidation of Complaints* ("[A] single investigatory and adjudicatory process may be used where it arises from the same incident and parties."); Council on Postsecondary Education, *Title IX Sexual Harassment Policy and Procedures*, Sec. XIX (Consolidation of Formal Complaints)("The Covered Entity may consolidate Formal Complaints of Sexual Harassment where the allegations arise out of the same facts or circumstances.").  This objection was previously raised with CCRI's General Counsel and the response was to refer all three complaints to you.  My client interprets this as a denial of his formal objection.

[4]  **Title IX**.  *Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.,* 947 F.3d 342, 350 (6th Cir. 2020) ("Plaintiffs cannot be faulted for finding Frye's use of the term "pussy" offensive, even in a football setting.  But crude or vulgar language alone does not rise to the level of a Title IX violation.  After all, Title IX, like Title VII, is not a 'general civility code.'"); *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011)("[T]to recover [under] Title IX . . ., Wolfe had to prove the harassment complained of amounted to more than mere name-calling; he was legally required to show the harasser intended to discriminate against him "on the basis of sex," meaning the harassment was motivated by either Wolfe's gender or failure to conform with gender stereotypes."); *Moeck v. Pleasant Valley Sch. Dist.*, 179 F. Supp. 3d 442, 447–48 (M.D. Pa. 2016) ("According to the plaintiff the sexual harassment she endured is as follows: Coach Getz 'would call people a pussy, a faggot.  Heard once, string bean arms.  He would curse almost every single letter in the alphabet.  He would say fuck.  He would call people assholes.'  He additionally used the word 'bitch'.  He used these words, however, to the boys not to plaintiff or her sister.  Additionally, plaintiff notes that Coach Getz told teammate J.J. to 'penetrate all the way through like he was having sex with a girl.'  These statements were not made to the plaintiff and are mere vulgarity, thus, we will not consider them sexual harassment of the plaintiff.")(internal citations to record omitted).

**Title VII**.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("Title VII, we have said, does not set forth "a general civility code for the American workplace.") (citing *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *Rios-Jimenez v. Princip*i, 520 F.3d 31, 44 (1st Cir. 2008) ("[T]he federal employment discrimination laws do not establish a 'general civility code' for the workplace."); *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 37 (1st Cir. 2003) ("A jury could easily find that Lee–Crespo was subjected to incivility.  But Title VII is neither a civility code nor a general anti-harassment code.  Title VII requires, rather, that the level of incivility or harassment must amount to either a tangible or a constructive employment action.")(internal citations and quotations omitted); *Shaver v. Indep. Stave Co,*, 350 F.3d 716, 721 (8th Cir. 2003)("On the other hand, we have repeatedly emphasized that anti-discrimination laws do not create a general civility code."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs,*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not create a claim for all unpleasant or abusive behavior in the workplace; it is not a general civility code and does not apply to the normal tribulations of the workplace, such as the sporadic use of abusive language, race-related jokes and occasional teasing.  The conduct must be extreme to amount to a change in the terms and conditions of employment."); *Montalvo-Figueroa v. DNA Auto Corp*., 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019)(Nevertheless, the harassment must pass a certain threshold of severity.  Mere discomfort is insufficient.  Title VII was not intended to be a "general civility code" for the workplace, so "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.")(internal citations and quotations omitted); *Thompson v. McDonald*, No. 16-80811-CIV, 2019 WL 11314995, at *6 (S.D. Fla. Mar. 25, 2019), aff'd sub nom. *Thompson v. Sec'y, U.S. Dep't of Veterans Aff*s,*, 801 F. App'x 688 (11th Cir. 2020) ("[T]itle VII is not a general "code of civility," and its prohibition against workplace harassment is limited to situations where the abusive workplace behavior is related to a protected classification, such as sex, race, or national origin.").

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
April 24, 2023
Page 4 of 10

not come within the scope of the law.[5]  To support a claim, the conduct must be extreme and not merely rude or unpleasant.[6]  Nor does conduct come within the scope of the law because the complainant invoked the mantra of "bullying."[7]  Moreover, conduct is not subject to sanction under Title IX merely because it was directed at someone of the opposite sex—in this case women.[8]  Moreover, insofar as well over 60% of the faculty and staff at CCRI are

---

[5]  *Shaver v. Indep. Stave Co*., 350 F.3d 716, 721 (8th Cir. 2003) ("Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law."); *accord*; *May v. Delta Air Lines,* No. CV 21-710 ADM/ECW, 2022 WL 2835123, at *7 (D. Minn. July 20, 2022), appeal dismissed sub nom. *May v. Delta Air Lines, Inc*., No. 22-2763, 2022 WL 18779768 (8th Cir. Nov. 2, 2022);  Elghoul v. United States, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. Elghoul v. McDonough, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022); *Thompson v. McDonald*, No. 16-80811-CIV, 2019 WL 11314995, at *6 (S.D. Fla. Mar. 25, 2019), aff'd sub nom. *Thompson v. Sec'y, U.S. Dep't of Veterans Affs*., 801 F. App'x 688 (11th Cir. 2020)*Andrews v. Green Bay Packaging, Inc.,* No. 4:17CV00788 JM, 2019 WL 1053612, at *7 (E.D. Ark. Mar. 5, 2019); *Guimaraes v. SuperValu, Inc*., No. CIV. 10-366 RHK JSM, 2010 WL 5099648, at *9 (D. Minn. Dec. 8, 2010), aff'd, 674 F.3d 962 (8th Cir. 2012); ); *Kent v. Anoka*, 651 F. Supp. 2d 910, 937 (D. Minn. 2009); *Miles v. Wal-Mart Stores, Inc*., No. CIV. 06-5162, 2008 WL 222694, at *4 (W.D. Ark. Jan. 25, 2008); *Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006); *Munoz v. Adventure Lands of Am., Inc*., 957 N.W.2d 324 (Iowa Ct. App. 2021); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing [do not rise to the level of a Title VII violation].");  *Suarez v. Pueblo Int'l, Inc*., 229 F.3d 49, 54 (1st Cir.2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins.").

[6]  *Stoddard v. BE & K, Inc.*, 993 F. Supp. 2d 991, 1002 (S.D. Iowa 2014); *accord Munoz v. Adventure Lands of Am., Inc.,* 957 N.W.2d 324 (Iowa Ct. App. 2021); *see Wilkie v. Dep't. of Health & Human Servs.,* 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be *extreme,*" and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace.") (emphasis added) (citation omitted); *accord Barron v. Decare Dental, LLC*, No. CIV. 12-699 RHK/SER, 2013 WL 3989786, at *6 (D. Minn. Aug. 2, 2013);  *LaCroix v. Sears, Roebuck, and Co*., 240 F.3d 688, 691 (8th Cir. 2001) ("Moreover, "[not] everything that makes an employee unhappy is an actionable adverse employment action [instead] an adverse employment action is exhibited by a material disadvantage, such as a change in salary, benefits, or responsibilities."); *accord Elghoul v. United States*, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. *Elghoul v. McDonough*, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022).

[7]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended and does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Whitley v. Indep. Sch. Dist. No. 10 of Dewey Cnty., Oklahoma*, No. CIV-18-331-SLP, 2019 WL 7667329, at *5 (W.D. Okla. Apr. 22, 2019) ("Under Title IX, the prohibited discrimination does not include bullying, but the prohibited discrimination does include sexual harassment. The harassment must be "gender-oriented," and it must be more than mere name-calling."); *see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("Each Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient. Whether . . . . . harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well-being of employees is a question to be determined in light of the totality of the circumstances")

[8]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended . . .  to provide them recourse for mistreatment that is not based on sex."; .); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016) ("A review of all these statements reveals fewer than ten sexually-tinged comments over the course of two or three years.  Such sporadic incidents are not sufficiently pervasive to establish a sexual harassment claim, the statements are mere offensive utterances.  While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way.  Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner."); *see also Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations.  The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
April 24, 2023
Page 5 of 10

woman, having an interpersonal conflict with a woman would appear to be highly probable and nothing unusual, particularly in the context of a fiercely and hotly contested union vote on a proposed T.A. wherein my client's position is at odds with both that of the faculty leadership (CCRIFA and Faculty Senate) and CCRI management, *the Presidents of which are all women and the former two of which are complainants*. In addition, mere subjective feelings or perceptions are insufficient; the conduct complained of must also satisfy an objective standard that meets all of the foregoing elements of a claim and be so severe, pervasive, and objectively offensive that it effectively denies a person access to an institution's employment programs and/or activities.[9] The Complaint clearly does not meet even the broad definition of gender or other protected conduct related adverse conduct prohibited under CCRI's policies and procedures.[10]

**B.      Allegations in the Complaint Fail to Establish Even a Colorable Violation of Either the Title IX or Title VII Policies.**

The allegations in the Complaint fail to establish even a colorable Title IX or Title VII violation. In addition, the subject matter of all the communications at issue were all related either to the union, collective bargaining/terms and conditions of employment, and/or the CCRI administration. As such, the communications were, therefore, clearly and indisputably protected from adverse action by CCRI under applicable labor and constitutional law. CCRI nevertheless issued a facially and obviously deficient Title IX for Title VII complaint on the basis thereof and utilized

---

not exposed.") (internal quotations omitted); *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011)( "[A]cts of name-calling do not amount to sex-based harassment, even if the words used are gender-specific, unless the underlying motivation for the harassment is hostility toward the person's gender."); *Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir.2011) (stating harassment is actionable under Title IX only if it is "based on sex, per the words of Title IX, and not merely tinged with offensive sexual connotations" and affirming summary judgment where record fails to suggest the harasser "was motivated by anything other than personal animus.").

[9] CCRI Title IX policy forbids "sexual harassment" defined as "conduct on the basis of sex that constitutes Quid Pro Quo Sexual Harassment, Hostile Environment Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence, or Stalking." *Id*. VIII. A. *Such conduct must be objectively "so severe, pervasive, and objectively offensive that it effectively denies a person access to [the institution's] Programs or Activities*." *Id*. VIII. C.  CCRI Title VII policy forbids "discrimination, harassment, or retaliation" that is "directed toward an individual because of their membership in a protected class (or a perception that someone is a member of a protected class) that has the purpose or effect of substantially interfering with the individual's educational or work performance, or creating an intimidating, hostile or offensive working or academic environment. A person's subjective belief that behavior is intimidating, hostile, or offensive does not make that behavior harassment. *The behavior must create a hostile environment from both a subjective and objective perspective and must be so severe, persistent, or pervasive that it unreasonably interferes with, limits, or deprives a member of the community of the ability to participate in or to receive benefits, services, or opportunities from the Covered Entity's education or employment programs and/or activities. In determining whether a hostile environment exists, the Covered Entity examines the context, nature, scope, frequency, duration, and location of incidents, as well as the relationships of the persons involved." Id*. at V.  Protected classes covered by CCRI Title VII are "an[] individual's race, color, creed, national or ethnic origin, gender, gender identity or expression, religion, disability, age, sexual orientation, genetic information, marital status, citizenship status, veteran status, and any other legally protected characteristic." *Id*. at I.  *See Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21-23 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.. . .  We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."; *accord  Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006).

[10] *See* Title IX and Title VII policies and footnote 9 above.

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
April 24, 2023
Page 6 of 10

it as a pretext to silence my client by placing him on administrative leave and banning him from campus, barring his access to his school email and sole means of communicating with his fellow union faculty members, and prohibiting him from communicating with the CCRIFA and Faculty Senate presidents.

Based on such information that has been provided to my client to date, none of the three communications/interactions in the Complaint come remotely close to amounting to even a *prima facie* claim of discrimination prohibited under either the Title IX or Title VII policies.  The conduct complained of in the Complaint is nothing more than personal perceptions and subjective feelings of the complainants that the language, tone, and/or demeanor of my client in the communications was offensive or upsetting to them (without regard to *their* concurrent behavior, demeanor, and conduct toward my client).  There are no allegations in the Complaint of any vulgarity, unwanted touching, threats of violence, or criminal conduct.  None of the complainants claimed they were in fear for their physical safety.  As discussed in Section II.A. above, neither Title IX nor Title VII is a civility code nor a general anti-harassment code.

**Complainant Del Sesto** alleges that she subjectively felt "uncomfortable" and was "caught off guard by [my client's] unexpected visit and demeanor" when he came to her office and "in summary was ***speaking negatively about the PTFA, contract, administration and his role.***"  She does not even subjectively claim that the conduct complained of was in any way related to gender.  Additionally, this complaint, and was dealt with at a meeting between my client, his union representative, and Dean Stargard over a month prior to the issuance of a Complaint

**Complainant Sneesby** alleges that my client "emailed the faculty stating derogatory things about me or my performance at work."  Ms. Sneesby is ***President of the Faculty Senate and the email chain to which she refers and on which her allegations were based related to my client's criticism of her performance in that capacity.***  She also alleges my client is "condescending and dismissive and particularly targets females," without any factual basis or context for this self-serving, subjective opinion.  More pertinently, Ms. Sneesby omits her concurrent and severely unprofessional tone, demeanor, language, and treatment of my client which he has well documented, including independent third-party witnesses.

**Complainant Abbascia** complains about what she perceives as my client's "unprofessional, bullying, threatening tone in emails."  ***The context of these communications is all union related and arise out of her role as union president.***  She alleges that my client called her a "lame duck" president—apparently arising out of her announcement that she is leaving the college and her role as President of the union in June, prior to the end of her term of office (an objectively accurate description in light of the definition of that term)[11], called into question her ability to do her job as union president, called for her resignation, and "verbally told faculty members that [my client] is trying to oust [her] as CCRIFA President."  While she asserts the obvious, that she is being targeted as union president, she subjectively opines that it is also because she is a woman.  More pertinently, Ms. Abbascia omits context including the nature and extent of her professional and personal relationship with my client.

### Inference of Pretext is Compelling and Undeniable

**Content**.  The Complaint is so obviously devoid of any facts sufficient to establish a cognizable claim, that no reasonable college administrator could believe otherwise or would issue a notice of Title IX or other "non-discrimination" complaint based thereon.  First, at worst, the communications are "rude, abrasive, or unkind," which is not actionable according to black letter law.  Second, neither Title IX nor Title VII is a general civility code, neither prohibits conduct merely because a complainant alleges "bullying."  Moreover, the email threads that form the basis

---

[11]  *The Britannica Dictionary*: "[Defining 'lame duck' as] 1 . . .  an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help." https://www.britannica.com/dictionary/lame-duck

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
April 24, 2023
Page 7 of 10

of the allegations by two complainants, of which CCRI was clearly well aware, document that these were no more than passionate discussions among people in an emotionally charged debate. Third, the conduct clearly does not pass the high bar necessary to establish a Title IX or Title VII violation in this context established in *Harris v. Forklift Sys., Inc.*: conduct that is so severe and pervasive to create an objectively hostile or abusive work environment based on "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. 17, 21-23. Fourth, and finally, despite self-serving, subjective perception opinions, there is no "gender" nexus to the communications/conduct complained of, as it is undisputable that even if "offensive and inappropriate, the statements do not address [the complainants] in a sexual way. Significantly, [they were] not sexually propositioned, physically threatened or touched in a sexual manner." *Moeck v. Pleasant Valley Sch. Dist.*, 179 F. Supp. 3d 442, 447–48 (M.D. Pa. 2016).

**Timing.** The issuance of the Title IX complaint on February 28, 2021, during the midst of a heated debate and on the eve of a vote on the T.A. on which the faculty was closely divided, was clearly calculated to silence my client. The T.A. had been endorsed by union leadership and CCRI, and it was modified already at least once due to my client's criticisms and vigorous appeals to his fellow faculty members, which were communicated almost exclusively through the CCRI email system. The issuance of the Complaint at that time had the obvious purpose and the undeniable effect of silencing the most vocal and ardent opponent of the T.A. Notably, although the Complaint was issued at the end of February, the events about which DeSesto complained took place on January 19, 2023, originally took the form of an oral complaint, and was dealt with at a meeting between my client, his union representative, and Dean Stargard on ***January 23, 2023***. Similarly, the email chains which formed the basis of the Sneesby and Abbascia allegations took place almost two weeks prior to the issuance of the Complaint.

**Motivation**. Both CCRI and the complainants were motivated by a desire to ensure passage of the T.A. by gagging my client. All the agents of CCRI involved in the issuance of the Title IX complaint—Sybil Bailey, Director of Human Resources, Kara DiPaola, Esq, Assistant Director, Affirmative Action & Equal Opportunity Title IX & Section 504/ADA Coordinator, and Rosemary Costigan, Vice President for Academic Affairs, based on their knowledge and experience, ***well knew that the complaint was baseless and frivolous and were motivated to take affirmative action to ensure the T.A. passed***. The desire of Ms. Sneesby, as Faculty Senate president, and Ms. Abasscia, as CCRIFA president, to pass the T.A. was equally strong. The motivation of Ms. DelSesto, as the assistant to Ms. Costigan, second in command at CCRI, is self-evident.

**Protected Communications**. Insofar as the subject matter of all the communications at issue were all related either to the union, collective bargaining/terms and conditions of employment, or the CCRI administration and were, therefore, clearly and indisputably protected from adverse action by CCRI under applicable labor and constitutional law (as discussed in detail below), that CCRI would nevertheless issue a facially and obviously deficient Title IX complaint on the basis thereof, provides further compelling evidence that the complaint was issued as a pretext to silence my client. Moreover, taking adverse action against my client on the basis of these protected communications, under the circumstances presented, constitutes an unfair labor practice in violation of R.I. Gen. Laws §28-7-13 (10).

### Concerted Action is Exempt from Regulation by CCRI

It is beyond doubt that my client was involved in concerted activity protected under the Rhode Island Labor Relations Act, R.I. Gen. Laws §28-7-1, *et seq.* ("Act") when he was engaged in the communications with Ms. Sneesby and Ms. Abbascia referenced in the Complaint and when using the CCRI email system to communicate with other union faculty members regarding the TA..[12] The right to concerted action lies at the heart of the protections under

---

[12] The Rhode Island Labor Relations Act, R.I. Gen. Laws §28-7-1, *et seq.* ("Act"), was designed to, among other things, "protect employees in the exercise of full freedom of association, self-organization, and designation of representatives of their

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
April 24, 2023
Page 8 of 10

the Act and National Labor Relations Act ("NLRB") on which it was patterned.[13] Additionally, his communications and interactions with Ms. DelSesto referenced in the Complaint arose out of and were related to his attempt to speak to Dean Stargard regarding confusing emails being sent out by DelSesto related to a prorated adjunct pay issue—conduct protected under the Act in his capacity as an alternate to the CCRIFA executive board. ***Moreover, CCRI well knew that the interaction/communications were protected conduct and outside the purview of either a disciplinary or Title IX complaint, and it has refused to process complaints of this very type on my client's behalf***.[14]

Interpreting Title IX and its own policies and procedures as authorizing the issuance of a Complaint and imposing pre-determination sanctions based on heated discussions among union faculty members which CCRI deems "uncivil" or "unprofessional" also violates my client's and all other union members' right to collective action and constitutes an unfair labor practice prohibited by R.I. Gen. Laws §28-7-13 (10). This is so because the actual, necessary, and intended effect of this practice is to impair and chill the exercise of collective action rights out of fear of being disciplined if CCRI disapproves of the tone or content of the communications between members. R.I. Gen. Laws §28-7-13 (10) (making it is an unfair labor practice to "[d]o any acts . . . that interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by § 28-7-12."); *see also N.L.R.B. v. Ne. Land Servs., Ltd*., 645 F.3d 475, 481–83 (1st Cir. 2011) (The "mere maintenance" of a rule that "would reasonably tend to chill employees in the exercise of their Section 7 rights" is unlawful.). "It is axiomatic that that an employees' right to discuss, debate, and communicate with each other regarding workplace terms and conditions of employment" is protected under the Act. *See United States Postal Serv., & Roy Young, an Individual,*, No. 14-CA-195011, 2021 WL 1087421 (Mar. 18, 2021) (interpreting and applying Section 7 of the NLRA). The Supreme Court has acknowledged "the importance

_____

own choosing for the purposes of collective bargaining, or other mutual aid and protection, free from the interference, restraint, or coercion of their employers." R.I. Gen. Laws §28-2-(d). R.I. Gen. Laws §28-7-12 ensures the right of employees to "engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection free from interference, restraint, or coercion from any source." The Act closely mirrors the federal National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169, in particular, § 7 of the NLRA, 29 U.S.C. § 157. Section 7 guarantees employees the right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

[13] *McLaren Macomb and Local 40 RN Staff Council, Office and Professional Employees, International Union (OPEIU) AFL-CIO*, Case 07-CA- 263041 (decided August 31, 2021) ("The broad scope and the wide protection afforded employees by Section 7 of the Act bear repeating. 'It is axiomatic that discussing terms and conditions of employment with coworkers lies at the heart of protected Section 7 activity.' *St. Margaret Mercy Healthcare Centers*,350 NLRB 203, 205 (2007), enfd. 519 F.3d 373 (7th Cir. 2008). Section 7 rights are not limited to discussions with coworkers, as they do not depend on the existence of an employment relationship between the employee and the employer, and the Board has repeatedly affirmed that such rights extend to former employees. It is further long-established that Section 7 protections extend to employee efforts to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). These channels include administrative, judicial, legislative, and political forums, newspapers, the media, social media, and communications to the public that are part of and related to an ongoing labor dispute.").

[14] Sometime on or about 2018-2019, a female faculty member, Soudabeh Valicenti (Chair of the CCRI Math Department), was in a meeting with NEARI regarding a complaint that a staff member in the Math department had brought against Valicenti. My client was the Faculty Association president at the time and his office was near the conference room and he could hear people yelling. Valicenti exited the conference room and charged over to and pointed a finger in my client's face and stated, among other things, words to the effect of "you tell that 'cocksucker motherfucker' John Leidecker" (the NEARI representative at that meeting) and proceeded to vent her complaints to him. My client filed a complaint with CCRI HR for the manner in which Valicenti addressed and spoke to him. Sybill A. Baily, Director of H.R., responded by email that it was none of HR's concern since it was a "Union matter."

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
April 24, 2023
Page 9 of 10

of freedom of communication to the free exercise of organization rights" under the *NLRA*.  *Cent. Hardware Co. v. N.L.R.B.*, 407 U.S. 539, 542–43 (1972).

### III.    Demands in Lieu of Dismissal

If, notwithstanding the foregoing, you intend to proceed with your investigation and interview of my client, my client hereby respectfully demands the following:

1.    **Identification of Applicable Policies and Procedures**.  My client requests that you identify which policies he is alleged to have violated and which procedures apply to your investigation as the Title IX and Title VII complaint procedures, though similar, are different and neither CCRI nor the parties to this dispute can comply with both, and due process mandates that my client be apprised of the actual procedures under which this process will proceed and the specific policy or policies allegedly violated and the manner he is alleged to have violated the same.[15]

2.    **Disclosure of All Evidence**.  My client requests that you provide him in advance of his interview with access to all the evidence gathered to date, including copies of complete, signed complaints and any statements in support of or relative thereto, to which he is entitled regardless of whether the Title IX or Title VII complaint procedures apply, as both require disclosure of the same.[16]  *See also, supra,* footnote 15 above.  Disclosure of this

---

[15]  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal citation omitted).  In *Goldberg v. Kelly* 397 U.S. 254, 267-68 (1970), the United Stated Supreme Court held that due process requires that a benefit recipient facing termination of public benefits be given "***timely and adequate notice detailing the reasons for a proposed termination***, and an effective ***opportunity to defend*** by confronting any adverse witnesses and by presenting his own arguments and evidence." *See also Avanzo v. Rhode Island Dept. of Human Services,* 625 A.2d 208 (R.I. 1993) (affirming superior court ruling that notices of termination of eligibility for public assistance benefits did not comply with the requisite due process insofar as the notices provided only broad, conclusory language, and failed to apprise the recipients of the specific grounds for the agency's determination and finding that due process requires individualized notice, so that recipients can be apprised of the reasons their benefits are being denied or terminated.); *Cf Goss v. Lopez*, 419 U.S. 565, 578–84 (1975)("Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires in connection with a suspension . . . that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.").  ***Accordingly, a notice of violation containing conclusory language devoid of facts and/or which fails to identify the alleged misconduct does not satisfy the requirements of minimum due process.***  *Cf. id.*

[16]  The Title IX policy provides a Respondent with, among other things, the right to "[s]ufficient details" of the alleged violation and the "right to inspect and review evidence."  *Id.* at XXI.   The Title VII policy provides a Respondent with more extensive disclosure, including:

[S]hare the written complaint and details of the allegation(s); explain the Respondent's rights and responsibilities under the process; describe any potential sanctions that may result from a finding of responsibility; and answer any questions the Respondent may have.. . . [T]he Respondent will also be provided with information regarding the Respondent's rights, including the right to have the complaint heard under these procedures; the right to receive notice of all violations of this Policy which have been reported, as well as any ancillary violations being alleged against the Respondent; the right to be heard by an impartial arbiter under this process; and the right to hear a description of all relevant information presented to the investigator(s) and adjudicator(s) that supports a finding of responsible or not responsible.  Throughout this process, the Respondent will be informed of any new information that arises, which may impact the Respondent's rights under this Policy.

*Id.* at XXII. B.

Raymond A. Marcaccio Esq.
Oliverio & Marcaccio, LLP
April 24, 2023
Page 10 of 10

information (as well as that demanded in the previous paragraph) is not only required by law, but it is also necessary as a practical matter in order for my client to properly prepare for the interview so that he is able to meaningfully and fully address any questions or concerns interposed by you at the interview.

3. **Scheduling Interview**. My client requests the scheduling of a mutually convenient time, date, and place for an interview and that you disclose the manner in which the same will be conducted and documented. Assuming that you timely and fully respond to the disclosures requested in this Section III, my client and I are not available on either the May 1 or 5, 2023 dates you have proposed; however, we have significant availability the following week.

Please call me to discuss the foregoing at your earliest convenience.

Very truly yours,

Richard A. Sinapi, Esq.
ras@sinapilaw.com

RAS/ras
cc:     Client (email only)
        Leslie Florio, NEARI, Assistant Executive Director/UniServ (email only) Lflorio@neari.org
        John E. DeCubellis, Jr. Esq., NEARI, General Counsel, (email only) jdecubellis@nea.org

**COMMUNITY COLLEGE OF RHOD ISLAND,**
**COUNCIL ON POSTSECONDARY EDUCATION**
**TITLE IX ADJUDICATION**

| | |
|---|---|
| **Elizabeth Del Sesto, Sandra L. Sneesby,** | : |
| **And Tara Abbascia,** | : |
|       **Complainants** | : |
| | : |
| **v.** | : |
| | : |
| **Steven D. Murray,** | : |
|       **Respondent** | : |

**MOTION TO DISMISS AND RESPONDENT'S WRITTEN RESPONSE TO THE
INVESTIGATOR'S DRAFT FINDINGS PURSUANT TO TITLE IX POLICY AND
PROCEDURE § XXII D.**

Now comes the Respondent Steven D. Murray ("Murray") in the above cited matter and does hereby move to dismiss the pending Complaints and, in the alternative, provide the within written response to the investigator's preliminary findings/summary of testimonial evidence pursuant to CCRI's Council on Postsecondary Education Title IX Sexual Harassment Policy and Procedures ("CCRI Title IX Policy") § XXII D.

**I.**    <u>**APPLICABLE AND ADDITIONAL FACTS AND FINDINGS**</u>[1]

*General*

1.    When conduct which is the subject of a misconduct complaint involves union business, it is the policy of CCRI that the dispute is not subject to determination by the college.  Tr. Murray pp. 100-102, email chain 11/20/19—12/19/19 (Murray exhibit).

2.    During the relevant period, over two-thirds of the CCRI leadership, including President Hughes and Vice President of Academic Affairs Costigan ("V.P. Costigan"), were women, https://www.ccri.edu/about/leadership.html, as well as over 60% of the faculty, including both the Senate President, Sneesby, and Faculty President, Abbascia. https://www.ccri.edu/neasc/pdf/NEASCST5.pdf

---

[1] In Section I and in Section V. below, Murray proposes certain additional facts and corrections to facts and/or findings proposed by the Investigator.  Any proposed facts in this document where there is no citation to the record, Murray is prepared to swear to the same based on first-hand knowledge under oath and/or is otherwise prepared to produce relevant and competent evidence to support the same.

### Respondent Steven D. Murray[2]

3.     Respondent Steven D. Murray ("Murray") is a member of the Bars of the U.S. District Court for the District of Rhode Island, State of Rhode Island, Commonwealth of Massachusetts, and the Supreme Court of the United States and is a former Assistant Attorney General for the State of Rhode Island.

4.     He has taught law courses at CCRI for almost 32 years.

5.     He was President of the faculty union, CCRIFA, from April of 2016 until November of 2020.

6.     He is currently Vice President of the faculty union and an alternate member to the CCRIFA Executive Committee.

7.     He has a stellar record of largely "exceeds expectations" annual reviews and has never been disciplined by CCRI.

8.     He was elected Chair of the Criminal Justice department in 2012 and was reelected unanimously on three subsequent occasions, most recently in February of 2023.

9.     He also recently received an overall "outstanding evaluation" as a Department Chair and teacher and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty." (Evaluation of Murray by Dean Handley, April 22, 2021).

10.     However, as a vocal and passionate advocate, both as President and a member of the CCRIFA, seeking to improve the terms and conditions of employment on behalf of his co-worker union faculty members, he is and has been frequently at odds with the CCRI administration.

11.     In his roles as Faculty Association President and Department Chair, Murray has had severe disagreements over the years with President Hughes and VPAA Costigan that have led to faculty "No Confidence Votes," picketing, grievances and Unfair Labor Practice charges. Murray and Costigan have each filed complaints with HR against each other.[3]

---

[2] Most of the additional facts under the "Murray" heading are found in Respondent Counsel's Letter to Investigator dated April 24, 2024. Any proposed facts where there is no citation to the record, Murray is prepared to swear to the same based on first-hand knowledge under oath and/or is otherwise prepared to produce relevant and competent evidence to support the same..

[3] Murray's clashes with the CCRI administration over the years are numerous:

- February 2017  https://www.golocalprov.com/news/ccri-leadership-targets-difficult-faculty
- May 2017, at a meeting of the Strategic Planning Committee, Murray made a statement about a sentence in the draft report that Murray disagreed with that dealt with the abilities of "all" students at the College "are motivated, capable and committed to attaining academic achievement." Before Murray could finish speaking, VP Costigan loudly interrupted Murray, stating that she was repulsed by what Murray said, that Murray was negative, that Murray did not belong working at the College. She added that Murray does not represent the faculty." She went on to say "she had heard enough from Murray." VP Patten who was Chairing the

Committee then proceeded to move the meeting forward and by recommending the change Murray suggested be made. Murray filed a complaint with HR for Costigan violating the Policy Against Violence in the Workplace. Almost immediately and before any investigation, President Hughes put out a statement that she fully supported VP Costigan. The College brought in an attorney (Peter Harrington) who is employed in the Administration at URI to conduct an "independent investigation." His report concluded that there had been no violation of the policy.

- June 2017 – Student Senate votes no confidence in Hughes and Costigan over treatment of Professor Britton re the observatory. Students and faculty (including Murray) picket at the College.   http://www.rhodybeat.com/stories/ccri-senate-voices-dissatisfaction-with-president-over-observatory,25691
  https://www.providencejournal.com/story/news/education/2017/07/08/dispute-over-pay-at-ccri-observatory-spurs-protests/19252784007/

- August 2017, article in the Providence Journal, "CCRI president rocks the boat with changes aimed at helping students" that contained criticism by Murray of Hughes' decisions and lack of qualifications. The article also discussed the Student Government's vote, in June 2017, of No Confidence in Hughes and Costigan.
  https://www.providencejournal.com/story/news/politics/state/2017/08/25/ccri-president-rocks-boat-with-changes-aimed-at-helping-students/19145823007/

- Fall 2017, Hughes and Costigan tried to unilaterally impose a "Jterm". There was virtually no involvement of the faculty in this decision and Murray led the opposition to the implementation of "Jterm" and it did not go forward in 20218.
  https://www.providencejournal.com/story/news/education/2017/11/08/ccri-suspends-planned-january-term-amid-faculty-union-opposition/17124401007/

- October 2017, Murray notified Hughes of a potential "nepotism" issue involving Dean Sabbagh.
  https://www.golocalprov.com/news/ccri-faculty-union-head-raises-nepotism-concerns

- April 2018, Murray was reelected as President of the Union. On April 28, 2017, Costigan asked to meet with Murray. From the outset of the meeting, Costigan was insulting towards Murray regarding the union election results (Murray had run unopposed and approximately 130 faculty voted for Murray, but Costigan mocked Murray for not getting a "majority" of the approximate 300 faculty eligible to vote). The meeting ended with her screaming at Murray after she misunderstood a comment Murray had made. Murray filed another complaint with HR re her conduct and she filed a complaint against Murray. Both complaints  --- no decision was ever issued by HR.

- Fall 2018, Hughes and Costigan again seek to unilaterally to impose a "Jterm/Winter session". There is even greater faculty push back this time than last year.

- In November 2018, The Union Executive Committee met, and a motion was passed to call for a vote of "No Confidence" in President Hughes, VP Costigan, and Dean Sabbagh, due to their continued failures of leadership and that they either resign or be removed.  271 Faculty were eligible to vote. 219 voted. 160 voted yes /approve the motion of "No Confidence" -- 34 voted no -- 25 voted to abstain. The overwhelming vote of "No Confidence" received local and national media coverage. Hughes released a statement voicing disappointment and her view that "Change is hard."  The Council on Postsecondary Education and Governor Raimondo voiced their strong support of Hughes. https://warwickonline.com/stories/council-backs-ccris-hughes-in-wake-of-unions-no-confidence-vote,138903
  https://www.washingtontimes.com/news/2018/dec/4/faculty-at-ccri-college-vote-no-confidence-in-lead/

- January 2019 --Despite the near complete lack of support of the faculty (full time and adjuncts), Hughes/Costigan went forward with their "Jterm/Winter Session" beginning on January 2, 2019. The faculty (led by Murray and others) conducted Informational Picketing, with protest signs, leaflets and bumper stickers, at the College on January 2, 2019 and January 9, 2019. The media (Channel Ten news, Golocalprov, the Providence Journal and other media covered the story, and Murray gave interviews that contained negative comments about Hughes, Costigan and the Jterm/Winter Session.
  https://www.neari.org/blog/the-trouble-with-jterm
  https://www.newportri.com/story/news/local/2019/02/13/ccri-faculty-critical-of-j-term-outcome/6004716007/
  https://turnto10.com/news/local/faculty-at-ccri-protest-short-winter-term

**Page 3 of 44**

https://www.golocalprov.com/news/ccri-faculty-picket-following-no-confidence-vote-in-president-hughes

- On Tuesday, January 22, 2019, the day classes start, Hughes notified Murray by letter that his appointment as Department Chair was being terminated by her.
- January 23, 2019 – VP Costigan sent an email to Murray's department faculty and copied Melissa Fama (Assistant VP), Dean Busby and Dina Levitre (assistant Dean) notifying them that yesterday, Hughes terminated the appointment of Murray as department chair.  Costigan called for a department meeting to elect a new chair to serve out the remainder of Murray's term.
- January 23, 2019, about 50 faculty members, including Murray, attended a meeting of the Council on Postsecondary Education held at CCRI to object to Hughes' leadership. https://www.golocalprov.com/news/new-ccri-president-strips-leading-critic-of-free-tuition-program-of-departm
- January 28, 2019 – ProJo article – "CCRI union president: Demotion 'An Obvious Act of Retaliation'      "https://www.providencejournal.com/story/news/education/2019/01/28/ccri-union-president-demotion-an-obvious-act-of-retaliation/6165761007/
- January 29, 2019 – GoLocalProv article – "CCRI Faculty Support Leading Critic of Free Tuition Program Stripped of Department Chair" https://www.golocalprov.com/news/leading-critic-of-free-tuition-says-ccri-president-slashed-his-pay-illegall
- January 30 , 2019 – Murray sent a Letter to Tim DelGuidice, Chair, RI Office of Postsecondary Council, requesting clarification re "Committee of the Faculty" pursuant to 16-33.1-1-3  No response from him.
- February, 1, 2019 – Murray was unanimously re-elected as department Chair.
- February 4, 2019 –- Hughes again terminates Murray as department Chair
- February 13, 2019 – ProJo article "CCRI calls Winter Jterm a success, but some faculty leaders don't buy it".  https://www.providencejournal.com/story/news/education/2019/02/13/ccri-calls-winter-j-term-success-but-some-faculty-leaders-dont-buy-it/5984324007/
- February 13, 2019 Approximately 50 faculty (including Murray) attend the meeting of the Office of the Postsecondary Council to protest Hughes leadership and eight faculty members read parts of a memo detailing Hughes' failure with Jterm.
- February 22, 2019 – per the order of VP Costigan – Murray's department holds another election of Department chair – result – Murray was unanimously elected (again) as Chair.
- February 25, 2019 – Hughes emails Murray that she has terminated Murray's appointment as Chair again (third time) based on the allegations detailed in her January 22, 2019 letter to Murray.
- 4/25/19 Murray Chair matter is settled -- MOA signed by Murray with an NDA.
- 4/29/19 President Hughes appoints Murray as Chair.
- March 2020 – Murray's term as CCRIFA President is supposed to end in April . Murray agrees (covid) to continue as President until Nov 2022 when CCRIFA will hold an election.
- December 29, 2020 The Union representing Education Support Professionals at CCRI vote No Confidence in Hughes and Ogden.  The No Confidence vote Murray led in 2018 is referenced in paragraph 6 of the article. https://www.golocalprov.com/news/ccri-education-support-professionals-vote-no-confidence-in-hughes-citing-po
- June 2021 – Hughes' contract is up for renewal – CCRIFA and Support Professionals Union at College write to Council on Postsecondary Education voicing No Confidence in Hughes. https://www.providencejournal.com/story/news/education/2021/06/08/higher-education-council-renews-ccris-president-hughes-contract/7610836002/.
- Fall of 2022 – There is a dispute with Murray and Costigan/Stargard re Course Scheduling, Overload courses and their proposed Certificate for Law Enforcement Certificate .
- Feb 20, 2023 President Hughes re-appoints Murray as Department Chair.
- February 28, 2023 President Hughes banishes Murray.
- March 2023  Hughes announces her resignation effective August 2023. No confidence votes are mentioned in articles.  https://finance.yahoo.com/news/ccri-president-meghan-hughes-resigning-202634059.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAABDDz_WR9vMF92Fb0me4-

12.     Despite his differences with V.P. Costigan, she has praised Murray for his "excellent Criminal Justice Program" and personally acknowledged and recognized him as a worthy adversary, despite their professional differences. (Costigan email dated April 10, 2018, and Murray exhibit of gift/note from Costigan in April 2020).

13.     Over the years, Murray has filed numerous grievances against CCRI, nearly all of which have been successful, including one that was settled last fall.

14.     Murray has also been a longstanding critic of the lack of shared governance between faculty and the administration at CCRI and a vocal advocate for increasing the power and role of the faculty in that regard.

15.     Perhaps most significantly, Murray also currently is and has been a vocal advocate critical of the proposed Tentative Contract Agreement ("T.A.") endorsed both by union leadership and CCRI, which is the subject of recent and ongoing intense and fervent debate among the CCRI stakeholders.

16.     On February 28, 2023, in the midst of a fierce debate and imminent second vote on the above mentioned T.A., Murray was locked out of his office, denied access to his CCRI email account—which, under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others, the current CCRIFA Faculty Senate President, Complainant Sneesby ("Sneesby") and Faculty Association President, Complainant Abbascia ("Abbascia").

17.     The basis of this action against Murray by CCRI was purported Title IX violations arising out of three totally separate and unrelated communication encounters ("Complaint"), one of which occurred over *one month* prior (and had already been informally addressed by Dean Stargard) and two of which occurred about two weeks prior to the issuance of the Complaint.

18.     Murray has never been disciplined for misconduct or otherwise during his 32-year tenure with CCRI.

### *Complainant Elizabeth Del Sesto*

19.     The Elizabeth Del Sesto ("Del Sesto," formerly Capraro) Complaint arises solely from a single encounter (January 20, 2023) between Murray and Del Sesto , mere days before the Spring semester was to start, wherein Murray was expressing frustration over the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty. (Murray Tr. pgs. 22 – 38)

20.     The reason Del Sesto was the subject of the communication was that, although ostensibly issued under the authority of Dean Stargard, she was the author and

Ga7S2uCKvygitxedE3e72qoNxDvvPOL0_0tX535-nH3y1aRFg1ivlJ7DEsRHmnuq3Qn-ycUCfKiKAPYVnDZCAkFUndAoLxsBS-MCIryBIRf59TSNvi5FP-ybB8EdAAox5y0iRYl3z0-oMa441xBehFM

sender of the email which contained the last-minute disputed interpretation of the CBA and Dean Stargard was not in his office at that time. (Murray Tr. pg. 28).

21.    The entire interaction involved Murray in his capacity not just as a faculty member asserting rights under the CBA, but more significantly, as a faculty member Department Chair speaking on behalf of his members on an urgent and pressing issue impacting Law Department faculty members, as the semester was scheduled to begin on the next business day and as consequence of the confusion caused by the email and series of emails and events leading up to this point, Murray was unable to either finalize the assignment of faculty, complete and submit a faculty workload report, or complete and submit a payroll report, all of which were due *that date.* (Murray Tr. pps. 22-38)

22.    At the time of the interaction in question, Del Sesto was an assistant to V.P. Costigan.

23.    Murray has interacted with Del Sesto on innumerable occasions during her approximately eight years as a support person in the Academic Affairs suite.

24.    Del Sesto claims in her complaint that this was the "first time" Murray had directed any objectionable communications to or conduct toward her.

25.    Del Sesto does not claim in her Complaint or testimony that Murray was motivated by gender or that gender in any way played a role in their dispute. (Del Sesto Complaint; *see also* Del Sesto Tr. p. 34.[4])

26.    Dean Stargard previously determined that the interaction in question between Murray and Del Sesto was not a disciplinary matter. He stated this in both an email to Murray and again when he met to discuss the matter with Murray. Murray Tr.  pps. 33- 38, and Murray Exhibit (Email from Stargard to Murray dated January 26, 2023).

27.    Del Sesto was rewarded for filing her complaint by being appointed interim assistant dean BSTEM in June of 2023, which included a significant increase in annual salary (2023 $61,499.88 -- 2023 $75,000.12) from her previous position as academic affairs coordinator for which V.P. Costigan was her direct supervisor. (RI Transparency Portal  www.transparency.ri.gov -- CCRI for Capraro 2022 and Delsesto 2023)

---

[4] *See also* Del Sesto Tr. pp. 44-45: ("Q.   Let me ask you this though. Do you find that he is a bully only to you women or a  bully to both men and women?    A.   I find that he is often a bully – I  find that he's a bully to women and I find that  he ends up being a bully to men if he is  unsuccessful in befriending that man."; "Q. How about with women, does he try to  befriend women that he then has, I guess, as  allies?  A.   I mean I don't think he bullies all women, but I think depending on -- I think depending on what it involved . .."; A.   In a sense.  So I feel like he almost -- he -- he seems like the type of bully that is bullying to get people to back him and    if you don't support him, then that's it for  you.".

*Complainant Sandra Sneesby*

28. The Sandra Sneesby ("Sneesby") Complaint/"Incident Report" (Sneesby claims she submitted two "Complaints", Sneesby Tr. 52, but an actual "Complaint" form has never been produced to respondent) arises out of communications between her and Murray, wherein Murray is critical of the lack of power of the Faculty Senate and the lack of real shared governance between the faculty and the CCRI administration, as well as the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda, and asks Sneesby, in her position as President of the Faculty Senate, to publicly confirm what they had discussed in private, specifically that she concurs with his assessment. ( Murray Tr. pgs. 45—74).

29. By way of context, Sneesby played a significant role in the creation of the Faculty Senate in an attempt to rectify the issue of lack of shared governance. The Senate she created with the Administration has no authority -- it is purely advisory.  All power ultimately rests with the President of the College. (see CCRI Senate Constitution , Article II  www.ccri.edu/senate/S2022-001.pdf )

30. Murray has vigorously and publicly advocated that this is obviously not the required shared governance intended or required by statute, R.I. Gen. Laws §16-33.1-3 (providing that, among other things, "the president and a committee of the faculty" shall determine the academic standards and courses of study at the college (http://webserver.rilin.state.ri.us/Statutes/TITLE16/16-33.1/16-33.1-3.htm)), or by the college's accrediting body, the New England Commission of Higher Education, *see, e.g.,* Standard 3.15. ("The institution places primary responsibility for the content, quality, and effectiveness of the curriculum with its faculty. Faculty have a substantive voice in matters of educational programs, faculty personnel, and other aspects of institutional policy that relate to their areas of responsibility and expertise." www.neche.org/wp-content/uploads/2020/12/Standards-for-Accreditation-2021.pdf).  (Murray Tr. pg. 55)

31. Sneesby regarded Murray's criticisms of the Faculty Senate's lack of shared governance as a personal attack, despite Murray's repeated assurances that it was a criticism of the Faculty Senate's lack of power as an institution and not a criticism of or attack on her.  (Murray Tr.  pps. 45-74)

32. By way of additional context, for about ten years, Sneesby and Murray, had been faculty colleagues at CCRI and, at times, worthy adversaries when he defeated her for Faculty Association President in 2016.

33. In particular, during the fall of 2022 until Murray was placed on administrative leave on February 28, 2023, Murray had numerous phone and text communications with Sneesby regarding the shortcomings of the proposed T.A., the impact of Tara Abbascia's announcement that she would be leaving CCRI on her ability to continue to effectively lead the CCRIFA, and the lack of an equal role for the faculty in shared governance, and V.P. Costigan's attempts to use the Faculty Senate to advance the administration's agenda.

**Page 7 of 44**

34.     The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that the communications about which Sneesby complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications.  *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions.").

35.     As further confirmation that the communications and dispute in question involved solely union business, Sneesby a) claims that Murray has "emailed the faculty stating derogatory things about . . . [the] performance [of her] work," b) identifies as witnesses "[t]he entire faculty via email; and, c) asks as a remedy that "Murray [be] prohibited from sending mass emails regarding . . .[her] work performance."  (Sneesby Complaint.)

36.     Although Sneesby makes a bald-faced claim in her complaint that Murray is "condescending and dismissive and particularly targets females," nowhere in either Sneesby's complaint or testimony does she claim that her dispute with Murray or his conduct toward her was due to her gender and she expressly states in her testimony that Murray allegedly also bullies males and all those who disagree with him. (Sneesby Tr. 53.  [5])

37.     Sneesby told Murray that she plans on running for President of the CCRIFA Union in the next election. Sneesby was rewarded after filing her Complaint by the College creating a new department "Communications" without going through the Curriculum Review Committee and naming Sneesby as Department Chair.  Sneesby had been Chair of the English department with a much larger work load, including number of faculty to supervise, required assessment activities, and courses to schedule.

### *Complainant Tara Abbascia*

38.     The Tara Abbascia ("Abbascia") complaint arises out of communications between her and Murray wherein Murray questions and is critical of her ability to continue to effectively do her job as Faculty Association President in the context of an emotionally charged debate concerning ratification of a disputed proposed tentative contract agreement ("T.A."), which had already been rejected once by the faculty, in the midst of which Abbascia had announced she would be leaving the college in June, and as a consequence of which he called her a "lame duck" and called for her resignation.  (Abbascia Complaint).

---

[5]  Sneesby Tr. 53 ("Q.  Is this only directed towards you, or was it directed towards others as well?  A. He could do it towards others as well.· But he seemed to save it the most for particularly the, the administrators, other faculty.  Anybody that basically would say something he didn't ·agree with or was challenging his -- and he just is just the worst with women; he's more aggressive.· And if you're a man, or you're a lawyer, he is better.. . . I don't know.· I don't know.· I can't -- I don't know what's in his head, but it -- that's how it appears to me.").  Tr. 65 ("Q.  Could he have been behaving this way because he just didn't like the policies as opposed to the women? A.  He could have been.· I think it's possible.· I don't know what's in his head, ·technically.").  Sneesby also cites several males in her testimony whom she claims Murray also allegedly bullied.  *See, e.g.*, Sneesby Tr. 66.  Sneesby also concedes many of those in leadership at CCRI happen to be women.  Sneesby Tr. 66  ("We happen to have a lot of women who are in positions of leadership, as I'm realizing.").

39.　During the period of the above communications, Abbascia and Murray were also at odds because Abbascia supported and advocated for approval of the T.A. by the faculty, while Murray was a vocal opponent. (Murray Tr. 74- 93).

40.　The term "lame duck" is frequently and commonly used to describe an elected official who was completing the remaining term of his or her office for a position for which they had been defeated or were not seeking re-election and is therefore viewed to be ineffective due to the perceived lack of incentive or motivation. *See., e.g.*, *The Britannica Dictionary*: "[Defining 'lame duck' as] 1 . . .  an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help." https://www.britannica.com/dictionary/lame-duck

41.　Murray's communications and criticisms about which Abbascia complains all involve, directly or indirectly, Murray's call for Abbasica's resignation in the context of a faculty vote that rejected the proposed T.A., indicating a lack of confidence in her by the faculty, as well as her not having a personal or professional stake in the outcome since she would not be seeking re-election as Faculty Association President nor would she be subject to the terms of any new contract—a "lame duck." (Murray Tr. 74-93).

42.　Murray and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship. (Murray Tr. 75).

43.　Murray was a mentor and supporter of Abbasica when she declared to run for Faculty Association President in October of 2020. ( Abbascia Tr. 8, 11).

44.　The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that all but one of the communications about which Abbascia complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications. *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions."). (Murray Tr. 74-93).

45.　The private email(s) about which Abbascia complains is a communication from Murray wherein he is requesting that Abbascia, as President of the CCRIFA, appoint him as lead negotiator for the TA, and to clarify who she was referring to when she said in her email that lies were being spread regarding the TA. Abbascia Complaint.  (Abbascia Tr. 15 -20).

46.　As further confirmation that the communications and dispute in question involved solely union business, Abbascia a) seeks as a remedy in her complaint "that [Murray be placed on] paid administrative leave pending investigation [as] an appropriate action.  Taking away his ability to use CCRI email to communicate with faculty until this complaint has been investigated, I feel is appropriate" and b) identifies as witnesses, Leslie Florio, the NEARI union representative for the CCRIFA, and the "CCRI Faculty Association." (Abbascia Complaint).

47.    Although Abbasica makes the claim that she was a "target" of Murray as "president of the union and as a woman," her bald-faced, subjective claim she was targeted as a woman is without any logical or factual basis—she was the union President who recommended approval of a T.A. rejected by the faculty and then announced her intent to resign—and clearly was the "target" of Murray's criticisms on that basis. (Abbascia Complaint) Abbascia also recognizes that as Union President " I can take a lot of criticism. That's part of the job." (Abbascia Tr. 23).

48.    Indeed, in her sworn testimony, when asked twice whether Murray's alleged "bullying" was directed at men or just women, Abbasica concedes both times that " maybe it just so happens that a woman" is Union President, President of the College and Vice President of Academic Affairs. (Abbascia Tr. 30, 35).

49.    Abbascia left CCRI on June 17, 2023. Abbascia emphatically swore under oath that her leaving the College had nothing to do with Murray. (Abbascia Tr. 24).

**II.    <u>SINCE THE CONDUCT IN QUESTION WAS BETWEEN CCRIFA MEMBERS AND/OR INVOLVED ASSOCIATION BUSINESS, THE COMPLAINT MUST BE DISMISSED BECAUSE, ACCORDING TO CCRI POLICY AND R.I. GEN. LAWS §§ 28-7-2(D) AND 12, CCRI IS FORBIDDEN FROM RESTRAINING, COERCING, OR OTHERWISE INTERFERING WITH DISPUTES BETWEEN OR INVOLVING COLLECTIVE BARGAINING AND/OR OTHER MUTUAL AID AND PROTECTION.</u>**

Both the allegations in the three separate complaints (collectively referred to herein as "Complaint") and the evidence in the record establish beyond doubt that the communications and interactions at issue constituted protected concerted conduct under the Rhode Island Labor Relations Act, R.I. Gen. Laws §28-7-1, *et seq*. ("RILA"), which is not subject to regulation or sanction by CCRI in accordance with applicable law and CCRI's own policy. Indeed, as confirmed by the evidence in the record, including an email from Dean Alix Ogden, Special Advisor to the President overseeing the college's labor relations and governance system dated December 19, 2019, where conduct which is the subject of a misconduct complaint involves union business, it is the policy of CCRI that the dispute is not subject to determination by the college.

It is beyond doubt that my client was involved in concerted activity protected under the RILA when he was engaged in the communications with Sneesby and Abbasica referenced in the Complaint and when using the CCRI email/listserv system to communicate with other union faculty members regarding the TA. The right to concerted action lies at the heart of the protections under the RILA and National Labor Relations Act ("NLRB") on which it was patterned. Additionally, his communications and interactions with DelSesto referenced in the Complaint arose out of and were related to his disagreement and concern over the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty. Del Sesto was the author and sender of the email which contained the last-minute disputed interpretation of the CBA. The entire interaction involved Murray in his capacity not just as a faculty member asserting rights under the CBA, but more significantly, as a faculty member Department Chair speaking on behalf of his members on an urgent and pressing issue for Law Department faculty members. Moreover, CCRI well knew that the interaction/communications were protected conduct and outside the

purview of either a disciplinary or Title IX complaint, and it has refused to process complaints of this very type on my client's behalf.  Tr. Murray pp. 100-102, email chain 11/20/19—12/19/19 (Murray exhibit).

Interpreting Title IX and its own policies and procedures as authorizing the issuance of a Complaint and imposing pre-determination sanctions based on heated discussions among union faculty members which CCRI deems "uncivil" or "unprofessional" also violates my client's and all other union members' right to collective action and constitutes an unfair labor practice prohibited by R.I. Gen. Laws §28-7-13 (10).  This is so because the actual, necessary, and intended effect of this practice is to impair and chill the exercise of collective action rights out of fear of being disciplined if CCRI disapproves of the tone or content of the communications between members.  R.I. Gen. Laws §28-7-13 (10) (making it is an unfair labor practice to "[d]o any acts . . . that interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by § 28-7-12."); see also N.L.R.B. v. Ne. Land Servs., Ltd., 645 F.3d 475, 481–83 (1st Cir. 2011) (The "mere maintenance" of a rule that "would reasonably tend to chill employees in the exercise of their Section 7 rights" is unlawful.).  "It is axiomatic that that an employees' right to discuss, debate, and communicate with each other regarding workplace terms and conditions of employment" is protected under the Act.  *See United States Postal Serv., & Roy Young, an Individual*,, No. 14-CA-195011, 2021 WL 1087421 (Mar. 18, 2021) (interpreting and applying Section 7 of the NLRA).  The Supreme Court has acknowledged "the importance of freedom of communication to the free exercise of organization rights" under the NLRA.  *Cent. Hardware Co. v. N.L.R.B.*, 407 U.S. 539, 542–43 (1972).

The communications and conduct at issue involve interpersonal conflicts and disagreements between faculty members and, in the case of Del Sesto, staff and do not constitute conduct proscribed by the CCRI Title IX Policy

### III.    THE COMPLAINT MUST BE DISMISSED AS COMBINING THREE UNRELATED COMPLAINTS VIOLATES CCRI POLICY, FEDERAL ADMINISTATIVE GUIDANCE, AND DUE PROCESS OF LAW.

CCRI has improperly combined three complaints involving three totally unrelated communications/interactions in violation of CCRI Title IX Policy and applicable law in an apparent deliberate but misguided attempt to create a "pattern and practice" Title IX violation.  *First, combining these three unrelated interactions which are not probative or relevant to each other only serves to prejudice my client and for that reason also violates due process of law and warrants a dismissal of the Complaint on that basis alone.*  Second, largely because of the forgoing reason, combining such separate and distinct complaints violates applicable law regarding the Title IX complaint procedure, including the express provisions of the CCRI Title IX Policy.  Joint Guidance on Federal Title IX Regulations: *Summary Analysis of Sections § 106.45(b)94): Consolidation of Complaints* ("[A] single investigatory and adjudicatory process may be used *where it arises from the same incident and parties.*")(emphasis added); Council on Postsecondary Education, *Title IX Sexual Harassment Policy and Procedures*, Sec. XIX (Consolidation of Formal Complaints)("The Covered Entity may consolidate Formal Complaints of Sexual Harassment *where the allegations arise out of the same facts or circumstances*.")(emphasis added).  Third, the only real similarity between the three situations that is noteworthy is that they all arise out of and relate to conduct protected under R.I. Gen. Laws §28-7-12 as in detail above.  This objection was previously raised with both you and CCRI's General Counsel and is reiterated herein again as a ground for dismissal.

## IV.    THE COMPLAINT MUST BE DISMISSED AS THE ALLEGED CONDUCT IN QUESTION DOES NOT CONSTITUTE A VIOLATION OF TITLE IX

### *Background*

On February 28, 2023, in the midst of a fierce debate and imminent vote on the above mentioned T.A., my client was locked out of his office, denied access to his CCRI email account—which, under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others, the current CCRIFA and Faculty Senate presidents (both of whom are complainants). The basis of this action against my client by CCRI was purported Title IX violations arising out of three totally separate and unrelated communications ("Complaint"), one of which occurred over *one month* prior (and had already been informally addressed by Dean Stargard) and two of which occurred about two weeks prior to the issuance of the Complaint. Effectively, it was the combined action and express intent—both Abbascia and Sneesby expressly requested that Murray be banned from the faculty listserv—of two faculty association leaders of whom Murray was critical and the administration of which Murray was a longtime and vocal critic that succeed in banishing Murray from campus and the listserv in order to silence him in the midst of a vigorously contested debate over the proposed T.A. and lack of faculty governance. The administration accomplished this by converting a month-old non-disciplinary complaint of Del Sesto, V.P. Costigan's assistant, which had already been addressed by Dean Staargard, into a purported Title IX complaint and then improperly combining it with the two other union leadership complaints in a deliberate, but misguided attempt to create a pattern and practice Title IX violation, which only applies to systemic, institutional conduct—not to an individual.

As you are probably well aware from your review of the complaints and investigation to date, the substance of the allegations of all three of the complainants at issue is the subjective belief or "perception" of each that my client was apparently critical of their conduct and that his demeanor and tone was allegedly subjectively offensive to them—invoking the mantra "bullying," with two of them opining that they believed they were targeted because they were women.

### A.    Judicial interpretation of the elements of a Title IX claim.

The allegations in the Complaint and in the record fail to establish even a colorable Title IX violation. In addition, the subject matter of all the communications at issue were all related either to the union, collective bargaining/terms and conditions of employment, and/or a dispute/communication with the CCRI administration over the interpretation and application of the CBA. As such, the communications were, therefore, clearly and indisputably protected from adverse action by CCRI policy and the RILA. CCRI nevertheless issued a facially and obviously deficient Title IX complaint on the basis thereof and utilized it as a pretext to silence my client by placing him on administrative leave and banning him from campus, barring his access to his school email and sole means of communicating with his fellow union faculty members, and prohibiting him from communicating with the CCRIFA and Faculty Senate presidents.

It is black letter law that Title IX was not designed to create a general civility code.[6] Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of

---

[6] *Title IX. Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.,* 947 F.3d 342, 350 (6th Cir. 2020) ("Plaintiffs cannot be faulted for finding Frye's use of the term "pussy" offensive, even in a football setting. But crude or vulgar language alone does not rise to the level of a Title IX violation. After all, Title IX, like Title VII,

the law.[7] To support a claim, the conduct must be extreme and not merely rude or unpleasant.[8] Nor does conduct come within the scope of the law because the complainant invoked the mantra of "bullying."[9]  Moreover, conduct is not subject to sanction under Title IX merely

is not a "general civility code."); *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011)("[T]to recover [under] Title IX  . . ., Wolfe had to prove the harassment complained of amounted to more than mere name-calling; he was legally required to show the harasser intended to discriminate against him "on the basis of sex," meaning the harassment was motivated by either Wolfe's gender or failure to conform with gender stereotypes."); *Moeck v. Pleasant Valley Sch. Dist.*, 179 F. Supp. 3d 442, 447–48 (M.D. Pa. 2016) ("According to the plaintiff the sexual harassment she endured is as follows: Coach Getz 'would call people a pussy, a faggot. Heard once, string bean arms. He would curse almost every single letter in the alphabet. He would say fuck. He would call people assholes.'  He additionally used the word 'bitch'.  He used these words, however, to the boys not to plaintiff or her sister. Additionally, plaintiff notes that Coach Getz told teammate J.J. to 'penetrate all the way through like he was having sex with a girl.'  These statements were not made to the plaintiff and are mere vulgarity, thus, we will not consider them sexual harassment of the plaintiff.")(internal citations to record omitted); *see also Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003)("On the other hand, we have repeatedly emphasized that anti-discrimination laws do not create a general civility code."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not create a claim for all unpleasant or abusive behavior in the workplace; it is not a general civility code and does not apply to the normal tribulations of the workplace, such as the sporadic use of abusive language, race-related jokes and occasional teasing. The conduct must be extreme to amount to a change in the terms and conditions of employment."); *Montalvo-Figueroa v. DNA Auto Corp.*, 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019)(Nevertheless, the harassment must pass a certain threshold of severity.  Mere discomfort is insufficient.").

[7]  *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003) ("Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law."); *accord*; *May v. Delta Air Lines,* No. CV 21-710 ADM/ECW, 2022 WL 2835123, at *7 (D. Minn. July 20, 2022), appeal dismissed sub nom. *May v. Delta Air Lines, Inc.*, No. 22-2763, 2022 WL 18779768 (8th Cir. Nov. 2, 2022);  Elghoul v. United States, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. *Elghoul v. McDonough*, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022); *Thompson v. McDonald*, No. 16-80811-CIV, 2019 WL 11314995, at *6 (S.D. Fla. Mar. 25, 2019), aff'd sub nom. *Thompson v. Sec'y, U.S. Dep't of Veterans Affs.*, 801 F. App'x 688 (11th Cir. 2020)*Andrews v. Green Bay Packaging, Inc.,* No. 4:17CV00788 JM, 2019 WL 1053612, at *7 (E.D. Ark. Mar. 5, 2019); *Guimaraes v. SuperValu, Inc.*, No. CIV. 10-366 RHK JSM, 2010 WL 5099648, at *9 (D. Minn. Dec. 8, 2010), aff'd, 674 F.3d 962 (8th Cir. 2012); ); *Kent v. Iowa*, 651 F. Supp. 2d 910, 937 (S.D. Iowa 2009); *Miles v. Wal-Mart Stores, Inc.*, No. CIV. 06-5162, 2008 WL 222694, at *4 (W.D. Ark. Jan. 25, 2008); *Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006); *Munoz v. Adventure Lands of Am., Inc.*, 957 N.W.2d 324 (Iowa Ct. App. 2021); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing [do not violate anti-discrimination laws]."); *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir.2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins.").

[8]  *Stoddard v. BE & K, Inc.*, 993 F. Supp. 2d 991, 1002 (S.D. Iowa 2014); *accord Munoz v. Adventure Lands of Am., Inc.,* 957 N.W.2d 324 (Iowa Ct. App. 2021); *see Wilkie v. Dep't. of Health & Human Servs.,* 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be *extreme,*" and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace.") (emphasis added) (citation omitted); *accord Barron v. Decare Dental, LLC*, No. CIV. 12-699 RHK/SER, 2013 WL 3989786, at *6 (D. Minn. Aug. 2, 2013);  *LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir. 2001) ("Moreover, "[not] everything that makes an employee unhappy is an actionable adverse employment action [instead] an adverse employment action is exhibited by a material disadvantage, such as a change in salary, benefits, or responsibilities.");  *accord Elghoul v. United States*, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. *Elghoul v. McDonough*, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022).

[9]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended and does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Whitley v. Indep. Sch. Dist. No. 10 of Dewey Cnty., Oklahoma*, No. CIV-18-331-SLP, 2019 WL 7667329, at *5 (W.D. Okla. Apr. 22, 2019) ("Under Title IX, the prohibited discrimination does not include bullying, but the prohibited discrimination does include sexual harassment. The harassment must be "gender-oriented," and it must be more than mere name-calling."); *see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("Each Plaintiff, in other words, must show a practice or

because it was directed at someone of the opposite sex—in this case women.[10]  In addition, mere subjective feelings or perceptions are insufficient; the conduct complained of must also satisfy an objective standard that meets all of the foregoing elements of a claim and be so severe, pervasive, and objectively offensive that it effectively denies a person access to an institution's employment programs and/or activities.

### B.    The facts in the record do not establish any of the elements of a Title IX violation as to any of the complainants.

*Neither the Complaint nor the facts in the record contain facts sufficient to establish adverse gender-based conduct constituting a violation of the CCRI Title IX Policy.*

The CCRI Title IX Policy forbids "sexual harassment" defined as "conduct on the basis of sex that constitutes Quid Pro Quo Sexual Harassment, Hostile Environment Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence, or Stalking."  *Id*. VIII. A. None of the types of "sexual harassment" described in the policy has occurred in this case. Nevertheless, based on the allegations in the Complaint and the questioning by the Investigator, the administration appears to be attempting to build a case of "Hostile Environment Sexual Harassment."  ***Such conduct must be motivated or based on gender and be objectively "so severe, pervasive, and objectively offensive that it effectively denies a person access to [the institution's] Programs or Activities***."  *Id*. VIII., p. 4.[11]  *See Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21-23 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond [employment discrimination law] purview.  We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether

---

pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient. Whether . . . . harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well-being of employees is a question to be determined in light of the totality of the circumstances.")

[10]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended . . . to provide them recourse for mistreatment that is not based on sex."); .); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp*. 3d 442, 447–48 (M.D. Pa. 2016) ("A review of all these statements reveals fewer than ten sexually-tinged comments over the course of two or three years. Such sporadic incidents are not sufficiently pervasive to establish a sexual harassment claim, the statements are mere offensive utterances.  While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way.  Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner."); *see also Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations.  The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (internal quotations omitted); *Wolfe v. Fayetteville, Arkansas Sch. Dist*., 648 F.3d 860, 867 (8th Cir. 2011)( "[A]cts of name-calling do not amount to sex-based harassment, even if the words used are gender-specific, unless the underlying motivation for the harassment is hostility toward the person's gender."); *Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist*., 647 F.3d 156, 165 (5th Cir.2011) (stating harassment is actionable under Title IX only if it is "based on sex, per the words of Title IX, and not merely tinged with offensive sexual connotations" and affirming summary judgment where record fails to suggest the harasser "was motivated by anything other than personal animus.").

[11]  The CCRI Title IX Policy further requires that: "in determining whether a hostile environment exists, [CCRI] will consider the totality of circumstances, including factors such as the actual impact the conduct has had on the Complainant; the nature and severity of the conduct at issue; the frequency and duration of the conduct; the relationship between the parties (including accounting for whether one individual has power or authority over the other); the context in which the conduct occurred; and the number of persons affected."  *Id*. IX., pp 7-8.

**Page 14 of 44**

it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."); *accord Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006).

The conduct complained of in the Complaint is nothing more than personal perceptions and subjective feelings of the complainants that the language, tone, and/or demeanor of my client in the communications was offensive or upsetting to them (without regard to *their* concurrent behavior, demeanor, and conduct toward my client). There are no allegations in the Complaint of any vulgarity, unwanted touching, threats of violence, or criminal conduct. None of the complainants claimed they were in fear for their physical safety. As discussed above, Title IX is not a civility code nor a general anti-harassment code. Nor does the evidence establish that the communications/conduct at issue was related to or motivated by gender.

In short, there is no evidence in the record of **_any_** gender based or motivated conduct on the part of Murray that was so severe, pervasive, and objectively offensive as to effectively deny any of the complainants to access to any program or activity of CCRI.

### Requirement that Conduct be Gender Based

To constitute prohibited conduct under the CCRI Title IX Policy and applicable law, the conduct must be gender based or motivated. The mere fact that it is between a man and a woman is not enough. The fact that the conduct is "offensive and inappropriate [is insufficient where] the statements do not address plaintiff in a sexual way." *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016). "[W]orkplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Harassment is actionable under Title IX only if it is "based on sex, per the words of Title IX, and not merely tinged with offensive sexual connotations" and is thus not actionable where the harasser "was [not] motivated by anything other than personal animus."). *Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir.2011).

Nor is there any significance in this case that all three complainants happen to be woman, particularly given the context. First, over two-thirds of the CCRI leadership, including President Hughes and V.P. Costigan, and over 60% of the faculty at CCRI are women. Accordingly, if a faculty member is involved in an interpersonal conflict with a colleague or a member of the administration leadership team at the college, the chances are that it is with a woman. Second, the communications and conduct at issue arose in the context of a fiercely and hotly contested faculty association vote on a proposed T.A., controversy over the lack of shared governance, and the administration's attempt to use the Faculty Senate for its agenda, wherein Murray's position was at odds with both that of the faculty leadership (Abbascia as President of CCRIFA and Sneesby as President of the Faculty Senate) and the CCRI administration (President Hughes and V.P. Costigan), *the Presidents of which are all women and the former two of which are complainants*. The undisputed and ONLY READING of the evidence in the record is that the communications and conduct were motivated solely by Murray's sincere and vigorous advocacy of his positions on behalf of his co-worker faculty members. *See, e.g., Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 951 (N.D. Ill. 2017), aff'd, 933 F.3d 849 (7th Cir. 2019) ("The [alleged perpetrator] female student's activism and public statements were all in response to a specific act and were directed at a specific individual, not all males, and thus there was no actionable claim for Title IX sexual harassment.")

**Page 15 of 44**

Finally, pattern and practice Title IX violations relate solely to systemic, institutional violations—it does not apply to conduct by individuals. **Where, as here, a Title IX violation has been alleged, the complainant must show that the alleged perpetrator *engaged in conduct <u>toward the complainant</u> that was *motivated by gender and was so severe, pervasive, and objectively offensive as to effectively deny the complainant access to a program or activity of CCRI. As a matter of law, conduct toward others is irrelevant to this analysis.*** *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("Each Plaintiff, in other words, must show a practice or pattern of harassment **<u>against him</u>**. A single incident or isolated incidents generally will not be sufficient.") (emphasis added).

### 1.    *<u>Del Sesto Complaint</u>*

Del Sesto alleges that she subjectively felt "uncomfortable" and was "caught off guard by [my client's] unexpected visit and demeanor" when he came to her office and "in summary was ***speaking negatively about the PTFA, contract, administration and his role.***"

**Not Gender-Based.**  Del Sesto does not claim in her complaint or testimony that Murray was motivated by gender or that gender in any way played a role in their dispute.

**Not Severe**.  Del Sesto claims that Murray was angry and "flailing his arms" during the encounter in question which lasted a matter of a few minutes.  There is no evidence in the record of any vulgarity, unwanted touching, threats of violence, or criminal conduct toward Del Sesto, nor any evidence she was in fear for her physical safety.  Even if Del Sesto was subjectively "shaken up" by the interaction, she does not claim nor can it be inferred from the facts that she was denied access to any program or activity of CCRI as a result of this single interaction with Murray.  Additionally, the interaction could not have been that severe if, after investigating Del Sesto's complaint about the encounter, Dean Stargard determined that it was not a disciplinary matter.  *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not create a claim for all unpleasant or abusive behavior in the workplace; it is not a general civility code and does not apply to the normal tribulations of the workplace, such as the sporadic use of abusive language, race-related jokes and occasional teasing. ***The conduct must be <u>extreme</u> to amount to a change in the terms and conditions of employment.***") (emphasis added).

**Not Pervasive**.  Out of innumerable interactions over an eight (8) year period, Del Sesto claims that this was the "first time" Murray had directed any objectionable communications to or conduct toward her.  Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interaction alleged in the Del Sesto complaint, amount to nothing more than the normal give and take in the workplace. *See Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("[A] Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient.").

**Not Objectively Offensive**.  For the same reasons discussed above under the "Not Severe" heading, even if subjectively offensive or upsetting, keeping in mind the normal trials and tribulations of the workplace, actionable conduct "must pass a certain threshold of severity. Mere discomfort is insufficient.".  *Montalvo-Figueroa v. DNA Auto Corp.*, 414 F. Supp. 3d 213,

244 (D.Puerto Rico 2019). A co-worker venting frustration, even if he or she is animated and raises his or her voice, is hardly unusual or sanctionable objectively offensive behavior.

### 2. *Sneesby Complaint*

Sneesby alleges that Murray "emailed the faculty stating derogatory things about [her] or [her] performance at work." Sneesby is President of the Faculty Senate and a former President of the CCRIFA and the emails to which she refers and on which her allegations are based relate to Murray's criticism of her performance in that capacity. The criticisms were not directed to or at her personally, but arose over their differences of opinion. Specifically, Murray was and is critical of the lack of power of the Faculty Senate and the lack of real shared governance between the faculty and the CCRI administration, as well as the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda. Murray asked Sneesby, in her position as President of the Faculty Senate, to publicly confirm what they had discussed in private, specifically that she concurs with his assessment. The facts in the record show that she yelled and was unprofessional in her communications with Murray on a number of occasions during their approximately ten (10) years of interacting as colleagues at CCRI. Sneesby's unprofessional tone, demeanor, language, and treatment toward Murray in the record is supported both by Murray's testimony as well as statements of independent third-party witnesses.

**Not Gender-Based.** Sneesby alleges Murray is "condescending and dismissive and particularly targets females," without any factual basis or context for this self-serving, subjective opinion. *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Just saying so is not enough. A recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination.") In addition, nowhere in either Sneesby's complaint or testimony does she claim that her dispute with Murray or his conduct toward her was due to her gender and she expressly states in her testimony that Murray allegedly also bullies males and all those who disagree with him. She also claimed that she observed Professor Murray screaming at various people (with no reference to gender) during meetings. *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.*, No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX . . . does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016) ("While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way. Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner.").

**Not Severe**. There is no evidence in the record of any vulgarity, unwanted touching, threats of violence, or criminal conduct toward Sneesby, nor any evidence she was in fear for her physical safety. Moreover, the communications and any criticisms therein were not directed to or at her personally, but arose over their differences of opinion with respect to the lack of power of the Faculty Senate, the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda, and other faculty association matters. Even if Sneesby was subjectively offended or upset by Murray's communications in the faculty emails, she does not claim nor can it be inferred from the facts that she was denied access to any program or activity of CCRI as a result of her interactions with Murray. Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interactions alleged in the Sneesby complaint, amount to nothing more than the normal give and take in the workplace. *See Wilkie v. Dep't. of Health & Human Servs*., 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory

**Page 17 of 44**

intimidation, ridicule, and insult [must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not . . . apply to the normal tribulations of the workplace . .. ***The conduct must be*** <u>***extreme***</u> ***to amount to a change in the terms and conditions of employment.***") (emphasis added). *Montalvo-Figueroa v. DNA Auto Corp.*, 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019) ("Nevertheless, the harassment must pass a certain threshold of severity. Mere discomfort is insufficient.").

    **Not Pervasive**. Out of innumerable interactions over a ten (10) year period, Sneesby identifies only a few occasions wherein she complains about what she appears to characterize as Murray's vigorous criticisms of her. Moreover, Sneesby admits she also "interact[ed] with him…and . . . saw a different side of him," having "some really good discussions." Although Sneesby also complains about Murray's alleged"aggressive[] critici[sm]" of President Hughes and Abbascia, these and any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interaction alleged in the Sneesby complaint, amount to nothing more than the normal give and take in the workplace. *See Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("[A] Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient.").

    **Not Objectively Offensive**. For the same reasons discussed above under the "Not Severe" heading, even if subjectively offensive or upsetting, keeping in mind the normal trials and tribulations of the workplace as well as Sneesby's level of vitriol in some of her communications with Murray over the years, the communications and conduct in question do not arise to sanctionable, objectively offensive behavior. This is particularly true insofar as the complaint does not involve personal criticisms or attacks, but rather communications between professional colleagues about differences of opinion regarding college policies and practices. Such disputes are to be expected under such circumstances and a person like Sneesby, who holds a leadership/policy-making position, must expect criticism and disagreement from time to time—even if sometimes vigorous, persistent, and public.

### 3. *Abbascia Complaint*

    Abbascia complains about what she perceives as Murray's "unprofessional, bullying, threatening tone in emails." She objects to Murray's emails wherein he called her a "lame duck" president—arising out of her announcement that she is leaving the college and her role as President of the union in June, prior to the end of her term of office, called into question her ability to do her job as union president, called for her resignation, and "verbally told faculty members that [Murrray] is trying to oust [her] as CCRIFA President." During the period of the above communications, Abbascia and Murray were also at odds because Abbascia supported and advocated for approval of the T.A. by the faculty, while Murray was a vocal opponent. Murray's communications and criticisms about which Abbascia complains all involve, directly or indirectly, Murray's call for Abbasica's resignation in the context of a faculty vote that rejected the proposed T.A., indicating a lack of confidence in her by the faculty, as well as her not having a personal or professional stake in the outcome since she would not be seeking re-election as Faculty Association President nor would she be subject to the terms of any new

contract.  By dictionary definition, Abbascia was, objectively, a "lame duck." [12]  Murray and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship.  Murray was a mentor and supporter of Abbasica when she declared to run for Faculty Association President in October of 2020.  Abbascia described the change in the relationship to be related to the union contract negotiations with the administration and the way that she conducted faculty association meetings.  Abbascia stated under oath that for most of the time she was employed at CCRI, her relationship with Professor Murray was cordial and professional.   Other than the controversy surrounding her announcement to leave CCRI in June, and her continuation of her role as union president, Abbascia indicated that Murray had been cordial with her.  Abbascia stated that her decision to leave CCRI was personal, and was not prompted by her current dispute with Murray.

**Not Gender-Based.**  Although Abbasica makes the claim that she was a "target" of Murray as "president of the union and as a woman," her bald-faced, subjective claim she was targeted as a woman is without any logical or factual basis—she was the union President who recommended approval of a T.A. rejected by the faculty and then announced her intent to resign—and clearly was the "target" of Murray's criticisms on that basis.  *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Just saying so is not enough.  A recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination.")   Indeed, in her sworn testimony, when asked twice whether Murray's alleged "bullying" was directed at men or just women, Abbasica concedes both times that "maybe it just so happens that a woman" is union president, president of the college and vice president of academic affairs.  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX . . . does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016) ("While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way.  Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner.").

**Not Severe**.  There is no evidence in the record of any vulgarity, unwanted touching, threats of violence, or criminal conduct toward Abbascia, nor any evidence she was in fear for her physical safety.  Moreover, the communications and any criticisms therein were not directed to or at her personally, but arose over their differences of opinion with respect to her position in support of the T.A. and her role as Faculty Association President.  Even if Abbascia was subjectively offended or upset by Murray's communications in the faculty emails, she does not claim nor can it be inferred from the facts that she was denied access to any program or activity of CCRI as a result of her interactions with Murray.  Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interactions alleged in the Abbascia complaint, amount to nothing more than the normal give and take in the workplace.  *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not . . . apply to the normal tribulations of the workplace .  ***The conduct must be <u>extreme</u> to amount to a change in the terms and conditions of employmen***t.") (emphasis added); *Montalvo-Figueroa v. DNA Auto Corp*., 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019)("Nevertheless, the harassment must pass a certain threshold of severity.  Mere discomfort is insufficient.").

---

[12]   *The Britannica Dictionary*: "[Defining 'lame duck' as] 1 . . .  an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help." https://www.britannica.com/dictionary/lame-duck

**Not Pervasive**. Out of innumerable interactions during over a five (5) year period, including a brief intimate relationship, Abbasica admits that other than the controversy surrounding her announcement to leave CCRI in June and her continuation of her role as union president, Murray had been cordial with her. Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interaction alleged in the Abbacia complaint, amount to nothing more than the normal give and take in the workplace. *See Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("[A] Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient.").

**Not Objectively Offensive**. For the same reasons discussed above under the "Not Severe" heading, even if subjectively offensive or upsetting, keeping in mind the normal trials and tribulations of the workplace as well as the fact the Murray was previously a mentor, supporter, and intimate partner, the communications and conduct in question do not arise to sanctionable, objectively offensive behavior. This is particularly true insofar as the complaint does not involve personal criticisms or attacks, but rather communications between professional colleagues about differences of opinion regarding college policies and practices. Such disputes are to be expected under such circumstances and a person like Abbascia, who holds a leadership/policy-making position, must expect criticism and disagreement from time to time—even if sometimes vigorous, persistent, and public.

## V.  MODIFICATIONS TO THE INVESTIGATOR'S PROPOSED FINDINGS

### Del Sesto Claim

1.    Elizabeth Del Sesto alleges that on January 20, 2023, Professor Murray appeared at her office  expressing his anger both  verbally and with physical gestures.

**Comment**: *Del Sesto never uses the words "unprofessionally" or "aggressively" in her complaint or testimony in describing the event on January 20, 2023.*

2.    Ms. Del Sesto has been employed at CCRI since September of 2017.  She began  as an administrative assistant to the Dean of Arts, Humanities and Social Sciences. In November of 2019, she became the Coordinator of Academic Affairs where she remained until about March of 2023 when she started as the Manager of Academic and Faculty Initiatives.  She reports to Dr. Costigan, then Vice President for Academic Affairs and now serving as Interim President of CCRI.  She has been reporting to Dr. Rosemary Costigan since November of 2019.

3.    Ms. Del Sesto interacts with Professor Murray in her administrative role at

CCRI, which has included administrative support to the division of the Arts, Humanities and Social Sciences.  Ms. Del Sesto also has served as secretary to the Curriculum Review Committee ("CRC"), preparing the committee minutes.  Professor Murray is a member of the committee.

4.    On the afternoon of Thursday, January 19, 2023, Ms. Del Sesto sent an email to all department chairs, including Professor Murray, regarding payroll information for part-time instructors that was to be submitted by the chairs by the following day.

**Additional Proposed Finding**:  *There were a series of back-and-forth emails that predated the email mentioned here which purported to make a last minute material change to the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty.  Because of the confusion created by the Del Sesto email, Murray was unable to finalize the assignment of faculty, complete and submit a faculty workload report, or complete and submit a faculty payroll report, all of which were due that date.*

5.    Ms. Del Sesto responded to a previous email from Murray by email the following morning at 10:37 a.m., with an attachment of notes from a previous informational meeting held in October of 2022.  Shortly after sending the email, Professor Murray appeared in Ms. Del Sesto's office.  He was visibly upset, questioning the information contained in her last email.  His "arms [were] flailing right in the face."[1]  He behaved as if he had never learned of the modification to the compensation plan before her recent emails.

**Comment**.  *In Del Sesto's testimony p. 31 lines 18-19, she states "you know, arms flailing right in the face."  She does not clarify whether the arms were in her face or Murray's face   She was sitting down and Murray was standing a few feet away from her.  In her original statement and complaint she does not say Murray's arms*

*were in her face.  Also, Maya Geraldo does not say his arms were in her face.*

6.    Ms. Del Sesto stated that Professor Murray used "words and phrases such as 'this is ridiculous'...  [speaking] negatively about Dean Stargard and how he's not doing his job."[2]

**Additional Proposed Finding**.  *Del Sesto does not remember the exact substance of what was said; she does state that Murray said nothing disparaging or critical about her, no threats to her or about anyone else.  She says he was loud, not hollering, a bit louder than normal.*  **Del Sesto Tr. 33-34.**

7.    According to Ms. Del Sesto, Professor Murray was "venting in an angry way ... and in an unexpected way when he entered my office right at me."[3]

8.    The exchange with Professor Murray lasted for no more than five minutes.

9.    Ms. Maya Geraldo shares an office with Ms. Del Sesto.  Ms. Geraldo stated that on the morning of January 20, Professor Murray appeared in their office doorway and began to speak to Ms. Del Sesto.  Ms. Geraldo could tell that Professor Murray was upset, noting that he was 'red in the face.'  Professor Murray raised his voice, "flaring [his] arms angrily" stating that "this is ridiculous" and that he was not going to implement the policy for adjunct faculty, and "I'm waiting on my dean."  When he departed, Ms. Geraldo and Ms. Del Sesto looked at each other and asked, "what just happened?"

**Correction to Record**.  **Geraldo claimed Murray was "put on leave" in 2018 – this is incorrect – the only time Murray was placed on leave is the current one.**

---

[1] Elizabeth Del Sesto April 12, 2023 Interview Transcript at 31.

[2] Elizabeth Del Sesto April 12, 2023 Interview Transcript at 32.

[3] Elizabeth Del Sesto April 12, 2023 Interview Transcript at 32.

10.    Dr. Laruen Webb is employed at CCRI as the Director of Academic Program Review and Accreditation.  Dr. Webb's cubicle office is in the Academic Affairs suite, down the corridor from Ms. Del Sesto's office.  On January 20, while she was preparing to host an

important workshop later in the afternoon, Dr. Webb frequently went back and forth to a supply closet that is in the general vicinity of Ms. Del Sesto's office. In doing so, she noticed that Professor Murray was standing in Ms. Del Sesto's doorway and was speaking very loudly and he was quite insistent. While she was not paying attention to what he was saying, she concluded from his voice that he was angry. After Professor Murray left, she recalls speaking with Ms. Del Sesto and stating words to the effect, 'Wow, Steve was really upset.' Dr. Webb found Ms. Del Sesto to be 'shaken up.' Ms. Del Sesto was very emotional while she recounted the incident with Professor Murray.

11.    Dr. Costigan remembers returning to her office on January 20, and observed Ms.

Del Sesto at her desk. Ms. Del Sesto's 'eyes were big, and she looked shaken.' Ms. Geraldo, told Dr. Costigan that Professor Murray was the cause.

12.    Dr. Costigan reached out to Dean William Stargard and explained that Professor Murray had been up to her office and exhibited very assertive and aggressive behavior towards Ms. Del Sesto and that he needed to speak to Professor Murray about it.

13.    Professor Murray has been employed by CCRI as a full-time professor since 1993. He served as an adjunct professor for two or three years prior to that time. He originally was part of the Business Department and then was involved in the creation of the Criminal Justice and Legal Studies Department. Professor Murray has likewise served as the Chair of the department since approximately 2012. His department is part of the Arts, Humanities and Social Sciences division, which is presently overseen by Dean William Stargard since July 2022.

**Additional Proposed Findings**. **See also additional proposed findings 3-18 in Section I above.** ***Professor Murray was hired as an assistant Professor, granted tenure, promoted to Associate Professor and then promoted to full Professor. He has never been disciplined for misconduct or otherwise by the College. He has***

*outstanding work evaluations in his Professional file by the Deans who supervised him, the faculty in his department and from students.  In the last nine (9) years or so there have been nine (9) different deans employed by the College working under the direction of VP Costigan in the division of Arts, Humanities and Social Sciences.*

14.     Dean Stargard and Professor Murray have interacted since Dean Stargard's hire, which was over the summer of 2022.  Previously, there were nine (9)  other deans, including interim Dean John Cole, Interim Dean Allyson Handley, and Dean Brian Brophy-Baermann.  In addition to his teaching duties, Professor Murray has been an active member of the faculty association.  He served as the faculty association president for two terms, from approximately April 2016 until October 2020.  He likewise is presently and has been for many years a member of the Curriculum Review Committee ("CRC").  His office is located on the Knight Campus in Warwick.

15.     In his role as Chair of his department, Professor Murray also serves on the Chairs' Council.  The Chairs' Council meets once per month during the academic year. Likewise, there is a "Little Chairs'" meeting, which meets immediately prior to the Chairs' Council meeting.
The "Little Chairs" group is an informal gathering of department chairs who wish to discuss issues prior to the formal meeting of the Chairs' Council.

16.     Professor Murray stated that he has interacted with Ms. Del Sesto as an administrative support person for then Vice President of Academic Affairs, Rosemary Costigan. His interactions with Ms. Del Sesto would be in the context of his role as a department chair.

17.     Professor Murray recalls a series of emails with Ms. Del Sesto that dated back to and include the fall semester of 2022, regarding adjunct faculty, primarily, as well

as the scheduling of full-time faculty.  There are also emails concerning faculty load reports.  The adjunct faculty had just entered into a new contract and there were questions regarding compensation.  Professor Murray sent an email to Ms. Del Sesto on January 19.  The semester was scheduled to begin the following Monday, January 23, 2023.  Payroll and faculty workload reports were all due on January 20.

18.    On January 20, Professor Murray recalls going to the college administrative offices with the intention of speaking with Dean Stargard.  However, the dean was not in his office.

19.    Professor Murray then went to the office of Ms. Del Sesto and Ms. Geraldo and stood in the doorway.  He stated that he greeted both Ms. Del Sesto and Ms. Geraldo, asked if Dean Stargard was around, and then briefly spoke to Ms. Del Sesto about the emails that she and the administrative office were sending out regarding payrolls, scheduling, etc.  Professor Murray also stated that he told Ms. Del Sesto that he and others were confused by her email.  He denies raising his voice or hollering at anyone.

20.    With respect to any physical gestures, Professor Murray explained that most people communicate with some form of body language.  He denied doing anything "that would be considered violent or threatening in any way."  In his interview, he explained, "Sitting here, can you move your hands a little bit, I mean, I think that's normal. …I mean, you're moving around, I'm moving around."

21.    When asked if he was either flailing or flaring his arms during the encounter with Ms. Del Sesto, he denied knowing what either word meant and indicated that he would need to "ask [Ms. Del Sesto and Ms. Geraldo] what they meant and to show me."[4]

22.    While speaking to Ms. Del Sesto, Professor Murray did not view her as being visibly upset after the interaction with her.  He described the episode as a "non-event."[5]

23. Dean Stargard learned of the January 20, 2023 incident when Ms. Del Sesto appeared upset in his office, describing Professor Murray as being angry towards her. Dean Stargard scheduled a meeting with Professor Murray, along with a union representative. During

---

[4] Steven Murray May 12, 2023 Interview Transcript at 29.

[5] Steven Murray May 12, 2023 Interview Transcript at 31.

the meeting, Dean Stargard found that Professor Murray appeared to diminish the seriousness of the episode with Ms. Del Sesto: when Dean Stargard would move his hands (while Stargard was speaking) during their meeting, Professor Murray asked if 'that is a gesture?' in an apparent attempt to place in context Ms. Del Sesto's reaction to his alleged hand and arm movements.

**Comment. "Minimize" is an adverse assumption about what Murray's motivation was and the point he was trying to make. As stated previously, Del Sesto never used the word "aggressive" in either her statement or testimony.**

24. Regarding the meeting with Dean Stargard to review Ms. Del Sesto's allegations, Professor Murray recalled an email from Dean Stargard. Professor Murray stated that he did not know what was meant in his email by "raising your voice" and with respect to the dean's description of an "agitated demeanor," he indicated that Ms. Del Sesto did not specify that in her complaint. He also did not see any reference in her complaint to "directing your frustration to a staff member."[6]

25. Apart from the January 20, 2023 incident, Ms. Del Sesto was asked: Did Mr Murray ever treat you—to use the word – inappropriately at any of these meetings, these Curriculum Review Committee meetings?" To which she responded: "" Not that he would – he would almost indirectly mistreat me I think in the sense that, again, I know a lot of information in policies and procedures…" There are times when she attends CRC

meetings and:

> I have raised my hand and I have politely added my, you know, information related to whatever topic is being spoken about and he, you know, has said things like not – in direct quotes – but things like, you know, we don't need people other than the committee speaking and things like that, and actually at one recent meeting I had spoken up about something.

> **Comment:  This finding is misleading.  She said "*almost* indirectly mistreat me." This characterization is just that, an adverse spin on an ambiguous and incomprehensible response by Del Sesto.  Murray proposes the complete question and answer be substituted instead.**

26.     Ms. Del Sesto recalls receiving an email in the fall of 2022 from Professor Murray to Dean Stargard, requesting that she no longer serve as the CRC secretary.  Ms. Del Sesto provided the October 29, 2022 email correspondence in her supplemental documents on April 13, 2023.  The email was sent by Professor Murray to the CRC members and the Chair, Dean Stargard.  In part, the email reads:

> It would be appropriate for members of the CRC to be seated at the table and non- CRC members to be seated not at the table, but in seats nearby.  ….the CRC, like all committees, should have a CRC member in the role of committee Secretary.  Liz

---

[6] Steven Murray May 12, 2023 Interview Transcript at 44.

> [Del Sesto] has done a very good job with the support work needed for the CRC, but she is not a member of the CRC, and we should have a faculty member as Secretary (with Liz or another assistant in a support role for the Secretary).  ….I encourage anyone who has comments, pro or con, to share them with all of the members of the committee.

### *Sneesby Claim*

27.     Professor Sneesby alleges that Professor Murray made derogatory and false statements about her and her work performance, which were sent by email correspondence to the entire faculty.

> **Additional Proposed Finding**.  *Despite Sneesby's allegations, none of the emails produced by Sneesby or Murray contain derogatory and/or false statements about Sneesby or her work performance, but rather are critical about the lack of power of and manipulation of the Faculty Senate by the administration for its own*

*purposes.*

28.    Professor Sneesby has been employed as a full-time instructor since July of 2008 and previously served as a part-time instructor for an additional 15 years, since the mid-1990s. She began teaching in the Computer Studies Department and remained in that department until 2015, when she transferred to the English Department. She is the current Chair of the English Department and has served in that capacity for approximately the past two years.

29.    Professor Sneesby alleges that Professor Murray emailed the entire faculty, and stated derogatory comments about her and her performance at work. Despite requesting that he cease sending the emails, he allegedly continued to do so. Professor Sneesby also alleges that Professor Murray bullies her and other participants at meetings with condescending and dismissive behavior, particularly targeted towards women.

30.    Professor Sneesby previously assumed the presidency of the faculty association after both the elected president and vice president resigned. (She originally was elected to serve as secretary for the association.) She stated that Professor Murray orchestrated a faction of faculty members to "ratchet up email attacks and just spread untruths."[7] The adverse faction allegedly attempted to persuade Professor Sneesby to appoint Professor Murray as the leader

_____

[7] Sandra Luzzi Sneesby May 5, 2023 Interview Transcript at 13.

of the negotiation team for the new union contract with CCRI. The faction threatened that they would expel her as president if she failed to do so. However, the motion failed and she remained in the office of president.

31.    She subsequently ran for president but was defeated by Professor Murray. Professor Murray served for a total of four years as president and was succeeded by Professor Tara Abbascia. During his tenure as president, Professor Sneesby's interactions with Professor

**Page 28 of 44**

Murray improved significantly. She "began to interact with him…and I saw a different side of him," having "some really good discussions."[8]

32.     Professor Sneesby also developed a fear of interacting with Professor Murray when she observed Professor Murray aggressively criticizing President Meghan Hughes and Vice President Rosemary Costigan. She stated that she also observed Professor Murray screaming at various people during meetings.

33.     When Professor Sneesby publicly supported Professor Abbascia as president of the association, she claims to have once again become the target of Professor Murray's attacks. His criticisms of Professor Abbascia reminded Professor Sneesby of his former criticisms of her while she served as president of the faculty association.

34.     On February 1, Professor Sneesby emailed the faculty to express her support for Professor Abbascia. Professor Sneesby wrote in her email that the current behavior was "bullying" and that it reminded her of the years that she served as president and "faced a barrage of toxicity."

35.     There were a series of email correspondence between Professor Murray, Professor Sneesby and others regarding the role of the Faculty Senate. On February 13, Professor Murray

_____

[8] Sandra Luzzi Sneesby May 5, 2023 Interview Transcript at 20-21.

sent an email to the faculty association indicating that he was "awaiting a statement from Union leadership regarding the Union's position" on the authority and role of the Faculty Senate. He asked if there was "an agreement that the Faculty Senate is merely an advisory body to the  college president…." There followed email correspondence between Professors Killgore and Murray on that topic. Professor Killgore responded, disputing that the Senate is a failure and claiming that Professor Murray's comments were "unsupported

by example or evidence." In response, Professor Murray wrote that his "evidence" of the failure of the Senate "can be found in the 3 bills…that require faculty to take certain actions. …[it] should be noted that [one of the bills] was not introduced by Professor Kilduff or Professor Stockford, but rather by Dean Nauman. Both Ray Kilduff and Jason Stockford verified that to me today." At that point, Professor Sneesby sent an email to both Professors Stockford and Kilduff asking what Professor Murray's basis was for his statement, noting that "I don't recall Barbara submitting legislation. Can you explain what happened?" In response, Professor Stockford informed both Professors Sneesby and Kilduff that his recollection was "that the grading scale was introduced orally at our last meeting by Dean Nauman. Following the meeting, I put the grading scale into writing for the committee. My thought was that it would be further debated and refined in committee before going to the full Senate for consideration."

**Additional proposed finding**. *Accordingly, consistent with Murray's grave concerns about the administration's manipulation of the Faculty Senate, the bill in question was in fact improperly introduced by the administration, not a member of the faculty.*

36.    Later on February 14, Professor Sneesby confronted Professor Murray at the beginning of a "Little Chairs" meeting and asked him to go outside to meet with her. They went out into the hallway and Professor Murray claimed that Professor Sneesby berated him.

37.    Professor Sneesby asked him why he was attacking the Faculty Senate, asserting that it was an attack on her personally since she worked on its creation. Professor Murray told her that that his motivation was not directed against her personally.

38.    Professor Murray sent an email to Professor Sneesby at 1:08 pm on Thursday, February 16, 2023. Professor Murray asked if she was going to tell the entire

faculty about her view that the Faculty Senate was dominated by the college president and vice president and that the Faculty Senate had no real power.

39.     Professor Sneesby responded by calling Professor Murray from her office. She placed Professor Murray on speakerphone so that her colleague, Professor Jon Dorn, could listen to their conversation, and basically repeated the same conversation with him regarding her work on the Faculty Senate. [9]

> **Comment.  Sneesby never stated in her complaint or testimony that Murray threatened her.  There was no email exchange wherein Murray "threatened" Sneesby or said she was "a puppet of the administration" nor did he even imply this.  What Murray stated was that the *Faculty Senate* was being used by the administration for its own purposes, the implication of which could be that the *Faculty Senate* was a puppet of the administration, not Sneesby.**

40.     The conversation was argumentative, and Professor Murray stated that Professor Sneesby was screaming at him  during the phone call, a fact which was corroborated by three independent witnesses, Lolita Villanueva, Tiffany Jones, and Lauren Nagel.   Professor Sneesby denies it.  She did indicate that each of them was intense during the phone call but she denied any screaming.  Professor Sneesby also told Professor Murray that he should leave Tara Abbascia alone and stop criticizing  everyone.  The attacks reminded her of the time she served as president of the association and found that it was repeating the same pattern.

41.     During his interview, Professor Dorn stated that Professor Sneesby asked him to sit in on her February 16 phone call with Professor Murray.  He recalls Professor Sneesby either summarizing or showing him Professor Murray's email that was sent earlier that afternoon at  1:08 p.m.  Professor Dorn described both Professors Sneesby and Murray as speaking loudly and forcefully at times.  Professor Sneesby raised her voice occasionally to interject a comment.  At the conclusion of the call, Professor Sneesby appeared visibly

shaken and she told Professor  Dorn that she was going to report the incident to Human Resources.  Approximately 30 minutes later, she returned to Professor Dorn's office and asked him to prepare a written statement

---

[9] Sandra Luzzi Sneesby May 5, 2023 Interview Transcript at 33.

summarizing what he had heard during her phone call with Professor Murray.  His written statement was attached to Professor Sneesby's complaint.

42.    Professor Sneesby recalled other occasions, during CRC meetings, when she attempted to speak, and Professor Murray put his hand up to stop her.  He occasionally would say comments such as "that's nonsense" or "I didn't tell you to speak."[10]

43.    Professor Sneesby stated that she was so concerned and afraid of Professor Murray's past behavior that she asked for the campus police to be present at a Faculty Senate meeting in February since Professor Murray indicated that he would be attending.[11] She was "afraid he was going to attack me, like, verbally come after me or accuse me of whatever at that meeting and disrupt the meeting."[12]  Ultimately, however, no incidents involving Professor Murray occurred at the meeting.

44.    Professor Murray recalls learning from his assistant, Tiffany Jones, that Professor Sneesby was seen with the Chief of Police at CCRI and that the police were planning to attend a Faculty Senate meeting.  Professor Murray observed two officers at the meeting when he arrived. Professor Murray viewed their presence as an intimidation tactic.

45.    Professor Murray recalls the telephone conversation with Professor Sneesby of Thursday, February 16, 2023, regarding the role of the Faculty Senate and his view that it is purely advisory.  His recollection is that Professor Sneesby called him and was screaming, expressing her displeasure that he claimed that a Faculty Senate bill that was sponsored by two faculty members was purportedly introduced on behalf of the

administration.  Professor Murray

---

[10] Sandra Luzzi Sneesby May 5, 2023 Interview Transcript at 51.

[11] Sandra Luzzi Sneesby May 5, 2023 Interview Transcript at 69.

[12] Sandra Luzzi Sneesby May 5, 2023 Interview Transcript at 70.

urged Professor Sneesby to tell people about her concern that Vice President Costigan and

President Hughes were attempting to use the Faculty Senate for shared governance.

46.    Professor Murray denied that he was hollering at Professor Sneesby.[13]

Professor Murray described Professor Sneesby's conduct on the phone call as abusive.  Due

to Professor Sneesby's behavior, Professor Murray stated that he hung up the phone.

47.    After the telephone conference between Professors Murray and Sneesby on

February 16, Professor Murray sent an email to her, as well as Professors Kilduff and

Stockford and the entire faculty association noting that he "received a call from Faculty

Senate President Sandra Sneesby where she said I misrepresented to you what Ray Kilduff

and Jason Stockford had told me on Tuesday, February 14, 2023, in reference to the travel

of the 'bill to standardize the issuance of letter grades.'"  He then invited both Professors

Kilduff and Stockford to respond:

> To insure the record is clear, and that we all have a true understanding of how
> the Faculty Senate is actually functioning, I ask that Ray and Jason confirm
> that we discussed this on 2-14-23 and I did not misrepresent what they told
> me about the travel of that 'bill,' and that they also tell all of us in complete
> detail the travel of that 'bill' which was not sponsored/introduced by them.

Professor Sneesby sent an email response to Professor Murray immediately after the

telephone conversation, informing Professor Murray to "not use my name in any emails to

faculty or anyone else.  You are not my spokesperson, and you cannot compel me to speak

at your command."

48.    During her interview, Dean Nauman noted that she did attend a subcommittee

meeting of the Faculty Senate that was run by Professor Kilduff and that the grading system

was

_____

[13] Steven Murray May 12, 2023 Interview Transcript at 61.

discussed. Dean Nauman noted that she provided a chart on grading to those in attendance at the subcommittee meeting. She did not create or prepare the bill on standardized grading.

49.     Ms. Lauren Nagel has served as the Administrator for the Psychology Department on a full-time basis since 2016 and previously on a part-time basis as an Administrator for the Mathematics Department, from 2014 through 2016. Her office is located in the hallway directly outside the Psychology Department office for Chair Raymond Kilduff. Her desk is located in the same hallway as several other departments on that floor, including Criminal Justice. The Criminal Justice office of Professor Murray is approximately 50 feet down the hall, which is 6 or 7 doors away. There are two other administrators in the hallway, including Tiffany Jones, who is the administrator for Criminal Justice.

50.     Ms. Nagel recalls that on February 16, at approximately 1:45 pm, she was sitting at her desk in the hallway when Professor Murray walked down the hallway, talking on his phone, stating that he would check with Professor Murray. He then proceeded to the Psychology Department office and asked Ms. Nagel if Professor Kilduff was going to be in the office that day. He also asked Ms. Nagel to let Professor Kilduff know that he was looking for him. As he approached Ms. Nagel from the hall, he had his speaker phone on and Ms. Nagel could hear Professor Sneesby's voice, hollering continuously at Professor Murray. Ms. Nagel never heard Professor Murray raise his voice towards Professor Sneesby.

51.     While Ms. Nagel could not hear any of the details of Professor Sneesby's side of the conversation, she did hear Professor Murray say words to the effect that 'it's nothing personal,' and 'you need to lower your voice.' Ms. Nagel believes that the conversation between Professors Sneesby and Murray lasted approximately 20 minutes "In her view,

Professor Sneesby was hollering the 'whole time'." Ms. Tiffany Jones is the administrative assistant to the Civil Justice and Business Professional Studies divisions. Regarding the February 16 incident between Professors Murray and Sneesby, her recollection is that he was in his office when his phone rang. Ms. Jones was at her desk. She could hear yelling coming from his office and could hear Professor Sneesby's voice on the phone. She recognized Professor Sneesby's voice from other occasions. Ms. Jones indicated that only Professor Sneesby was yelling and that she continued to yell during the entirety of the phone call, which lasted approximately 20 minutes.

**Comment**. **The additional language is from the Investigator's summary of Nagel's statement to him.**

52.    Ms. Tiffany Jones is the administrative assistant to the Civil Justice and Business Professional Studies divisions. Regarding the February 16 incident between Professors Murray and Sneesby, her recollection is that he was in his office when his phone rang. Ms. Jones was at her desk. She could hear yelling coming from his office and could hear Professor Sneesby's voice on the phone. She recognized Professor Sneesby's voice from other occasions. Ms. Jones indicated that only Professor Sneesby was yelling and that she continued to yell during the entirety of the phone call, which lasted approximately 20 minutes.

53.    Ms. Lolita Villanueva is the administrative assistant for the Social Science Department. On Tuesday, February 14, 2023, while seated at her desk in the corridor, Professor Murray came out of his office to walk to the conference room located immediately behind Tiffany Jones' desk for attendance at the "Little Chairs" meeting. As he was going into the conference room, Professor Sneesby was walking down the hall and hollered out, "Steve, I need to speak with you." He noted that he was just going into the meeting and did not have time to speak but Professor Sneesby insisted. This occurred at the conference room door. Professor Sneesby appeared upset and she began to accuse Professor Murray of

**Page 35 of 44**

emails that were embarrassing to her and that he needed to say something to the faculty about them. In response, Professor Murray stated words to the effect, 'Sandra, I don't know what to say, but you need to tell them.' They both entered the meeting and, when it adjourned, each came out, going their separate ways.

54.    Ms. Villanueva also recalled the phone incident on Thursday, February 16, at around 1:30 pm. Ms. Villanueva could only understand Professor Murray's words, not those of Professor Sneesby. However, she could hear that Professor Sneesby was hollering on the other end of the phone. She did not hear any hollering by Professor Murray.

**Additional proposed finding.** *When Sneesby was asked directly, "Could [Murray] have been behaving this way because he just didn't like the policies as opposed to the women?," Sneesby responded, " He could have been. I think it's possible. I don't know what's in his head, technically."* **Sneesby Tr. p. 68.**

### *Abbascia Claim*

55.    Professor Abbascia alleges that Professor Murray attempted to damage her reputation by sending email correspondence to the entire faculty that were unprofessional, bullying and threatening in nature.

56.    Professor Abbascia was employed at CCRI for ten years and, until very recently, was the Chair of the Dental Health Department. Professor Abbascia has served as a department chair for the last two and a half years and likewise has served in the role as president of the faculty association for approximately the same period. She reports to Professor Suzanne Carr, Dean of Health and Rehabilitative Services.

57.    Professor Abbascia alleges that there have been multiple incidents of bullying and attempts to damage her reputation through email correspondence that relate to her ability to serve as faculty association president, calling for her resignation, calling her a "lame duck" president and threatening to send emails to the entire faculty at the College. Professor Abbascia further alleges that Professor Murray's behavior constitutes bullying and is

directed at her not only due to her role as the faculty union president, but also due to her gender.

58.    She ran for faculty association president with support from Professor Murray, indicating that Professor Murray was serving as president at the time and did not want to serve another term. He reached out to Professor Abbascia and asked her to run and he promoted her candidacy.

59.    For most of the time that she was employed at CCRI, her relationship with Professor Murray was cordial and professional. When she became a full-time professor in 2015, she joined the CRC, where she interacted with Professor Murray while he was faculty association president.

60.    For approximately six weeks in 2019, Professor Murray and Professor Abbascia dated. Thereafter, their relationship remained supportive and cordial throughout her tenure at CCRI, except until very recently, starting in the fall of 2022. Professor Abbascia described the change in the relationship to be related to the union contract negotiations with the administration. Professor Murray was critical of the way that she conducted faculty association meetings, including the fact that she conducted the meetings remotely, rather than in person. He was also very critical of the terms of the tentative agreement, and the work that Professor Abbascia and her team had done on contract negotiations.

61.    Professor Murray's criticisms were communicated by email and were routinely copied to the entire faculty association. Professor Murray explained that under the faculty contract, the CCRI faculty is to be notified of union matters. Professor Murray viewed the communication as a union matter and therefore copied the entire faculty on the emails.

62.    Professor Maddie Josephs serves as the Chair of Allied Health. She has read very critical emails from Professor Murray to Professor Abbascia. The change in Professor

Murray's tone in the emails with Professor Abbascia occurred only recently, when he became disappointed with union negotiations on the proposed faculty agreement. She also has a recollection that when Professor Sneesby served as faculty union president, Professor Murray had a similar tone in his emails with Professor Sneesby.

63.   Professor Abbascia stated that she previously witnessed Professor Murray's behavior towards other colleagues, but now it was directed towards her. He opposed the adoption of the union contract and worked to vote down the proposal. On January 30, 2023 Professor Abbascia informed the faculty that she was leaving CCRI at the end of the school year.

64.   Professor Murray responded by email to Professor Abbascia, copied to all faculty, stating that her resignation announcement made her a "lame duck" president and "has weakened our bargaining position with the Administration." He asked her by email to reconsider his  request that he be appointed as the lead negotiator. Faculty nominations supporting Professor Murray's role as negotiator followed. Professor Abbascia declined, noting that she would remain in her position as president and continue in the role of lead negotiator. That same evening, Professor Murray emailed the faculty to state that his comments about Professor Abbascia were not personal and were "about business."

65.   On February 1, Professor Sneesby emailed the faculty to express her support for Professor Abbascia. Professor Sneesby told the faculty that the current behavior was "bullying" and that it reminded her of the years that she served as union president and "faced a barrage of toxicity." Professor Susi likewise emailed Professor Murray and the faculty on February 1, stating that she witnessed Professor Murray's "bullying and [ ] disparaging comments" to colleagues during previous contract negotiations, asking him to "tone down the vitriol."

66.   On February 15, Professor Murray sent an email to the faculty seeking a

response to his concerns with the role of the Faculty Senate at CCRI and the possibility of

a class action grievance due to the senate's introduction of a bill that conflicted with union

contract provisions. He referenced "detailed conversations with the President of the Faculty

Senate Professor Sandra Sneesby on these matters. I would ask her to respond in this email

thread to the issues that I and others have raised."

67.     Professor Abbascia responded to the email that morning, explaining her

support for a bill pending before the senate. She ended her email to the faculty, "On another

note, there

are those that find it necessary to spread lies. If you hear something and you wonder if it is

true, contact me directly."

68.     Professor Murray immediately wrote to her alone, seeking a clarification

that if Professor Abbascia was accusing him of spreading lies, to "have the backbone to

publicly do so and tell the world what 'lie' I'm spreading." Professor Abbascia replied

back to Professor Murray alone, denying that she was referring to him in her previous

email.

**Additional proposed finding.** *Despite this denial, in her sworn testimony,*

*Professor Abbascia admitted that she was referring to Professor Murray in this*

*email as one of the people purportedly spreading lies.* **(Abbascia Tr. 17,18)**

69.     When she did not send her explanation to the entire faculty, Professor

Murray wrote, "I am giving you the opportunity to correct this [to the faculty] in your

own words. Would you prefer that I just forward [our] email thread to everyone?"

During her interview,

Professor Abbascia described this last email as a threat, constituting part of her complaint

against Professor Murray.

70.     Professor Abbascia was concerned with Professor Murray's "mindset" of

threatening her, saying that he would distribute their email correspondence to others if she did not immediately resign.[14]

71.    Other than the controversy surrounding her announcement to leave CCRI in June, and her continuation of her role as union president, Professor Abbascia indicated that Professor Murray previously had been cordial with her.

72.    Professor Abbascia stated that her decision to leave CCRI was personal, and was not prompted by her current dispute with Professor Murray.

73.    Ms. Alix Ogden, senior advisor to the President of the College, routinely met with the President and the faculty association presidents every six weeks. Professor Abbascia complained about how stressful Professor Murray can be.

---

[14] Tara Abbascia April 21, 2023 Interview Transcript at 23.

..

**Comment.**  **Whether or not Ogden stated this in the unsworn and unrecorded interview with the Investigator, it is hearsay which is clearly inaccurate since Abbascia expressly denied this in her sworn testimony and stated her leaving was for personal reasons.**

## VI.    ALL THE PROPOSED FINDINGS IN THE "CLAIM OF PATTERN AND PRACTICE OF DISCRIMINATION" SECTION MUST BE DELETED AS THEY ARE IRRELEVANT TO THE CLAIMS ASSERTED IN THE COMPLAINT.

**A.    The Investigator's proposed findings 74-123 must be deleted as they are incompetent and irrelevant as to whether the complainants were subjected to any gender motivated conduct <u>as to each of them</u> that was so severe, pervasive, and objectively offensive as to effectively deny the complainant to access to any program or activity of CCRI.**

As stated previously above, pattern and practice Title IX violations relate solely to systemic, institutional violations—it does not apply to conduct by individuals. **Where, as here, a Title IX violation has been alleged, the complainant must show that the alleged perpetrator *engaged in conduct <u>toward the complainant</u>* that was *motivated by gender and***

*was so severe, pervasive, and objectively offensive as to effectively deny the complainant access to a program or activity of CCRI.  As a matter of law, conduct toward others is irrelevant to this analysis.*  *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("Each Plaintiff, in other words, *must show a practice or pattern of harassment against him*.  A single incident or isolated incidents generally will not be sufficient.") (emphasis added).

Nor is there any significance in this case that all three complainants happen to be women, particularly given the context.  First, over two-thirds of the CCRI leadership, including President Hughes and V.P. Costigan, and over 60% of the faculty at CCRI are women.  Accordingly, if a faculty member is involved in an interpersonal conflict with a colleague or a member of the administration leadership team at the college, the chances are that it is with a woman.  Second, the communications and conduct at issue arose in the context of a fiercely and hotly contested faculty association vote on a proposed T.A., controversy over the lack of shared governance, and the administration's attempt to use the Faculty Senate for its agenda, wherein Murray's position was at odds with both that of the leadership of the Faculty Senate and the CCRIFA and the CCRI administration, *the Presidents of which are all women and two of which are complainants.*  The undisputed and ONLY READING of the evidence in the record is that the communications and conduct were motivated solely by Murray's sincere and vigorous advocacy of his positions on behalf of his co-worker faculty members and that his communications were directed at the complainants in their respective official capacities, ***not as women.***  *See, e.g., Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 951 (N.D. Ill. 2017), aff'd, 933 F.3d 849 (7th Cir. 2019) ("The [alleged perpetrator] female student's activism and public statements were all in response to a specific act and were directed at a specific individual, not all males, and thus there was no actionable claim for Title IX sexual harassment.").

Finally, the additional fatal flaw in the efforts of CCRI to manufacture a Title IX violation that does not exist is the failure and inability to identify similarly situated males that were treated differently by Murray in similar contexts ***as they do not exist.***  There is no similarly situated male who helped found a Faculty Senate that lacks true shared governance power, was President while the administration was manipulating the Senate to advance its agenda, and while agreeing that both were a problem, refused to publicly acknowledge and advocate for and seek remediation of these deficiencies.  There is no similarly situated male CCRIFA President with whom Murray had a professional, personal, and briefly intimate relationship, who negotiated and advocated for faculty approval of a T.A. that was resoundingly rejected by the faculty, and then announced that he would be leaving the college in a few months in the midst of the controversy over approval of the T.A. and declined to resign and allow a new President with a stake in the outcome to complete negotiations.  There is no similarly situated male assistant to VP Costigan, who, after a series of emails regarding confusion over the interpretation of a provision of the CBA, sent out an email on the business day prior to the beginning of the semester which contained a last-minute change in the disputed interpretation, as consequence of which Murray was unable to either finalize the assignment of faculty or complete and submit a faculty workload report, both of which were due that day, and happened to be in the office when an agitated Murray went to seek clarification from Dean Stargard who happened not to be there.  Each of these is a unique situation with only one similarly situated component—Murray acting in his capacity as a vocal and passionate advocate for the best interests of the college and all his fellow faculty members.  Of that, he is guilty as charged. "The similarly situated requirement is crucial because 'without it a plaintiff would only have to point to one . . . [person] who was treated better than he . . . [which] would be meaningless . . ..'"  *Bull v. Bd. Of Trustees of Ball State Univ.*, No. 1:10-CV-00878-JMS, 2012 WL 1560461,

**Page 41 of 44**

at *5-6 (S.D. Ind., May 2, 2012) ("[S]imilarly situated employees must be 'directly comparable to the plaintiff in all material respects . ..'").

There is no competent evidence in the record that Murray treated females any different than males, similarly situated or otherwise. Such "other" evidence in the record that exists is incompetent lay opinion, conclusory, and equivocal, which, if it leads to any conclusion, it is that  Murray treated all those who disagreed with him in the same manner, whether male or female. *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Just saying so is not enough.  A recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination.. .  [C]onclusory allegations that the male students were treated differently than similarly situated female students based on sex [is insufficient].")

Accordingly, for all the foregoing reasons, findings 74-123 of the Investigator's proposed findings of facts must be deleted.

### B.     Conditional Additional Proposed Findings

Finally, to the extent the Investigator fails or refuses to remove this irrelevant and incompetent "other" evidence from his findings; then Murray would propose the following additional findings of his own in that regard:

1.     *Murray has served at the College as a professor since 1993 and interacted with thousands of female students and hundreds of female professors, staff and administrators without incident or claim of gender discrimination.*

2.     *Murray has worked closely with female members of his department (all of whom have provided statements and/or been interviewed), including his assistant, Maureen Papagolos (over 20 years), Professor Sheryl MacDougall (over 20 years), current assistant Tiffany Jones (1 year) and Lolita Villanueva (9 years -- she works directly outside his office door as the assistant for Social Sciences). Each of these women stated unequivocally that Professor Murray has always been respectful and professional in his interactions with them and with all others*.

3.     *The deans who have supervised Professor Murray and interacted with him regularly, including Dean Stargard, Dean Cole, Dean Handley and Dean Bryan Brophy-Baermann, in their annual Performance Reviews, have all provided glowing reviews of Professor Murray.  None of the deans wrote anything in their annual Performance Review about Professor Murray discriminating against anyone, creating a hostile work environment, or the like.*

4.     *One of those deans, Allyson Handley, EdD, who was dean in 2020, was recently appointed as Vice President of Academic Affairs at CCRI.*

5.     *In 2020, Dean Handley, as Murray's supervisor, in her annual Performance Review, praised Professor Murray: "Chair Murray received an overall "outstanding" evaluation from [her] across all rating categories included in the rating scale. Chair Murray is to be commended for setting "high standards*

**Page 42 of 44**

*regarding the academic and professional preparation of his full-time and adjunct faculty" within the Criminal Justice department. He manages his department with dedication and efficiency." "He is to be commended for his many years of service to faculty welfare through his leadership of the faculty union. Since stepping down from that demanding leadership role recently, he should be encouraged to utilize his considerable talents and expertise within other academic leadership roles at CCRI."*

6.   *Dr Lauren Webb, Director of Academic Program Review and Accreditation, who reports to V.P. Costigan, stated she had many interactions with Murray regarding assessments and other issues and that Murray never treated her inappropriately.*

7.   *Maya Geraldo, Manager of Academic and Faculty Initiatives, who also reports to V.P. Costigan, stated that Murray had disagreements with men and women and that Murray had spoken in a similarly critical manner to male deans including John Cole and Bruce Busby. She also states that Murray treated her with respect.*

8.   *Murray, along with others, was critical of Shawn Parker, a male, when he was President of the CCRIFA.*

84.   With respect to the incident involving Dean Nauman, Professor Murray recalls speaking at the time and being interrupted by Dean Nauman and he asked not to be interrupted. He also recalls Dean Stargard asking Dean Nauman to stop speaking. He denies yelling but also admitted that he did raise his hand to stop her from speaking. Dean Stargard denies that he asked Dean Nauman to stop speaking at the meeting. Murray testified he was approximately thirty (30) feet away from Dean Nauman when he asked her to not interrupt him. (Murray Tr 97) A CRC member at the meeting, Professor Mazin Adam in his statement corroborates Murray. Raising one's hand is a more professional manner in which to signal a speaker to stop as opposed to talking over them or raising ones voice and orally commanding them to stop. **[Modification to Investigator's proposed finding 84].**

                    **RESPONDENT,**
                    Steven D. Murray
                    By his attorneys,
                    **SINAPI LAW ASSOCIATES, LTD.**

**Dated: July 24, 2023**          **/s/ Richard A. Sinapi_____**
                    **Richard A. Sinapi, Esq. (#2977)**
                    2374 Post Road, Suite 201
                    Warwick, R.I. 02886
                    Phone:(401) 739-9690; Fax: (401) 739-9040
                    E-mail: ras@sinapilaw.com

**CERTIFICATION OF SERVICE**

**Page 43 of 44**

I hereby certify that on the **24th** day of **July, 2023** I served this document via email on the Investigator:

**Raymond A. Marcaccio Esq.**
**Oliverio & Marcaccio, LLP**
**30 Romano Vineyard Way, Suite 109**
**North Kingstown, RI 02852-**
**Phone:  (401) 861-2900; FAX:  (401) 861-2922**
**Email: RAM@om-rilaw.com**

                                        **/s/ Richard A. Sinapi                            **

**COMMUNITY COLLEGE OF RHODE ISLAND,**
**COUNCIL ON POSTSECONDARY EDUCATION**
**TITLE IX ADJUDICATION**

| | |
|---|---|
| **Elizabeth Del Sesto, Sandra L. Sneesby,** | : |
| **And Tara Abbascia,** | : |
| **Complainants** | : |
| | : |
| **v.** | : |
| | : |
| **Steven D. Murray,** | : |
| **Respondent** | : |

**RENEWED MOTION TO DISMISS AND RESPONDENT'S WRITTEN RESPONSE**
**TO THE INVESTIGATOR'S SECOND DRAFT FINDINGS PURSUANT TO TITLE**
**IX POLICY AND PROCEDURE § XXII D.**

Now comes the Respondent Steven D. Murray ("Murray") in the above cited matter and does hereby renew his motion to dismiss the pending Complaints and, in the alternative, provide the within written response to the investigator's preliminary findings/summary of testimonial evidence pursuant to CCRI's Council on Postsecondary Education Title IX Sexual Harassment Policy and Procedures ("CCRI Title IX Policy") § XXII D.

**I.    SUMMARY**

As stated previously and reiterated again herein, the Complaints must be dismissed as a matter of law because 1) the conduct in question constitutes concerted conduct protected from employer interference or sanction according to CCRI policy and R.I. Gen. Laws §§ 28-7-2(d) and 12; 2) three unrelated complaints have been improperly combined in violation of CCRI policy, federal administrative guidance, and due process of law; and, 3) the conduct in question does not constitute a violation of Title IX.

What has been set forth in the Investigator's Second Draft Findings is random, selected and largely incompetent, subjective Complainant characterizations and lay opinions about Murray's conduct and motivations—which at times is mischaracterized by the Investigator. Even based on this selective, one-sided record, there is no evidence in the record of _**any**_ gender based or motivated conduct on the part of Murray that was so severe, pervasive, and objectively offensive as to effectively deny any of the complainants to access to any program or activity of CCRI so as to constitute a violation of Title IX.

Moreover, the Investigator has ignored and refused to include in his findings the undisputed fact that Murray has a stellar record as an educator with CCRI, who has never been disciplined for misconduct or otherwise during his 32-year tenure. He was elected Chair of the Criminal Justice department in 2012 by his peers and was reelected unanimously on three subsequent occasions, most recently in February of 2023. As Chair, he received rave reviews in his faculty performance evaluations, with no mention whatsoever of any gender based or other misconduct. Indeed, Murray's evaluations, in particular, those of Dean Handley and Dean Stargard, totally contradict the portrayal of Murray, which the Investigator's findings attempt to paint in the "Pattern and Practice of Discrimination" section of his "findings." The draft findings cobble together isolated, insignificant incidents during the course of his 32 year career and try to now make them out as important, yet none of these purported events resulted in a finding of misconduct nor were they even mentioned in any of his evaluations. For instance,

**Page 1 of 63**

the draft findings attempt to make much of an instance where Murray, as a member of the CRC, not the Chair, merely put up his hand to signal Dean Nauman to stop speaking and not interrupt him.

Finally, the Investigator has failed or refused to include any of Murray's numerous proposed additional findings in his report, even though they provide context and are otherwise relevant and probative facts, the truth of which cannot be disputed and is not in dispute.

## II.  APPLICABLE AND ADDITIONAL FACTS AND FINDINGS[1]

### *General*

1.  When conduct which is the subject of a misconduct complaint involves union business, it is the policy of CCRI that the dispute is not subject to determination by the college.  Tr. Murray pp. 100-102, email chain 11/20/19—12/19/19 (Murray exhibit).

2.  During the relevant period, over two-thirds of the CCRI leadership, including President Hughes and Vice President of Academic Affairs Costigan ("V.P. Costigan"), were women, https://www.ccri.edu/about/leadership.html, as well as over 60% of the faculty, including both the Senate President, Sneesby, and Faculty President, Abbascia. https://www.ccri.edu/neasc/pdf/NEASCST5.pdf

### *Respondent Steven D. Murray[2]*

3.  Respondent Steven D. Murray ("Murray") is a member of the Bars of the U.S. District Court for the District of Rhode Island, State of Rhode Island, Commonwealth of Massachusetts, and the Supreme Court of the United States and is a former Assistant Attorney General for the State of Rhode Island.

4.  He has taught law courses at CCRI for almost 32 years.

5.  He was President of the faculty union, CCRIFA, from April of 2016 until November of 2020.

6.  He is currently Vice President of the faculty union and an alternate member to the CCRIFA Executive Committee.

7.  He has a stellar record of largely "exceeds expectations" annual reviews and has never been disciplined by CCRI.

---

[1]  In Section I and in Section V. below, Murray proposes certain additional facts and corrections to facts and/or findings proposed by the Investigator.  Any proposed facts in this document where there is no citation to the record, Murray is prepared to swear to the same based on first-hand knowledge under oath and/or is otherwise prepared to produce relevant and competent evidence to support the same.

[2]  Most of the additional facts under the "Murray" heading are found in Respondent Counsel's Letter to Investigator dated April 24, 2024.  Any proposed facts where there is no citation to the record, Murray is prepared to swear to the same based on first-hand knowledge under oath and/or is otherwise prepared to produce relevant and competent evidence to support the same..

8.    He was elected Chair of the Criminal Justice department in 2012 and was reelected unanimously on three subsequent occasions, most recently in February of 2023.

9.    He also recently received an overall "outstanding evaluation" as a Department Chair and teacher and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty." (Evaluation of Murray by Dean Handley, April 22, 2021).

10.   However, as a vocal and passionate advocate, both as President and a member of the CCRIFA, seeking to improve the terms and conditions of employment on behalf of his co-worker union faculty members, he is and has been frequently at odds with the CCRI administration.

11.   In his roles as Faculty Association President and Department Chair, Murray has had severe disagreements over the years with President Hughes and VPAA Costigan that have led to faculty "No Confidence Votes," picketing, grievances and Unfair Labor Practice charges.    Murray and Costigan have each filed complaints with HR against each other.[3]

---

[3] Murray's clashes with the CCRI administration over the years are numerous:

- February 2017  https://www.golocalprov.com/news/ccri-leadership-targets-difficult-faculty
- May 2017, at a meeting of the Strategic Planning Committee, Murray made a statement about a sentence in the draft report that Murray disagreed with that dealt with the abilities of "all" students at the College "are motivated, capable and committed to attaining academic achievement." Before Murray could finish speaking, VP Costigan loudly interrupted Murray, stating that she was repulsed by what Murray said, that Murray was negative, that Murray did not belong working at the College. She added that Murray does not represent the faculty." She went on to say "she had heard enough from Murray." VP Patten who was Chairing the Committee then proceeded to move the meeting forward and by recommending the change Murray suggested be made. Murray filed a complaint with HR for Costigan violating the Policy Against Violence in the Workplace. Almost immediately and before any investigation, President Hughes put out a statement that she fully supported VP Costigan. The College brought in an attorney (Peter Harrington) who is employed in the Administration at URI to conduct an "independent investigation." His report concluded that there had been no violation of the policy.
- June 2017 – Student Senate votes no confidence in Hughes and Costigan over treatment of Professor Britton re the observatory. Students and faculty (including Murray) picket at the College.  http://www.rhodybeat.com/stories/ccri-senate-voices-dissatisfaction-with-president-over-observatory,25691
  https://www.providencejournal.com/story/news/education/2017/07/08/dispute-over-pay-at-ccri-observatory-spurs-protests/19252784007/
- August  2017,  article in the Providence Journal, "CCRI president rocks the boat with changes aimed at helping students" that contained criticism by Murray of Hughes' decisions and lack of qualifications. The article also discussed the Student Government's vote, in June 2017, of No Confidence in Hughes and Costigan.
   https://www.providencejournal.com/story/news/politics/state/2017/08/25/ccri-president-rocks-boat-with-changes-aimed-at-helping-students/19145823007/
- Fall  2017, Hughes and Costigan tried to unilaterally impose a "Jterm". There was virtually no involvement of the faculty in this decision and Murray led the opposition to the implementation of "Jterm" and it did not go forward in 20218.
  https://www.providencejournal.com/story/news/education/2017/11/08/ccri-suspends-planned-january-term-amid-faculty-union-opposition/17124401007/
- October 2017, Murray notified Hughes of a potential "nepotism" issue involving Dean Sabbagh.
  https://www.golocalprov.com/news/ccri-faculty-union-head-raises-nepotism-concerns

- April 2018, Murray was reelected as President of the Union. On April 28, 2017, Costigan asked to meet with Murray. From the outset of the meeting, Costigan was insulting towards Murray regarding the union election results (Murray had run unopposed and approximately 130 faculty voted for Murray, but Costigan mocked Murray for not getting a "majority" of the approximate 300 faculty eligible to vote). The meeting ended with her screaming at Murray after she misunderstood a comment Murray had made. Murray filed another complaint with HR re her conduct and she filed a complaint against Murray. Both complaints --- no decision was ever issued by HR.
- Fall 2018, Hughes and Costigan again seek to unilaterally to impose a "Jterm/Winter session". There is even greater faculty push back this time than last year.
- In November 2018, The Union Executive Committee met, and a motion was passed to call for a vote of "No Confidence" in President Hughes, VP Costigan, and Dean Sabbagh, due to their continued failures of leadership and that they either resign or be removed. 271 Faculty were eligible to vote. 219 voted. 160 voted yes /approve the motion of "No Confidence" -- 34 voted no -- 25 voted to abstain. The overwhelming vote of "No Confidence" received local and national media coverage. Hughes released a statement voicing disappointment and her view that "Change is hard." The Council on Postsecondary Education and Governor Raimondo voiced their strong support of Hughes. https://warwickonline.com/stories/council-backs-ccris-hughes-in-wake-of-unions-no-confidence-vote,138903
  https://www.washingtontimes.com/news/2018/dec/4/faculty-at-ccri-college-vote-no-confidence-in-lead/
- January 2019 --Despite the near complete lack of support of the faculty (full time and adjuncts), Hughes/Costigan went forward with their "Jterm/Winter Session" beginning on January 2, 2019. The faculty (led by Murray and others) conducted Informational Picketing, with protest signs, leaflets and bumper stickers, at the College on January 2, 2019 and January 9, 2019. The media (Channel Ten news, Golocalprov, the Providence Journal and other media covered the story, and Murray gave interviews that contained negative comments about Hughes, Costigan and the Jterm/Winter Session.
  https://www.neari.org/blog/the-trouble-with-jterm
  https://www.newportri.com/story/news/local/2019/02/13/ccri-faculty-critical-of-j-term-outcome/6004716007/
  https://turnto10.com/news/local/faculty-at-ccri-protest-short-winter-term
  https://www.golocalprov.com/news/ccri-faculty-picket-following-no-confidence-vote-in-president-hughes
- On Tuesday, January 22, 2019, the day classes start, Hughes notified Murray by letter that his appointment as Department Chair was being terminated by her.
- January 23, 2019 – VP Costigan sent an email to Murray's department faculty and copied Melissa Fama (Assistant VP), Dean Busby and Dina Levitre (assistant Dean) notifying them that yesterday, Hughes terminated the appointment of Murray as department chair. Costigan called for a department meeting to elect a new chair to serve out the remainder of Murray's term.
- January 23, 2019, about 50 faculty members, including Murray, attended a meeting of the Council on Postsecondary Education held at CCRI to object to Hughes' leadership. https://www.golocalprov.com/news/new-ccri-president-strips-leading-critic-of-free-tuition-program-of-departm
- January 28, 2019 – ProJo article – "CCRI union president: Demotion 'An Obvious Act of Retaliation'          "https://www.providencejournal.com/story/news/education/2019/01/28/ccri-union-president-demotion-an-obvious-act-of-retaliation/6165761007/
- January 29, 2019 – GoLocalProv article – "CCRI Faculty Support Leading Critic of Free Tuition Program Stripped of Department Chair" https://www.golocalprov.com/news/leading-critic-of-free-tuition-says-ccri-president-slashed-his-pay-illegall
- January 30 , 2019 – Murray sent a Letter to Tim DelGuidice, Chair, RI Office of Postsecondary Council, requesting clarification re "Committee of the Faculty" pursuant to 16-33.1-1-3 No response from him.
- February, 1, 2019 – Murray was unanimously re-elected as department Chair.
- February 4, 2019 –- Hughes again terminates Murray as department chair

**Page 4 of 63**

12.    Despite his differences with V.P. Costigan, she has praised Murray for his "excellent Criminal Justice Program" and personally acknowledged and recognized him as a worthy adversary, despite their professional differences. (Costigan email dated April 10, 2018, and Murray exhibit of gift/note from Costigan in April 2020).

13.    Over the years, Murray has filed numerous grievances against CCRI, nearly all of which have been successful, including one that was settled last fall.

14.    Murray has also been a longstanding critic of the lack of shared governance between faculty and the administration at CCRI and a vocal advocate for increasing the power and role of the faculty in that regard.

15.    Perhaps most significantly, Murray also currently is and has been a vocal advocate critical of the proposed Tentative Contract Agreement ("T.A.") endorsed both by union leadership and CCRI, which is the subject of recent and ongoing intense and fervent debate among the CCRI stakeholders.

---

- February 13, 2019 – ProJo article "CCRI calls Winter Jterm a success, but some faculty leaders don't buy it". https://www.providencejournal.com/story/news/education/2019/02/13/ccri-calls-winter-j-term-success-but-some-faculty-leaders-dont-buy-it/5984324007/
- February 13, 2019 Approximately 50 faculty (including Murray) attend the meeting of the Office of the Postsecondary Council to protest Hughes leadership and eight faculty members read parts of a memo detailing Hughes' failure with Jterm.
- February 22, 2019 – per the order of VP Costigan – Murray's department holds another election of Department chair – result – Murray was unanimously elected (again) as Chair.
- February 25, 2019 – Hughes emails Murray that she has terminated Murray's appointment as Chair again (third time) based on the allegations detailed in her January 22, 2019 letter to Murray.
- 4/25/19 Murray Chair matter is settled -- MOA signed by Murray with an NDA.
- 4/29/19 President Hughes appoints Murray as Chair.
- March 2020 – Murray's term as CCRIFA President is supposed to end in April . Murray agrees (covid) to continue as President until Nov 2022 when CCRIFA will hold an election.
- December 29, 2020 The Union representing Education Support Professionals at CCRI vote No Confidence in Hughes and Ogden. The No Confidence vote Murray led in 2018 is referenced in paragraph 6 of the article. https://www.golocalprov.com/news/ccri-education-support-professionals-vote-no-confidence-in-hughes-citing-po
- June 2021 – Hughes' contract is up for renewal – CCRIFA and Support Professionals Union at College write to Council on Postsecondary Education voicing No Confidence in Hughes. https://www.providencejournal.com/story/news/education/2021/06/08/higher-education-council-renews-ccris-president-hughes-contract/7610836002/.
- Fall of 2022 – There is a dispute with Murray and Costigan/Stargard re Course Scheduling, Overload courses and their proposed Certificate for Law Enforcement Certificate .
- Feb 20, 2023 President Hughes re-appoints Murray as Department Chair.
- February 28, 2023 President Hughes banishes Murray.
- March 2023  Hughes announces her resignation effective August 2023. No confidence votes are mentioned in articles. https://finance.yahoo.com/news/ccri-president-meghan-hughes-resigning-202634059.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAABDDz_WR9vMF92Fb0me4-Ga7S2uCKvygitxedE3e72qoNxDvvPOL0_0tX535-nH3y1aRFg1ivlJ7DEsRHmnuq3Qn-ycUCfKiKAPYVnDZCAkFUndAoLxsBS-MCIryBIRf59TSNvi5FP-ybB8EdAAox5y0iRYl3z0-oMa441xBehFM

16.    On February 28, 2023, in the midst of a fierce debate and imminent second vote on the above mentioned T.A., Murray was locked out of his office, denied access to his CCRI email account—which, under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others, the then CCRIFA Faculty Senate President, Complainant Sneesby ("Sneesby) and then Faculty Association President, Complainant Abbascia ("Abbascia").

17.    The basis of this action against Murray by CCRI was purported Title IX violations arising out of three totally separate and unrelated communication encounters ("Complaint"), one of which occurred over *one month* prior (and had already been informally addressed by Dean Stargard) and two of which occurred about two weeks prior to the issuance of the Complaint.

18.    Murray has never been disciplined for misconduct or otherwise during his 32-year tenure with CCRI.

### *Complainant Elizabeth Del Sesto*

19.    The Elizabeth Del Sesto ("Del Sesto," formerly Capraro) Complaint arises solely from a single encounter (January 20, 2023) between Murray and Del Sesto , mere days before the Spring semester was to start, wherein Murray was expressing frustration over the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty. (Murray Tr. pgs. 22 – 38)

20.    The reason Del Sesto was the subject of the communication was that, although ostensibly issued under the authority of Dean Stargard, she was the author and sender of the email which contained the last-minute disputed interpretation of the CBA and Dean Stargard was not in his office at that time.  (Murray Tr. pg. 28).

21.    The entire interaction involved Murray in his capacity not just as a faculty member asserting rights under the CBA, but more significantly, as a faculty member Department Chair speaking on behalf of his members on an urgent and pressing issue impacting Law Department faculty members, as the semester was scheduled to begin on the next business day and as consequence of the confusion caused by the email and series of emails and events leading up to this point, Murray was unable to either finalize the assignment of faculty, complete and submit a faculty workload report, or complete and submit a payroll report, all of which were due *that date.*  (Murray Tr. pps. 22-38)

22.    At the time of the interaction in question, Del Sesto was an assistant to V.P. Costigan.

23.    Murray has interacted with Del Sesto on innumerable occasions during her approximately eight years as a support person in the Academic Affairs suite.

24.    Del Sesto claims in her complaint that this was the "first time" Murray had directed any objectionable communications to or conduct toward her.

25.   Del Sesto does not claim in her Complaint or testimony that Murray was motivated by gender or that gender in any way played a role in their dispute. (Del Sesto Complaint; *see also* Del Sesto Tr. p. 34.[4])

26.   Dean Stargard previously determined that the interaction in question between Murray and Del Sesto was not a disciplinary matter. He stated this in both in an email to Murray and again when he met to discuss the matter with Murray. Murray Tr.  pps. 33- 38, and Murray Exhibit (Email from Stargard to Murray dated January 26, 2023).

27.   Del Sesto was rewarded for filing her complaint by being appointed interim assistant dean BSTEM in June of 2023, which included a significant increase in annual salary (2023 $61,499.88 -- 2023 $75,000.12) from her previous position as academic affairs coordinator for which V.P. Costigan was her direct supervisor.  (RI Transparency Portal  www.transparency.ri.gov  -- CCRI for Capraro 2022 and Delsesto 2023)

### *Complainant Sandra Sneesby*

28.   The Sandra Sneesby ("Sneesby") Complaint/"Incident Report" (Sneesby claims she submitted two "Complaints", Sneesby Tr. 52, but an actual "Complaint" form has never been produced to respondent) arises out of communications between her and Murray, wherein Murray is critical of the lack of power of the Faculty Senate and the lack of real shared governance between the faculty and the CCRI administration, as well as the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda, and asks Sneesby, in her position as President of the Faculty Senate, to publicly confirm what they had discussed in private, specifically that she concurs with his assessment.  ( Murray Tr. pgs. 45—74).

29.   By way of context, Sneesby played a significant role in the creation of the Faculty Senate in an attempt to rectify the issue of lack of shared governance. The Senate she created with the Administration has no authority -- it is purely advisory.  All power ultimately rests with the President of the College. (see CCRI Senate Constitution , Article II  www.ccri.edu/senate/S2022-001.pdf )

30.   Murray has vigorously and publicly advocated that this is obviously not the required shared governance intended or required by statute, R.I. Gen. Laws §16-33.1-3 (providing that, among other things, "the president and a committee of the faculty" shall determine the academic standards and courses of study at the college    (http://webserver.rilin.state.ri.us/Statutes/TITLE16/16-33.1/16-33.1-3.htm)), or by the college's accrediting body, the New England Commission of

---

[4]  *See also* Del Sesto Tr. pp. 44-45: ("Q.   Let me ask you this though. Do you find that he is a bully only to you women or a  bully to both men and women?    A.   I find that he is often a bully – I  find that he's a bully to women and I find that  he ends up being a bully to men if he is  unsuccessful in befriending that man."; "Q. How about with women, does he try to  befriend women that he then has, I guess, as  allies? A.   I mean I don't think he bullies all women, but I think depending on -- I think depending on what it involved . .."; A.   In a sense.  So I feel like he almost -- he -- he seems like the type of bully that is bullying to get people to back him and   if you don't support him, then that's it for  you.".

Higher Education, *see, e.g.,* Standard 3.15. ("The institution places primary responsibility for the content, quality, and effectiveness of the curriculum with its faculty. Faculty have a substantive voice in matters of educational programs, faculty personnel, and other aspects of institutional policy that relate to their areas of responsibility and expertise." www.neche.org/wp-content/uploads/2020/12/Standards-for-Accreditation-2021.pdf).   (Murray Tr. pg. 55)

31.   Sneesby regarded Murray's criticisms of the Faculty Senate's lack of shared governance as a personal attack, despite Murray's repeated assurances that it was a criticism of the Faculty Senate's lack of power as an institution and not a criticism of or attack on her.  (Murray Tr.  pps. 45-74)

32.   By way of additional context, for about ten years, Sneesby and Murray, had been faculty colleagues at CCRI and, at times, worthy adversaries when he defeated her for Faculty Association President in 2016.

33.   In particular, during the fall of 2022 until Murray was placed on administrative leave on February 28, 2023, Murray had numerous phone and text communications with Sneesby regarding the shortcomings of the proposed T.A., the impact of Tara Abbascia's announcement that she would be leaving CCRI on her ability to continue to effectively lead the CCRIFA, and the lack of an equal role for the faculty in shared governance, and V.P. Costigan's attempts to use the Faculty Senate to advance the administration's agenda.

34.   The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that the communications about which Sneesby complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications.  *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions.").

35.   As further confirmation that the communications and dispute in question involved solely union business, Sneesby a) claims that Murray has "emailed the faculty stating derogatory things about . . . [the] performance [of her] work," b) identifies as witnesses "[t]he entire faculty via email; and, c) asks as a remedy that "Murray [be] prohibited from sending mass emails regarding . . .[her] work performance."  (Sneesby Complaint.)

36.   Although Sneesby makes a bald-faced claim in her complaint that Murray is "condescending and dismissive and particularly targets females," nowhere in either Sneesby's complaint or testimony does she claim that her dispute with Murray or his conduct toward her was due to her gender and she expressly states in her testimony that Murray allegedly also bullies males and all those who disagree with him. (Sneesby Tr. 53.  [5])

---

[5]  Sneesby Tr. 53 ("Q.  Is this only directed towards you, or was it directed towards others as well?  A. He could do it towards others as well.· But he seemed to save it the most for particularly the, the administrators, other faculty.  Anybody that basically would say something he didn't ·agree with or was challenging his -- and he just is just the worst with women; he's more aggressive.· And if you're a man, or you're a lawyer, he is better.. . . I don't know.· I don't know.· I can't -- I don't know what's in his head, but it -- that's how it appears to me.").  Tr.

**Page 8 of 63**

37.   Sneesby told Murray that she plans on running for President of the CCRIFA Union in the next election.

38.   Sneesby was rewarded after filing her Complaint by the College creating a new department "Communications" without going through the Curriculum Review Committee and naming Sneesby as Department Chair. Sneesby had been Chair of the English department with a much larger work load, including number of faculty to supervise, required assessment activities, and courses to schedule.

### *Complainant Tara Abbascia*

39.   The Tara Abbascia ("Abbascia") complaint arises out of communications between her and Murray wherein Murray questions and is critical of her ability to continue to effectively do her job as Faculty Association President in the context of an emotionally charged debate concerning ratification of a disputed proposed tentative contract agreement ("T.A."), which had already been rejected once by the faculty, in the midst of which Abbascia had announced she would be leaving the college in June, and as a consequence of which he called her a "lame duck" and called for her resignation. (Abbascia Complaint).

40.   During the period of the above communications, Abbascia and Murray were also at odds because Abbascia supported and advocated for approval of the T.A. by the faculty, while Murray was a vocal opponent. (Murray Tr. 74- 93).

41.   The term "lame duck" is frequently and commonly used to describe an elected official who was completing the remaining term of his or her office for a position for which they had been defeated or were not seeking re-election and is therefore viewed to be ineffective due to the perceived lack of incentive or motivation. *See., e.g.*, *The Britannica Dictionary*: "[Defining 'lame duck' as] 1 . . . an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help." https://www.britannica.com/dictionary/lame-duck

42.   Murray's communications and criticisms about which Abbascia complains all involve, directly or indirectly, Murray's call for Abbasica's resignation in the context of a faculty vote that rejected the proposed T.A., indicating a lack of confidence in her by the faculty, as well as her not having a personal or professional stake in the outcome since she would not be seeking re-election as Faculty Association President nor would she be subject to the terms of any new contract—a "lame duck." (Murray Tr. 74-93).

43.   Murray and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship. (Murray Tr. 75).

---

65 ("Q. Could he have been behaving this way because he just didn't like the policies as opposed to the women? A. He could have been.· I think it's possible.· I don't know what's in his head, ·technically."). Sneesby also cites several males in her testimony whom she claims Murray also allegedly bullied. *See, e.g.*, Sneesby Tr. 66. Sneesby also concedes many of those in leadership at CCRI happen to be women. Sneesby Tr. 66 ("We happen to have a lot of women who are in positions of leadership, as I'm realizing.").

44.     Murray was a mentor and supporter of Abbasica when she declared to run for Faculty Association President in October of 2020. ( Abbascia Tr. 8, 11).

45.     The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that all but one of the communications about which Abbascia complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications. *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions."). (Murray Tr. 74-93).

46.     The private email(s) about which Abbascia complains is a communication from Murray wherein he is requesting that Abbascia, as President of the CCRIFA, appoint him as lead negotiator for the TA, and to clarify who she was referring to when she said in her email that lies were being spread regarding the TA. Abbascia Complaint. (Abbascia Tr. 15 -20).

47.     As further confirmation that the communications and dispute in question involved solely union business, Abbascia a) seeks as a remedy in her complaint "that [Murray be placed on] paid administrative leave pending investigation [as] an appropriate action.    Taking away his ability to use CCRI email to communicate with faculty until this complaint has been investigated, I feel is appropriate" and b) identifies as witnesses, Leslie Florio, the NEARI union representative for the CCRIFA, and the "CCRI Faculty Association." (Abbascia Complaint).

48.     Although Abbasica makes the claim that she was a "target" of Murray as "president of the union and as a woman," her bald-faced, subjective claim she was targeted as a woman is without any logical or factual basis—she was the union President who recommended approval of a T.A. rejected by the faculty and then announced her intent to resign—and clearly was the "target" of Murray's criticisms on that basis.  (Abbascia Complaint)  Abbascia also recognizes that as Union President " I can take a lot of criticism. That's part of the job." (Abbascia Tr. 23).

49.     Indeed, in her sworn testimony, when asked twice whether Murray's alleged "bullying" was directed at men or just women, Abbasica concedes both times that "maybe it just so happens that a woman" is Union President, President of the College and Vice President of Academic Affairs.  (Abbascia Tr. 30, 35).

50.     Abbascia left CCRI on June 17, 2023.  Abbascia emphatically swore under oath that her leaving the College had nothing to do with Murray. (Abbascia Tr. 24).

III.    **SINCE THE CONDUCT IN QUESTION WAS BETWEEN CCRIFA MEMBERS AND/OR INVOLVED ASSOCIATION BUSINESS, THE COMPLAINT MUST BE DISMISSED BECAUSE, ACCORDING TO CCRI POLICY AND R.I. GEN. LAWS §§ 28-7-2(D) AND 12, CCRI IS FORBIDDEN FROM RESTRAINING, COERCING, OR OTHERWISE INTERFERING WITH DISPUTES BETWEEN OR INVOLVING COLLECTIVE BARGAINING AND/OR OTHER MUTUAL AID AND PROTECTION.**

Both the allegations in the three separate complaints (collectively referred to herein as "Complaint") and the evidence in the record establish beyond doubt that the communications and interactions at issue constituted protected concerted conduct under the Rhode Island Labor Relations Act, R.I. Gen. Laws §28-7-1, *et seq*. ("RILA"), which is not subject to regulation or sanction by CCRI in accordance with applicable law and CCRI's own policy. Indeed, as confirmed by the evidence in the record, including an email from Vice President Alix Ogden, Special Advisor to the President overseeing the college's labor relations and governance system dated December 19, 2019, where conduct which is the subject of a misconduct complaint involves union business, it is the policy of CCRI that the dispute is not subject to determination by the college.

It is beyond doubt that my client was involved in concerted activity protected under the RILA when he was engaged in the communications with Sneesby and Abbascia referenced in the Complaint and when using the CCRI email/listserv system to communicate with other union faculty members regarding the TA. The right to concerted action lies at the heart of the protections under the RILA and National Labor Relations Act ("NLRB") on which it was patterned. Additionally, his communications and interactions with DelSesto referenced in the Complaint arose out of and were related to his disagreement and concern over the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty. Del Sesto was the author and sender of the email which contained the last-minute disputed interpretation of the CBA. The entire interaction involved Murray in his capacity not just as a faculty member asserting rights under the CBA, but more significantly, as a faculty member Department Chair speaking on behalf of his members on an urgent and pressing issue for Law Department faculty members. Moreover, CCRI well knew that the interaction/communications were protected conduct and outside the purview of either a disciplinary or Title IX complaint, and it has refused to process complaints of this very type on my client's behalf. Tr. Murray pp. 100-102, email chain 11/20/19—12/19/19 (Murray exhibit).

Interpreting Title IX and its own policies and procedures as authorizing the issuance of a Complaint and imposing pre-determination sanctions based on heated discussions among union faculty members which CCRI deems "uncivil" or "unprofessional" also violates my client's and all other union members' right to collective action and constitutes an unfair labor practice prohibited by R.I. Gen. Laws §28-7-13 (10). This is so because the actual, necessary, and intended effect of this practice is to impair and chill the exercise of collective action rights out of fear of being disciplined if CCRI disapproves of the tone or content of the communications between members. R.I. Gen. Laws §28-7-13 (10) (making it is an unfair labor practice to "[d]o any acts . . . that interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by § 28-7-12."); see also N.L.R.B. v. Ne. Land Servs., Ltd., 645 F.3d 475, 481–83 (1st Cir. 2011) (The "mere maintenance" of a rule that "would reasonably tend to chill employees in the exercise of their Section 7 rights" is unlawful.). "It is axiomatic that that an employees' right to discuss, debate, and communicate with each other regarding workplace terms and conditions of employment" is protected under the Act. *See United States Postal Serv., & Roy Young, an Individual*,, No. 14-CA-195011, 2021 WL 1087421 (Mar. 18, 2021) (interpreting and applying Section 7 of the NLRA. The Supreme Court has acknowledged "the importance of freedom of communication to the free exercise of organization rights" under the NLRA. *Cent. Hardware Co. v. N.L.R.B.*, 407 U.S. 539, 542–43 (1972).

The communications and conduct at issue involve interpersonal conflicts and disagreements between faculty members and, in the case of Del Sesto, staff and do not constitute conduct proscribed by the CCRI Title IX Policy

**Page 11 of 63**

**IV.   THE COMPLAINT MUST BE DISMISSED AS COMBINING THREE UNRELATED COMPLAINTS VIOLATES CCRI POLICY, FEDERAL ADMINISTATIVE GUIDANCE, AND DUE PROCESS OF LAW.**

CCRI has improperly combined three complaints involving three totally unrelated communications/interactions in violation of CCRI Title IX Policy and applicable law in an apparent deliberate but misguided attempt to create a "pattern and practice" Title IX violation. ***First, combining these three unrelated interactions which are not probative or relevant to each other only serves to prejudice my client and for that reason also violates due process of law and warrants a dismissal of the Complaint on that basis alone.*** Second, largely because of the forgoing reason, combining such separate and distinct complaints violates applicable law regarding the Title IX complaint procedure, including the express provisions of the CCRI Title IX Policy. Joint Guidance on Federal Title IX Regulations: *Summary Analysis of Sections § 106.45(b)94): Consolidation of Complaints* ("[A] single investigatory and adjudicatory process may be used ***where it arises from the same incident and parties.***")(emphasis added); Council on Postsecondary Education, *Title IX Sexual Harassment Policy and Procedures*, Sec. XIX (Consolidation of Formal Complaints)("The Covered Entity may consolidate Formal Complaints of Sexual Harassment ***where the allegations arise out of the same facts or circumstances***.")(emphasis added). Third, the only real similarity between the three situations that is noteworthy is that they all arise out of and relate to conduct protected under R.I. Gen. Laws §28-7-12 as in detail above. This objection was previously raised with both you and CCRI's General Counsel and is reiterated herein again as a ground for dismissal.

**V.   THE COMPLAINT MUST BE DISMISSED AS THE ALLEGED CONDUCT IN QUESTION DOES NOT CONSTITUTE A VIOLATION OF TITLE IX**

*Background*

On February 28, 2023, in the midst of a fierce debate and imminent vote on the above mentioned T.A., my client was locked out of his office, denied access to his CCRI email account—which, under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others, the then CCRIFA and Faculty Senate presidents (both of whom are complainants). The basis of this action against my client by CCRI was purported Title IX violations arising out of three totally separate and unrelated communications ("Complaint"), one of which occurred over *one month* prior (and had already been informally addressed by Dean Stargard) and two of which occurred about two weeks prior to the issuance of the Complaint. Effectively, it was the combined action and express intent—both Abbascia and Sneesby expressly requested that Murray was banned from the faculty listserv—of two faculty association leaders of whom Murray was critical and the administration of which Murray was a longtime and vocal critic that succeed in banishing Murray from campus and the listserv in order to silence him in the midst of a vigorously contested debate over the proposed T.A. and lack of faculty governance. The administration accomplished this by converting a month-old non-disciplinary complaint of Del Sesto, V.P. Costigan's assistant, which had already been addressed by Dean Staargard, into a purported Title IX complaint and then improperly combining it with the two other union leadership complaints in a deliberate, but misguided attempt to create a pattern and practice Title IX violation, which only applies to systemic, institutional conduct—not to an individual.

As you are probably well aware from your review of the complaints and investigation to date, the substance of the allegations of all three of the complainants at issue is the subjective belief or "perception" of each that my client was apparently critical of their conduct and that

his demeanor and tone was allegedly subjectively offensive to them—invoking the mantra "bullying," with two of them opining that they believed they were targeted because they were women.

### A.    Judicial interpretation of the elements of a Title IX claim.

The allegations in the Complaint and in the record fail to establish even a colorable Title IX violation. In addition, the subject matter of all the communications at issue were all related either to the union, collective bargaining/terms and conditions of employment, and/or a dispute/communication with the CCRI administration over the interpretation and application of the CBA. As such, the communications were, therefore, clearly and indisputably protected from adverse action by CCRI policy and the RILA. CCRI nevertheless issued a facially and obviously deficient Title IX complaint on the basis thereof and utilized it as a pretext to silence my client by placing him on administrative leave and banning him from campus, barring his access to his school email and sole means of communicating with his fellow union faculty members, and prohibiting him from communicating with the CCRIFA and Faculty Senate presidents.

It is black letter law that Title IX was not designed to create a general civility code.[6] Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of

---

[6]    ***Title IX***. *Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.,* 947 F.3d 342, 350 (6th Cir. 2020) ("Plaintiffs cannot be faulted for finding Frye's use of the term "pussy" offensive, even in a football setting. But crude or vulgar language alone does not rise to the level of a Title IX violation. After all, Title IX, like Title VII, is not a "general civility code."); *Wolfe v. Fayetteville, Arkansas Sch. Dist.,* 648 F.3d 860, 867 (8th Cir. 2011)("[T]to recover [under] Title IX  . . ., Wolfe had to prove the harassment complained of amounted to more than mere name-calling; he was legally required to show the harasser intended to discriminate against him "on the basis of sex," meaning the harassment was motivated by either Wolfe's gender or failure to conform with gender stereotypes."); *Moeck v. Pleasant Valley Sch. Dist.,* 179 F. Supp. 3d 442, 447–48 (M.D. Pa. 2016) ("According to the plaintiff the sexual harassment she endured is as follows: Coach Getz 'would call people a pussy, a faggot. Heard once, string bean arms. He would curse almost every single letter in the alphabet. He would say fuck. He would call people assholes.' He additionally used the word 'bitch'. He used these words, however, to the boys not to plaintiff or her sister. Additionally, plaintiff notes that Coach Getz told teammate J.J. to 'penetrate all the way through like he was having sex with a girl.' These statements were not made to the plaintiff and are mere vulgarity, thus, we will not consider them sexual harassment of the plaintiff.")(internal citations to record omitted); *see also Shaver v. Indep. Stave Co.,* 350 F.3d 716, 721 (8th Cir. 2003)("On the other hand, we have repeatedly emphasized that anti-discrimination laws do not create a general civility code."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.,* 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not create a claim for all unpleasant or abusive behavior in the workplace; it is not a general civility code and does not apply to the normal tribulations of the workplace, such as the sporadic use of abusive language, race-related jokes and occasional teasing. The conduct must be extreme to amount to a change in the terms and conditions of employment."); *Montalvo-Figueroa v. DNA Auto Corp.,* 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019)(Nevertheless, the harassment must pass a certain threshold of severity. Mere discomfort is insufficient.").

**Page 13 of 63**

the law.[7]  To support a claim, the conduct must be extreme and not merely rude or unpleasant.[8]  Nor does conduct come within the scope of the law because the complainant invoked the mantra of "bullying."[9]  Moreover, conduct is not subject to sanction under Title IX merely because it was directed at someone of the opposite sex—in this case women.[10]  In addition,

---

[7]  *Shaver v. Indep. Stave Co*., 350 F.3d 716, 721 (8th Cir. 2003) ("Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law."); *accord*; *May v. Delta Air Lines,* No. CV 21-710 ADM/ECW, 2022 WL 2835123, at *7 (D. Minn. July 20, 2022), appeal dismissed sub nom. *May v. Delta Air Lines*, *Inc*., No. 22-2763, 2022 WL 18779768 (8th Cir. Nov. 2, 2022);  Elghoul v. United States, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. *Elghoul v. McDonough*, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022); *Thompson v. McDonald*, No. 16-80811-CIV, 2019 WL 11314995, at *6 (S.D. Fla. Mar. 25, 2019), aff'd sub nom. *Thompson v. Sec'y, U.S. Dep't of Veterans Affs*., 801 F. App'x 688 (11th Cir. 2020)*Andrews v. Green Bay Packaging, Inc.,* No. 4:17CV00788 JM, 2019 WL 1053612, at *7 (E.D. Ark. Mar. 5, 2019); *Guimaraes v. SuperValu, Inc*., No. CIV. 10-366 RHK JSM, 2010 WL 5099648, at *9 (D. Minn. Dec. 8, 2010), aff'd, 674 F.3d 962 (8th Cir. 2012); ); *Kent v. Iowa*, 651 F. Supp. 2d 910, 937 (S.D. Iowa 2009); *Miles v. Wal-Mart Stores, Inc*., No. CIV. 06-5162, 2008 WL 222694, at *4 (W.D. Ark. Jan. 25, 2008); *Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006); *Munoz v. Adventure Lands of Am., Inc*., 957 N.W.2d 324 (Iowa Ct. App. 2021); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing [do not violate anti-discrimination laws]."); *Suarez v. Pueblo Int'l, Inc*., 229 F.3d 49, 54 (1st Cir.2000) ("The workplace is not a cocoon, and those who labin in it are expected to have reasonably thick skins.").

[8]  *Stoddard v. BE & K, Inc.*, 993 F. Supp. 2d 991, 1002 (S.D. Iowa 2014); *accord Munoz v. Adventure Lands of Am., Inc.,* 957 N.W.2d 324 (Iowa Ct. App. 2021); *see Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be *extreme,*" and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace.") (emphasis added) (citation omitted); *accord Barron v. Decare Dental, LLC*, No. CIV. 12-699 RHK/SER, 2013 WL 3989786, at *6 (D. Minn. Aug. 2, 2013);  *LaCroix v. Sears, Roebuck, and Co*., 240 F.3d 688, 691 (8th Cir. 2001) ("Moreover, "[not] everything that makes an employee unhappy is an actionable adverse employment action [instead] an adverse employment action is exhibited by a material disadvantage, such as a change in salary, benefits, or responsibilities.");  *accord Elghoul v. United States*, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. *Elghoul v. McDonough*, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022).

[9]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended and does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Whitley v. Indep. Sch. Dist. No. 10 of Dewey Cnty., Oklahoma*, No. CIV-18-331-SLP, 2019 WL 7667329, at *5 (W.D. Okla. Apr. 22, 2019) ("Under Title IX, the prohibited discrimination does not include bullying, but the prohibited discrimination does include sexual harassment. The harassment must be "gender-oriented," and it must be more than mere name-calling."); *see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs*., 327 F.3d 771, 782 (8th Cir. 2003)("Each Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient. Whether . . . . harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well-being of employees is a question to be determined in light of the totality of the circumstances.")

[10]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended . . . to provide them recourse for mistreatment that is not based on sex."); .); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016) ("A review of all these statements reveals fewer than ten sexually-tinged comments over the course of two or three years. Such sporadic incidents are not sufficiently pervasive to establish a sexual harassment claim, the statements are mere offensive utterances.  While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way.  Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner."); *see also Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (internal quotations omitted); *Wolfe v. Fayetteville, Arkansas Sch. Dist*., 648 F.3d 860, 867 (8th Cir. 2011)( "[A]cts of name-calling do not amount to sex-based harassment, even if the words used are gender-specific, unless the underlying motivation for the harassment is hostility toward the person's gender."); *Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist*., 647 F.3d 156, 165 (5th Cir.2011)

**Page 14 of 63**

mere subjective feelings or perceptions are insufficient; the conduct complained of must also satisfy an objective standard that meets all of the foregoing elements of a claim and be so severe, pervasive, and objectively offensive that it effectively denies a person access to an institution's employment programs and/or activities.

**B.    The facts in the record do not establish any of the elements of a Title IX violation as to any of the complainants.**

*Neither the Complaint nor the facts in the record contain facts sufficient to establish adverse gender-based conduct constituting a violation of the CCRI Title IX Policy.*

The CCRI Title IX Policy forbids "sexual harassment" defined as "conduct on the basis of sex that constitutes Quid Pro Quo Sexual Harassment, Hostile Environment Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence, or Stalking." *Id*. VIII. A. None of the types of "sexual harassment" described in the policy has occurred in this case. Nevertheless, based on the allegations in the Complaint and the questioning by the Investigator, the administration appears to be attempting to build a case of "Hostile Environment Sexual Harassment." ***Such conduct must be motivated or based on gender and be objectively "so severe, pervasive, and objectively offensive that it effectively denies a person access to [the institution's] Programs or Activities*.**" *Id*. VIII., p. 4.[11]  *See Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21-23 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond [employment discrimination law] purview.  We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."); *accord  Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006).

The conduct complained of in the Complaint is nothing more than personal perceptions and subjective feelings of the complainants that the language, tone, and/or demeanor of my client in the communications was offensive or upsetting to them (without regard to *their* concurrent behavior, demeanor, and conduct toward my client).  There are no allegations in the Complaint of any vulgarity, unwanted touching, threats of violence, or criminal conduct.  None of the complainants claimed they were in fear for their physical safety.  As discussed above, Title IX is not a civility code nor a general anti-harassment code.  Nor does the evidence establish that the communications/conduct at issue was related to or motivated by gender.

In short, there is no evidence in the record of ***any*** gender based or motivated conduct on the part of Murray that was so severe, pervasive, and objectively offensive as to effectively deny any of the complainants to access to any program or activity of CCRI.

---

(stating harassment is actionable under Title IX only if it is "based on sex, per the words of Title IX, and not merely tinged with offensive sexual connotations" and affirming summary judgment where record fails to suggest the harasser "was motivated by anything other than personal animus.").

[11]  The CCRI Title IX Policy further requires that: "in determining whether a hostile environment exists, [CCRI] will consider the totality of circumstances, including factors such as the actual impact the conduct has had on the Complainant; the nature and severity of the conduct at issue; the frequency and duration of the conduct; the  relationship between the parties (including accounting for whether one individual has power or authority over the other); the context in which the conduct occurred; and the number of persons affected." *Id*. IX., pp 7-8.

**Page 15 of 63**

***Requirement that Conduct be Gender Based***

To constitute prohibited conduct under the CCRI Title IX Policy and applicable law, the conduct must be gender based or motivated.   The mere fact that it is between a man and a woman is not enough.  The fact that the conduct is "offensive and inappropriate [is insufficient where] the statements do not address plaintiff in a sexual way."  *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016).  "[W]orkplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations.  The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80 (1998).  Harassment is actionable under Title IX only if it is "based on sex, per the words of Title IX, and not merely tinged with offensive sexual connotations" and is thus not actionable where the harasser "was [not] motivated by anything other than personal animus.").  *Branch Indep. Sch. Dist*., 647 F.3d 156, 165 (5th Cir.2011).

Nor is there any significance in this case that all three complainants happen to be women, particularly given the context.  First, over two-thirds of the CCRI leadership, including President Hughes and V.P. Costigan, and over 60% of the faculty at CCRI are women.  Accordingly, if a faculty member is involved in an interpersonal conflict with a colleague or a member of the administration leadership team at the college, the chances are that it is with a woman.  Second, the communications and conduct at issue arose in the context of a fiercely and hotly contested faculty association vote on a proposed T.A., controversy over the lack of shared governance, and the administration's attempt to use the Faculty Senate for its agenda, wherein Murray's position was at odds with both that of the faculty leadership (Abbascia as President of CCRIFA and Sneesby as President of the Faculty Senate) and the CCRI administration (President Hughes and V.P. Costigan), ***the Presidents of which are all women and the former two of which are complainants***.  The undisputed and ONLY READING of the evidence in the record is that the communications and conduct were motivated solely by Murray's sincere and vigorous advocacy of his positions on behalf of his co-worker faculty members.  *See, e.g., Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 951 (N.D. Ill. 2017), aff'd, 933 F.3d 849 (7th Cir. 2019) ("The [alleged perpetrator] female student's activism and public statements were all in response to a specific act and were directed at a specific individual, not all males, and thus there was no actionable claim for Title IX sexual harassment.")

Finally, pattern and practice Title IX violations relate solely to systemic, institutional violations—it does not apply to conduct by individuals.  **Where, as here, a Title IX violation has been alleged, the complainant must show that the alleged perpetrator** ***engaged in conduct <u>toward the complainant</u> that was motivated by gender and was so severe, pervasive, and objectively offensive as to effectively deny the complainant access to a program or activity of CCRI.  As a matter of law, conduct toward others is irrelevant to this analysis.*** *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("Each Plaintiff, in other words, must show a practice or pattern of harassment ***<u>against him</u>***. A single incident or isolated incidents generally will not be sufficient.") (emphasis added).

1.    <u>***Del Sesto Complaint***</u>

Del Sesto alleges that she subjectively felt "uncomfortable" and was "caught off guard by [my client's] unexpected visit and demeanor" when he came to her office and "in summary was ***speaking negatively about the PTFA, contract, administration and his role.***"

**Not Gender-Based.**  Del Sesto does not claim in her complaint or testimony that Murray was motivated by gender or that gender in any way played a role in their dispute.

**Not Severe**.  Del Sesto claims that Murray was angry and "flailing his arms" during the encounter in question which lasted a matter of a few minutes.  There is no evidence in the record of any vulgarity, unwanted touching, threats of violence, or criminal conduct toward Del Sesto, nor any evidence she was in fear for her physical safety.  Even if Del Sesto was subjectively "shaken up" by the interaction, she does not claim nor can it be inferred from the facts that she was denied access to any program or activity of CCRI as a result of this single interaction with Murray.  Additionally, the interaction could not have been that severe if, after investigating Del Sesto's complaint about the encounter, Dean Stargard determined that it was not a disciplinary matter.  *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not create a claim for all unpleasant or abusive behavior in the workplace; it is not a general civility code and does not apply to the normal tribulations of the workplace, such as the sporadic use of abusive language, race-related jokes and occasional teasing. ***The conduct must be <u>extreme</u> to amount to a change in the terms and conditions of employment.***") (emphasis added).

**Not Pervasive**.  Out of innumerable interactions over an eight (8) year period, Del Sesto claims that this was the "first time" Murray had directed any objectionable communications to or conduct toward her.  Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interaction alleged in the Del Sesto complaint, amount to nothing more than the normal give and take in the workplace.  *See Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("[A] Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient.").

**Not Objectively Offensive**.  For the same reasons discussed above under the "Not Severe" heading, even if subjectively offensive or upsetting, keeping in mind the normal trials and tribulations of the workplace, actionable conduct "must pass a certain threshold of severity. Mere discomfort is insufficient.".  *Montalvo-Figueroa v. DNA Auto Corp.*, 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019).  A co-worker venting frustration, even if he or she is animated and raises his or her voice, is hardly unusual or sanctionable objectively offensive behavior.

## 2. *Sneesby Complaint*

Sneesby alleges that Murray "emailed the faculty stating derogatory things about [her] or [her] performance at work."  Sneesby is President of the Faculty Senate and a former President of the CCRIFA and the emails to which she refers and on which her allegations are based relate to Murray's criticism of her performance in that capacity.  The criticisms were not directed to or at her personally, but arose over their differences of opinion.  Specifically, Murray was and is critical of the lack of power of the Faculty Senate and the lack of real shared governance between the faculty and the CCRI administration, as well as the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda.  Murray asked Sneesby, in her position as President of the Faculty Senate, to publicly confirm what they had discussed in private, specifically that she concurs with his assessment.  The facts in the record show that she yelled and was unprofessional in her communications with Murray on a number of occasions during their approximately ten (10) years of interacting as colleagues at CCRI. Sneesby's unprofessional tone, demeanor, language, and treatment toward Murray in the record

**Page 17 of 63**

is supported both by Murray's testimony as well as statements of independent third-party witnesses.

**Not Gender-Based.** Sneesby alleges Murray is "condescending and dismissive and particularly targets females," without any factual basis or context for this self-serving, subjective opinion. *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Just saying so is not enough. A recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination.") In addition, nowhere in either Sneesby's complaint or testimony does she claim that her dispute with Murray or his conduct toward her was due to her gender and she expressly states in her testimony that Murray allegedly also bullies males and all those who disagree with him. She also claimed that she observed Professor Murray screaming at various people (with no reference to gender) during meetings. *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.*, No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX . . . does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016) ("While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way. Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner.").

**Not Severe.** There is no evidence in the record of any vulgarity, unwanted touching, threats of violence, or criminal conduct toward Sneesby, nor any evidence she was in fear for her physical safety. Moreover, the communications and any criticisms therein were not directed to or at her personally, but arose over their differences of opinion with respect to the lack of power of the Faculty Senate, the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda, and other faculty association matters. Even if Sneesby was subjectively offended or upset by Murray's communications in the faculty emails, she does not claim nor can it be inferred from the facts that she was denied access to any program or activity of CCRI as a result of her interactions with Murray. Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interactions alleged in the Sneesby complaint, amount to nothing more than the normal give and take in the workplace. *See Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.,* 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not . . . apply to the normal tribulations of the workplace . . .. ***The conduct must be <u>extreme</u> to amount to a change in the terms and conditions of employment.***") (emphasis added). *Montalvo-Figueroa v. DNA Auto Corp.*, 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019) ("Nevertheless, the harassment must pass a certain threshold of severity. Mere discomfort is insufficient.").

**Not Pervasive.** Out of innumerable interactions over a ten (10) year period, Sneesby identifies only a few occasions wherein she complains about what she appears to characterize as Murray's vigorous criticisms of her. Moreover, Sneesby admits she also "interact[ed] with him…and . . . saw a different side of him," having "some really good discussions." Although Sneesby also complains about Murray's alleged "aggressive[] critici[sm]" of President Hughes and Abbascia, these and any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interaction alleged in the Sneesby complaint, amount to nothing more than the normal give and take in the workplace. *See Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult

[must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("[A] Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient.").

**Not Objectively Offensive**.  For the same reasons discussed above under the "Not Severe" heading, even if subjectively offensive or upsetting, keeping in mind the normal trials and tribulations of the workplace as well as Sneesby's level of vitriol in some of her communications with Murray over the years, the communications and conduct in question do not arise to sanctionable, objectively offensive behavior.  This is particularly true insofar as the complaint does not involve personal criticisms or attacks, but rather communications between professional colleagues about differences of opinion regarding college policies and practices.  Such disputes are to be expected under such circumstances and a person like Sneesby, who holds a leadership/policy-making position, must expect criticism and disagreement from time to time—even if sometimes vigorous, persistent, and public.

### 3.  *Abbascia Complaint*

Abbascia complains about what she perceives as Murray's "unprofessional, bullying, threatening tone in emails."  She objects to Murray's emails wherein he called her a "lame duck" president—arising out of her announcement that she is leaving the college and her role as President of the union in June, prior to the end of her term of office, called into question her ability to do her job as union president, called for her resignation, and "verbally told faculty members that [Murrray] is trying to oust [her] as CCRIFA President."  During the period of the above communications, Abbascia and Murray were also at odds because Abbascia supported and advocated for approval of the T.A. by the faculty, while Murray was a vocal opponent. Murray's communications and criticisms about which Abbascia complains all involve, directly or indirectly, Murray's call for Abbasica's resignation in the context of a faculty vote that rejected the proposed T.A., indicating a lack of confidence in her by the faculty, as well as her not having a personal or professional stake in the outcome since she would not be seeking re-election as Faculty Association President nor would she be subject to the terms of any new contract.  By dictionary definition, Abbascia was, objectively, a "lame duck." [12]  Murray and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship.  Murray was a mentor and supporter of Abbasica when she declared to run for Faculty Association President in October of 2020.  Abbascia described the change in the relationship to be related to the union contract negotiations with the administration and the way that she conducted faculty association meetings.  Abbascia stated under oath that for most of the time she was employed at CCRI, her relationship with Professor Murray was cordial and professional.   Other than the controversy surrounding her announcement to leave CCRI in June, and her continuation of her role as union president, Abbascia indicated that Murray had been cordial with her.  Abbascia stated that her decision to leave CCRI was personal, and was not prompted by her current dispute with Murray.

**Not Gender-Based.**  Although Abbasica makes the claim that she was a "target" of Murray as "president of the union and as a woman," her bald-faced, subjective claim she was targeted as a woman is without any logical or factual basis—she was the union President who recommended approval of a T.A. rejected by the faculty and then announced her intent to resign—and clearly was the "target" of Murray's criticisms on that basis. *See Austin v. Univ.*

---

[12]  *The Britannica Dictionary*: "[Defining 'lame duck' as] 1 . . .  an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help." https://www.britannica.com/dictionary/lame-duck

*of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Just saying so is not enough. A recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination.") Indeed, in her sworn testimony, when asked twice whether Murray's alleged "bullying" was directed at men or just women, Abbasica concedes both times that "maybe it just so happens that a woman" is union president, president of the college and vice president of academic affairs. *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.*, No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX . . . does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016) ("While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way. Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner.").

**Not Severe**. There is no evidence in the record of any vulgarity, unwanted touching, threats of violence, or criminal conduct toward Abbascia, nor any evidence she was in fear for her physical safety. Moreover, the communications and any criticisms therein were not directed to or at her personally, but arose over their differences of opinion with respect to her position in support of the T.A. and her role as Faculty Association President. Even if Abbascia was subjectively offended or upset by Murray's communications in the faculty emails, she does not claim nor can it be inferred from the facts that she was denied access to any program or activity of CCRI as a result of her interactions with Murray. Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interactions alleged in the Abbascia complaint, amount to nothing more than the normal give and take in the workplace. *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not . . . apply to the normal tribulations of the workplace . ***The conduct must be extreme to amount to a change in the terms and conditions of employmen***t.") (emphasis added); *Montalvo-Figueroa v. DNA Auto Corp.*, 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019)("Nevertheless, the harassment must pass a certain threshold of severity. Mere discomfort is insufficient.").

**Not Pervasive**. Out of innumerable interactions during over a five (5) year period, including a brief intimate relationship, Abbasica admits that other than the controversy surrounding her announcement to leave CCRI in June and her continuation of her role as union president, Murray had been cordial with her. Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interaction alleged in the Abbacia complaint, amount to nothing more than the normal give and take in the workplace. *See Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("[A] Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient.").

**Not Objectively Offensive**. For the same reasons discussed above under the "Not Severe" heading, even if subjectively offensive or upsetting, keeping in mind the normal trials and tribulations of the workplace as well as the fact the Murray was previously a mentor, supporter, and intimate partner, the communications and conduct in question do not arise to sanctionable, objectively offensive behavior. This is particularly true insofar as the complaint does not involve personal criticisms or attacks, but rather communications between professional colleagues about differences of opinion regarding college policies and practices. Such disputes are to be expected under such circumstances and a person like Abbascia, who

holds a leadership/policy-making position, must expect criticism and disagreement from time to time—even if sometimes vigorous, persistent, and public.

## VI.    MODIFICATIONS TO THE INVESTIGATOR'S INTRODCUTION

It should be noted that the Maya Geraldo "statement" mentioned in the second paragraph of the "Introduction" section was unsigned.  Also, in the next to the last line of the second paragraph in this section, Del Sesto never uses the words "unprofessionally" or "aggressively" in her complaint or testimony in describing the event on January 20, 2023. Accordingly, as written, this statement is misleading as it suggests that this was a characterization of the witness, when it was that of the Investigator, who has identified his function as merely gathering the facts.  Therefore, Murray demands that these words be stricken from the "Introduction."

## VII.    INVESTIGATOR PROPOSED FINDINGS—INTERVIEWS

### *Del Sesto Claim*

1.    On the afternoon of Thursday, January 19, 2023, Ms. Del Sesto sent an email to all department chairs, including Professor Murray, regarding payroll information for part-time instructors that was to be submitted by the chairs by the following day. [**Additional Proposed Finding**:    ***There were a series of back-and-forth emails that predated the email mentioned here which purported to make a last minute material change to the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty.  Because of the confusion created by the Del Sesto email, Murray was unable to finalize the assignment of faculty, complete and submit a faculty workload report, or complete and submit a faculty payroll report, all of which were due that date.***]

2.    Ms. Del Sesto stated that Professor Murray used "words and phrases such as 'this is ridiculous'... [speaking] negatively about Dean Stargard and how he's not doing his job." [**Additional Proposed Finding**.    ***Del Sesto does not remember the exact substance***

**Page 21 of 63**

*of what was said; she does state that Murray said nothing disparaging or critical about her, no threats to her or about anyone else.  She says he was loud, not hollering, a bit louder than normal.*  **Del Sesto Tr. 33-34.].**

3.     Professor Murray sends extremely long emails late into the night with a negative tone and accusations towards Dean Stargard.  Ms. Del Sesto recalls being told by the English Department Chair, Sandra Sneesby, that she stopped attending divisional meetings for the Arts, Humanities and Social Sciences because of Professor Murray's involvement.  [**Comment and Request to Strike or Clarify**: First, this is rank hearsay— Sneesby never said this, only Del Sesto did—and it should be stricken on that basis.  Second, it is highly misleading as Sneesby only missed one such meeting prior to my client being banned from campus and therefore should be stricken as misleading as well.  If you refuse to remove this rank hearsay comment of dubious credibility and relevance, then my client proposes the following: **Additional Proposed Finding**.  *Professor Sneesby only failed to attend one such meeting prior to Professor Murray being placed on administrative leave.*]

4.     **Correction to Record**.  **Geraldo claimed Murray was "put on leave" in 2018 – this is incorrect – the only time Murray was placed on leave is the current one.**

5.     **Additional Proposed Findings**.  *See also* **additional proposed findings 3-18 in Section II above**.  *Professor Murray was hired as an assistant Professor, granted tenure, promoted to Associate Professor and then promoted to full Professor.  He has never been disciplined for misconduct or otherwise by the College. He has outstanding work evaluations in his Professional file by the Deans who supervised him, the faculty in his department and from students.   In the last nine (9) years or so there have been nine (9) different deans employed by the College working under the direction of VP Costigan in the division of Arts, Humanities and Social Sciences.*

6.     Ms. Del Sesto witnessed hostility by Professor Murray towards Dean Stargard.  [**Additional Proposed Finding**.  *Dean Stargard is male.*]

**Additional Proposed Del Sesto Findings from Section II above**

7.     The Elizabeth Del Sesto ("Del Sesto," formerly Capraro) Complaint arises solely from a single encounter (January 20, 2023) between Murray and Del Sesto, mere days before the Spring semester was to start, wherein Murray was expressing frustration over the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty. (Murray Tr. pgs. 22 – 38)

8.     The reason Del Sesto was the subject of the communication was that, although ostensibly issued under the authority of Dean Stargard, she was the author and sender of the email which contained the last-minute disputed interpretation of the CBA and Dean Stargard was not in his office at that time.  (Murray Tr. pg. 28).

9.     The entire interaction involved Murray in his capacity not just as a faculty member asserting rights under the CBA, but more significantly, as a faculty member Department Chair speaking on behalf of his members on an urgent and pressing issue impacting Law Department faculty members, as the semester was scheduled to begin on the next business day and as consequence of the confusion caused by the email and series of emails and events leading up to this point, Murray was unable to either finalize the assignment of faculty, complete and submit a faculty workload report, or complete and submit a payroll report, all of which were due ***that date.***  (Murray Tr. pps. 22-38)

10.     At the time of the interaction in question, Del Sesto was an assistant to V.P. Costigan.

11.     Murray has interacted with Del Sesto on innumerable occasions during her approximately eight years as a support person in the Academic Affairs suite.

12.     Del Sesto claims in her complaint that this was the "first time" Murray had directed any objectionable communications to or conduct toward her.

13.     Del Sesto does not claim in her Complaint or testimony that Murray was motivated by gender or that gender in any way played a role in their dispute.  (Del Sesto

Complaint; *see also* Del Sesto Tr. p. 34.[13])

14.     Dean Stargard previously determined that the interaction in question between Murray and Del Sesto was not a disciplinary matter. He stated this in both in an email to Murray and again when he met to discuss the matter with Murray.  Murray Tr.  pps. 33- 38, and Murray Exhibit (Email from Stargard to Murray dated January 26, 2023).

15.     Del Sesto was rewarded for filing her complaint by being appointed interim assistant dean BSTEM in June of 2023, which included a significant increase in annual salary (2023 $61,499.88 -- 2023 $75,000.12) from her previous position as academic affairs coordinator for which V.P. Costigan was her direct supervisor.  (RI Transparency Portal www.transparency.ri.gov -- CCRI for Capraro 2022 and Delsesto 2023)

### *Sneesby Claim*

16.     She ***was*** ~~is presently~~ the Chair of the English Department and ~~has~~ served in that capacity for the past two years.  **Additional Proposed Finding/Correction.** *Professor Sneesby is currently the newly appointed Chair of the Communications Department.*

17.     Professor Sneesby alleges that Professor Murray has subjected her to sex discrimination, harassment, bullying and retaliation on several occasions, including specific instances that occurred in the month of February 2023.  Professor Murray allegedly emailed the entire faculty, stating derogatory comments about her or her work performance. [**Additional Proposed Finding.**   *Professor Sneesby produced no emails to the entire faculty wherein Professor Murray has either made derogatory comments about her directly or indirectly or mentioned her by name.*]

---

[13]  *See also* Del Sesto Tr. pp. 44-45: ("Q.   Let me ask you this though. Do you find that he is a bully only to you women or a  bully to both men and women?    A.   I find that he is often a bully – I  find that he's a bully to women and I find that  he ends up being a bully to men if he is  unsuccessful in befriending that man.";  "Q.  How about with women, does he try to  befriend women that he then has, I guess, as  allies?  A.   I mean I don't think he bullies all women, but I think depending on -- I think depending on what it involved . ..";     A.  In a sense.   So I feel like he almost -- he -- he seems like the type of bully that is bullying to get people to back him and   if you don't support him, then that's it for  you.".

18.    Professor Sneesby previously assumed the presidency of the faculty association after both the elected president and vice president resigned *in approximately 2015* **[additional proposed fact in bold italic to be added to provide context].**

19.    She stated that Professor Murray orchestrated a faction of faculty members to "ratchet up email attacks and just spread untruths." The adverse faction allegedly attempted to persuade Professor Sneesby to appoint Professor Murray as the leader of the negotiation team for the new union contract with the College. The faction threatened that they would expel her as faculty association president if she failed to do so. However, the motion failed and she remained as president.  **[Comment and Request to Strike or Clarify**.  These findings should be deleted as misleading and irrelevant. Sneesby's trials and tribulations eight (8) years ago as CCRIFA President attempting to get a faculty approval of a new contract in the face of vigorous opposition of other faculty association members, of which Murray was only one, is irrelevant and misleading. Additionally, such conduct is protected concerted conduct under applicable law and is provided enormous deference.  Finally, the interactions in question are far too remote in time to have any relevance to Sneesby's current complaint.   If you refuse to remove these misleading and irrelevant findings, then my client proposes the following:  **Additional Proposed Finding**.  *Professor Murray disputes that he led or instigated any faculty faction to expel Professor Sneesby if he were not appointed to the negotiation team***.]**

20.    Ultimately, Professor Sneesby was successful in getting the proposed contract approved by the faculty, despite what she described as "lots and lots of emails attacking it, attacking me, attacking people.  **[Additional Proposed Finding**.  *However, none of these purported emails were produced to the Investigator***.].**

21.    She observed Professor Murray aggressively criticizing President Meghan Hughes and Vice President Rosemary Costigan "with a vengeance." **[Additional Proposed Finding**.  *Professor Sneesby has also engaged in harsh criticism of Vice President*

*Costigan, at one point claiming her "ineptitude" has cost the college a million dollars in legal fees and resulted in the resignation or removal "of some good people who actually know something about academics." See Sneesby June 3, 2020 email to Murray.].*

22.    She observed Professor Murray screaming at people during meetings. Comment.  [**Comment.  This finding must be deleted as it contains no date, time, place, circumstance or context and is merely a bald faced lay opinion claim without basis that has no probative value nor relevance to the Complaint.** ]

23.    When Faculty Association President Abbascia announced that she would be leaving the College on June 17, 2023, Professor Murray criticized the announcement by email to all faculty. *See*, *Exhibit 5* at 259-260.  Professor Sneesby responded to all faculty on February 1, stating in part, that the recent emails reminded her of the time she served as president and that "there is no room in the academy for bullying…we do not need to vilify or humiliate our every own… ." *Exhibit 5* at 255-256.  [**Additional Proposed Finding Sneesby and Murray had a phone conversation the night before she sent her email supporting Abbascia wherein she agreed with Murray that Abbascia should resign. She texted Murray that she would do "good cop/bad cop."**][14]

24.    Professor Stockford notified Professor Sneesby that the "grading scale was introduced orally at our last meeting by Dean Nauman." *Id*. at 234.  [**Additional proposed finding**. *Accordingly, consistent with Murray's grave concerns about the administration's manipulation of the Faculty Senate, the bill in question was in fact improperly introduced by the administration, not a member of the faculty.  Moreover, in expressing his concerns about the manipulation of the Faculty Senate by the Administration, Professor Murray never mentioned Professor Sneesby directly or indirectly.*]

25.    Some of the things that you've told me that I think you should share with everyone:

---

[14]  A copy of a text from Sneesby to Murray confirming this is attached.

- The Faculty Senate is dominated by Meghan and Rosemary
- The Faculty Senate has no real power and is merely advisory to Meghan
- The Faculty Senate is being used by Meghan and Rosemary to complete their agenda
- The only way to have a real Faculty Senate that has 'shared governance' would be to go to the RI Legislature and get them to pass a law that give power/shared governance to a newly created Faculty Senate modeled on the URI Faculty Senate.
- [**Additional Proposed Finding**. *After Murray suggested this above action, Sneesby in the Spring of 2023 made a failed attempted to increase the power of the Faculty Senate by changing the statute regarding shared governance at CCRI by inserting the "faculty senate" into the proposed statute House Bill 2023 -6138 in the RI House of Representatives.*].

26.    Professor Sneesby immediately called Professor Murray. She placed Professor Murray on speakerphone so that her colleague, Professor Jon Dorn, could listen to the conversation, and basically repeated the same conversation with him regarding her work on the Faculty Senate.[43]    *She claims that ~~Hh~~e threatened to claim that she was "a puppet of the administration."*    [**Reason for Proposed Change and Additional Proposed Findings**. *Sneesby does not really remember what Professor Murray said he was going to do*. [Sneesby May 5, 2023 p. 35].    *Murray denies that he told Sneesby she was "a puppet of the administration" nor did he even imply this. Nor did he state he was going to assert such a claim to the faculty or anyone else. What Murray stated was that the Faculty Senate was being used by the administration for its own purposes, the implication of which could be that the Faculty Senate was a puppet of the administration, not Sneesby*.].

27.    The conversation was argumentative, and Professor Murray stated that Professor Sneesby was screaming ~~or hollering~~ during the phone call.    [**Comment**. **Murray stated she was screaming, not "hollering." Accordingly, "hollering" should be deleted**] Professor Sneesby denies it.    [**Additional Proposed Finding**. *However, three independent witnesses, Lolita Villanueva, Tiffany Jones, and Lauren Nagel, confirm that Sneesby was screaming at Murray, while Murray never raised his voice.*]

28.    Professor Sneesby also told Professor Murray that he should leave Tara

Abbascia alone and "stop attacking everyone."[46]   The attacks reminded her of the time she served as president of the union and  found that "it's all happening again**." [Additional Proposed Finding**.  *Three independent witnesses heard Sneesby screaming at Murray on that phone call and confirmed that Murray never raised his voice*.].

29.    When Professor Sneesby cited emails in her complaint, she was "thinking of some of the older emails from the older incidents…"  that Professor Murray sent to the entire staff while she served as faculty association president.    **[Additional Proposed Finding**. *Professor Sneesby never identified or produced any of these alleged emails*.]

30.    As an example of a recent email in which Professor Sneesby claimed that Professor Murray stated something that constituted criticism, bullying or harassment, she referenced the email correspondence in which Professor Murray criticized the Faculty Senate. **[Additional Proposed Finding**.  *Sneesby is one of 40 faculty on the Faculty Senate.  None of the emails referenced by Sneesby mentions her name or anyone else's name.  The emails are merely express Murray's concern about the lack of power of the Faculty Senate and the manipulation of the Faculty Senate by the Administration for its own ends all due to the lack of true shared governance with the Administration*.].  [**Comment.**  **Such conduct is concerted conduct among association members absolutely protected under applicable law.].**

31.    The critical email regarding the faculty staff was then "leaked to the entire faculty, and now the faculty's getting reports that I'm responsible, the administration is trying to take down Steve Murray, and I am doing it, me."  **[Comment.**  **There is nothing in the Sneesby Transcript on Page 44 that supports this quote.  Additionally, even if true, it is neither relevant nor probative to the Sneesby Complaint.  Accordingly, this sentence should be deleted.].**

32.     Professor Sneesby recalls occasions during CRC meetings when Professor Murray put his hand up to stop her from speaking.  He occasionally would say comments such

as "that's nonsense" or "I didn't tell you to speak." [**Comment. These two findings must be deleted as they contain no date, time, place, or circumstance and are merely bald faced allegations without context that have no probative value nor relevance to the Complaint.**].

33.     On one occasion, approximately four years ago, Professor Murray "upended a meeting" because Professor Sneesby was attempting to pass a proposal for a communications program.[53] She recalls that Professor Murray was arguing during the meeting that the proposal should fail and she believes that "he was retaliating because he wanted my proposal for communications program to be stopped." [**Additional Proposed Finding. *Murray disputes this and that, to the best of his recollection, he ultimately voted in favor of the measure.***].

34.     Professor Sneesby recalls walking out of a meeting after a yelling episode and "people came out after the meeting, like we do every meeting, and it's like ugh, we had to suffer through that.  So people will…shoulder on through his…behavior."  Professor Sneesby continued that it is "hard for me to distinguish because it's like a constant."  [**Comment. These findings must be deleted as they contain no date, time, place, or circumstance and are merely a bald faced allegations without context that have no probative value nor relevance to the Complaint.**].

35.     Professor Sneesby also referenced Soudabeh Valicenti, Chair of the Math Department. She thought that Professor Murray may have obtained a restraining order against her after she filed a complaint against him for his behavior.  [**Comment and Request to Strike or Clarify**:  **First, this is rank hearsay and should be stricken on that basis.  Second, it is highly prejudicial and misleading and contains no date, time, place, or circumstance and is merely a bald-faced allegation without context that have no probative value nor relevance to the Complaint.  If you refuse to remove this rank hearsay comment of dubious credibility and relevance, then my client proposes the following**:  **Additional Proposed. *However, Murray never sought nor obtained such a restraining order.***].

36.     There were occasions when Professor Murray would raise his hand towards

Dean Barabara Nauman during *a* meeting**s** *to signal her to refrain* , stopping her from

speaking.  [**Reason for Changes**.  **There is no evidence in the record that this happened at**

**more than one meeting.  Additional Proposed Finding**.  *As confirmed by the statement of*

*Professor Mazin Adam, Dean Nauman was about thirty (30) feet away from Professor*

*Murray the one-time it happened*.

37.    She recalls Professor Murray screaming at Dean Nauman at one meeting.

[**Comment.  This finding must be deleted as it contains no date, time, place, circumstance**

**or context and is merely a bald-faced lay opinion claim without basis that has no probative**

**value nor relevance to the Complaint.**].

**Additional Proposed Sneesby Findings from Section II above**

38.    The  Sandra  Sneesby  ("Sneesby")  Complaint/"Incident  Report"  (Sneesby

claims she submitted two "Complaints", Sneesby Tr. 52, but an actual "Complaint" form has

never been produced to respondent) arises out of communications between her and Murray,

wherein Murray is critical of the lack of power of the Faculty Senate and the lack of real shared

governance between the faculty and the CCRI administration, as well as the maneuvers by the

administration to use the Senate as a rubber stamp for the its agenda, and asks Sneesby, in her

position as President of the Faculty Senate, to publicly confirm what they had discussed in

private, specifically that she concurs with his assessment.  ( Murray Tr. pgs. 45—74).

39.    By way of context, Sneesby played a significant role in the creation of the

Faculty Senate in an attempt to rectify the issue of lack of shared governance.  The Senate she

created with the Administration has no authority -- it is purely advisory.  All power ultimately

rests  with  the  President  of  the  College.  (CCRI  Senate  Constitution,  Article  II

www.ccri.edu/senate/S2022-001.pdf )

40.    Murray has vigorously and publicly advocated that this is obviously not the

required shared governance intended or required by statute, R.I. Gen. Laws §16-33.1-3

(providing that, among other things, "the president and a committee of the faculty" shall

determine the academic standards and courses of study at the college (http://webserver.rilin.state.ri.us/Statutes/TITLE16/16-33.1/16-33.1-3.htm)), or by the college's accrediting body, the New England Commission of Higher Education, *see, e.g.,* Standard 3.15. ("The institution places primary responsibility for the content, quality, and effectiveness of the curriculum with its faculty. Faculty have a substantive voice in matters of educational programs, faculty personnel, and other aspects of institutional policy that relate to their areas of responsibility and expertise." www.neche.org/wp-content/uploads/2020/12/Standards-for-Accreditation-2021.pdf). (Murray Tr. pg. 55)

41.     Sneesby regarded Murray's criticisms of the Faculty Senate's lack of shared governance as a personal attack, despite Murray's repeated assurances that it was a criticism of the Faculty Senate's lack of power as an institution and not a criticism of or attack on her. (Murray Tr.  pps. 45-74)

42.     By way of additional context, for about ten years, Sneesby and Murray, had been faculty colleagues at CCRI and, at times, worthy adversaries when he defeated her for Faculty Association President in 2016.

43.     In particular, during the fall of 2022 until Murray was placed on administrative leave on February 28, 2023, Murray had numerous phone and text communications with Sneesby regarding the shortcomings of the proposed T.A., the impact of Tara Abbascia's announcement that she would be leaving CCRI on her ability to continue to effectively lead the CCRIFA, and the lack of an equal role for the faculty in shared governance, and V.P. Costigan's attempts to use the Faculty Senate to advance the administration's agenda.

44.     The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that the communications about which Sneesby complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications. *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's

**Page 31 of 63**

"right to use faculty mailboxes and email communications, including mass distributions.").

45.     As further confirmation that the communications and dispute in question involved solely union business, Sneesby a) claims that Murray has "emailed the faculty stating derogatory things about . . . [the] performance [of her] work," b) identifies as witnesses "[t]he entire faculty via email; and, c) asks as a remedy that "Murray [be] prohibited from sending mass emails regarding . . .[her] work performance."  (Sneesby Complaint.)

46.     Although Sneesby makes a bald-faced claim in her complaint that Murray is "condescending and dismissive and particularly targets females," nowhere in either Sneesby's complaint or testimony does she claim that her dispute with Murray or his conduct toward her was due to her gender and she expressly states in her testimony that Murray allegedly also bullies males and all those who disagree with him. (Sneesby Tr. 53. [15])

47.     Sneesby told Murray that she plans on running for President of the CCRIFA Union in the next election.

48.     Sneesby was rewarded after filing her Complaint by the College creating a new department "Communications" without going through the Curriculum Review Committee and naming Sneesby as Department Chair.  Sneesby had been Chair of the English department with a much larger work load, including number of faculty to supervise, required assessment activities, and courses to schedule.

### *Abbascia Claim*

49.     Professor Abbascia was employed at the College for ten years and ~~has been~~ **was previously** the Chair of the Dental Health Department.  **As of June 17, 2023, she was no longer**

---

[15]  Sneesby Tr. 53 ("Q.  Is this only directed towards you, or was it directed towards others as well?  A. He could do it towards others as well.· But he seemed to save it the most for particularly the, the administrators, other faculty.  Anybody that basically would say something he didn't ·agree with or was challenging his -- and he just is just the worst with women; he's more aggressive.· And if you're a man, or you're a lawyer, he is better.. . . I don't know.· I don't know.· I can't -- I don't know what's in his head, but it -- that's how it appears to me.").  Tr. 65 ("Q.  Could he have been behaving this way because he just didn't like the policies as opposed to the women? A.  He could have been.· I think it's possible.· I don't know what's in his head, ·technically.").  Sneesby also cites several males in her testimony whom she claims Murray also allegedly bullied.  *See, e.g.*, Sneesby Tr. 66.  Sneesby also concedes many of those in leadership at CCRI happen to be women.  Sneesby Tr. 66  ("We happen to have a lot of women who are in positions of leadership, as I'm realizing.").

*employed by CCRI.*    [**Reason for Changes**.    **The reason for these changes are self-explanatory.].**

50.    Professor Abbascia alleges that there have been multiple incidents of bullying by Professor Murray and efforts to damage her reputation through email correspondence that relate to her service as faculty association president. ***After she announced her resignation as President of the Union effective June 17, 2023,*** ~~H~~*he* ~~has~~ *requested* ~~demanded~~ that she resign from the presidency ***because Murray, and many other faculty members, felt that her resignation made her ineffectual***, calling her a "lame duck" ***and*** threatened*~~ing~~* to send the entire faculty a copy of email correspondence between them ***relative to her allegation against him claiming he was spreading lies.***    [**Reason for Changes**.    **The reason for these changes are self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole].**

51.    For approximately six weeks in 2019, Professor Murray and Professor Abbascia dated ***after Professor Abbascia asked Murray out on a date***. [**Reason for Change**.    **The reason for this change is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole].**

52.     Professors Susi and MacInnes commented by email, noting that Professor Murray's "rhetoric is disrespectful" and a "mocking tone." *Id*. at 278.    [**Additional Proposed Findings**.    ***Many other faculty members supported Murray's position that Abbascia should resign***.    **This reason for this proposed finding is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole.].**

53.    The arguments∕disagreement between Professors Abbascia and Murray ***continued solely via email***.    [**Reason for Change**.    **The reason for this change is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole].**

54.    Professor Abbascia replied back to Professor Murray and denied that she was referring to him in the email that was sent to the entire faculty. *Id*.    [**Additional Proposed Findings**. *However, in her testimony she admits that her email was not true, but rather she was saying Murray was spreading lies and that "…there was lies not only being put out by him…" See Abbascia Transcript Pages 17-18. The reason for this proposed finding is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole.*].

### Additional Proposed Abbascia Findings from Section II above

55.    The Tara Abbascia ("Abbascia") complaint arises out of communications between her and Murray wherein Murray questions and is critical of her ability to continue to effectively do her job as Faculty Association President in the context of an emotionally charged debate concerning ratification of a disputed proposed tentative contract agreement ("T.A."), which had already been rejected once by the faculty, in the midst of which Abbascia had announced she would be leaving the college in June, and as a consequence of which he called her a "lame duck" and called for her resignation. (Abbascia Complaint).

56.    During the period of the above communications, Abbascia and Murray were also at odds because Abbascia supported and advocated for approval of the T.A. by the faculty, while Murray was a vocal opponent. (Murray Tr. 74- 93).

57.    The term "lame duck" is frequently and commonly used to describe an elected official who was completing the remaining term of his or her office for a position for which they had been defeated or were not seeking re-election and is therefore viewed to be ineffective due to the perceived lack of incentive or motivation. *See., e.g.*, *The Britannica Dictionary*: "[Defining 'lame duck' as] 1 . . .  an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help." https://www.britannica.com/dictionary/lame-duck.

58.    Murray's communications and criticisms about which Abbascia complains all

involve, directly or indirectly, Murray's call for Abbasica's resignation in the context of a faculty vote that rejected the proposed T.A., indicating a lack of confidence in her by the faculty, as well as her not having a personal or professional stake in the outcome since she would not be seeking re-election as Faculty Association President nor would she be subject to the terms of any new contract—a "lame duck." (Murray Tr. 74-93).

59.     Murray and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship. (Murray Tr. 75).

60.     Murray was a mentor and supporter of Abbasica when she declared to run for Faculty Association President in October of 2020. ( Abbascia Tr. 8, 11).

61.     The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that all but one of the communications about which Abbascia complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications. *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions."). (Murray Tr. 74-93).

62.     The private email(s) about which Abbascia complains is a communication from Murray wherein he is requesting that Abbascia, as President of the CCRIFA, appoint him as lead negotiator for the TA, and to clarify who she was referring to when she said in her email that lies were being spread regarding the TA. Abbascia Complaint. (Abbascia Tr. 15 -20).

63.     As further confirmation that the communications and dispute in question involved solely union business, Abbascia a) seeks as a remedy in her complaint "that [Murray be placed on] paid administrative leave pending investigation [as] an appropriate action. Taking away his ability to use CCRI email to communicate with faculty until this complaint has been investigated, I feel is appropriate" and b) identifies as witnesses, Leslie Florio, the NEARI union representative for the CCRIFA, and the "CCRI Faculty Association." (Abbascia

**Page 35 of 63**

Complaint).

64.    Although Abbasica makes the claim that she was a "target" of Murray as "president of the union and as a woman," her bald-faced, subjective claim she was targeted as a woman is without any logical or factual basis—she was the union President who recommended approval of a T.A. rejected by the faculty and then announced her intent to resign—and clearly was the "target" of Murray's criticisms on that basis.   (Abbascia Complaint)  Abbascia also recognizes that as Union President " I can take a lot of criticism. That's part of the job." (Abbascia Tr. 23).

65.    Indeed, in her sworn testimony, when asked twice whether Murray's alleged "bullying" was directed at men or just women, Abbasica concedes both times that "maybe it just so happens that a woman" is Union President, President of the College and Vice President of Academic Affairs.  (Abbascia Tr. 30, 35).

66.    Abbascia left CCRI on June 17, 2023.  Abbascia emphatically swore under oath that her leaving the College had nothing to do with Murray. (Abbascia Tr. 24).

### *Respondent Steven D. Murray*

67.    Previously, there were several other deans, including interim Dean John Cole, Interim Dean Allyson Handley, and Dean Brian Brophy-Baerman.   **[Additional Proposed Findings**.  *Each of the deans he has worked with closely have given him excellent reviews and none have ever indicated that he is a bully or discriminates against anyone.  The one female dean he has had in the last few years Dean Allyson Handley, now promoted to the position of VP of Academic Affairs for CCRIR wrote in 2021 Chair Evaluation that "Chair Murray received an overall 'outstanding' evaluation from Interim Dean Handley across all rating categories included in the rating scale."  With respect to "Category Leadership" #1 on the Evaluation form used by the Deans she wrote "represents the department effectively within the College."  Dean Handley also wrote that Murray "Exceeds Expectations" and in the section on "Communicates Effectively" she wrote for "Resolves Conflicts Fairly"*

*"Satisfactory" and for " Successfully Articulates program's image and academic reputation"*
*"Exceeds Expectations." Other Deans gave similar positive reviews.*

68.     The semester was scheduled to begin the following Monday, January 23, 2023. Payroll, workload reports, faculty workload were all due by *the next day* January 20, 2023. **[Reason for Additional Fact.  The reason is for clarification and context.].**

69.     Professor Murray recalls going to the administrative offices with the intention of speaking with Dean Stargard on January 20, 2023. The office of Ms. Del Sesto and Maya Geraldo is located next to it. ***Dean Stargard was not in his office***. **[Reason for Additional Fact.  The reason is for clarification and context.].**

70.     The dean noted ***that DelSesto said*** he was gesturing with his hands and appeared red in the face.  Professor Murray noted during the interview that "as [Dean Stargard] was saying I move my hands around, he was moving his hands around.   **[Reason for Additional Fact.  The reason is for clarification and context.  Stargard did not witness the interaction in question].**

71.     Professor Sneesby responded by email requesting that her name not be used in any emails to the faculty concerning the matter.  [**Additional Proposed Fact**.  ***Murray neither before nor after this request identified Sneesby in his emails to the faculty regarding the lack of power of the Faculty Senate or the administration's manipulation of the Faculty Senate for its own purposes***.   **Reason for Additional Fact.  The reason is for clarification and context.].**

72.     They went out into the hallway and Professor Murray indicated that Professor Sneesby berated him.  [**Additional Proposed Fact**.  ***Witness Lolita Villaneuva confirmed Murray's account of this interaction***.]

73.     When asked if such conduct would stand out in his mind, he indicated that he could not answer that question.  [**Additional Proposed Finding**.  ***Murray did recall that on one occasion*** ~~*subsequent to*~~ ***at a CRC meeting in October of 2022, wherein after Murray was***

**Page 37 of 63**

*recognized by the Committee Chair to speak, Dean Nauman (who was sitting approximately 30 feet away at the other end of the room) interrupted him and he asked her to please not interrupt him and raised his hand to signal the same.  Professor Mazin Adam confirms Murray's recollection of this interaction.]*.

74.    Professor Murray observed two officers at the meeting when he arrived. Professor Murray viewed it as intimidation.  **[Additional Proposed Finding.  *Campus Police and Sneesby both confirmed that they were asked to attend the meeting by Sneesby because Murray was attending this meeting that is open to the public.*]**

75.    She exited the room and approached Professor Murray and began to swear and holler about John Leidecker, an attorney who was involved with the union.  *He reported the incident to HR at the College and they dismissed it as outside of their jurisdiction as a Union matter*.  He also recounted another meeting that occurred on February 11, 2020 at a meeting of the "Little Chairs" where Professor Valicenti allegedly referred to Professor Murray and other faculty members who are not present as "thuggish."  Professor Murray was not present at that meeting.  *He nevertheless reported that matter to HR at the College and again the College dismissed it.*  **[Reason for Additional Proposed Findings.  The reason is for clarification and context and to emphasize that by CCRI's own policy, such conduct, like Murray's conduct at issue herein, is protected concerted conduct not subject to sanction or regulation by the college].**

76.    With respect to a letter being circulated to faculty members to support Professor Murray's reinstatement as the Chair of his department, Professor Murray denied that there was any altercation between them.  *Valicenti filed a Complaint with HR at the College and after an investigation the Complaint was dismissed as unfounded.*  Instead, he described it as "two people who had been in an intimate relationship."  *In 2019,* Professor Murray was removed by President Hughes and VP Costigan as the Chair of his department.  A number of people supported his reinstatement as Chair.  When Professor Valicenti declined to sign the letter,

Professor Murray went to her office. He denied any foul language or anything pertaining to her gender *during that interaction*. *Again, Valicenti filed a Complaint with HR as referenced earlier in this paragraph and after an investigation it was dismissed as unfounded.*

77.     With respect to an ~~incident~~ *a meeting of the CRC"* involving Leslie Killgore, he recalls attending a CRC meeting in which Professor Killgore referred to herself *in front of the entire CRC* "as a bitch."    Professor Murray found the comment to be inappropriate. Professor Killgore *apologized to the CRC* for her comment.    He then notified the Vice President of the College and asked that the minutes reflect her inappropriate language.  [**Reason for Changes/Additional Proposed Findings**.  **The reason is for clarification and context.**].

78.     Professor Murray denies that any of his interactions with the Complainants or any of the incidents described by them were motivated by gender*.   As Union President and as a Union Member,* h e  recounted that he had "many professional disagreements" with men in position of authority, such as the President of the Faculty Association, Shawn Parker.

### Additional Proposed Murray Findings from Section II above

79.     Respondent Steven D. Murray ("Murray") is a member of the Bars of the U.S. District Court for the District of Rhode Island, State of Rhode Island, Commonwealth of Massachusetts, and the Supreme Court of the United States and is a former Assistant Attorney General for the State of Rhode Island.

80.     He has taught law courses at CCRI for almost 32 years.

81.     He was President of the faculty union, CCRIFA, from April of 2016 until November of 2020.

82.     He is currently Vice President of the faculty union and an alternate member to the CCRIFA Executive Committee.

83.     He has a stellar record of largely "exceeds expectations" annual reviews and has never been disciplined by CCRI.

84.     He was elected Chair of the Criminal Justice department in 2012 and was

reelected unanimously on three subsequent occasions, most recently in February of 2023.

85.     He also recently received an overall "outstanding evaluation" as a Department Chair and teacher and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty." (Evaluation of Murray by Dean Handley, April 22, 2021).

86.     However, as a vocal and passionate advocate, both as President and a member of the CCRIFA, seeking to improve the terms and conditions of employment on behalf of his co-worker union faculty members, he is and has been frequently at odds with the CCRI administration.

87.     In his roles as Faculty Association President and Department Chair, Murray has had severe disagreements over the years with President Hughes and VPAA Costigan that have led to faculty "No Confidence Votes," picketing, grievances and Unfair Labor Practice charges. Murray and Costigan have each filed complaints with HR against each other.[16]

---

[16] Murray's clashes with the CCRI administration over the years are numerous:

- February 2017  https://www.golocalprov.com/news/ccri-leadership-targets-difficult-faculty
- May 2017, at a meeting of the Strategic Planning Committee, Murray made a statement about a sentence in the draft report that Murray disagreed with that dealt with the abilities of "all" students at the College "are motivated, capable and committed to attaining academic achievement." Before Murray could finish speaking, VP Costigan loudly interrupted Murray, stating that she was repulsed by what Murray said, that Murray was negative, that Murray did not belong working at the College. She added that Murray does not represent the faculty." She went on to say "she had heard enough from Murray." VP Patten who was Chairing the Committee then proceeded to move the meeting forward and by recommending the change Murray suggested be made. Murray filed a complaint with HR for Costigan violating the Policy Against Violence in the Workplace. Almost immediately and before any investigation, President Hughes put out a statement that she fully supported VP Costigan. The College brought in an attorney (Peter Harrington) who is employed in the Administration at URI to conduct an "independent investigation." His report concluded that there had been no violation of the policy.
- June 2017 – Student Senate votes no confidence in Hughes and Costigan over treatment of Professor Britton re the observatory. Students and faculty (including Murray) picket at the College.  http://www.rhodybeat.com/stories/ccri-senate-voices-dissatisfaction-with-president-over-observatory,25691  https://www.providencejournal.com/story/news/education/2017/07/08/dispute-over-pay-at-ccri-observatory-spurs-protests/19252784007/
- August  2017,  article in the Providence Journal, "CCRI president rocks the boat with changes aimed at helping students" that contained criticism by Murray of Hughes' decisions and lack of qualifications. The article also discussed the Student Government's vote, in June 2017, of No Confidence in Hughes and Costigan.

**Page 40 of 63**

---

      https://www.providencejournal.com/story/news/politics/state/2017/08/25/ccri-president-rocks-boat-with-changes-aimed-at-helping-students/19145823007/

- Fall 2017, Hughes and Costigan tried to unilaterally impose a "Jterm". There was virtually no involvement of the faculty in this decision and Murray led the opposition to the implementation of "Jterm" and it did not go forward in 20218. https://www.providencejournal.com/story/news/education/2017/11/08/ccri-suspends-planned-january-term-amid-faculty-union-opposition/17124401007/

- October 2017, Murray notified Hughes of a potential "nepotism" issue involving Dean Sabbagh. https://www.golocalprov.com/news/ccri-faculty-union-head-raises-nepotism-concerns

- April 2018, Murray was reelected as President of the Union. On April 28, 2017, Costigan asked to meet with Murray. From the outset of the meeting, Costigan was insulting towards Murray regarding the union election results (Murray had run unopposed and approximately 130 faculty voted for Murray, but Costigan mocked Murray for not getting a "majority" of the approximate 300 faculty eligible to vote). The meeting ended with her screaming at Murray after she misunderstood a comment Murray had made. Murray filed another complaint with HR re her conduct and she filed a complaint against Murray. Both complaints --- no decision was ever issued by HR.

- Fall 2018, Hughes and Costigan again seek to unilaterally to impose a "Jterm/Winter session". There is even greater faculty push back this time than last year.

- In November 2018, The Union Executive Committee met, and a motion was passed to call for a vote of "No Confidence" in President Hughes, VP Costigan, and Dean Sabbagh, due to their continued failures of leadership and that they either resign or be removed. 271 Faculty were eligible to vote. 219 voted. 160 voted yes /approve the motion of "No Confidence" -- 34 voted no -- 25 voted to abstain. The overwhelming vote of "No Confidence" received local and national media coverage. Hughes released a statement voicing disappointment and her view that "Change is hard." The Council on Postsecondary Education and Governor Raimondo voiced their strong support of Hughes. https://warwickonline.com/stories/council-backs-ccris-hughes-in-wake-of-unions-no-confidence-vote,138903 https://www.washingtontimes.com/news/2018/dec/4/faculty-at-ccri-college-vote-no-confidence-in-lead/

- January 2019 --Despite the near complete lack of support of the faculty (full time and adjuncts), Hughes/Costigan went forward with their "Jterm/Winter Session" beginning on January 2, 2019. The faculty (led by Murray and others) conducted Informational Picketing, with protest signs, leaflets and bumper stickers, at the College on January 2, 2019 and January 9, 2019. The media (Channel Ten news, Golocalprov, the Providence Journal and other media covered the story, and Murray gave interviews that contained negative comments about Hughes, Costigan and the Jterm/Winter Session. https://www.neari.org/blog/the-trouble-with-jterm https://www.newportri.com/story/news/local/2019/02/13/ccri-faculty-critical-of-j-term-outcome/6004716007/ https://turnto10.com/news/local/faculty-at-ccri-protest-short-winter-term https://www.golocalprov.com/news/ccri-faculty-picket-following-no-confidence-vote-in-president-hughes

- On Tuesday, January 22, 2019, the day classes start, Hughes notified Murray by letter that his appointment as Department Chair was being terminated by her.

- January 23, 2019 – VP Costigan sent an email to Murray's department faculty and copied Melissa Fama (Assistant VP), Dean Busby and Dina Levitre (assistant Dean) notifying them that yesterday, Hughes terminated the appointment of Murray as department chair. Costigan called for a department meeting to elect a new chair to serve out the remainder of Murray's term.

- January 23, 2019, about 50 faculty members, including Murray, attended a meeting of the Council on Postsecondary Education held at CCRI to object to Hughes' leadership. https://www.golocalprov.com/news/new-ccri-president-strips-leading-critic-of-free-tuition-program-of-departm

**Page 41 of 63**

88.    Despite his differences with V.P. Costigan, she has praised Murray for his

"excellent Criminal Justice Program" and personally acknowledged and recognized him as a

worthy adversary, despite their professional differences.  (Costigan email dated April 10, 2018,

and Murray exhibit of gift/note from Costigan in April 2020).

---

- January 28, 2019 – ProJo article – "CCRI union president: Demotion 'An Obvious Act of Retaliation'        "https://www.providencejournal.com/story/news/education/2019/01/28/ccri-union-president-demotion-an-obvious-act-of-retaliation/6165761007/
- January 29, 2019 – GoLocalProv article – "CCRI Faculty Support Leading Critic of Free Tuition Program Stripped of Department Chair" https://www.golocalprov.com/news/leading-critic-of-free-tuition-says-ccri-president-slashed-his-pay-illegall
- January 30 , 2019 – Murray sent a Letter to Tim DelGuidice, Chair, RI Office of Postsecondary Council, requesting clarification re "Committee of the Faculty" pursuant to 16-33.1-1-3  No response from him.
- February, 1, 2019 – Murray was unanimously re-elected as department Chair.
- February 4, 2019 –- Hughes again terminates Murray as department Chair
- February 13, 2019 – ProJo article "CCRI calls Winter Jterm a success, but some faculty leaders don't buy it".  https://www.providencejournal.com/story/news/education/2019/02/13/ccri-calls-winter-j-term-success-but-some-faculty-leaders-dont-buy-it/5984324007/
- February 13, 2019 Approximately 50 faculty (including Murray) attend the meeting of the Office of the Postsecondary Council to protest Hughes leadership and eight faculty members read parts of a memo detailing Hughes' failure with Jterm.
- February 22, 2019 – per the order of VP Costigan – Murray's department holds another election of Department chair – result – Murray was unanimously elected (again) as Chair.
- February 25, 2019 – Hughes emails Murray that she has terminated Murray's appointment as Chair again (third time) based on the allegations detailed in her January 22, 2019 letter to Murray.
- 4/25/19 Murray Chair matter is settled -- MOA signed by Murray with an NDA.
- 4/29/19 President Hughes appoints Murray as Chair.
- March 2020 – Murray's term as CCRIFA President is supposed to end in April . Murray agrees (covid) to continue as President until Nov 2022 when CCRIFA will hold an election.
- December 29, 2020 The Union representing Education Support Professionals at CCRI vote No Confidence in Hughes and Ogden.  The No Confidence vote Murray led in 2018 is referenced in paragraph 6 of the article. https://www.golocalprov.com/news/ccri-education-support-professionals-vote-no-confidence-in-hughes-citing-po
- June 2021 – Hughes' contract is up for renewal – CCRIFA and Support Professionals Union at College write to Council on Postsecondary Education voicing No Confidence in Hughes. https://www.providencejournal.com/story/news/education/2021/06/08/higher-education-council-renews-ccris-president-hughes-contract/7610836002/.
- Fall of 2022 – There is a dispute with Murray and Costigan/Stargard re Course Scheduling, Overload courses and their proposed Certificate for Law Enforcement Certificate .
- Feb 20, 2023 President Hughes re-appoints Murray as Department Chair.
- February 28, 2023 President Hughes banishes Murray.
- March 2023  Hughes announces her resignation effective August 2023. No confidence votes are mentioned in articles.  https://finance.yahoo.com/news/ccri-president-meghan-hughes-resigning-202634059.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAABDDz_WR9vMF92Fb0me4-Ga7S2uCKvygitxedE3e72qoNxDvvPOL0_0tX535-nH3y1aRFg1ivlJ7DEsRHmnuq3Qn-ycUCfKiKAPYVnDZCAkFUndAoLxsBS-MCIryBIRf59TSNvi5FP-ybB8EdAAox5y0iRYl3z0-oMa441xBehFM

89.     Over the years, Murray has filed numerous grievances against CCRI, nearly all of which have been successful, including one that was settled last fall.

90.     Murray has also been a longstanding critic of the lack of shared governance between faculty and the administration at CCRI and a vocal advocate for increasing the power and role of the faculty in that regard.

91.     Perhaps most significantly, Murray also currently is and has been a vocal advocate critical of the proposed Tentative Contract Agreement ("T.A.") endorsed both by union leadership and CCRI, which is the subject of recent and ongoing intense and fervent debate among the CCRI stakeholders.

92.     On February 28, 2023, in the midst of a fierce debate and imminent second vote on the above mentioned T.A., Murray was locked out of his office, denied access to his CCRI email account—which, under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others, the then CCRIFA Faculty Senate President, Complainant Sneesby ("Sneesby) and then Faculty Association President, Complainant Abbascia ("Abbascia").

93.     The basis of this action against Murray by CCRI was purported Title IX violations arising out of three totally separate and unrelated communication encounters ("Complaint"), one of which occurred over *one month* prior (and had already been informally addressed by Dean Stargard) and two of which occurred about two weeks prior to the issuance of the Complaint.

94.     Murray has never been disciplined for misconduct or otherwise during his 32-year tenure with CCRI.

95.     Murray has served at the College as a professor since 1993 and interacted with thousands of female students and hundreds of female professors, staff and administrators without incident or claim of gender discrimination.

96.     Murray has worked closely with female members of his department (all of

whom have provided statements and/or been interviewed), including his assistant, Maureen Papagolos (over 20 years), Professor Sheryl MacDougall (over 20 years), current assistant Tiffany Jones (1 year) and Lolita Villanueva (9 years -- she works directly outside his office door as the assistant for Social Sciences). Each of these women stated unequivocally that Professor Murray has always been respectful and professional in his interactions with them and with all others.

97.     The deans who have supervised Professor Murray and interacted with him regularly, including Dean Stargard, Dean Cole, Dean Handley and Dean Bryan Brophy-Baermann, in their annual Performance Reviews, have all provided glowing reviews of Professor Murray.  None of the deans wrote anything in their annual Performance Review about Professor Murray discriminating against anyone, creating a hostile work environment, or the like.

98.     One of those deans, Allyson Handley, EdD, who was dean in 2020, was recently appointed as Vice President of Academic Affairs at CCRI.

99.     In 2020, Dean Handley, as Murray's supervisor, in her annual Performance Review, praised Professor Murray: "Chair Murray received an overall "outstanding" evaluation from [her] across all rating categories included in the rating scale. Chair Murray is to be commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty" within the Criminal Justice department. He manages his department with dedication and efficiency." "He is to be commended for his many years of service to faculty welfare through his leadership of the faculty union. Since stepping down from that demanding leadership role recently, he should be encouraged to utilize his considerable talents and expertise within other academic leadership roles at CCRI."

100.     Dr Lauren Webb, Director of Academic Program Review and Accreditation, who reports to V.P. Costigan, stated she had many interactions with Murray regarding assessments and other issues and that Murray never treated her inappropriately.

**Page 44 of 63**

101.    Maya Geraldo, Manager of Academic and Faculty Initiatives, who also reports to V.P. Costigan, stated that Murray had disagreements with men and women and that Murray had spoken in a similarly critical manner to male deans including John Cole and Bruce Busby. She also states that Murray treated her with respect.

102.    Murray was critical of and has had public disagreements and disputes and interactions with numerous male colleagues in positions of authority, including, but not limited to, Dean Bruce Busby, Dean John Cole, Dean Bill Stargard, Dean Thomas Sabbagh, and Professor Parker, when he was Faculty Association President, Professor Richard Tessier, when he was Vice-President of the Faculty Association under Sneesby, and Professor Joseph Arsenault, Program Director for Homeland Security and Emergency Management.

**VIII.    <u>ALL THE PROPOSED FINDINGS IN THE "NON-PARTY WITNESS" SECTION THAT DO NOT RELATE TO THE SPECIFIC INTERACTIONS IN DISPUTE MUST BE STRICKEN AS THEY ARE IRRELEVANT TO THE CLAIMS ASSERTED IN THE COMPLAINT.</u>**

**A.    The Investigator's proposed findings in the non-party witness section that do not relate to the specific interactions in dispute must be deleted as they are incompetent and irrelevant as to whether the complainants were subjected to any gender motivated conduct <u>as to each of them</u> that was so severe, pervasive, and objectively offensive as to effectively deny the complainant to access to any program or activity of CCRI.**

As stated previously above, pattern and practice Title IX violations relate solely to systemic, institutional violations—it does not apply to conduct by individuals.  **Where, as here, a Title IX violation has been alleged, the complainant must show that the alleged perpetrator *engaged in conduct <u>toward the complainant</u>* that was *motivated by gender and was so severe, pervasive, and objectively offensive as to effectively deny the complainant access to a program or activity of CCRI.  As a matter of law, conduct toward others is irrelevant to this analysis.*  *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("Each Plaintiff, in other words, *must show a practice or pattern of harassment against him*.  A single incident or isolated incidents generally will not be sufficient.") (emphasis added).**

Nor is there any significance in this case that all three complainants happen to be women, particularly given the context.  First, over two-thirds of the CCRI leadership, including President Hughes and V.P. Costigan, and over 60% of the faculty at CCRI are women.  Accordingly, if a faculty member is involved in an interpersonal conflict with a colleague or a member of the administration leadership team at the college, the chances are that it is with a woman.  Second, the communications and conduct at issue arose in the context of a fiercely and hotly contested faculty association vote on a proposed T.A., controversy over the lack of shared governance, and the administration's attempt to use the Faculty Senate for

**Page 45 of 63**

its agenda, wherein Murray's position was at odds with both that of the leadership of the Faculty Senate and the CCRIFA and the CCRI administration, *the Presidents of which are all women and two of which are complainants.*  The undisputed and ONLY READING of the evidence in the record is that the communications and conduct were motivated solely by Murray's sincere and vigorous advocacy of his positions on behalf of his co-worker faculty members and that his communications were directed at the complainants in their respective official capacities, *__not as women.__  See, e.g., Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 951 (N.D. Ill. 2017), aff'd, 933 F.3d 849 (7th Cir. 2019) ("The [alleged perpetrator] female student's activism and public statements were all in response to a specific act and were directed at a specific individual, not all males, and thus there was no actionable claim for Title IX sexual harassment.").

Finally, the additional fatal flaw in the efforts of CCRI to manufacture a Title IX violation that does not exist is the failure and inability to identify similarly situated males that were treated differently by Murray in similar contexts *__as they do not exist.__*  There is no similarly situated male who helped found a Faculty Senate that lacks true shared governance power, was President while the administration was manipulating the Senate to advance its agenda, and while agreeing that both were a problem, refused to publicly acknowledge and advocate for and seek remediation of these deficiencies.  There is no similarly situated male CCRIFA President with whom Murray had a professional, personal, and briefly intimate relationship, who negotiated and advocated for faculty approval of a T.A. that was resoundingly rejected by the faculty, and then announced that he would be leaving the college in a few months in the midst of the controversy over approval of the T.A. and declined to resign and allow a new President with a stake in the outcome to complete negotiations.  There is no similarly situated male assistant to VP Costigan, who, after a series of emails regarding confusion over the interpretation of a provision of the CBA, sent out an email on the business day prior to the beginning of the semester which contained a last-minute change in the disputed interpretation, as consequence of which Murray was unable to either finalize the assignment of faculty or complete and submit a faculty workload report, both of which were due that day, and happened to be in the office when an agitated Murray went to seek clarification from Dean Stargard who happened not to be there.  Each of these is a unique situation with only one similarly situated component—Murray acting in his capacity as a vocal and passionate advocate for the best interests of the college and all his fellow faculty members.  Of that, he is guilty as charged. "The similarly situated requirement is crucial because 'without it a plaintiff would only have to point to one . . . [person] who was treated better than he . . . [which] would be meaningless . . ..'" *Bull v. Bd. Of Trustees of Ball State Univ.*, No. 1:10-CV-00878-JMS, 2012 WL 1560461, at *5-6 (S.D. Ind., May 2, 2012) ("[S]imilarly situated employees must be 'directly comparable to the plaintiff in all material respects . ..'").

There is no competent evidence in the record that Murray treated females any different than males, similarly situated or otherwise. Such "other" evidence in the record that exists is incompetent lay opinion, conclusory, and equivocal, which, if it leads to any conclusion, it is that Murray treated all those who disagreed with him in the same manner, whether male or female.  *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Just saying so is not enough.  A recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination.. .  [C]onclusory allegations that the male students were treated differently than similarly situated female students based on sex [is insufficient].")

Accordingly, for all the foregoing reasons, the Investigator's proposed findings of facts related to purported "pattern and practice" evidence must be stricken.

**Page 46 of 63**

### B.     Proposed Changes and Additional Proposed Findings to Non-Party Witness Section

To the extent the Investigator does not remove the proposed findings of facts that do not relate to the specific interactions in dispute and with respect to those that do relate, Murray proposes the following changes and/or additional proposed facts:

### *Dean Suzanne Carr*

1.     On one occasion, Professor Murray moved to table all proposals, which was seconded and ~~voted~~ *approved by a majority of the Committee* with the result being everyone walked out of the meeting.  **[Reason for Proposed Change.  The reason for this change and additional fact is context and clarification.].**

2.     On two specific occasions, she recalls conduct that directly affected her department.   On one occasion, Joseph Arsenault, Program Director of Fire Science, was working on developing a new certificate program in public safety.   **[Additional Proposed Fact.  *Professor Arsenault's program in Emergency Management and Homeland Security always had very low enrollment and eventually was terminated by VPAA Costigan and Arsenault left the College*.]**

3.     As a result, the certificate initiative was not pursued at CRC.   **[Additional Proposed Fact**.  *The Chief of Police Providence Police Department Hugh Clements and Lt Zarella of the RISP, who runs the Municipal Police Academy, both told Murray that the certificate VPAA was proposing would have no value.   The CJLS department faculty unanimously voted against the proposal.   VPAA Costigan said she would no longer pursue it.  After Murray was placed on leave and was banished from campus and could therefore no longer actively oppose it, VPAA Costigan pushed the certificate through the CRC*.]**

### *Dean William Stargard*

4.     Dean Stargard started to receive long, combative emails from Professor Murray.

**[Additional Proposed Findings.  *In March of 2023, (after Complainants filed their complaints) Dean Stargard completed an "Evaluation of Chair Murray by Dean Stargard".***

*The evaluation was very positive.  Under the category of "Exhibits Leadership" "represents the department effectively within the College "Satisfactory" was noted. "Deals with faculty fairly and equitably" "Exceeds Expectations" was noted. In the category "Communicates Effectively" "Is an effective advocate for faculty and staff" "exceeds Expectations" was noted. "Resolves conflicts fairly" "not observed" was noted. "Articulates needs of the department to dean and other College officials" "Satisfactory" was noted. In the comments Dean Stargard wrote "Steve is a strong advocate for his department He shares information with his faculty and staff colleagues and articulates the need of the department to me." In the category of "Manages the Affairs of the Division" of the 8 Questions he noted "Exceeds Expectations in response to 5 questions "Satisfactory" in response to 2 Questions and "Not Observed" to one Question. In the comments he wrote " As an experienced Chair, Steve does a very good job in managing the day to day responsibilities of payroll, grade submissions, etc. in his department." Nowhere in the evaluation by Dean Stargard is there any mention of negative or unprofessional conduct by Murray.*

*The "evaluation" of Chair Murray by Faculty" March 2023 was likewise an affirmation.  For each and every Question faculty answered that Murray "Exceeds Expectations" noted the outstanding work Murray has done at the College.*

**5.**     Dean Stargard learned of the January 20, 2023 incident between Professor Murray and  Ms. Del Sesto when she appeared upset in his office, describing Professor Murray as being angry towards her.  Concerned with the behavior, Dean Stargard scheduled a meeting with Professor Murray, along with a union representative.     **[Additional Proposed Facts.** *Dean Stargard wrote a letter to Murray saying he wanted to meet with him as a "counseling" matter and that it was a "non-disciplinary" meeting.***]**

6.     Professor Murray took exception to  a comment by Professor Killgore, describing herself as appearing to be a "bitch" sometimes, indicating before the attendees of the meeting that the language was inappropriate and that she must apologize.  **[Additional**

**Proposed Fact**: *Murray denies asking Killgore to apologize.*  **Alternatively, Stargard's hearsay statement should be stricken.].**

7.     Dean Stargard recalls an occasion when Professor Murray mentioned~~, in passing~~, *in an email sent to him by Murray documenting the event* that he was speaking with a woman, *Professor Cheryl Amantea of the Business department who walked into his office uninvited when he was in the middle of a project* at his office, and she placed her hand on his shoulder.  The incident occurred in early fall of 2022.  Professor Murray notified Dean Stargard and the Chair of the Business department was questioning whether such physical contact constituted sexual harassment.  **[Reason for Changes.  The reason for the changes and proposed finding is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole.].**

8.     On another occasion, in mid-February 2023, Professor Sneesby approached Dean Stargard, stating "I don't believe what just happened."  She appeared close to tears.  She indicated that Professor Murray had been very insulting towards her, complaining about her doing something wrong.  **[Comment and Request to Strike:  First, this is rank hearsay and should be stricken on that basis.  Second, it is highly prejudicial and misleading and contains no date, time, place, or circumstance and is merely a bald-faced allegation without context and therefore lacks probative value.].**

*Maya Geraldo*

9.     On another occasion, Ms. Geraldo witnessed Professor Murray**, *while seated,*** raise his hand towards Dean Nauman**, *who was thirty (30) feet away,*** in order to *signal her to* stop ~~her from~~ talking.  **[Reason for Changes.  The reason for these changes are self-explanatory.].**

10.     Ms. Geraldo stated that she has observed Professor Murray behaving in an insubordinate manner towards the former interim dean, Bruce Busby.   In one incident, which occurred possibly in late 2018, Professor Murray *had been removed as department Chair.*

~~was put on leave~~.  However, on that day, interim Dean Busby resigned.  ***Busby was caught being untruthful at a hearing involving his attempt to justify Murray's removal as department Chair and when the administration withdrew their attempt to remove Murray as Chair and reinstated Murray, Busby immediately resigned and left the College.***  Ms. Geraldo found that Professor Murray treated "men in as bad a way as women."  **[Reason for Changes. As stated numerous times previously and can be confirmed by Human Resources, Murray was never placed on leave until the current dispute.  The reason for the changes is to correct this error and the additional facts place the interaction in context.].**

### *Soudabeh Valicenti*

11.    ~~She recalls other specific instances in which Professor Murray treated women badly at the College, including frequent yelling at Vice President Costigan during chairs' council meetings and writing demeaning emails to union president Tara Abbascia. There were so many occasions, according to Professor Valicenti, that she could not recall many of the specifics.~~

**[Comment and Request to Strike.  Murray disputes this finding as written as the deleted portion constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which has no probative value with respect to the Complaint at issue.].  Additional Proposed Facts for Context:  Murray and Valicenti had an intimate personal relationship that he ended.  She was upset with him when he ended it.  JoAnn Albro the department assistant of the Math department can verify the relationship existed as can Valicenti's daughter, Emily Valicenti.  VPAA Costigan was also aware Murray and Valicenti were involved in a romantic relationship as she commented to people about it.**

### *VP Rosemary Costigan*

12.    Professor Murray was an opponent of the adjunct professors having a contract.

**[Additional Proposed Fact:  *Murray denies he opposed* Adjunct Faculty members right to Unionize.  Alternatively, Costigan's statement should be stricken.].**

**Page 50 of 63**

13.    She recalls that Dean Allison Hanley, who previously served as a college president, was treated poorly by Professor Murray.    Dean Hanley filed a complaint with Human Resources and directly informed Professor Murray that she found him to be an ageist and sexist. [**Comment and Request to Strike or Clarify**:  **First, this is rank hearsay and should be stricken on that basis.  Second, it is highly prejudicial and just plain false and contains no date, time, place, or circumstance and is merely a bald-faced allegation without context that have no probative value nor relevance to the Complaint.  If you refuse to remove this rank hearsay comment of dubious credibility and relevance, then my client proposes the following**: **Additional Proposed Finding**.  [*No such Complaint was ever filed, which can be verified by Human Resources.  Additionally, Dean Handley wrote a glowing evaluation of Chair Murray*.]**

14.    Dr. Costigan recalls a meeting in August of 2017 in which the topic was the creation of a master schedule.  Present for the meeting were Professor Murray*, in his capacity as Faculty Association President,* legal counsel for NEARI and legal counsel for the College. Professor Murray became upset and threw his hands up, flailing.  ~~He behaved in a demeaning manner towards Dr. Costigan.~~ [**Comment.  This finding must be deleted as it is a subjective lay opinion asserting a highly prejudicial and vague characterization without disclosing any of the underlying facts upon which the conclusion was based.**].

15.    ~~He stated, "Rosemary, everybody knows your nephew was killed."  He was flailing his arms and gesturing aggressively.  Dr. Costigan became upset and told Professor Murray that he needed to leave.  She said, "you are a despicable person."~~ [**Comment.  This entire finding must be deleted as it is out of context, does not disclose all the salient facts and circumstances of the meeting or the discussion, and contains a subjective lay opinion asserting a highly prejudicial and vague characterization without disclosing any of the underlying facts upon which the conclusion was based.**].

16.    Dean Nauman also interacted with Professor Murray in the context of the

Chairs' Council meetings. ~~She finds that Professor Murray is "always looking for conflict."~~ ~~Likewise, during the informal "Little Chairs" meetings, Professor Murray tends to draw into~~ ~~his circle the male department chairs~~. [**Comment.** **The first part of the finding must be deleted as it constitutes a subjective lay opinion asserting a highly prejudicial and vague characterization without disclosing any of the underlying facts upon which the conclusion was based. The second part of the finding must be deleted as it is absolutely false since the "Little Chairs Meeting" is just for department chairs without the administration present. That is the entire purpose of it. Accordingly, Dean Nauman never attended a "Little Chairs" meeting, since only faculty who are department chairs are invited and she was never a department chair.**].

17.    Dean Nauman attended a meeting in the President's conference room in ~~the spring of 2022,~~ *October of 2022*, which was attended by approximately 25-30 colleagues from the College. The meeting was chaired by Dean Stargard. *At one point, when Murray had been recognized by CRC Chair Stargard to speak,* Dean Nauman was speaking, Professor Murray raised his hand towards her and *asked her not to interrupt him* ~~said "I did not ask you that question."~~ [**Reason for Changes: This is out of context, hence the reason for the additional proposed factual findings, and contains inaccurate information based on all the evidence in the record, in particular the interviews of both Dean Stargard and Murray, hence the proposed deletion**].

### *Holly Susi*

18.    She decided not to attend because she was copied on many emails from Professor Murray. ~~that were "bombastic," "insulting" and appeared to her to be "misogynistic."~~ She also had seen him raise his voice *at* ~~and insult~~ people at meetings. [**Comment. The indicated factual findings must be deleted as they constitute subjective lay opinion asserting highly prejudicial and vague characterizations without disclosing any of the underlying facts upon which the conclusions were based.**].

**Page 52 of 63**

*Alix Ogden*

19.    Professor Abbascia complained about how stressful Professor Murray can be ~~and that his behavior towards her was part of her decision to leave the College~~.  Professor Abbascia made it clear that it was not her exclusive reason, since she had a very good opportunity at her husband's business.  **Comment and Request to Strike or Clarify**:  **First, this is rank hearsay and should be stricken on that basis.  Second, it is highly prejudicial and false as Abbascia has denied this in her sworn statement to the Investigator.  If you refuse to remove this rank and false hearsay statement, then my client proposes the following**:  **Additional Proposed Finding.**  *However, Abbascia has expressly denied that Murray had anything to do with her decision to leave the college.*].

*Dr. Lauren Webb*

20.    She has observed that when he disagrees with a position, he can be ~~"beyond collegial behavior."~~ *"difficult and not collegial."*  **[Reason for Change.  The stricken quote does not exist in the Investigator's summary of his interview of Dr. Webb and must be stricken and corrected as it is prejudicial and misleading as written, because the words used have an extremely negative connotation.  The exact quote from the Investigator's summary on page 2 reads, "She has observed that when he disagrees with a position, he can be 'difficult and not collegial.'"].**

**VII.    PRESENTATION OF TESTIMONIAL AND DOCUMENTARY EVIDENCE**

Murray incorporates in this Section VII. all his proposed changes and/or additions in the previous sections.

**A.    Claims by Elizabeth Del Sesto, Sandra Luzzi Sneesby and Tara Abbascia**

*Del Sesto*

6.    According to Ms. Del Sesto, Professor Murray was "venting in an angry way ... and in an unexpected way when he entered my office right at me ... ."  (D)  [**Additional Undisputed Finding Material to the Complaint at Issue**:  *Delsesto testified Murray never threatened her, never used disparaging words about her, never said anything about the fact*

**Page 53 of 63**

*that she was a woman or anything made any gender related comment.  He was upset, complaining about the conduct of Dean Bill Stargard, a male administrator.  (Del Sesto Trans. p. 34).].*

### *Sneesby*

29.    __Comment.__  This should be labeled (D) as Murray has expressly disputed this previously and again herein, specifically he disputes that he "orchestrated a faction of faculty members to 'ratchet up email attacks and just spread untruths.'"

40.    The conversation was argumentative, and Professor Murray stated that Professor Sneesby was *screaming at him* ~~hollering~~ during the phone call.  *Three witnesses support Murray's statement that Sneesby was screaming at him and that he never raised his voice.*  **[__Reason for Change__.  Murray described Sneesby's conduct as "screaming" not "hollering" in his statement and the added sentences is supported by the record as a whole.**

50.    On February 16, at approximately 1:45 pm, Ms. Nagel was sitting at her desk when Professor Murray walked down the hallway, talking on his phone, stating that he would check with Professor ~~Murray~~.*Kilduff Chair of Psychology*.  **[__Reason for Change__.  The reason for this change is self-explanatory, Murray was not speaking to himself.].**

55.    She did not create or prepare the bill on standardized grading. **[__Comment.__  This sentence should be labeled (D) as Murray has expressly disputed this previously and again herein, specifically two faculty members told him that Dean Nauman was the sponsor of the bill on standardized grading.].**

58.    For approximately six weeks in 2019, Professor Murray and Professor Abbascia dated.  **[__Comment.__  This sentence should be labeled (D) as Murray claims that they had an intimate relationship over an approximately two month period.].**

63.    On January 30, 2023 Professor Abbascia informed the faculty association that she was leaving CCRI ~~at the end of the school year~~ *on June 17, 2023. She testified her decision*

*to leave the College had nothing to do with Professor Murray.* [<u>Comment</u>.  **As clarified,**

**Murray does not dispute the statement**].

67.    [<u>**Additional Finding and Clarification**</u>.  *In her sworn testimony, Abbascia*

*admits she was referring to Murray about spreading lies, confirming his claim asserted to*

*her in a previous private email.*].

70.    <u>Comment.</u>  **This sentence should be labeled (D) as Murray never threatened**

**to distribute their email correspondence if she did not resign.  This is totally inaccurate**

**and there is no support in the record for it.  The Investigator is erroneously and**

**inaccurately conflating two different interactions/communications.**

71.    Professor Abbascia ~~stated~~ ***testified under oath*** that her decision to leave CCRI

was personal, and was not prompted by her current dispute with Professor Murray ***and, in fact,***

***expressly denied it had anything to do with Professor Murray.***  [<u>Comment</u>.  **The proposed**

**changes are necessary because, as written, this finding is misleading, particularly in light**

**of Ogden's inaccurate hearsay statement that follows in number 72.**].

   B    <u>Claim of Pattern and Practice of Discrimination</u>

   Murray objects and moves to strike all "pattern and practice of discrimination"
purported evidence for the reasons previously set forth in section VI.B. above whether or not
repeated below.

   C.    <u>Proposed Changes and Additional Proposed Findings to "Pattern And</u>
        <u>Practice of Discrimination" Section</u>

   To the extent the Investigator does not remove the proposed findings of facts related to
purported "pattern and practice of discrimination," Murray proposes the following changes
and/or additional proposed facts:

                    *Changes/Clarifications*

75.    Ms. Del Sesto witnessed Professor Murray "go after" Barbara Nauman, Dean

of Business, Science, Technology and Math.  Professor Murray "put his hand up to stop [Dean

Nauman] talking when she speaks or answers a question."  [<u>Comment</u>:  **Murray disputes this**

**proposed finding as it is not supported by the record as a whole.  This finding must be**

stricken as it contains no date, time, place, or circumstance and amount to nothing more than bald-faced allegations and characterizations without context that have no probative value nor relevance to the Complaint. Murray proposes the following <u>Additional Proposed Finding,</u> that is supported by the record: *Murray did recall that on one occasion* ~~subsequent to~~ *at a CRC meeting in October of 2022, wherein after Murray was recognized by the Committee Chair to speak, Dean Nauman (who was sitting approximately 30 feet away at the other end of the room) interrupted him and he asked her to please not interrupt him and raised his hand to signal the same. Professor Mazin Adam confirms Murray's recollection of this interaction*.].

79.    <u>Comment:</u>  Murray disputes this finding and proposes the alternative finding supported by the record as a whole set forth in the previous paragraph to which he has no objection.

81.    In response to a question on whether he *during the over thirty (30) years he was employed by the college he* ever raised his hand in front of someone to stop them from speaking, Professor Murray indicated that he could not recall any such behavior without being told of a specific date and context. When asked if such conduct would stand out in his mind, he indicated that he could not answer that question *without being given more details.* [<u>Comment:</u>  **Murray disputes this finding as written and proposes the above changes to provide context and accuracy.   With these changes, Murray would not object to the finding.].**

82.    With respect to the incident involving Dean Nauman *at a meeting of the Curriculum Review Committee in October of 2022, where Murray is a member of the CRC and Nauman is not a member, Professor Murray recalls raising his hand (pursuant to Roberts Rules of Order that govern CRC meetings) and being recognized by the CRC Chair Dean Stargard to speak.* While speaking at the time and being interrupted by Dean Nauman and he asked not to be interrupted.  He also recalls Dean Stargard asking Dean Nauman to stop

**Page 56 of 63**

speaking.  He denies yelling but ~~also admitted~~ *stated that he was seated thirty (30) feet away from Dean Nauman* and did raise his hand *to signal her to* stop ~~her from~~ speaking.    Dean Stargard denies that he asked Dean Nauman to stop speaking at the meeting.  **[Comment: Murray disputes this finding as written and proposes the above changes to provide context and accuracy.  With these changes, Murray would not object to the finding, provided the record is clear that he disagrees with Dean Stargard's recollection].**

83.    With respect to an incident involving Leslie Killgore, he recalls attending a CRC meeting in which Professor Killgore referred to herself *while she was asking a question of another CRC member* "as a bitch."  Professor Murray found the comment to be inappropriate.  Professor Killgore apologized for her comment.    He then notified the Vice President of the College and asked that the minutes reflect her inappropriate language. **[Comment:  Murray disputes this finding as written and proposes the above changes to provide some context and accuracy.  The full context is set forth in an email Murray sent after the meeting to VP Costigan dated February 3, 2023 summarizing what transpired at the meeting, a copy of which is attached hereto].**

85.    Dean Carr observed ~~similar conduct towards other people, including his~~ *Murray* raising of his hand to stop Dean Barbara Nauman from speaking at a CRC meeting. **[Comment:  Murray disputes this finding as written as the deleted portion constitutes inadmissible subjective lay opinion asserting a highly prejudicial and vague characterization without disclosing any of the underlying facts upon which the conclusion was based.]**

91    Dean Stargard recalled that in early October of 2022, at a CRC meeting, Dean Nauman wanted to speak but Professor Murray stopped her, possibly raising his hand towards her, stating 'don't interrupt me.'  ~~Dean Stargard found Professor Murray's conduct to be "insulting" and "more aggressive than he had to be," which almost appeared to "chastise" Dean Nauman.~~ **[Comment:  Murray disputes this finding as written as the deleted portion**

constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which has no probative value with respect to the Complaint at issue.]**.

95.    In mid-February 2023, Professor Sneesby approached Dean Stargard, stating "I don't believe what just happened." She appeared close to tears. She indicated that Professor Murray was very insulting, complaining about her doing something wrong. **[Comment and Request to Strike: First, this is rank hearsay and should be stricken on that basis. Second, it is highly prejudicial and misleading and contains no date, time, place, or circumstance and is merely a bald-faced allegation without context and therefore lacks probative value as to the Complaint at issue.]**.

97.    ~~When the door opened, Dr. Costigan was visibly upset and said to Professor Murray that 'you need to get out of my office now.' Ms. Geraldo walked into the room to usher him out. During the tense exchange between Dr. Costigan and Professor Murray, Ms. Geraldo stood between them. Ms. Geraldo asked Dr. Costigan if she was okay and asked if she should call security. Dr. Costigan responded that she "needed a moment~~." (D)." **[Comment. This entire finding must be stricken as it is out of context, does not disclose all the salient facts and circumstances of the meeting or the discussion, and lacks probative value as to the Complaint at issue.]**.

98.    **[Comment. Murray objects to this finding for the same reason above and requests it be stricken.]**.

101.    Ms. Geraldo stated that she has seen Professor Murray behaving in an insubordinate manner towards former interim dean, Bruce Busby. In one incident, which occurred possibly in late 2018, Professor Murray *in January of 2019 had been removed as department Chair* ~~was put on leave~~. Ms. Geraldo observed that Professor Murray treated men as badly as women. **[Reason for Changes. As stated numerous times previously and can be confirmed by Human Resources, Murray was never placed on leave until the current dispute. The reason for the changes is to correct this error. With these changes, Murray**

**would not object to the finding.].**

103.    Professor Murray then ~~physically~~ confronted Professor Valicenti, shouting at her for not signing the letter of support.  Professor Murray was ~~"in my face" and~~ was texting Professor Adam to verify his accusation.  ~~He kept showing his phone to Professor Valicenti in her face, accusing her of lying.  He kept repeating, 'is this correct?'~~  Professor Valicenti left the encounter shaking and went to her car in the parking lot to compose herself.  She left the office and when she arrived home, Professor Murray texted her with Professor Adam's number.  (D) **[Comment and Request to Strike.  Murray disputes this finding for multiple reasons. First, he has never been accused of any physical conduct in any of the Complaints or otherwise.  Second, it is uncertain what is meant by the use of the word "physical" in this context—does it mean he was there in person as opposed to via phone or text or email. Murray expressly denies any "physical" contact in any alleged confrontation.  Second, while Murray does not recall all the details of this encounter, he is certain he did not call her a liar.** ~~as that is not something he does and it is not a term he uses.~~

105.    Professor Murray denied that there was any altercation with Professor Valicenti.  Instead, he described it as "two people who had been in an intimate relationship." **Additional Proposed Facts for Context:  Murray and Valicenti had an intimate personal relationship that he ended.  She was upset with him when he ended it.  JoAnn Albro the department assistant of the Math department can verify the relationship existed as can Valicenti's daughter, Emily Valicenti.  VPAA Costigan was also aware Murray and Valicenti were involved in a romantic relationship as she commented to people about it.**

106.    Dr. Costigan stated that Professor Murray discredits his supervisors~~, particularly women, by both embarrassing and bullying them~~.  She recalls articles in local newspapers in or about 2018 in which Professor Murray spoke to the press *in his capacity as Faculty Association President* and said that there was a need for a change in leadership.  Dr. Costigan recalls that her name and President Hughes' name were specifically mentioned.  There

are news articles from that time period showing several quotes from Professor Murray that are critical of Dr. Costigan, President Hughes and, at times, Dean Thomas Sabbagh. **[Comment: Murray disputes this finding as written as the deleted portion constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which have no probative value with respect to the Complaint at issue. In addition, Murray has added additional language to place his conduct in proper context. Murray objects to the entire finding, even as edited, as irrelevant to the Complaint at issue. Murray does not dispute the finding with the proposed edit as constituting Costigan's lay opinion.].**

107.    Dr. Costigan recalls a meeting in August of 2017 ***with the Faculty Association leadership*** in which the topic was the creation of a master schedule. Attendees included Professor Murray ***as President of the CCRIFA***, legal counsel for NEARI and legal counsel for CCRI. ~~Professor Murray became upset and threw his hands up, flailing them, and was very demeaning towards Dr. Costigan.~~ (D) **[Comment: Murray disputes the deleted portion which constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which has no probative value with respect to the Complaint at issue. In addition, Murray has proposed additional language to place the encounter in context.].**

114.    Professor Josephs ~~recalled Professor Murray raising a hand during meetings to stop people from speaking and noted that it occurred mostly towards women but then~~ stated that her division of faculty is predominately women. **[Comment. The deleted portion must be stricken as it contains no date, time, place, circumstance or context and contains a bald-faced lay opinion claim without basis that has no probative value nor relevance to the Complaint. Additionally, it is clear from the record as a whole, that Murray only raised his hand on one occasion to signal a female colleague to stop speaking.].**

118.    **Murray disputes this finding.**

120.    Professor Susi served on a negotiations committee in ***2014 or 2015,*** at the

request of acting Vice President Richard Tessier.  ~~Professor Murray was aggressively yelling and insulting people who were in attendance at the meeting.~~  He then turned to Professor Susi and asked a question ~~in a very loud manner~~.  Professor Susi quietly responded, "I do not have to answer your questions." Professor Murray immediately stopped, stating, "No, you're right, you don't."  Professor Susi  has had no other adverse interactions with Professor Murray since that time.    [**Comment:  Murray disputes the deleted portion which constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which has no probative value with respect to the Complaint at issue.  In addition, Murray has proposed additional language to place the encounter in context.].**

### *Proposed Additional Facts*

1.      Murray has served at the College as a professor since 1993 and interacted with thousands of female students and hundreds of female professors, staff and administrators without incident or claim of gender discrimination.

2.      Murray has worked closely with female members of his department (all of whom have provided statements and/or been interviewed), including his assistant, Maureen Papagolos (over 20 years), Professor Sheryl MacDougall (over 20 years), current assistant Tiffany Jones (1 year) and Lolita Villanueva (9 years -- she works directly outside his office door as the assistant for Social Sciences).  Each of these women stated unequivocally that Professor Murray has always been respectful and professional in his interactions with them and with all others.

3.      The deans who have supervised Professor Murray and interacted with him regularly, including Dean Stargard, Dean Cole, Dean Handley and Dean Bryan Brophy-Baermann, in their annual Performance Reviews, have all provided glowing reviews of Professor Murray.  None of the deans wrote anything in their annual Performance Review about Professor Murray discriminating against anyone, creating a hostile work environment, or the like.

4.      One of those deans, Allyson Handley, EdD, who was dean in 2020, was recently appointed as Vice President of Academic Affairs at CCRI.

5.      In 2020, Dean Handley, as Murray's supervisor, in her annual Performance Review, praised Professor Murray: "Chair Murray received an overall "outstanding" evaluation from [her] across all rating categories included in the rating scale. Chair Murray is to be commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty" within the Criminal Justice department. He manages his department with dedication and efficiency." "He is to be commended for his many years of service to faculty welfare through his leadership of the faculty union. Since stepping down from that demanding leadership role recently, he should be encouraged to utilize his considerable talents and expertise within other academic leadership roles at CCRI."

6.      Dr Lauren Webb, Director of Academic Program Review and Accreditation, who reports to V.P. Costigan, stated she had many interactions with Murray regarding assessments and other issues and that Murray never treated her inappropriately.

7.      Maya Geraldo, Manager of Academic and Faculty Initiatives, who also reports to V.P. Costigan, stated that Murray had disagreements with men and women and that Murray had spoken in a similarly critical manner to male deans including John Cole and Bruce Busby. She also states that Murray treated her with respect.

8.      Murray was critical of and has had public disagreements and disputes and interactions with numerous male colleagues in positions of authority, including, but not limited to, Dean Bruce Busby, Dean John Cole, Dean Bill Stargard, Dean Thomas Sabbagh, and Professor Parker, when he was Faculty Association President, Professor Richard Tessier, when he was Vice-President of the Faculty Association under Sneesby, and Professor Joseph Arsenault, Program Director for Homeland Security and Emergency Management.

## IX.    CONCLUSION

For all the foregoing reasons, Murray respectfully prays that the Complaint be dismissed as a matter of law on the following grounds:

**Page 62 of 63**

1.  The conduct in question constitutes concerted conduct protected from employer interference or sanction according to CCRI policy and R.I. Gen. Laws §§ 28-7-2(d) and 12;

2.  Three unrelated complaints have been improperly combined in violation of CCRI policy, federal administrative guidance, and due process of law;

3.  The conduct in question does not constitute a violation of Title IX, as there is no evidence in the record of ***any*** gender based or motivated conduct on the part of Murray that was so severe, pervasive, and objectively offensive as to effectively deny any of the Complainants to access to any program or activity of CCRI.

RESPONDENT,
Steven D. Murray
By his attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

**Dated:  September 21, 2023**          **/s/ Richard A. Sinapi_____**
                                        **Richard A. Sinapi, Esq. (#2977)**
                                        2374 Post Road, Suite 201
                                        Warwick, R.I. 02886
                                        Phone:(401) 739-9690; Fax: (401) 739-9040
                                        E-mail: ras@sinapilaw.com

## CERTIFICATION OF SERVICE

I hereby certify that on the **21st** day of **September, 2023** I served this document via email on the Investigator:

**Raymond A. Marcaccio Esq.**
**Oliverio & Marcaccio, LLP**
**30 Romano Vineyard Way, Suite 109**
**North Kingstown, RI 02852-**
**Phone:  (401) 861-2900; FAX:  (401) 861-2922**
**Email:  RAM@om-rilaw.com**

                                        **/s/ Richard A. Sinapi_____**