# EXHIBIT T

**COMMUNITY COLLEGE OF RHODE ISLAND,**
**COUNCIL ON POSTSECONDARY EDUCATION**
**TITLE IX ADJUDICATION**

| | |
|---|---|
| **Elizabeth Del Sesto, Sandra L. Sneesby,** | : |
| **And Tara Abbascia,** | : |
| **Complainants** | : |
| | |
| **v.** | : |
| | |
| **Steven D. Murray,** | : |
| **Respondent** | : |

**RENEWED MOTION TO DISMISS AND RESPONDENT'S WRITTEN RESPONSE TO THE INVESTIGATOR'S SECOND DRAFT FINDINGS PURSUANT TO TITLE IX POLICY AND PROCEDURE § XXII D.**

Now comes the Respondent Steven D. Murray ("Murray") in the above cited matter and does hereby renew his motion to dismiss the pending Complaints and, in the alternative, provide the within written response to the investigator's preliminary findings/summary of testimonial evidence pursuant to CCRI's Council on Postsecondary Education Title IX Sexual Harassment Policy and Procedures ("CCRI Title IX Policy") § XXII D.

**I.    SUMMARY**

As stated previously and reiterated again herein, the Complaints must be dismissed as a matter of law because 1) the conduct in question constitutes concerted conduct protected from employer interference or sanction according to CCRI policy and R.I. Gen. Laws §§ 28-7-2(d) and 12; 2) three unrelated complaints have been improperly combined in violation of CCRI policy, federal administrative guidance, and due process of law; and, 3) the conduct in question does not constitute a violation of Title IX.

What has been set forth in the Investigator's Second Draft Findings is random, selected and largely incompetent, subjective Complainant characterizations and lay opinions about Murray's conduct and motivations—which at times is mischaracterized by the Investigator. Even based on this selective, one-sided record, there is no evidence in the record of _**any**_ gender based or motivated conduct on the part of Murray that was so severe, pervasive, and objectively offensive as to effectively deny any of the complainants to access to any program or activity of CCRI so as to constitute a violation of Title IX.

Moreover, the Investigator has ignored and refused to include in his findings the undisputed fact that Murray has a stellar record as an educator with CCRI, who has never been disciplined for misconduct or otherwise during his 32-year tenure.  He was elected Chair of the Criminal Justice department in 2012 by his peers and was reelected unanimously on three subsequent occasions, most recently in February of 2023.  As Chair, he received rave reviews in his faculty performance evaluations, with no mention whatsoever of any gender based or other misconduct.  Indeed, Murray's evaluations, in particular, those of Dean Handley and Dean Stargard, totally contradict the portrayal of Murray, which the Investigator's findings attempt to paint in the "Pattern and Practice of Discrimination" section of his "findings."  The draft findings cobble together isolated, insignificant incidents during the course of his 32 year career and try to now make them out as important, yet none of these purported events resulted in a finding of misconduct nor were they even mentioned in any of his evaluations.  For instance,

the draft findings attempt to make much of an instance where Murray, as a member of the CRC, not the Chair, merely put up his hand to signal Dean Nauman to stop speaking and not interrupt him.

Finally, the Investigator has failed or refused to include any of Murray's numerous proposed additional findings in his report, even though they provide context and are otherwise relevant and probative facts, the truth of which cannot be disputed and is not in dispute.

## II.    APPLICABLE AND ADDITIONAL FACTS AND FINDINGS[1]

### *General*

1.    When conduct which is the subject of a misconduct complaint involves union business, it is the policy of CCRI that the dispute is not subject to determination by the college.  Tr. Murray pp. 100-102, email chain 11/20/19—12/19/19 (Murray exhibit).

2.    During the relevant period, over two-thirds of the CCRI leadership, including President Hughes and Vice President of Academic Affairs Costigan ("V.P. Costigan"), were women, https://www.ccri.edu/about/leadership.html, as well as over 60% of the faculty, including both the Senate President, Sneesby, and Faculty President, Abbascia. https://www.ccri.edu/neasc/pdf/NEASCST5.pdf

### *Respondent Steven D. Murray[2]*

3.    Respondent Steven D. Murray ("Murray") is a member of the Bars of the U.S. District Court for the District of Rhode Island, State of Rhode Island, Commonwealth of Massachusetts, and the Supreme Court of the United States and is a former Assistant Attorney General for the State of Rhode Island.

4.    He has taught law courses at CCRI for almost 32 years.

5.    He was President of the faculty union, CCRIFA, from April of 2016 until November of 2020.

6.    He is currently Vice President of the faculty union and an alternate member to the CCRIFA Executive Committee.

7.    He has a stellar record of largely "exceeds expectations" annual reviews and has never been disciplined by CCRI.

---

[1]  In Section I and in Section V. below, Murray proposes certain additional facts and corrections to facts and/or findings proposed by the Investigator.  Any proposed facts in this document where there is no citation to the record, Murray is prepared to swear to the same based on first-hand knowledge under oath and/or is otherwise prepared to produce relevant and competent evidence to support the same.

[2]  Most of the additional facts under the "Murray" heading are found in Respondent Counsel's Letter to Investigator dated April 24, 2024.  Any proposed facts where there is no citation to the record, Murray is prepared to swear to the same based on first-hand knowledge under oath and/or is otherwise prepared to produce relevant and competent evidence to support the same..

**Page 2 of 63**

8.    He was elected Chair of the Criminal Justice department in 2012 and was reelected unanimously on three subsequent occasions, most recently in February of 2023.

9.    He also recently received an overall "outstanding evaluation" as a Department Chair and teacher and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty." (Evaluation of Murray by Dean Handley, April 22, 2021).

10.   However, as a vocal and passionate advocate, both as President and a member of the CCRIFA, seeking to improve the terms and conditions of employment on behalf of his co-worker union faculty members, he is and has been frequently at odds with the CCRI administration.

11.   In his roles as Faculty Association President and Department Chair, Murray has had severe disagreements over the years with President Hughes and VPAA Costigan that have led to faculty "No Confidence Votes," picketing, grievances and Unfair Labor Practice charges.   Murray and Costigan have each filed complaints with HR against each other.[3]

---

[3] Murray's clashes with the CCRI administration over the years are numerous:

- February 2017  https://www.golocalprov.com/news/ccri-leadership-targets-difficult-faculty
- May 2017, at a meeting of the Strategic Planning Committee, Murray made a statement about a sentence in the draft report that Murray disagreed with that dealt with the abilities of "all" students at the College "are motivated, capable and committed to attaining academic achievement." Before Murray could finish speaking, VP Costigan loudly interrupted Murray, stating that she was repulsed by what Murray said, that Murray was negative, that Murray did not belong working at the College. She added that Murray does not represent the faculty." She went on to say "she had heard enough from Murray." VP Patten who was Chairing the Committee then proceeded to move the meeting forward and by recommending the change Murray suggested be made. Murray filed a complaint with HR for Costigan violating the Policy Against Violence in the Workplace. Almost immediately and before any investigation, President Hughes put out a statement that she fully supported VP Costigan. The College brought in an attorney (Peter Harrington) who is employed in the Administration at URI to conduct an "independent investigation." His report concluded that there had been no violation of the policy.
- June 2017 – Student Senate votes no confidence in Hughes and Costigan over treatment of Professor Britton re the observatory. Students and faculty (including Murray) picket at the College.   http://www.rhodybeat.com/stories/ccri-senate-voices-dissatisfaction-with-president-over-observatory,25691
  https://www.providencejournal.com/story/news/education/2017/07/08/dispute-over-pay-at-ccri-observatory-spurs-protests/19252784007/
- August  2017,  article in the Providence Journal, "CCRI president rocks the boat with changes aimed at helping students" that contained criticism by Murray of Hughes' decisions and lack of qualifications. The article also discussed the Student Government's vote, in June 2017, of No Confidence in Hughes and Costigan.
  https://www.providencejournal.com/story/news/politics/state/2017/08/25/ccri-president-rocks-boat-with-changes-aimed-at-helping-students/19145823007/
- Fall  2017, Hughes and Costigan tried to unilaterally impose a "Jterm". There was virtually no involvement of the faculty in this decision and Murray led the opposition to the implementation of "Jterm" and it did not go forward in 20218.
  https://www.providencejournal.com/story/news/education/2017/11/08/ccri-suspends-planned-january-term-amid-faculty-union-opposition/17124401007/
- October 2017, Murray notified Hughes of a potential "nepotism" issue involving Dean Sabbagh.
  https://www.golocalprov.com/news/ccri-faculty-union-head-raises-nepotism-concerns

- April 2018, Murray was reelected as President of the Union. On April 28, 2017, Costigan asked to meet with Murray. From the outset of the meeting, Costigan was insulting towards Murray regarding the union election results (Murray had run unopposed and approximately 130 faculty voted for Murray, but Costigan mocked Murray for not getting a "majority" of the approximate 300 faculty eligible to vote). The meeting ended with her screaming at Murray after she misunderstood a comment Murray had made. Murray filed another complaint with HR re her conduct and she filed a complaint against Murray. Both complaints --- no decision was ever issued by HR.
- Fall 2018, Hughes and Costigan again seek to unilaterally to impose a "Jterm/Winter session". There is even greater faculty push back this time than last year.
- In November 2018, The Union Executive Committee met, and a motion was passed to call for a vote of "No Confidence" in President Hughes, VP Costigan, and Dean Sabbagh, due to their continued failures of leadership and that they either resign or be removed. 271 Faculty were eligible to vote. 219 voted. 160 voted yes /approve the motion of "No Confidence" -- 34 voted no -- 25 voted to abstain. The overwhelming vote of "No Confidence" received local and national media coverage. Hughes released a statement voicing disappointment and her view that "Change is hard." The Council on Postsecondary Education and Governor Raimondo voiced their strong support of Hughes. https://warwickonline.com/stories/council-backs-ccris-hughes-in-wake-of-unions-no-confidence-vote,138903
https://www.washingtontimes.com/news/2018/dec/4/faculty-at-ccri-college-vote-no-confidence-in-lead/
- January 2019 --Despite the near complete lack of support of the faculty (full time and adjuncts), Hughes/Costigan went forward with their "Jterm/Winter Session" beginning on January 2, 2019. The faculty (led by Murray and others) conducted Informational Picketing, with protest signs, leaflets and bumper stickers, at the College on January 2, 2019 and January 9, 2019. The media (Channel Ten news, Golocalprov, the Providence Journal and other media covered the story, and Murray gave interviews that contained negative comments about Hughes, Costigan and the Jterm/Winter Session.
 https://www.neari.org/blog/the-trouble-with-jterm
https://www.newportri.com/story/news/local/2019/02/13/ccri-faculty-critical-of-j-term-outcome/6004716007/
https://turnto10.com/news/local/faculty-at-ccri-protest-short-winter-term
https://www.golocalprov.com/news/ccri-faculty-picket-following-no-confidence-vote-in-president-hughes
- On Tuesday, January 22, 2019, the day classes start, Hughes notified Murray by letter that his appointment as Department Chair was being terminated by her.
- January 23, 2019 – VP Costigan sent an email to Murray's department faculty and copied Melissa Fama (Assistant VP), Dean Busby and Dina Levitre (assistant Dean) notifying them that yesterday, Hughes terminated the appointment of Murray as department chair. Costigan called for a department meeting to elect a new chair to serve out the remainder of Murray's term.
- January 23, 2019, about 50 faculty members, including Murray, attended a meeting of the Council on Postsecondary Education held at CCRI to object to Hughes' leadership. https://www.golocalprov.com/news/new-ccri-president-strips-leading-critic-of-free-tuition-program-of-departm
- January 28, 2019 – ProJo article – "CCRI union president: Demotion 'An Obvious Act of Retaliation'    "https://www.providencejournal.com/story/news/education/2019/01/28/ccri-union-president-demotion-an-obvious-act-of-retaliation/6165761007/
- January 29, 2019 – GoLocalProv article – "CCRI Faculty Support Leading Critic of Free Tuition Program Stripped of Department Chair" https://www.golocalprov.com/news/leading-critic-of-free-tuition-says-ccri-president-slashed-his-pay-illegall
- January 30 , 2019 – Murray sent a Letter to Tim DelGuidice, Chair, RI Office of Postsecondary Council, requesting clarification re "Committee of the Faculty" pursuant to 16-33.1-1-3  No response from him.
- February, 1, 2019 – Murray was unanimously re-elected as department Chair.
- February 4, 2019 –-- Hughes again terminates Murray as department chair

**Page 4 of 63**

12. Despite his differences with V.P. Costigan, she has praised Murray for his "excellent Criminal Justice Program" and personally acknowledged and recognized him as a worthy adversary, despite their professional differences. (Costigan email dated April 10, 2018, and Murray exhibit of gift/note from Costigan in April 2020).

13. Over the years, Murray has filed numerous grievances against CCRI, nearly all of which have been successful, including one that was settled last fall.

14. Murray has also been a longstanding critic of the lack of shared governance between faculty and the administration at CCRI and a vocal advocate for increasing the power and role of the faculty in that regard.

15. Perhaps most significantly, Murray also currently is and has been a vocal advocate critical of the proposed Tentative Contract Agreement ("T.A.") endorsed both by union leadership and CCRI, which is the subject of recent and ongoing intense and fervent debate among the CCRI stakeholders.

---

- February 13, 2019 – ProJo article "CCRI calls Winter Jterm a success, but some faculty leaders don't buy it". https://www.providencejournal.com/story/news/education/2019/02/13/ccri-calls-winter-j-term-success-but-some-faculty-leaders-dont-buy-it/5984324007/
- February 13, 2019 Approximately 50 faculty (including Murray) attend the meeting of the Office of the Postsecondary Council to protest Hughes leadership and eight faculty members read parts of a memo detailing Hughes' failure with Jterm.
- February 22, 2019 – per the order of VP Costigan – Murray's department holds another election of Department chair – result – Murray was unanimously elected (again) as Chair.
- February 25, 2019 – Hughes emails Murray that she has terminated Murray's appointment as Chair again (third time) based on the allegations detailed in her January 22, 2019 letter to Murray.
- 4/25/19 Murray Chair matter is settled -- MOA signed by Murray with an NDA.
- 4/29/19 President Hughes appoints Murray as Chair.
- March 2020 – Murray's term as CCRIFA President is supposed to end in April . Murray agrees (covid) to continue as President until Nov 2022 when CCRIFA will hold an election.
- December 29, 2020 The Union representing Education Support Professionals at CCRI vote No Confidence in Hughes and Ogden. The No Confidence vote Murray led in 2018 is referenced in paragraph 6 of the article. https://www.golocalprov.com/news/ccri-education-support-professionals-vote-no-confidence-in-hughes-citing-po
- June 2021 – Hughes' contract is up for renewal – CCRIFA and Support Professionals Union at College write to Council on Postsecondary Education voicing No Confidence in Hughes. https://www.providencejournal.com/story/news/education/2021/06/08/higher-education-council-renews-ccris-president-hughes-contract/7610836002/.
- Fall of 2022 – There is a dispute with Murray and Costigan/Stargard re Course Scheduling, Overload courses and their proposed Certificate for Law Enforcement Certificate .
- Feb 20, 2023 President Hughes re-appoints Murray as Department Chair.
- February 28, 2023 President Hughes banishes Murray.
- March 2023  Hughes announces her resignation effective August 2023. No confidence votes are mentioned in articles. https://finance.yahoo.com/news/ccri-president-meghan-hughes-resigning-202634059.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbvS8&guce_referrer_sig=AQAAABDDz_WR9vMF92Fb0me4-Ga7S2uCKvygitxedE3e72qoNxDvvPOL0_0tX535-nH3y1aRFg1ivlJ7DEsRHmnuq3Qn-ycUCfKiKAPYVnDZCAkFUndAoLxsBS-MCIryBIRf59TSNvi5FP-ybB8EdAAox5y0iRYl3z0-oMa441xBehFM

**Page 5 of 63**

16.    On February 28, 2023, in the midst of a fierce debate and imminent second vote on the above mentioned T.A., Murray was locked out of his office, denied access to his CCRI email account—which, under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others, the then CCRIFA Faculty Senate President, Complainant Sneesby ("Sneesby) and then Faculty Association President, Complainant Abbascia ("Abbascia").

17.    The basis of this action against Murray by CCRI was purported Title IX violations arising out of three totally separate and unrelated communication encounters ("Complaint"), one of which occurred over *one month* prior (and had already been informally addressed by Dean Stargard) and two of which occurred about two weeks prior to the issuance of the Complaint.

18.    Murray has never been disciplined for misconduct or otherwise during his 32-year tenure with CCRI.

### *Complainant Elizabeth Del Sesto*

19.    The Elizabeth Del Sesto ("Del Sesto," formerly Capraro) Complaint arises solely from a single encounter (January 20, 2023) between Murray and Del Sesto , mere days before the Spring semester was to start, wherein Murray was expressing frustration over the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty. (Murray Tr. pgs. 22 – 38)

20.    The reason Del Sesto was the subject of the communication was that, although ostensibly issued under the authority of Dean Stargard, she was the author and sender of the email which contained the last-minute disputed interpretation of the CBA and Dean Stargard was not in his office at that time.  (Murray Tr. pg. 28).

21.    The entire interaction involved Murray in his capacity not just as a faculty member asserting rights under the CBA, but more significantly, as a faculty member Department Chair speaking on behalf of his members on an urgent and pressing issue impacting Law Department faculty members, as the semester was scheduled to begin on the next business day and as consequence of the confusion caused by the email and series of emails and events leading up to this point, Murray was unable to either finalize the assignment of faculty, complete and submit a faculty workload report, or complete and submit a payroll report, all of which were due *that date.*  (Murray Tr. pps. 22-38)

22.    At the time of the interaction in question, Del Sesto was an assistant to V.P. Costigan.

23.    Murray has interacted with Del Sesto on innumerable occasions during her approximately eight years as a support person in the Academic Affairs suite.

24.    Del Sesto claims in her complaint that this was the "first time" Murray had directed any objectionable communications to or conduct toward her.

25.    Del Sesto does not claim in her Complaint or testimony that Murray was motivated by gender or that gender in any way played a role in their dispute. (Del Sesto Complaint; *see also* Del Sesto Tr. p. 34.[4])

26.    Dean Stargard previously determined that the interaction in question between Murray and Del Sesto was not a disciplinary matter. He stated this in both in an email to Murray and again when he met to discuss the matter with Murray. Murray Tr. pps. 33- 38, and Murray Exhibit (Email from Stargard to Murray dated January 26, 2023).

27.    Del Sesto was rewarded for filing her complaint by being appointed interim assistant dean BSTEM in June of 2023, which included a significant increase in annual salary (2023 $61,499.88 -- 2023 $75,000.12) from her previous position as academic affairs coordinator for which V.P. Costigan was her direct supervisor. (RI Transparency Portal www.transparency.ri.gov -- CCRI for Capraro 2022 and Delsesto 2023)

### *Complainant Sandra Sneesby*

28.    The Sandra Sneesby ("Sneesby") Complaint/"Incident Report" (Sneesby claims she submitted two "Complaints", Sneesby Tr. 52, but an actual "Complaint" form has never been produced to respondent) arises out of communications between her and Murray, wherein Murray is critical of the lack of power of the Faculty Senate and the lack of real shared governance between the faculty and the CCRI administration, as well as the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda, and asks Sneesby, in her position as President of the Faculty Senate, to publicly confirm what they had discussed in private, specifically that she concurs with his assessment. ( Murray Tr. pgs. 45—74).

29.    By way of context, Sneesby played a significant role in the creation of the Faculty Senate in an attempt to rectify the issue of lack of shared governance. The Senate she created with the Administration has no authority -- it is purely advisory. All power ultimately rests with the President of the College. (see CCRI Senate Constitution , Article II www.ccri.edu/senate/S2022-001.pdf )

30.    Murray has vigorously and publicly advocated that this is obviously not the required shared governance intended or required by statute, R.I. Gen. Laws §16-33.1-3 (providing that, among other things, "the president and a committee of the faculty" shall determine the academic standards and courses of study at the college (http://webserver.rilin.state.ri.us/Statutes/TITLE16/16-33.1/16-33.1-3.htm)), or by the college's accrediting body, the New England Commission of

---

[4] *See also* Del Sesto Tr. pp. 44-45: ("Q.   Let me ask you this though. Do you find that he is a bully only to you women or a  bully to both men and women?    A.   I find that he is often a bully – I  find that he's a bully to women and I find that  he ends up being a bully to men if he is  unsuccessful in befriending that man."; "Q. How about with women, does he try to  befriend women that he then has, I guess, as  allies?  A.   I mean I don't think he bullies all women, but I think depending on -- I think depending on what it involved . ..";    A.   In a sense.  So I feel like he almost -- he -- he seems like the type of bully that is bullying to get people to back him and   if you don't support him, then that's it for  you.".

Higher Education, *see, e.g.,* Standard 3.15. ("The institution places primary responsibility for the content, quality, and effectiveness of the curriculum with its faculty. Faculty have a substantive voice in matters of educational programs, faculty personnel, and other aspects of institutional policy that relate to their areas of responsibility and expertise." www.neche.org/wp-content/uploads/2020/12/Standards-for-Accreditation-2021.pdf). (Murray Tr. pg. 55)

31.    Sneesby regarded Murray's criticisms of the Faculty Senate's lack of shared governance as a personal attack, despite Murray's repeated assurances that it was a criticism of the Faculty Senate's lack of power as an institution and not a criticism of or attack on her. (Murray Tr. pps. 45-74)

32.    By way of additional context, for about ten years, Sneesby and Murray, had been faculty colleagues at CCRI and, at times, worthy adversaries when he defeated her for Faculty Association President in 2016.

33.    In particular, during the fall of 2022 until Murray was placed on administrative leave on February 28, 2023, Murray had numerous phone and text communications with Sneesby regarding the shortcomings of the proposed T.A., the impact of Tara Abbascia's announcement that she would be leaving CCRI on her ability to continue to effectively lead the CCRIFA, and the lack of an equal role for the faculty in shared governance, and V.P. Costigan's attempts to use the Faculty Senate to advance the administration's agenda.

34.    The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that the communications about which Sneesby complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications. *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions.").

35.    As further confirmation that the communications and dispute in question involved solely union business, Sneesby a) claims that Murray has "emailed the faculty stating derogatory things about . . . [the] performance [of her] work," b) identifies as witnesses "[t]he entire faculty via email; and, c) asks as a remedy that "Murray [be] prohibited from sending mass emails regarding . . .[her] work performance." (Sneesby Complaint.)

36.    Although Sneesby makes a bald-faced claim in her complaint that Murray is "condescending and dismissive and particularly targets females," nowhere in either Sneesby's complaint or testimony does she claim that her dispute with Murray or his conduct toward her was due to her gender and she expressly states in her testimony that Murray allegedly also bullies males and all those who disagree with him. (Sneesby Tr. 53. [5])

---

[5]    Sneesby Tr. 53 ("Q. Is this only directed towards you, or was it directed towards others as well? A. He could do it towards others as well.· But he seemed to save it the most for particularly the, the administrators, other faculty. Anybody that basically would say something he didn't ·agree with or was challenging his -- and he just is just the worst with women; he's more aggressive.· And if you're a man, or you're a lawyer, he is better.. . . I don't know.· I don't know.· I can't -- I don't know what's in his head, but it -- that's how it appears to me."). Tr.

37.    Sneesby told Murray that she plans on running for President of the CCRIFA Union in the next election.

38.    Sneesby was rewarded after filing her Complaint by the College creating a new department "Communications" without going through the Curriculum Review Committee and naming Sneesby as Department Chair. Sneesby had been Chair of the English department with a much larger work load, including number of faculty to supervise, required assessment activities, and courses to schedule.

### Complainant Tara Abbascia

39.    The Tara Abbascia ("Abbascia") complaint arises out of communications between her and Murray wherein Murray questions and is critical of her ability to continue to effectively do her job as Faculty Association President in the context of an emotionally charged debate concerning ratification of a disputed proposed tentative contract agreement ("T.A."), which had already been rejected once by the faculty, in the midst of which Abbascia had announced she would be leaving the college in June, and as a consequence of which he called her a "lame duck" and called for her resignation. (Abbascia Complaint).

40.    During the period of the above communications, Abbascia and Murray were also at odds because Abbascia supported and advocated for approval of the T.A. by the faculty, while Murray was a vocal opponent. (Murray Tr. 74- 93).

41.    The term "lame duck" is frequently and commonly used to describe an elected official who was completing the remaining term of his or her office for a position for which they had been defeated or were not seeking re-election and is therefore viewed to be ineffective due to the perceived lack of incentive or motivation. *See., e.g.*, *The Britannica Dictionary*: "[Defining 'lame duck' as] 1 . . . an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help." https://www.britannica.com/dictionary/lame-duck

42.    Murray's communications and criticisms about which Abbascia complains all involve, directly or indirectly, Murray's call for Abbasica's resignation in the context of a faculty vote that rejected the proposed T.A., indicating a lack of confidence in her by the faculty, as well as her not having a personal or professional stake in the outcome since she would not be seeking re-election as Faculty Association President nor would she be subject to the terms of any new contract—a "lame duck." (Murray Tr. 74-93).

43.    Murray and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship. (Murray Tr. 75).

---

65 ("Q. Could he have been behaving this way because he just didn't like the policies as opposed to the women? A. He could have been.· I think it's possible.· I don't know what's in his head, ·technically."). Sneesby also cites several males in her testimony whom she claims Murray also allegedly bullied. *See, e.g.*, Sneesby Tr. 66. Sneesby also concedes many of those in leadership at CCRI happen to be women. Sneesby Tr. 66 ("We happen to have a lot of women who are in positions of leadership, as I'm realizing.").

44.  Murray was a mentor and supporter of Abbasica when she declared to run for Faculty Association President in October of 2020.  ( Abbascia Tr. 8, 11).

45.  The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that all but one of the communications about which Abbascia complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications.  *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions."). (Murray Tr. 74-93).

46.  The private email(s) about which Abbascia complains is a communication from Murray wherein he is requesting that Abbascia, as President of the CCRIFA, appoint him as lead negotiator for the TA, and to clarify who she was referring to when she said in her email that lies were being spread regarding the TA. Abbascia Complaint.  (Abbascia Tr. 15 -20).

47.  As further confirmation that the communications and dispute in question involved solely union business, Abbascia a) seeks as a remedy in her complaint "that [Murray be placed on] paid administrative leave pending investigation [as] an appropriate action.   Taking away his ability to use CCRI email to communicate with faculty until this complaint has been investigated, I feel is appropriate" and b) identifies as witnesses, Leslie Florio, the NEARI union representative for the CCRIFA, and the "CCRI Faculty Association." (Abbascia Complaint).

48.  Although Abbasica makes the claim that she was a "target" of Murray as "president of the union and as a woman," her bald-faced, subjective claim she was targeted as a woman is without any logical or factual basis—she was the union President who recommended approval of a T.A. rejected by the faculty and then announced her intent to resign—and clearly was the "target" of Murray's criticisms on that basis.  (Abbascia Complaint)  Abbascia also recognizes that as Union President " I can take a lot of criticism. That's part of the job." (Abbascia Tr. 23).

49.  Indeed, in her sworn testimony, when asked twice whether Murray's alleged "bullying" was directed at men or just women, Abbasica concedes both times that "maybe it just so happens that a woman" is Union President, President of the College and Vice President of Academic Affairs.  (Abbascia Tr. 30, 35).

50.  Abbascia left CCRI on June 17, 2023.  Abbascia emphatically swore under oath that her leaving the College had nothing to do with Murray. (Abbascia Tr. 24).

III.  **SINCE THE CONDUCT IN QUESTION WAS BETWEEN CCRIFA MEMBERS AND/OR INVOLVED ASSOCIATION BUSINESS, THE COMPLAINT MUST BE DISMISSED BECAUSE, ACCORDING TO CCRI POLICY AND R.I. GEN. LAWS §§ 28-7-2(D) AND 12, CCRI IS FORBIDDEN FROM RESTRAINING, COERCING, OR OTHERWISE INTERFERING WITH DISPUTES BETWEEN OR INVOLVING COLLECTIVE BARGAINING AND/OR OTHER MUTUAL AID AND PROTECTION.**

Both the allegations in the three separate complaints (collectively referred to herein as "Complaint") and the evidence in the record establish beyond doubt that the communications and interactions at issue constituted protected concerted conduct under the Rhode Island Labor Relations Act, R.I. Gen. Laws §28-7-1, *et seq*. ("RILA"), which is not subject to regulation or sanction by CCRI in accordance with applicable law and CCRI's own policy. Indeed, as confirmed by the evidence in the record, including an email from Vice President Alix Ogden, Special Advisor to the President overseeing the college's labor relations and governance system dated December 19, 2019, where conduct which is the subject of a misconduct complaint involves union business, it is the policy of CCRI that the dispute is not subject to determination by the college.

It is beyond doubt that my client was involved in concerted activity protected under the RILA when he was engaged in the communications with Sneesby and Abbascia referenced in the Complaint and when using the CCRI email/listserv system to communicate with other union faculty members regarding the TA. The right to concerted action lies at the heart of the protections under the RILA and National Labor Relations Act ("NLRB") on which it was patterned. Additionally, his communications and interactions with DelSesto referenced in the Complaint arose out of and were related to his disagreement and concern over the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty. Del Sesto was the author and sender of the email which contained the last-minute disputed interpretation of the CBA. The entire interaction involved Murray in his capacity not just as a faculty member asserting rights under the CBA, but more significantly, as a faculty member Department Chair speaking on behalf of his members on an urgent and pressing issue for Law Department faculty members. Moreover, CCRI well knew that the interaction/communications were protected conduct and outside the purview of either a disciplinary or Title IX complaint, and it has refused to process complaints of this very type on my client's behalf. Tr. Murray pp. 100-102, email chain 11/20/19—12/19/19 (Murray exhibit).

Interpreting Title IX and its own policies and procedures as authorizing the issuance of a Complaint and imposing pre-determination sanctions based on heated discussions among union faculty members which CCRI deems "uncivil" or "unprofessional" also violates my client's and all other union members' right to collective action and constitutes an unfair labor practice prohibited by R.I. Gen. Laws §28-7-13 (10). This is so because the actual, necessary, and intended effect of this practice is to impair and chill the exercise of collective action rights out of fear of being disciplined if CCRI disapproves of the tone or content of the communications between members. R.I. Gen. Laws §28-7-13 (10) (making it is an unfair labor practice to "[d]o any acts . . . that interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by § 28-7-12."); see also N.L.R.B. v. Ne. Land Servs., Ltd., 645 F.3d 475, 481–83 (1st Cir. 2011) (The "mere maintenance" of a rule that "would reasonably tend to chill employees in the exercise of their Section 7 rights" is unlawful.). "It is axiomatic that that an employees' right to discuss, debate, and communicate with each other regarding workplace terms and conditions of employment" is protected under the Act. *See United States Postal Serv., & Roy Young, an Individual,*, No. 14-CA-195011, 2021 WL 1087421 (Mar. 18, 2021) (interpreting and applying Section 7 of the NLRA. The Supreme Court has acknowledged "the importance of freedom of communication to the free exercise of organization rights" under the NLRA. *Cent. Hardware Co. v. N.L.R.B.*, 407 U.S. 539, 542–43 (1972).

The communications and conduct at issue involve interpersonal conflicts and disagreements between faculty members and, in the case of Del Sesto, staff and do not constitute conduct proscribed by the CCRI Title IX Policy

**Page 11 of 63**

**IV.    THE COMPLAINT MUST BE DISMISSED AS COMBINING THREE UNRELATED COMPLAINTS VIOLATES CCRI POLICY, FEDERAL ADMINISTATIVE GUIDANCE, AND DUE PROCESS OF LAW.**

CCRI has improperly combined three complaints involving three totally unrelated communications/interactions in violation of CCRI Title IX Policy and applicable law in an apparent deliberate but misguided attempt to create a "pattern and practice" Title IX violation. ***First, combining these three unrelated interactions which are not probative or relevant to each other only serves to prejudice my client and for that reason also violates due process of law and warrants a dismissal of the Complaint on that basis alone.*** Second, largely because of the forgoing reason, combining such separate and distinct complaints violates applicable law regarding the Title IX complaint procedure, including the express provisions of the CCRI Title IX Policy. Joint Guidance on Federal Title IX Regulations: *Summary Analysis of Sections § 106.45(b)94): Consolidation of Complaints* ("[A] single investigatory and adjudicatory process may be used ***where it arises from the same incident and parties.***")(emphasis added); Council on Postsecondary Education, *Title IX Sexual Harassment Policy and Procedures*, Sec. XIX (Consolidation of Formal Complaints)("The Covered Entity may consolidate Formal Complaints of Sexual Harassment ***where the allegations arise out of the same facts or circumstances***.")(emphasis added). Third, the only real similarity between the three situations that is noteworthy is that they all arise out of and relate to conduct protected under R.I. Gen. Laws §28-7-12 as in detail above. This objection was previously raised with both you and CCRI's General Counsel and is reiterated herein again as a ground for dismissal.

**V.    THE COMPLAINT MUST BE DISMISSED AS THE ALLEGED CONDUCT IN QUESTION DOES NOT CONSTITUTE A VIOLATION OF TITLE IX**

*Background*

On February 28, 2023, in the midst of a fierce debate and imminent vote on the above mentioned T.A., my client was locked out of his office, denied access to his CCRI email account—which, under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others, the then CCRIFA and Faculty Senate presidents (both of whom are complainants). The basis of this action against my client by CCRI was purported Title IX violations arising out of three totally separate and unrelated communications ("Complaint"), one of which occurred over *one month* prior (and had already been informally addressed by Dean Stargard) and two of which occurred about two weeks prior to the issuance of the Complaint. Effectively, it was the combined action and express intent—both Abbascia and Sneesby expressly requested that Murray be banned from the faculty listserv—of two faculty association leaders of whom Murray was critical and the administration of which Murray was a longtime and vocal critic that succeed in banishing Murray from campus and the listserv in order to silence him in the midst of a vigorously contested debate over the proposed T.A. and lack of faculty governance. The administration accomplished this by converting a month-old non-disciplinary complaint of Del Sesto, V.P. Costigan's assistant, which had already been addressed by Dean Staargard, into a purported Title IX complaint and then improperly combining it with the two other union leadership complaints in a deliberate, but misguided attempt to create a pattern and practice Title IX violation, which only applies to systemic, institutional conduct—not to an individual.

As you are probably well aware from your review of the complaints and investigation to date, the substance of the allegations of all three of the complainants at issue is the subjective belief or "perception" of each that my client was apparently critical of their conduct and that

his demeanor and tone was allegedly subjectively offensive to them—invoking the mantra "bullying," with two of them opining that they believed they were targeted because they were women.

### A.    Judicial interpretation of the elements of a Title IX claim.

The allegations in the Complaint and in the record fail to establish even a colorable Title IX violation.  In addition, the subject matter of all the communications at issue were all related either to the union, collective bargaining/terms and conditions of employment, and/or a dispute/communication with the CCRI administration over the interpretation and application of the CBA.  As such, the communications were, therefore, clearly and indisputably protected from adverse action by CCRI policy and the RILA.  CCRI nevertheless issued a facially and obviously deficient Title IX complaint on the basis thereof and utilized it as a pretext to silence my client by placing him on administrative leave and banning him from campus, barring his access to his school email and sole means of communicating with his fellow union faculty members, and prohibiting him from communicating with the CCRIFA and Faculty Senate presidents.

It is black letter law that Title IX was not designed to create a general civility code.[6] Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of

---

[6]    ***Title IX****.  Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 350 (6th Cir. 2020) ("Plaintiffs cannot be faulted for finding Frye's use of the term "pussy" offensive, even in a football setting.  But crude or vulgar language alone does not rise to the level of a Title IX violation.  After all, Title IX, like Title VII, is not a "general civility code."); *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011)("[T]to recover [under] Title IX  . . ., Wolfe had to prove the harassment complained of amounted to more than mere name-calling; he was legally required to show the harasser intended to discriminate against him "on the basis of sex," meaning the harassment was motivated by either Wolfe's gender or failure to conform with gender stereotypes."); *Moeck v. Pleasant Valley Sch. Dist.*, 179 F. Supp. 3d 442, 447–48 (M.D. Pa. 2016) ("According to the plaintiff the sexual harassment she endured is as follows: Coach Getz 'would call people a pussy, a faggot.  Heard once, string bean arms. He would curse almost every single letter in the alphabet.  He would say fuck.  He would call people assholes.'  He additionally used the word 'bitch'.  He used these words, however, to the boys not to plaintiff or her sister. Additionally, plaintiff notes that Coach Getz told teammate J.J. to 'penetrate all the way through like he was having sex with a girl.'  These statements were not made to the plaintiff and are mere vulgarity, thus, we will not consider them sexual harassment of the plaintiff.")(internal citations to record omitted); *see also Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003)("On the other hand, we have repeatedly emphasized that anti-discrimination laws do not create a general civility code."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not create a claim for all unpleasant or abusive behavior in the workplace; it is not a general civility code and does not apply to the normal tribulations of the workplace, such as the sporadic use of abusive language, race-related jokes and occasional teasing.  The conduct must be extreme to amount to a change in the terms and conditions of employment."); *Montalvo-Figueroa v. DNA Auto Corp.*, 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019)(Nevertheless, the harassment must pass a certain threshold of severity.  Mere discomfort is insufficient.").

the law.[7]  To support a claim, the conduct must be extreme and not merely rude or unpleasant.[8]  Nor does conduct come within the scope of the law because the complainant invoked the mantra of "bullying."[9]  Moreover, conduct is not subject to sanction under Title IX merely because it was directed at someone of the opposite sex—in this case women.[10]  In addition,

---

[7]  *Shaver v. Indep. Stave Co*., 350 F.3d 716, 721 (8th Cir. 2003) ("Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law."); *accord*; *May v. Delta Air Lines,* No. CV 21-710 ADM/ECW, 2022 WL 2835123, at *7 (D. Minn. July 20, 2022), appeal dismissed sub nom. *May v. Delta Air Lines*, *Inc*., No. 22-2763, 2022 WL 18779768 (8th Cir. Nov. 2, 2022);  Elghoul v. United States, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. *Elghoul v. McDonough*, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022); *Thompson v. McDonald*, No. 16-80811-CIV, 2019 WL 11314995, at *6 (S.D. Fla. Mar. 25, 2019), aff'd sub nom. *Thompson v. Sec'y, U.S. Dep't of Veterans Affs*., 801 F. App'x 688 (11th Cir. 2020)*Andrews v. Green Bay Packaging, Inc.,* No. 4:17CV00788 JM, 2019 WL 1053612, at *7 (E.D. Ark. Mar. 5, 2019); *Guimaraes v. SuperValu, Inc*., No. CIV. 10-366 RHK JSM, 2010 WL 5099648, at *9 (D. Minn. Dec. 8, 2010), aff'd, 674 F.3d 962 (8th Cir. 2012); ); *Kent v. Iowa*, 651 F. Supp. 2d 910, 937 (S.D. Iowa 2009); *Miles v. Wal-Mart Stores, Inc*., No. CIV. 06-5162, 2008 WL 222694, at *4 (W.D. Ark. Jan. 25, 2008); *Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006); *Munoz v. Adventure Lands of Am., Inc*., 957 N.W.2d 324 (Iowa Ct. App. 2021); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing [do not violate anti-discrimination laws]."); *Suarez v. Pueblo Int'l, Inc*., 229 F.3d 49, 54 (1st Cir.2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins.").

[8]  *Stoddard v. BE & K, Inc.*, 993 F. Supp. 2d 991, 1002 (S.D. Iowa 2014); *accord Munoz v. Adventure Lands of Am., Inc.,* 957 N.W.2d 324 (Iowa Ct. App. 2021); *see Wilkie v. Dep't. of Health & Human Servs.,* 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be *extreme,*" and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace.") (emphasis added) (citation omitted); *accord Barron v. Decare Dental, LLC*, No. CIV. 12-699 RHK/SER, 2013 WL 3989786, at *6 (D. Minn. Aug. 2, 2013);  *LaCroix v. Sears, Roebuck and Co*., 240 F.3d 688, 691 (8th Cir. 2001) ("Moreover, "[not] everything that makes an employee unhappy is an actionable adverse employment action [instead] an adverse employment action is exhibited by a material disadvantage, such as a change in salary, benefits, or responsibilities.");  *accord Elghoul v. United States*, No. 4:18-CV-01009-HFS, 2021 WL 1847336, at *5 (W.D. Mo. Mar. 9, 2021), aff'd sub nom. *Elghoul v. McDonough*, No. 21-2014, 2022 WL 457409 (8th Cir. Feb. 15, 2022).

[9]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended and does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Whitley v. Indep. Sch. Dist. No. 10 of Dewey Cnty., Oklahoma*, No. CIV-18-331-SLP, 2019 WL 7667329, at *5 (W.D. Okla. Apr. 22, 2019) ("Under Title IX, the prohibited discrimination does not include bullying, but the prohibited discrimination does include sexual harassment. The harassment must be "gender-oriented," and it must be more than mere name-calling."); *see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("Each Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient. Whether . . . . harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well-being of employees is a question to be determined in light of the totality of the circumstances.")

[10]  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX was not intended . . . to provide them recourse for mistreatment that is not based on sex."); .); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp*. 3d 442, 447–48 (M.D. Pa. 2016) ("A review of all these statements reveals fewer than ten sexually-tinged comments over the course of two or three years. Such sporadic incidents are not sufficiently pervasive to establish a sexual harassment claim, the statements are mere offensive utterances.  While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way.  Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner."); *see also Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (internal quotations omitted); *Wolfe v. Fayetteville, Arkansas Sch. Dist*., 648 F.3d 860, 867 (8th Cir. 2011)( "[A]cts of name-calling do not amount to sex-based harassment, even if the words used are gender-specific, unless the underlying motivation for the harassment is hostility toward the person's gender."); *Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist*., 647 F.3d 156, 165 (5th Cir.2011)

mere subjective feelings or perceptions are insufficient; the conduct complained of must also satisfy an objective standard that meets all of the foregoing elements of a claim and be so severe, pervasive, and objectively offensive that it effectively denies a person access to an institution's employment programs and/or activities.

> **B.      The facts in the record do not establish any of the elements of a Title IX violation as to any of the complainants.**

> ***Neither the Complaint nor the facts in the record contain facts sufficient to establish adverse gender-based conduct constituting a violation of the CCRI Title IX Policy.***

The CCRI Title IX Policy forbids "sexual harassment" defined as "conduct on the basis of sex that constitutes Quid Pro Quo Sexual Harassment, Hostile Environment Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence, or Stalking." *Id*. VIII. A. None of the types of "sexual harassment" described in the policy has occurred in this case. Nevertheless, based on the allegations in the Complaint and the questioning by the Investigator, the administration appears to be attempting to build a case of "Hostile Environment Sexual Harassment." ***Such conduct must be motivated or based on gender and be objectively "so severe, pervasive, and objectively offensive that it effectively denies a person access to [the institution's] Programs or Activities***." *Id*. VIII., p. 4.[11] *See Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21-23 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond [employment discrimination law] purview.  We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."); *accord  Casada v. Lester E. Cox Med. Centers*, No. 04-3467-CV-S-ODS, 2006 WL 89840, at *4 (W.D. Mo. Jan. 13, 2006).

The conduct complained of in the Complaint is nothing more than personal perceptions and subjective feelings of the complainants that the language, tone, and/or demeanor of my client in the communications was offensive or upsetting to them (without regard to *their* concurrent behavior, demeanor, and conduct toward my client).  There are no allegations in the Complaint of any vulgarity, unwanted touching, threats of violence, or criminal conduct.  None of the complainants claimed they were in fear for their physical safety.  As discussed above, Title IX is not a civility code nor a general anti-harassment code.  Nor does the evidence establish that the communications/conduct at issue was related to or motivated by gender.

In short, there is no evidence in the record of **_any_** gender based or motivated conduct on the part of Murray that was so severe, pervasive, and objectively offensive as to effectively deny any of the complainants to access to any program or activity of CCRI.

---

(stating harassment is actionable under Title IX only if it is "based on sex, per the words of Title IX, and not merely tinged with offensive sexual connotations" and affirming summary judgment where record fails to suggest the harasser "was motivated by anything other than personal animus.").

[11]   The CCRI Title IX Policy further requires that: "in determining whether a hostile environment exists, [CCRI] will consider the totality of circumstances, including factors such as the actual impact the conduct has had on the Complainant; the nature and severity of the conduct at issue; the frequency and duration of the conduct; the  relationship between the parties (including accounting for whether one individual has power or authority over the other); the context in which the conduct occurred; and the number of persons affected." *Id*. IX., pp 7-8.

*Requirement that Conduct be Gender Based*

To constitute prohibited conduct under the CCRI Title IX Policy and applicable law, the conduct must be gender based or motivated.   The mere fact that it is between a man and a woman is not enough.  The fact that the conduct is "offensive and inappropriate [is insufficient where] the statements do not address plaintiff in a sexual way."  *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016).  "[W]orkplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations.  The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80 (1998).  Harassment is actionable under Title IX only if it is "based on sex, per the words of Title IX, and not merely tinged with offensive sexual connotations" and is thus not actionable where the harasser "was [not] motivated by anything other than personal animus.").  *Branch Indep. Sch. Dist*., 647 F.3d 156, 165 (5th Cir.2011).

Nor is there any significance in this case that all three complainants happen to be women, particularly given the context.  First, over two-thirds of the CCRI leadership, including President Hughes and V.P. Costigan, and over 60% of the faculty at CCRI are women.  Accordingly, if a faculty member is involved in an interpersonal conflict with a colleague or a member of the administration leadership team at the college, the chances are that it is with a woman.  Second, the communications and conduct at issue arose in the context of a fiercely and hotly contested faculty association vote on a proposed T.A., controversy over the lack of shared governance, and the administration's attempt to use the Faculty Senate for its agenda, wherein Murray's position was at odds with both that of the faculty leadership (Abbascia as President of CCRIFA and Sneesby as President of the Faculty Senate) and the CCRI administration (President Hughes and V.P. Costigan), *the Presidents of which are all women and the former two of which are complainants*.  The undisputed and ONLY READING of the evidence in the record is that the communications and conduct were motivated solely by Murray's sincere and vigorous advocacy of his positions on behalf of his co-worker faculty members.  *See, e.g., Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 951 (N.D. Ill. 2017), aff'd, 933 F.3d 849 (7th Cir. 2019) ("The [alleged perpetrator] female student's activism and public statements were all in response to a specific act and were directed at a specific individual, not all males, and thus there was no actionable claim for Title IX sexual harassment.")

Finally, pattern and practice Title IX violations relate solely to systemic, institutional violations—it does not apply to conduct by individuals.  **Where, as here, a Title IX violation has been alleged, the complainant must show that the alleged perpetrator *engaged in conduct <u>toward the complainant</u>* that was *motivated by gender and was so severe, pervasive, and objectively offensive as to effectively deny the complainant access to a program or activity of CCRI.  As a matter of law, conduct toward others is irrelevant to this analysis.*** *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("Each Plaintiff, in other words, must show a practice or pattern of harassment <u>***against him***</u>. A single incident or isolated incidents generally will not be sufficient.") (emphasis added).

1.    <u>*Del Sesto Complaint*</u>

Del Sesto alleges that she subjectively felt "uncomfortable" and was "caught off guard by [my client's] unexpected visit and demeanor" when he came to her office and "in summary was ***speaking negatively about the PTFA, contract, administration and his role.***"

**Not Gender-Based.**  Del Sesto does not claim in her complaint or testimony that Murray was motivated by gender or that gender in any way played a role in their dispute.

**Not Severe**.  Del Sesto claims that Murray was angry and "flailing his arms" during the encounter in question which lasted a matter of a few minutes.  There is no evidence in the record of any vulgarity, unwanted touching, threats of violence, or criminal conduct toward Del Sesto, nor any evidence she was in fear for her physical safety.  Even if Del Sesto was subjectively "shaken up" by the interaction, she does not claim nor can it be inferred from the facts that she was denied access to any program or activity of CCRI as a result of this single interaction with Murray.  Additionally, the interaction could not have been that severe if, after investigating Del Sesto's complaint about the encounter, Dean Stargard determined that it was not a disciplinary matter.  *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not create a claim for all unpleasant or abusive behavior in the workplace; it is not a general civility code and does not apply to the normal tribulations of the workplace, such as the sporadic use of abusive language, race-related jokes and occasional teasing. ***The conduct must be <u>extreme</u> to amount to a change in the terms and conditions of employment.***") (emphasis added).

**Not Pervasive**.  Out of innumerable interactions over an eight (8) year period, Del Sesto claims that this was the "first time" Murray had directed any objectionable communications to or conduct toward her.  Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interaction alleged in the Del Sesto complaint, amount to nothing more than the normal give and take in the workplace.  *See Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace.");  *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("[A] Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient.").

**Not Objectively Offensive**.  For the same reasons discussed above under the "Not Severe" heading, even if subjectively offensive or upsetting, keeping in mind the normal trials and tribulations of the workplace, actionable conduct "must pass a certain threshold of severity. Mere discomfort is insufficient.".  *Montalvo-Figueroa v. DNA Auto Corp.*, 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019).  A co-worker venting frustration, even if he or she is animated and raises his or her voice, is hardly unusual or sanctionable objectively offensive behavior.

## 2.    *Sneesby Complaint*

Sneesby alleges that Murray "emailed the faculty stating derogatory things about [her] or [her] performance at work."   Sneesby is President of the Faculty Senate and a former President of the CCRIFA and the emails to which she refers and on which her allegations are based relate to Murray's criticism of her performance in that capacity.  The criticisms were not directed to or at her personally, but arose over their differences of opinion.  Specifically, Murray was and is critical of the lack of power of the Faculty Senate and the lack of real shared governance between the faculty and the CCRI administration, as well as the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda.  Murray asked Sneesby, in her position as President of the Faculty Senate, to publicly confirm what they had discussed in private, specifically that she concurs with his assessment.  The facts in the record show that she yelled and was unprofessional in her communications with Murray on a number of occasions during their approximately ten (10) years of interacting as colleagues at CCRI. Sneesby's unprofessional tone, demeanor, language, and treatment toward Murray in the record

is supported both by Murray's testimony as well as statements of independent third-party witnesses.

**Not Gender-Based.**  Sneesby alleges Murray is "condescending and dismissive and particularly targets females," without any factual basis or context for this self-serving, subjective opinion.  *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Just saying so is not enough.  A recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination.")  In addition, nowhere in either Sneesby's complaint or testimony does she claim that her dispute with Murray or his conduct toward her was due to her gender and she expressly states in her testimony that Murray allegedly also bullies males and all those who disagree with him.  She also claimed that she observed Professor Murray screaming at various people (with no reference to gender) during meetings.  *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ*., No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX . . . does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016) ("While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way.  Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner.").

**Not Severe.**  There is no evidence in the record of any vulgarity, unwanted touching, threats of violence, or criminal conduct toward Sneesby, nor any evidence she was in fear for her physical safety.  Moreover, the communications and any criticisms therein were not directed to or at her personally, but arose over their differences of opinion with respect to the lack of power of the Faculty Senate, the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda, and other faculty association matters.  Even if Sneesby was subjectively offended or upset by Murray's communications in the faculty emails, she does not claim nor can it be inferred from the facts that she was denied access to any program or activity of CCRI as a result of her interactions with Murray.  Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interactions alleged in the Sneesby complaint, amount to nothing more than the normal give and take in the workplace.  *See Wilkie v. Dep't. of Health & Human Servs*., 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs*., 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not . . . apply to the normal tribulations of the workplace . .. ***The conduct must be*** <u>***extreme***</u> ***to amount to a change in the terms and conditions of employment.***") (emphasis added).  *Montalvo-Figueroa v. DNA Auto Corp*., 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019) ("Nevertheless, the harassment must pass a certain threshold of severity.  Mere discomfort is insufficient.").

**Not Pervasive**.  Out of innumerable interactions over a ten (10) year period, Sneesby identifies only a few occasions wherein she complains about what she appears to characterize as Murray's vigorous criticisms of her.  Moreover, Sneesby admits she also "interact[ed] with him…and . . . saw a different side of him," having "some really good discussions."  Although Sneesby also complains about Murray's alleged "aggressive[] critici[sm]" of President Hughes and Abbascia, these and any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interaction alleged in the Sneesby complaint, amount to nothing more than the normal give and take in the workplace.  *See Wilkie v. Dep't. of Health & Human Servs*., 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult

[must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("[A] Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient.").

**Not Objectively Offensive**.  For the same reasons discussed above under the "Not Severe" heading, even if subjectively offensive or upsetting, keeping in mind the normal trials and tribulations of the workplace as well as Sneesby's level of vitriol in some of her communications with Murray over the years, the communications and conduct in question do not arise to sanctionable, objectively offensive behavior.  This is particularly true insofar as the complaint does not involve personal criticisms or attacks, but rather communications between professional colleagues about differences of opinion regarding college policies and practices.  Such disputes are to be expected under such circumstances and a person like Sneesby, who holds a leadership/policy-making position, must expect criticism and disagreement from time to time—even if sometimes vigorous, persistent, and public.

### 3.    *Abbascia Complaint*

Abbascia complains about what she perceives as Murray's "unprofessional, bullying, threatening tone in emails."  She objects to Murray's emails wherein he called her a "lame duck" president—arising out of her announcement that she is leaving the college and her role as President of the union in June, prior to the end of her term of office, called into question her ability to do her job as union president, called for her resignation, and "verbally told faculty members that [Murrray] is trying to oust [her] as CCRIFA President."  During the period of the above communications, Abbascia and Murray were also at odds because Abbascia supported and advocated for approval of the T.A. by the faculty, while Murray was a vocal opponent.  Murray's communications and criticisms about which Abbascia complains all involve, directly or indirectly, Murray's call for Abbasica's resignation in the context of a faculty vote that rejected the proposed T.A., indicating a lack of confidence in her by the faculty, as well as her not having a personal or professional stake in the outcome since she would not be seeking re-election as Faculty Association President nor would she be subject to the terms of any new contract.  By dictionary definition, Abbascia was, objectively, a "lame duck." [12]  Murray and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship.  Murray was a mentor and supporter of Abbasica when she declared to run for Faculty Association President in October of 2020.  Abbascia described the change in the relationship to be related to the union contract negotiations with the administration and the way that she conducted faculty association meetings.  Abbascia stated under oath that for most of the time she was employed at CCRI, her relationship with Professor Murray was cordial and professional.   Other than the controversy surrounding her announcement to leave CCRI in June, and her continuation of her role as union president, Abbascia indicated that Murray had been cordial with her.  Abbascia stated that her decision to leave CCRI was personal, and was not prompted by her current dispute with Murray.

**Not Gender-Based.**  Although Abbasica makes the claim that she was a "target" of Murray as "president of the union and as a woman," her bald-faced, subjective claim she was targeted as a woman is without any logical or factual basis—she was the union President who recommended approval of a T.A. rejected by the faculty and then announced her intent to resign—and clearly was the "target" of Murray's criticisms on that basis.  *See Austin v. Univ.*

---

[12]  *The Britannica Dictionary*: "[Defining 'lame duck' as] 1 . . .  an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help." https://www.britannica.com/dictionary/lame-duck

*of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Just saying so is not enough. A recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination.") Indeed, in her sworn testimony, when asked twice whether Murray's alleged "bullying" was directed at men or just women, Abbasica concedes both times that "maybe it just so happens that a woman" is union president, president of the college and vice president of academic affairs. *See Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.*, No. CIV. 3:06CV1947PCD, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009)("Title IX . . . does not function to protect [an aggrieved party] from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex."); *Moeck v. Pleasant Valley Sch. Dist., 179 F. Supp.* 3d 442, 447–48 (M.D. Pa. 2016) ("While they are offensive and inappropriate, the statements do not address plaintiff in a sexual way. Significantly, she was not sexually propositioned, physically threatened or touched in a sexual manner.").

**Not Severe**. There is no evidence in the record of any vulgarity, unwanted touching, threats of violence, or criminal conduct toward Abbascia, nor any evidence she was in fear for her physical safety. Moreover, the communications and any criticisms therein were not directed to or at her personally, but arose over their differences of opinion with respect to her position in support of the T.A. and her role as Faculty Association President. Even if Abbascia was subjectively offended or upset by Murray's communications in the faculty emails, she does not claim nor can it be inferred from the facts that she was denied access to any program or activity of CCRI as a result of her interactions with Murray. Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interactions alleged in the Abbascia complaint, amount to nothing more than the normal give and take in the workplace. *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("The law governing . . . discrimination does not . . . apply to the normal tribulations of the workplace . *The conduct must be extreme to amount to a change in the terms and conditions of employmen*t.") (emphasis added); *Montalvo-Figueroa v. DNA Auto Corp.*, 414 F. Supp. 3d 213, 244 (D.Puerto Rico 2019)("Nevertheless, the harassment must pass a certain threshold of severity. Mere discomfort is insufficient.").

**Not Pervasive**. Out of innumerable interactions during over a five (5) year period, including a brief intimate relationship, Abbasica admits that other than the controversy surrounding her announcement to leave CCRI in June and her continuation of her role as union president, Murray had been cordial with her. Any other interactions which are part of the record of this case are irrelevant, prejudicial, and, in any event, like the interaction alleged in the Abbacia complaint, amount to nothing more than the normal give and take in the workplace. *See Wilkie v. Dep't. of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir.2011) ("Rather, to be actionable, the challenged conduct "must ... be extreme," and "discriminatory intimidation, ridicule, and insult [must] permeate[ ] the workplace."); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003)("[A] Plaintiff, in other words, must show a practice or pattern of harassment against him. A single incident or isolated incidents generally will not be sufficient.").

**Not Objectively Offensive**. For the same reasons discussed above under the "Not Severe" heading, even if subjectively offensive or upsetting, keeping in mind the normal trials and tribulations of the workplace as well as the fact the Murray was previously a mentor, supporter, and intimate partner, the communications and conduct in question do not arise to sanctionable, objectively offensive behavior. This is particularly true insofar as the complaint does not involve personal criticisms or attacks, but rather communications between professional colleagues about differences of opinion regarding college policies and practices. Such disputes are to be expected under such circumstances and a person like Abbascia, who

holds a leadership/policy-making position, must expect criticism and disagreement from time to time—even if sometimes vigorous, persistent, and public.

## VI. MODIFICATIONS TO THE INVESTIGATOR'S INTRODCUTION

It should be noted that the Maya Geraldo "statement" mentioned in the second paragraph of the "Introduction" section was unsigned.  Also, in the next to the last line of the second paragraph in this section, Del Sesto never uses the words "unprofessionally" or "aggressively" in her complaint or testimony in describing the event on January 20, 2023. Accordingly, as written, this statement is misleading as it suggests that this was a characterization of the witness, when it was that of the Investigator, who has identified his function as merely gathering the facts.  Therefore, Murray demands that these words be stricken from the "Introduction."

## VII. INVESTIGATOR PROPOSED FINDINGS—INTERVIEWS

### *Del Sesto Claim*

1.    On the afternoon of Thursday, January 19, 2023, Ms. Del Sesto sent an email to all department chairs, including Professor Murray, regarding payroll information for part-time instructors that was to be submitted by the chairs by the following day. [**Additional Proposed Finding**:    *There were a series of back-and-forth emails that predated the email mentioned here which purported to make a last minute material change to the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty.  Because of the confusion created by the Del Sesto email, Murray was unable to finalize the assignment of faculty, complete and submit a faculty workload report, or complete and submit a faculty payroll report, all of which were due that date.*]

2.    Ms. Del Sesto stated that Professor Murray used "words and phrases such as 'this is ridiculous'... [speaking] negatively about Dean Stargard and how he's not doing his job." [**Additional Proposed Finding**.  *Del Sesto does not remember the exact substance*

*of what was said; she does state that Murray said nothing disparaging or critical about her, no threats to her or about anyone else.  She says he was loud, not hollering, a bit louder than normal.*  **Del Sesto Tr. 33-34.].**

3.      Professor Murray sends extremely long emails late into the night with a negative tone and accusations towards Dean Stargard.  Ms. Del Sesto recalls being told by the English  Department Chair, Sandra Sneesby, that she stopped attending divisional meetings for the Arts, Humanities and Social Sciences because of Professor Murray's involvement.  [**Comment and Request to Strike or Clarify**:  First, this is rank hearsay—Sneesby never said this, only Del Sesto did—and it should be stricken on that basis.  Second, it is highly misleading as Sneesby only missed one such meeting prior to my client being banned from campus and therefore should be stricken as misleading as well.  If you refuse to remove this rank hearsay comment of dubious credibility and relevance, then my client proposes the following: **Additional Proposed Finding**.  *Professor Sneesby only failed to attend one such meeting prior to Professor Murray being placed on administrative leave.*]

4.      **Correction to Record**.  **Geraldo claimed Murray was "put on leave" in 2018 – this is incorrect – the only time Murray was placed on leave is the current one.**

5.      **Additional Proposed Findings**.  *See also* **additional proposed findings 3-18 in Section II above**.  *Professor Murray was hired as an assistant Professor, granted tenure, promoted to Associate Professor and then promoted to full Professor.  He has never been disciplined for misconduct or otherwise by the College. He has outstanding work evaluations in his Professional file by the Deans who supervised him, the faculty in his department and from students.   In the last nine (9) years or so there have been nine (9) different deans employed by the College working under the direction of VP Costigan in the division of Arts, Humanities and Social Sciences.*

6.      Ms. Del Sesto witnessed hostility by Professor Murray towards Dean Stargard.  [**Additional Proposed Finding**.  *Dean Stargard is male.*]

**Additional Proposed Del Sesto Findings from Section II above**

7.      The Elizabeth Del Sesto ("Del Sesto," formerly Capraro) Complaint arises solely from a single encounter (January 20, 2023) between Murray and Del Sesto, mere days before the Spring semester was to start, wherein Murray was expressing frustration over the administration's interpretation of the CBA relative to the assignment of and compensation for courses for both full time and part time faculty. (Murray Tr. pgs. 22 – 38)

8.      The reason Del Sesto was the subject of the communication was that, although ostensibly issued under the authority of Dean Stargard, she was the author and sender of the email which contained the last-minute disputed interpretation of the CBA and Dean Stargard was not in his office at that time.  (Murray Tr. pg. 28).

9.      The entire interaction involved Murray in his capacity not just as a faculty member asserting rights under the CBA, but more significantly, as a faculty member Department Chair speaking on behalf of his members on an urgent and pressing issue impacting Law Department faculty members, as the semester was scheduled to begin on the next business day and as consequence of the confusion caused by the email and series of emails and events leading up to this point, Murray was unable to either finalize the assignment of faculty, complete and submit a faculty workload report, or complete and submit a payroll report, all of which were due *that date.*  (Murray Tr. pps. 22-38)

10.     At the time of the interaction in question, Del Sesto was an assistant to V.P. Costigan.

11.     Murray has interacted with Del Sesto on innumerable occasions during her approximately eight years as a support person in the Academic Affairs suite.

12.     Del Sesto claims in her complaint that this was the "first time" Murray had directed any objectionable communications to or conduct toward her.

13.     Del Sesto does not claim in her Complaint or testimony that Murray was motivated by gender or that gender in any way played a role in their dispute.  (Del Sesto

Complaint; *see also* Del Sesto Tr. p. 34.[13])

14.    Dean Stargard previously determined that the interaction in question between Murray and Del Sesto was not a disciplinary matter. He stated this in both in an email to Murray and again when he met to discuss the matter with Murray.  Murray Tr.  pps. 33- 38, and Murray Exhibit (Email from Stargard to Murray dated January 26, 2023).

15.    Del Sesto was rewarded for filing her complaint by being appointed interim assistant dean BSTEM in June of 2023, which included a significant increase in annual salary (2023 $61,499.88 -- 2023 $75,000.12) from her previous position as academic affairs coordinator for which V.P. Costigan was her direct supervisor.  (RI Transparency Portal www.transparency.ri.gov -- CCRI for Capraro 2022 and Delsesto 2023)

### *Sneesby Claim*

16.    She *was* is presently the Chair of the English Department and has served in that capacity for the past two years.  **Additional Proposed Finding/Correction.** *Professor Sneesby is currently the newly appointed Chair of the Communications Department.*

17.    Professor Sneesby alleges that Professor Murray has subjected her to sex discrimination, harassment, bullying and retaliation on several occasions, including specific instances that occurred in the month of February 2023.  Professor Murray allegedly emailed the entire faculty, stating derogatory comments about her or her work performance. [**Additional Proposed Finding.**  *Professor Sneesby produced no emails to the entire faculty wherein Professor Murray has either made derogatory comments about her directly or indirectly or mentioned her by name.*]

---

[13]  *See also* Del Sesto Tr. pp. 44-45: ("Q.   Let me ask you this though. Do you find that he is a bully only to you women or a  bully to both men and women?    A.   I find that he is often a bully – I  find that he's a bully to women and I find that  he ends up being a bully to men if he is  unsuccessful in befriending that man."; "Q.  How about with women, does he try to  befriend women that he then has, I guess, as  allies?  A.   I mean I don't think he bullies all women, but I think depending on -- I think depending on what it involved . .";     A.  In a sense.   So I feel like he almost -- he -- he seems like the type of bully that is bullying to get people to back him and   if you don't support him, then that's it for  you.".

18.    Professor Sneesby previously assumed the presidency of the faculty association after both the elected president and vice president resigned *in approximately 2015* **[additional proposed fact in bold italic to be added to provide context].**

19.    She stated that Professor Murray orchestrated a faction of faculty members to "ratchet up email attacks and just spread untruths."  The adverse faction allegedly attempted to persuade Professor Sneesby to appoint Professor Murray as the leader of the negotiation team for the new union contract with the College. The faction threatened that they would expel her as faculty association president if she failed to do so. However, the motion failed and she  remained as president.  **[Comment and Request to Strike or Clarify**.  These findings should be deleted as misleading and irrelevant. Sneesby's trials and tribulations eight (8) years ago as CCRIFA President attempting to get a faculty approval of a new contract in the face of vigorous opposition of other faculty association members, of which Murray was only one, is irrelevant and misleading. Additionally, such conduct is protected concerted conduct under applicable law and is provided enormous deference.  Finally, the interactions in question are far too remote in time to have any relevance to Sneesby's current complaint.   If you refuse to remove these misleading and irrelevant findings, then my client proposes the following:  **Additional Proposed Finding**.  *Professor Murray disputes that he led or instigated any faculty faction to expel Professor Sneesby if he were not appointed to the negotiation team*.**]**

20.    Ultimately, Professor Sneesby was successful in getting the proposed contract approved by the faculty, despite what she described as "lots and lots of emails attacking it, attacking me, attacking people.  **[Additional Proposed Finding**.  *However, none of these purported emails were produced to the Investigator*.**].**

21.    She observed Professor Murray aggressively criticizing President Meghan Hughes and Vice President Rosemary Costigan "with a vengeance."  **[Additional Proposed Finding**.  *Professor Sneesby has also engaged in harsh criticism of Vice President*
Page 25 of 63

*Costigan, at one point claiming her "ineptitude" has cost the college a million dollars in legal fees and resulted in the resignation or removal "of some good people who actually know something about academics." See Sneesby June 3, 2020 email to Murray.***].**

22.    She observed Professor Murray screaming at people during meetings. Comment.  [**Comment.  This finding must be deleted as it contains no date, time, place, circumstance or context and is merely a bald faced lay opinion claim without basis that has no probative value nor relevance to the Complaint. ]**

23.    When Faculty Association President Abbascia announced that she would be leaving the College on June 17, 2023, Professor Murray criticized the announcement by email to all faculty. *See*, *Exhibit 5* at 259-260.  Professor Sneesby responded to all faculty on February 1, stating in part, that the recent emails reminded her of the time she served as president and that "there is no room in the academy for bullying…we do not need to vilify or humiliate our every own… ." *Exhibit 5* at 255-256.  [**Additional Proposed Finding Sneesby and Murray had a phone conversation the night before she sent her email supporting Abbascia wherein she agreed with Murray that Abbascia should resign. She texted Murray that she would do "good cop/bad cop."]**[14]

24.    Professor Stockford notified Professor Sneesby that the "grading scale was introduced orally at our last meeting by Dean Nauman." *Id*. at 234.  [**Additional proposed finding**.  *Accordingly, consistent with Murray's grave concerns about the administration's manipulation of the Faculty Senate, the bill in question was in fact improperly introduced by the administration, not a member of the faculty.  Moreover, in expressing his concerns about the manipulation of the Faculty Senate by the Administration, Professor Murray never mentioned Professor Sneesby directly or indirectly.*]

25.    Some of the things that you've told me that I think you should share with everyone:

---

[14] A copy of a text from Sneesby to Murray confirming this is attached.

-     The Faculty Senate is dominated by Meghan and Rosemary
-     The Faculty Senate has no real power and is merely advisory to Meghan
-     The Faculty Senate is being used by Meghan and Rosemary to complete their agenda
-     The only way to have a real Faculty Senate that has 'shared governance' would be to go to the RI Legislature and get them to pass a law that give power/shared governance to a newly created Faculty Senate modeled on the URI Faculty Senate.
-     [**Additional Proposed Finding**. *After Murray suggested this above action, Sneesby in the Spring of 2023 made a failed attempted to increase the power of the Faculty Senate by changing the statute regarding shared governance at CCRI by inserting the "faculty senate" into the proposed statute House Bill 2023 -6138 in the RI House of Representatives.*].

26.     Professor Sneesby immediately called Professor Murray. She placed Professor Murray on speakerphone so that her colleague, Professor Jon Dorn, could listen to the conversation, and basically repeated the same conversation with him regarding her work on the Faculty Senate.[43] ***She claims that H̶h̶e threatened to claim*** that she was "a puppet of the administration." **[Reason for Proposed Change and Additional Proposed Findings.** *Sneesby does not really remember what Professor Murray said he was going to do*. [Sneesby May 5, 2023 p. 35]. *Murray denies that he told Sneesby she was "a puppet of the administration" nor did he even imply this. Nor did he state he was going to assert such a claim to the faculty or anyone else. What Murray stated was that the Faculty Senate was being used by the administration for its own purposes, the implication of which could be that the Faculty Senate was a puppet of the administration, not Sneesby*.].

27.     The conversation was argumentative, and Professor Murray stated that Professor Sneesby was screaming o̶r̶ h̶o̶l̶l̶e̶r̶i̶n̶g̶ during the phone call. **[Comment.** **Murray stated she was screaming, not "hollering." Accordingly, "hollering" should be deleted]** Professor Sneesby denies it. **[Additional Proposed Finding.** *However, three independent witnesses, Lolita Villanueva, Tiffany Jones, and Lauren Nagel, confirm that Sneesby was screaming at Murray, while Murray never raised his voice.*]

28.     Professor Sneesby also told Professor Murray that he should leave Tara

Abbascia alone and "stop attacking everyone."[46]   The attacks reminded her of the time she served as president of the union and  found that "it's all happening again**." [Additional Proposed Finding**. *Three independent witnesses heard Sneesby screaming at Murray on that phone call and confirmed that Murray never raised his voice*.].

29.     When Professor Sneesby cited emails in her complaint, she was "thinking of some of the older emails from the older incidents…"  that Professor Murray sent to the entire staff while she served as faculty association president.     [**Additional Proposed Finding**. *Professor Sneesby never identified or produced any of these alleged emails*.]

30.     As an example of a recent email in which Professor Sneesby claimed that Professor Murray stated something that constituted criticism, bullying or harassment, she referenced the email correspondence in which Professor Murray criticized the Faculty Senate. [**Additional Proposed Finding**. *Sneesby is one of 40 faculty on the Faculty Senate.  None of the emails referenced by Sneesby mentions her name or anyone else's name.  The emails are merely express Murray's concern about the lack of power of the Faculty Senate and the manipulation of the Faculty Senate by the Administration for its own ends all due to the lack of true shared governance with the Administration*.].   [**Comment.  Such conduct is concerted conduct among association members absolutely protected under applicable law.**].

31.     The critical email regarding the faculty staff was then "leaked to the entire faculty, and now the faculty's getting reports that I'm responsible, the administration is trying to take down Steve Murray, and I am doing it, me."  [**Comment.  There is nothing in the Sneesby Transcript on Page 44 that supports this quote.  Additionally, even if true, it is neither relevant nor probative to the Sneesby Complaint.  Accordingly, this sentence should be deleted.**].

32.      Professor Sneesby recalls occasions during CRC meetings when Professor Murray put his hand up to stop her from speaking.  He occasionally would say comments such

as "that's nonsense" or "I didn't tell you to speak." **[Comment. These two findings must be deleted as they contain no date, time, place, or circumstance and are merely bald faced allegations without context that have no probative value nor relevance to the Complaint.].**

33.    On one occasion, approximately four years ago, Professor Murray "upended a meeting" because Professor Sneesby was attempting to pass a proposal for a communications program.[53] She recalls that Professor Murray was arguing during the meeting that the proposal should fail and she believes that "he was retaliating because he wanted my proposal for communications program to be stopped." **[Additional Proposed Finding. *Murray disputes this and that, to the best of his recollection, he ultimately voted in favor of the measure.*].**

34.    Professor Sneesby recalls walking out of a meeting after a yelling episode and "people came out after the meeting, like we do every meeting, and it's like ugh, we had to suffer through that. So people will…shoulder on through his…behavior." Professor Sneesby continued that it is "hard for me to distinguish because it's like a constant." **[Comment. These findings must be deleted as they contain no date, time, place, or circumstance and are merely a bald faced allegations without context that have no probative value nor relevance to the Complaint.].**

35.    Professor Sneesby also referenced Soudabeh Valicenti, Chair of the Math Department. She thought that Professor Murray may have obtained a restraining order against her after she filed a complaint against him for his behavior. **[Comment and Request to Strike or Clarify: First, this is rank hearsay and should be stricken on that basis. Second, it is highly prejudicial and misleading and contains no date, time, place, or circumstance and is merely a bald-faced allegation without context that have no probative value nor relevance to the Complaint. If you refuse to remove this rank hearsay comment of dubious credibility and relevance, then my client proposes the following: Additional Proposed. *However, Murray never sought nor obtained such a restraining order*.].**

36.    There were occasions when Professor Murray would raise his hand towards

Dean Barabara Nauman during *a* meeting~~s~~ *to signal her to refrain* ~~, stopping her~~ from speaking.  **[Reason for Changes.  There is no evidence in the record that this happened at more than one meeting.  Additional Proposed Finding.  *As confirmed by the statement of Professor Mazin Adam, Dean Nauman was about thirty (30) feet away from Professor Murray the one-time it happened.***

37.     She recalls Professor Murray screaming at Dean Nauman at one meeting. [**Comment.  This finding must be deleted as it contains no date, time, place, circumstance or context and is merely a bald-faced lay opinion claim without basis that has no probative value nor relevance to the Complaint.].**

**Additional Proposed Sneesby Findings from Section II above**

38.     The Sandra Sneesby ("Sneesby") Complaint/"Incident Report" (Sneesby claims she submitted two "Complaints", Sneesby Tr. 52, but an actual "Complaint" form has never been produced to respondent) arises out of communications between her and Murray, wherein Murray is critical of the lack of power of the Faculty Senate and the lack of real shared governance between the faculty and the CCRI administration, as well as the maneuvers by the administration to use the Senate as a rubber stamp for the its agenda, and asks Sneesby, in her position as President of the Faculty Senate, to publicly confirm what they had discussed in private, specifically that she concurs with his assessment.  ( Murray Tr. pgs. 45—74).

39.     By way of context, Sneesby played a significant role in the creation of the Faculty Senate in an attempt to rectify the issue of lack of shared governance.  The Senate she created with the Administration has no authority -- it is purely advisory.  All power ultimately rests with the President of the College. (CCRI Senate Constitution, Article II www.ccri.edu/senate/S2022-001.pdf )

40.     Murray has vigorously and publicly advocated that this is obviously not the required shared governance intended or required by statute, R.I. Gen. Laws §16-33.1-3 (providing that, among other things, "the president and a committee of the faculty" shall

determine the academic standards and courses of study at the college (http://webserver.rilin.state.ri.us/Statutes/TITLE16/16-33.1/16-33.1-3.htm)), or by the college's accrediting body, the New England Commission of Higher Education, *see, e.g.,* Standard 3.15. ("The institution places primary responsibility for the content, quality, and effectiveness of the curriculum with its faculty. Faculty have a substantive voice in matters of educational programs, faculty personnel, and other aspects of institutional policy that relate to their areas of responsibility and expertise." www.neche.org/wp-content/uploads/2020/12/Standards-for-Accreditation-2021.pdf). (Murray Tr. pg. 55)

41.    Sneesby regarded Murray's criticisms of the Faculty Senate's lack of shared governance as a personal attack, despite Murray's repeated assurances that it was a criticism of the Faculty Senate's lack of power as an institution and not a criticism of or attack on her. (Murray Tr. pps. 45-74)

42.    By way of additional context, for about ten years, Sneesby and Murray, had been faculty colleagues at CCRI and, at times, worthy adversaries when he defeated her for Faculty Association President in 2016.

43.    In particular, during the fall of 2022 until Murray was placed on administrative leave on February 28, 2023, Murray had numerous phone and text communications with Sneesby regarding the shortcomings of the proposed T.A., the impact of Tara Abbascia's announcement that she would be leaving CCRI on her ability to continue to effectively lead the CCRIFA, and the lack of an equal role for the faculty in shared governance, and V.P. Costigan's attempts to use the Faculty Senate to advance the administration's agenda.

44.    The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that the communications about which Sneesby complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications. *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's

"right to use faculty mailboxes and email communications, including mass distributions.").

45.     As further confirmation that the communications and dispute in question involved solely union business, Sneesby a) claims that Murray has "emailed the faculty stating derogatory things about . . . [the] performance [of her] work," b) identifies as witnesses "[t]he entire faculty via email; and, c) asks as a remedy that "Murray [be] prohibited from sending mass emails regarding . . .[her] work performance."  (Sneesby Complaint.)

46.     Although Sneesby makes a bald-faced claim in her complaint that Murray is "condescending and dismissive and particularly targets females," nowhere in either Sneesby's complaint or testimony does she claim that her dispute with Murray or his conduct toward her was due to her gender and she expressly states in her testimony that Murray allegedly also bullies males and all those who disagree with him. (Sneesby Tr. 53.  [15])

47.     Sneesby told Murray that she plans on running for President of the CCRIFA Union in the next election.

48.     Sneesby was rewarded after filing her Complaint by the College creating a new department "Communications" without going through the Curriculum Review Committee and naming Sneesby as Department Chair.  Sneesby had been Chair of the English department with a much larger work load, including number of faculty to supervise, required assessment activities, and courses to schedule.

### *Abbascia Claim*

49.     Professor Abbascia was employed at the College for ten years and ~~has been~~ **was previously** the Chair of the Dental Health Department.  **As of June 17, 2023, she was no longer**

---

[15]  Sneesby Tr. 53 ("Q.  Is this only directed towards you, or was it directed towards others as well?  A. He could do it towards others as well.· But he seemed to save it the most for particularly the, the administrators, other faculty.  Anybody that basically would say something he didn't ·agree with or was challenging his -- and he just is just the worst with women; he's more aggressive.· And if you're a man, or you're a lawyer, he is better... . I don't know.· I don't know.· I can't -- I don't know what's in his head, but it -- that's how it appears to me.").  Tr. 65 ("Q.  Could he have been behaving this way because he just didn't like the policies as opposed to the women? A.  He could have been.· I think it's possible.· I don't know what's in his head, ·technically.").  Sneesby also cites several males in her testimony whom she claims Murray also allegedly bullied.  *See, e.g.*, Sneesby Tr. 66.  Sneesby also concedes many of those in leadership at CCRI happen to be women.  Sneesby Tr. 66  ("We happen to have a lot of women who are in positions of leadership, as I'm realizing.").

*employed by CCRI.*  [**Reason for Changes**.  **The reason for these changes are self-explanatory.**].

50.      Professor Abbascia alleges that there have been multiple incidents of bullying by Professor Murray and efforts to damage her reputation through email correspondence that relate to her service as faculty association president. ***After she announced her resignation as President of the Union effective June 17, 2023,*** ~~Hh~~e ~~has~~ *requested* ~~demanded~~ that she resign from the presidency ***because Murray, and many other faculty members, felt that her resignation made her ineffectual***, calling her a "lame duck" ***and*** threatened~~*ing*~~ to send the entire faculty a copy of email correspondence between them ***relative to her allegation against him claiming he was spreading lies.***  [**Reason for Changes**.  **The reason for these changes are self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole**].

51.      For approximately six weeks in 2019, Professor Murray and Professor Abbascia dated ***after Professor Abbascia asked Murray out on a date***. [**Reason for Change**.  **The reason for this change is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole**].

52.       Professors Susi and MacInnes commented by email, noting that Professor Murray's "rhetoric is disrespectful" and a "mocking tone." *Id*. at 278.  [**Additional Proposed Findings**.  ***Many other faculty members supported Murray's position that Abbascia should resign*.  This reason for this proposed finding is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole**.].

53.      The arguments⁄disagreement between Professors Abbascia and Murray ***continued solely via email***.    [**Reason for Change**.  **The reason for this change is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole**].

54.    Professor Abbascia replied back to Professor Murray and denied that she was referring to him in the email that was sent to the entire faculty. *Id*.   [**Additional Proposed Findings**.  ***However, in her testimony she admits that her email was not true, but rather she was saying Murray was spreading lies and that "…there was lies not only being put out by him…" See Abbascia Transcript Pages 17-18.   The reason for this proposed finding is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole.**].

### Additional Proposed Abbascia Findings from Section II above

55.    The Tara Abbascia ("Abbascia") complaint arises out of communications between her and Murray wherein Murray questions and is critical of her ability to continue to effectively do her job as Faculty Association President in the context of an emotionally charged debate concerning ratification of a disputed proposed tentative contract agreement ("T.A."), which had already been rejected once by the faculty, in the midst of which Abbascia had announced she would be leaving the college in June, and as a consequence of which he called her a "lame duck" and called for her resignation.  (Abbascia Complaint).

56.    During the period of the above communications, Abbascia and Murray were also at odds because Abbascia supported and advocated for approval of the T.A. by the faculty, while Murray was a vocal opponent. (Murray Tr. 74- 93).

57.    The term "lame duck" is frequently and commonly used to describe an elected official who was completing the remaining term of his or her office for a position for which they had been defeated or were not seeking re-election and is therefore viewed to be ineffective due to the perceived lack of incentive or motivation.  *See., e.g*., *The Britannica Dictionary*: "[Defining 'lame duck' as] 1 . . .  an elected official whose time in an office or position will soon end . . . 2 . . . a person, company, etc., that is weak or unsuccessful and needs help." https://www.britannica.com/dictionary/lame-duck.

58.    Murray's communications and criticisms about which Abbascia complains all

involve, directly or indirectly, Murray's call for Abbasica's resignation in the context of a faculty vote that rejected the proposed T.A., indicating a lack of confidence in her by the faculty, as well as her not having a personal or professional stake in the outcome since she would not be seeking re-election as Faculty Association President nor would she be subject to the terms of any new contract—a "lame duck." (Murray Tr. 74-93).

59.    Murray and Abbascia had been colleagues and friends for about five years including a brief period during which they had an intimate relationship. (Murray Tr. 75).

60.    Murray was a mentor and supporter of Abbasica when she declared to run for Faculty Association President in October of 2020. ( Abbascia Tr. 8, 11).

61.    The undisputable fact that communications at issue were discussions among union members about union business is established and corroborated by the fact that all but one of the communications about which Abbascia complains were sent to all faculty on the faculty listserv, which, under the CBA, is the agreed upon means of CCRIFA member communications. *See* CBA (CCRI/CCRIFA CBA, Article II, subsection A. recognizes a union faculty member's "right to use faculty mailboxes and email communications, including mass distributions."). (Murray Tr. 74-93).

62.    The private email(s) about which Abbascia complains is a communication from Murray wherein he is requesting that Abbascia, as President of the CCRIFA, appoint him as lead negotiator for the TA, and to clarify who she was referring to when she said in her email that lies were being spread regarding the TA. Abbascia Complaint. (Abbascia Tr. 15 -20).

63.    As further confirmation that the communications and dispute in question involved solely union business, Abbascia a) seeks as a remedy in her complaint "that [Murray be placed on] paid administrative leave pending investigation [as] an appropriate action. Taking away his ability to use CCRI email to communicate with faculty until this complaint has been investigated, I feel is appropriate" and b) identifies as witnesses, Leslie Florio, the NEARI union representative for the CCRIFA, and the "CCRI Faculty Association." (Abbascia

Complaint).

64.    Although Abbasica makes the claim that she was a "target" of Murray as "president of the union and as a woman," her bald-faced, subjective claim she was targeted as a woman is without any logical or factual basis—she was the union President who recommended approval of a T.A. rejected by the faculty and then announced her intent to resign—and clearly was the "target" of Murray's criticisms on that basis.    (Abbascia Complaint)  Abbascia also recognizes that as Union President " I can take a lot of criticism. That's part of the job." (Abbascia Tr. 23).

65.    Indeed, in her sworn testimony, when asked twice whether Murray's alleged "bullying" was directed at men or just women, Abbasica concedes both times that "maybe it just so happens that a woman" is Union President, President of the College and Vice President of Academic Affairs.  (Abbascia Tr. 30, 35).

66.    Abbascia left CCRI on June 17, 2023.  Abbascia emphatically swore under oath that her leaving the College had nothing to do with Murray. (Abbascia Tr. 24).

### *Respondent Steven D. Murray*

67.    Previously, there were several other deans, including interim Dean John Cole, Interim Dean Allyson Handley, and Dean Brian Brophy-Baerman.  **[Additional Proposed Findings***.  Each of the deans he has worked with closely have given him excellent reviews and none have ever indicated that he is a bully or discriminates against anyone.  The one female dean he has had in the last few years Dean Allyson Handley, now promoted to the position of VP of Academic Affairs for CCRIR wrote in 2021 Chair Evaluation that "Chair Murray received an overall 'outstanding' evaluation from Interim Dean Handley across all rating categories included in the rating scale."  With respect to "Category Leadership" #1 on the Evaluation form used by the Deans she wrote "represents the department effectively within the College."  Dean Handley also wrote that Murray "Exceeds Expectations" and in the section on "Communicates Effectively" she wrote for "Resolves Conflicts Fairly"*

*"Satisfactory" and for " Successfully Articulates program's image and academic reputation"*

*"Exceeds Expectations." Other Deans gave similar positive reviews.*

68.      The semester was scheduled to begin the following Monday, January 23, 2023. Payroll, workload reports, faculty workload were all due by *the next day* January 20, 2023. **[Reason for Additional Fact.  The reason is for clarification and context.].**

69.      Professor Murray recalls going to the administrative offices with the intention of speaking with Dean Stargard on January 20, 2023. The office of Ms. Del Sesto and Maya Geraldo is located next to it. *Dean Stargard was not in his office*. **[Reason for Additional Fact.  The reason is for clarification and context.].**

70.      The dean noted *that DelSesto said* he was gesturing with his hands and appeared red in the face.  Professor Murray noted during the interview that "as [Dean Stargard] was saying I move my hands around, he was moving his hands around.   **[Reason for Additional Fact.  The reason is for clarification and context.  Stargard did not witness the interaction in question].**

71.      Professor Sneesby responded by email requesting that her name not be used in any emails to the faculty concerning the matter.  [**Additional Proposed Fact**.  *Murray neither before nor after this request identified Sneesby in his emails to the faculty regarding the lack of power of the Faculty Senate or the administration's manipulation of the Faculty Senate for its own purposes.*   **Reason for Additional Fact**.  The reason is for clarification and context.].

72.      They went out into the hallway and Professor Murray indicated that Professor Sneesby berated him.  [**Additional Proposed Fact**.  *Witness Lolita Villaneuva confirmed Murray's account of this interaction*.]

73.      When asked if such conduct would stand out in his mind, he indicated that he could not answer that question.  [**Additional Proposed Finding**.  *Murray did recall that on one occasion* ~~subsequent to~~ *at a CRC meeting in October of 2022, wherein after Murray was*

**Page 37 of 63**

*recognized by the Committee Chair to speak, Dean Nauman (who was sitting approximately*

*30 feet away at the other end of the room) interrupted him and he asked her to please not*

*interrupt him and raised his hand to signal the same.  Professor Mazin Adam confirms*

*Murray's recollection of this interaction.***].**

74.    Professor Murray observed two officers at the meeting when he arrived. Professor Murray viewed it as intimidation.  **[<u>Additional Proposed Finding</u>.  *Campus Police and Sneesby both confirmed that they were asked to attend the meeting by Sneesby because Murray was attending this meeting that is open to the public.***]**

75.    She exited the room and approached Professor Murray and began to swear and holler about John Leidecker, an attorney who was involved with the union.  *He reported the incident to HR at the College and they dismissed it as outside of their jurisdiction as a Union matter*.  He also recounted another meeting that occurred on February 11, 2020 at a meeting of the "Little Chairs" where Professor Valicenti allegedly referred to Professor Murray and other faculty members who are not present as "thuggish."   Professor Murray was not present at that meeting.  *He nevertheless reported that matter to HR at the College and again the College dismissed it.*   [<u>Reason for Additional Proposed Findings</u>.  **The reason is for clarification and context and to emphasize that by CCRI's own policy, such conduct, like Murray's conduct at issue herein, is protected concerted conduct not subject to sanction or regulation by the college].**

76.    With respect to a letter being circulated to faculty members to support Professor Murray's reinstatement as the Chair of his department, Professor Murray denied that there was any altercation between them.  *Valicenti filed a Complaint with HR at the College and after an investigation the Complaint was dismissed as unfounded.*  Instead, he described it as "two people who had been in an intimate relationship."  *In 2019,* Professor Murray was removed by President Hughes and VP Costigan as the Chair of his department.  A number of people supported his reinstatement as Chair.  When Professor Valicenti declined to sign the letter,

Professor Murray went to her office. He denied any foul language or anything pertaining to her gender *during that interaction*. *Again, Valicenti filed a Complaint with HR as referenced earlier in this paragraph and after an investigation it was dismissed as unfounded.*

77.     With respect to an ~~incident~~ *a meeting of the CRC"* involving Leslie Killgore, he recalls attending a CRC meeting in which Professor Killgore referred to herself *in front of the entire CRC* "as a bitch."   Professor Murray found the comment to be inappropriate. Professor Killgore *apologized to the CRC* for her comment.    He then notified the Vice President of the College and asked that the minutes reflect her inappropriate language.  [**Reason for Changes/Additional Proposed Findings.  The reason is for clarification and context.**].

78.     Professor Murray denies that any of his interactions with the Complainants or any of the incidents described by them were motivated by gender*.   As Union President and as a Union Member,* h e  recounted that he had "many professional disagreements" with men in position of authority, such as the President of the Faculty Association, Shawn Parker.

## Additional Proposed Murray Findings from Section II above

79.     Respondent Steven D. Murray ("Murray") is a member of the Bars of the U.S. District Court for the District of Rhode Island, State of Rhode Island, Commonwealth of Massachusetts, and the Supreme Court of the United States and is a former Assistant Attorney General for the State of Rhode Island.

80.     He has taught law courses at CCRI for almost 32 years.

81.     He was President of the faculty union, CCRIFA, from April of 2016 until November of 2020.

82.     He is currently Vice President of the faculty union and an alternate member to the CCRIFA Executive Committee.

83.     He has a stellar record of largely "exceeds expectations" annual reviews and has never been disciplined by CCRI.

84.     He was elected Chair of the Criminal Justice department in 2012 and was

reelected unanimously on three subsequent occasions, most recently in February of 2023.

85.    He also recently received an overall "outstanding evaluation" as a Department Chair and teacher and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty." (Evaluation of Murray by Dean Handley, April 22, 2021).

86.    However, as a vocal and passionate advocate, both as President and a member of the CCRIFA, seeking to improve the terms and conditions of employment on behalf of his co-worker union faculty members, he is and has been frequently at odds with the CCRI administration.

87.    In his roles as Faculty Association President and Department Chair, Murray has had severe disagreements over the years with President Hughes and VPAA Costigan that have led to faculty "No Confidence Votes," picketing, grievances and Unfair Labor Practice charges. Murray and Costigan have each filed complaints with HR against each other.[16]

---

[16] Murray's clashes with the CCRI administration over the years are numerous:

- February 2017  https://www.golocalprov.com/news/ccri-leadership-targets-difficult-faculty
- May 2017, at a meeting of the Strategic Planning Committee, Murray made a statement about a sentence in the draft report that Murray disagreed with that dealt with the abilities of "all" students at the College "are motivated, capable and committed to attaining academic achievement." Before Murray could finish speaking, VP Costigan loudly interrupted Murray, stating that she was repulsed by what Murray said, that Murray was negative, that Murray did not belong working at the College. She added that Murray does not represent the faculty." She went on to say "she had heard enough from Murray." VP Patten who was Chairing the Committee then proceeded to move the meeting forward and by recommending the change Murray suggested be made. Murray filed a complaint with HR for Costigan violating the Policy Against Violence in the Workplace. Almost immediately and before any investigation, President Hughes put out a statement that she fully supported VP Costigan. The College brought in an attorney (Peter Harrington) who is employed in the Administration at URI to conduct an "independent investigation." His report concluded that there had been no violation of the policy.
- June 2017 – Student Senate votes no confidence in Hughes and Costigan over treatment of Professor Britton re the observatory. Students and faculty (including Murray) picket at the College.   http://www.rhodybeat.com/stories/ccri-senate-voices-dissatisfaction-with-president-over-observatory,25691   https://www.providencejournal.com/story/news/education/2017/07/08/dispute-over-pay-at-ccri-observatory-spurs-protests/19252784007/
- August  2017,  article in the Providence Journal, "CCRI president rocks the boat with changes aimed at helping students" that contained criticism by Murray of Hughes' decisions and lack of qualifications. The article also discussed the Student Government's vote, in June 2017, of No Confidence in Hughes and Costigan.

https://www.providencejournal.com/story/news/politics/state/2017/08/25/ccri-president-rocks-boat-with-changes-aimed-at-helping-students/19145823007/

- Fall 2017, Hughes and Costigan tried to unilaterally impose a "Jterm". There was virtually no involvement of the faculty in this decision and Murray led the opposition to the implementation of "Jterm" and it did not go forward in 20218. https://www.providencejournal.com/story/news/education/2017/11/08/ccri-suspends-planned-january-term-amid-faculty-union-opposition/17124401007/

- October 2017, Murray notified Hughes of a potential "nepotism" issue involving Dean Sabbagh. https://www.golocalprov.com/news/ccri-faculty-union-head-raises-nepotism-concerns

- April 2018, Murray was reelected as President of the Union. On April 28, 2017, Costigan asked to meet with Murray. From the outset of the meeting, Costigan was insulting towards Murray regarding the union election results (Murray had run unopposed and approximately 130 faculty voted for Murray, but Costigan mocked Murray for not getting a "majority" of the approximate 300 faculty eligible to vote). The meeting ended with her screaming at Murray after she misunderstood a comment Murray had made. Murray filed another complaint with HR re her conduct and she filed a complaint against Murray. Both complaints --- no decision was ever issued by HR.

- Fall 2018, Hughes and Costigan again seek to unilaterally to impose a "Jterm/Winter session". There is even greater faculty push back this time than last year.

- In November 2018, The Union Executive Committee met, and a motion was passed to call for a vote of "No Confidence" in President Hughes, VP Costigan, and Dean Sabbagh, due to their continued failures of leadership and that they either resign or be removed. 271 Faculty were eligible to vote. 219 voted. 160 voted yes /approve the motion of "No Confidence" -- 34 voted no -- 25 voted to abstain. The overwhelming vote of "No Confidence" received local and national media coverage. Hughes released a statement voicing disappointment and her view that "Change is hard." The Council on Postsecondary Education and Governor Raimondo voiced their strong support of Hughes. https://warwickonline.com/stories/council-backs-ccris-hughes-in-wake-of-unions-no-confidence-vote,138903 https://www.washingtontimes.com/news/2018/dec/4/faculty-at-ccri-college-vote-no-confidence-in-lead/

- January 2019 --Despite the near complete lack of support of the faculty (full time and adjuncts), Hughes/Costigan went forward with their "Jterm/Winter Session" beginning on January 2, 2019. The faculty (led by Murray and others) conducted Informational Picketing, with protest signs, leaflets and bumper stickers, at the College on January 2, 2019 and January 9, 2019. The media (Channel Ten news, Golocalprov, the Providence Journal and other media covered the story, and Murray gave interviews that contained negative comments about Hughes, Costigan and the Jterm/Winter Session. https://www.neari.org/blog/the-trouble-with-jterm https://www.newportri.com/story/news/local/2019/02/13/ccri-faculty-critical-of-j-term-outcome/6004716007/ https://turnto10.com/news/local/faculty-at-ccri-protest-short-winter-term https://www.golocalprov.com/news/ccri-faculty-picket-following-no-confidence-vote-in-president-hughes

- On Tuesday, January 22, 2019, the day classes start, Hughes notified Murray by letter that his appointment as Department Chair was being terminated by her.

- January 23, 2019 – VP Costigan sent an email to Murray's department faculty and copied Melissa Fama (Assistant VP), Dean Busby and Dina Levitre (assistant Dean) notifying them that yesterday, Hughes terminated the appointment of Murray as department chair. Costigan called for a department meeting to elect a new chair to serve out the remainder of Murray's term.

- January 23, 2019, about 50 faculty members, including Murray, attended a meeting of the Council on Postsecondary Education held at CCRI to object to Hughes' leadership. https://www.golocalprov.com/news/new-ccri-president-strips-leading-critic-of-free-tuition-program-of-departm

88.    Despite his differences with V.P. Costigan, she has praised Murray for his "excellent Criminal Justice Program" and personally acknowledged and recognized him as a worthy adversary, despite their professional differences.  (Costigan email dated April 10, 2018, and Murray exhibit of gift/note from Costigan in April 2020).

---

- January 28, 2019 – ProJo article – "CCRI union president: Demotion 'An Obvious Act of Retaliation'    "https://www.providencejournal.com/story/news/education/2019/01/28/ccri-union-president-demotion-an-obvious-act-of-retaliation/6165761007/
- January 29, 2019 – GoLocalProv article – "CCRI Faculty Support Leading Critic of Free Tuition Program Stripped of Department Chair" https://www.golocalprov.com/news/leading-critic-of-free-tuition-says-ccri-president-slashed-his-pay-illegall
- January 30 , 2019 – Murray sent a Letter to Tim DelGuidice, Chair, RI Office of Postsecondary Council, requesting clarification re "Committee of the Faculty" pursuant to 16-33.1-1-3  No response from him.
- February, 1, 2019 – Murray was unanimously re-elected as department Chair.
- February 4, 2019 –-- Hughes again terminates Murray as department Chair
- February 13, 2019 – ProJo article "CCRI calls Winter Jterm a success, but some faculty leaders don't buy it".  https://www.providencejournal.com/story/news/education/2019/02/13/ccri-calls-winter-j-term-success-but-some-faculty-leaders-dont-buy-it/5984324007/
- February 13, 2019 Approximately 50 faculty (including Murray) attend the meeting of the Office of the Postsecondary Council to protest Hughes leadership and eight faculty members read parts of a memo detailing Hughes' failure with Jterm.
- February 22, 2019 – per the order of VP Costigan – Murray's department holds another election of Department chair – result – Murray was unanimously elected (again) as Chair.
- February 25, 2019 – Hughes emails Murray that she has terminated Murray's appointment as Chair again (third time) based on the allegations detailed in her January 22, 2019 letter to Murray.
- 4/25/19 Murray Chair matter is settled -- MOA signed by Murray with an NDA.
- 4/29/19 President Hughes appoints Murray as Chair.
- March 2020 – Murray's term as CCRIFA President is supposed to end in April . Murray agrees (covid) to continue as President until Nov 2022 when CCRIFA will hold an election.
- December 29, 2020 The Union representing Education Support Professionals at CCRI vote No Confidence in Hughes and Ogden.  The No Confidence vote Murray led in 2018 is referenced in paragraph 6 of the article. https://www.golocalprov.com/news/ccri-education-support-professionals-vote-no-confidence-in-hughes-citing-po
- June 2021 – Hughes' contract is up for renewal – CCRIFA and Support Professionals Union at College write to Council on Postsecondary Education voicing No Confidence in Hughes. https://www.providencejournal.com/story/news/education/2021/06/08/higher-education-council-renews-ccris-president-hughes-contract/7610836002/.
- Fall of 2022 – There is a dispute with Murray and Costigan/Stargard re Course Scheduling, Overload courses and their proposed Certificate for Law Enforcement Certificate .
- Feb 20, 2023 President Hughes re-appoints Murray as Department Chair.
- February 28, 2023 President Hughes banishes Murray.
- March 2023  Hughes announces her resignation effective August 2023. No confidence votes are mentioned in articles.  https://finance.yahoo.com/news/ccri-president-meghan-hughes-resigning-202634059.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAABDDz_WR9vMF92Fb0me4-Ga7S2uCKvygitxedE3e72qoNxDvvPOL0_0tX535-nH3y1aRFg1ivlJ7DEsRHmnuq3Qn-ycUCfKiKAPYVnDZCAkFUndAoLxsBS-MCIryBIRf59TSNvi5FP-ybB8EdAAox5y0iRYl3z0-oMa441xBehFM

89.     Over the years, Murray has filed numerous grievances against CCRI, nearly all of which have been successful, including one that was settled last fall.

90.     Murray has also been a longstanding critic of the lack of shared governance between faculty and the administration at CCRI and a vocal advocate for increasing the power and role of the faculty in that regard.

91.     Perhaps most significantly, Murray also currently is and has been a vocal advocate critical of the proposed Tentative Contract Agreement ("T.A.") endorsed both by union leadership and CCRI, which is the subject of recent and ongoing intense and fervent debate among the CCRI stakeholders.

92.     On February 28, 2023, in the midst of a fierce debate and imminent second vote on the above mentioned T.A., Murray was locked out of his office, denied access to his CCRI email account—which, under the CBA, is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with, among others, the then CCRIFA Faculty Senate President, Complainant Sneesby ("Sneesby) and then Faculty Association President, Complainant Abbascia ("Abbascia").

93.     The basis of this action against Murray by CCRI was purported Title IX violations arising out of three totally separate and unrelated communication encounters ("Complaint"), one of which occurred over *one month* prior (and had already been informally addressed by Dean Stargard) and two of which occurred about two weeks prior to the issuance of the Complaint.

94.     Murray has never been disciplined for misconduct or otherwise during his 32-year tenure with CCRI.

95.     Murray has served at the College as a professor since 1993 and interacted with thousands of female students and hundreds of female professors, staff and administrators without incident or claim of gender discrimination.

96.     Murray has worked closely with female members of his department (all of

whom have provided statements and/or been interviewed), including his assistant, Maureen Papagolos (over 20 years), Professor Sheryl MacDougall (over 20 years), current assistant Tiffany Jones (1 year) and Lolita Villanueva (9 years -- she works directly outside his office door as the assistant for Social Sciences). Each of these women stated unequivocally that Professor Murray has always been respectful and professional in his interactions with them and with all others.

97.    The deans who have supervised Professor Murray and interacted with him regularly, including Dean Stargard, Dean Cole, Dean Handley and Dean Bryan Brophy-Baermann, in their annual Performance Reviews, have all provided glowing reviews of Professor Murray.  None of the deans wrote anything in their annual Performance Review about Professor Murray discriminating against anyone, creating a hostile work environment, or the like.

98.    One of those deans, Allyson Handley, EdD, who was dean in 2020, was recently appointed as Vice President of Academic Affairs at CCRI.

99.    In 2020, Dean Handley, as Murray's supervisor, in her annual Performance Review, praised Professor Murray: "Chair Murray received an overall "outstanding" evaluation from [her] across all rating categories included in the rating scale. Chair Murray is to be commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty" within the Criminal Justice department. He manages his department with dedication and efficiency." "He is to be commended for his many years of service to faculty welfare through his leadership of the faculty union. Since stepping down from that demanding leadership role recently, he should be encouraged to utilize his considerable talents and expertise within other academic leadership roles at CCRI."

100.    Dr Lauren Webb, Director of Academic Program Review and Accreditation, who reports to V.P. Costigan, stated she had many interactions with Murray regarding assessments and other issues and that Murray never treated her inappropriately.

101.    Maya Geraldo, Manager of Academic and Faculty Initiatives, who also reports to V.P. Costigan, stated that Murray had disagreements with men and women and that Murray had spoken in a similarly critical manner to male deans including John Cole and Bruce Busby. She also states that Murray treated her with respect.

102.    Murray was critical of and has had public disagreements and disputes and interactions with numerous male colleagues in positions of authority, including, but not limited to, Dean Bruce Busby, Dean John Cole, Dean Bill Stargard, Dean Thomas Sabbagh, and Professor Parker, when he was Faculty Association President, Professor Richard Tessier, when he was Vice-President of the Faculty Association under Sneesby, and Professor Joseph Arsenault, Program Director for Homeland Security and Emergency Management.

## VIII. ALL THE PROPOSED FINDINGS IN THE "NON-PARTY WITNESS" SECTION THAT DO NOT RELATE TO THE SPECIFIC INTERACTIONS IN DISPUTE MUST BE STRICKEN AS THEY ARE IRRELEVANT TO THE CLAIMS ASSERTED IN THE COMPLAINT.

### A.    The Investigator's proposed findings in the non-party witness section that do not relate to the specific interactions in dispute must be deleted as they are incompetent and irrelevant as to whether the complainants were subjected to any gender motivated conduct <u>as to each of them</u> that was so severe, pervasive, and objectively offensive as to effectively deny the complainant to access to any program or activity of CCRI.

As stated previously above, pattern and practice Title IX violations relate solely to systemic, institutional violations—it does not apply to conduct by individuals. **Where, as here, a Title IX violation has been alleged, the complainant must show that the alleged perpetrator *engaged in conduct <u>toward the complainant</u>* that was *motivated by gender and was so severe, pervasive, and objectively offensive as to effectively deny the complainant access to a program or activity of CCRI. As a matter of law, conduct toward others is irrelevant to this analysis*.** *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 782 (8th Cir. 2003) ("Each Plaintiff, in other words, ***must show a practice or pattern of harassment against him***. A single incident or isolated incidents generally will not be sufficient.") (emphasis added).

Nor is there any significance in this case that all three complainants happen to be women, particularly given the context. First, over two-thirds of the CCRI leadership, including President Hughes and V.P. Costigan, and over 60% of the faculty at CCRI are women. Accordingly, if a faculty member is involved in an interpersonal conflict with a colleague or a member of the administration leadership team at the college, the chances are that it is with a woman. Second, the communications and conduct at issue arose in the context of a fiercely and hotly contested faculty association vote on a proposed T.A., controversy over the lack of shared governance, and the administration's attempt to use the Faculty Senate for

**Page 45 of 63**

its agenda, wherein Murray's position was at odds with both that of the leadership of the Faculty Senate and the CCRIFA and the CCRI administration, ***the Presidents of which are all women and two of which are complainants.***  The undisputed and ONLY READING of the evidence in the record is that the communications and conduct were motivated solely by Murray's sincere and vigorous advocacy of his positions on behalf of his co-worker faculty members and that his communications were directed at the complainants in their respective official capacities, ***not as women.***  *See, e.g., Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 951 (N.D. Ill. 2017), aff'd, 933 F.3d 849 (7th Cir. 2019) ("The [alleged perpetrator] female student's activism and public statements were all in response to a specific act and were directed at a specific individual, not all males, and thus there was no actionable claim for Title IX sexual harassment.").

Finally, the additional fatal flaw in the efforts of CCRI to manufacture a Title IX violation that does not exist is the failure and inability to identify similarly situated males that were treated differently by Murray in similar contexts ***as they do not exist.***  There is no similarly situated male who helped found a Faculty Senate that lacks true shared governance power, was President while the administration was manipulating the Senate to advance its agenda, and while agreeing that both were a problem, refused to publicly acknowledge and advocate for and seek remediation of these deficiencies.  There is no similarly situated male CCRIFA President with whom Murray had a professional, personal, and briefly intimate relationship, who negotiated and advocated for faculty approval of a T.A. that was resoundingly rejected by the faculty, and then announced that he would be leaving the college in a few months in the midst of the controversy over approval of the T.A. and declined to resign and allow a new President with a stake in the outcome to complete negotiations.  There is no similarly situated male assistant to VP Costigan, who, after a series of emails regarding confusion over the interpretation of a provision of the CBA, sent out an email on the business day prior to the beginning of the semester which contained a last-minute change in the disputed interpretation, as consequence of which Murray was unable to either finalize the assignment of faculty or complete and submit a faculty workload report, both of which were due that day, and happened to be in the office when an agitated Murray went to seek clarification from Dean Stargard who happened not to be there.  Each of these is a unique situation with only one similarly situated component—Murray acting in his capacity as a vocal and passionate advocate for the best interests of the college and all his fellow faculty members.  Of that, he is guilty as charged.  "The similarly situated requirement is crucial because 'without it a plaintiff would only have to point to one . . . [person] who was treated better than he . . . [which] would be meaningless . . ..'"  *Bull v. Bd. Of Trustees of Ball State Univ.*, No. 1:10-CV-00878-JMS, 2012 WL 1560461, at *5-6 (S.D. Ind., May 2, 2012) ("[S]imilarly situated employees must be 'directly comparable to the plaintiff in all material respects . ..'").

There is no competent evidence in the record that Murray treated females any different than males, similarly situated or otherwise.  Such "other" evidence in the record that exists is incompetent lay opinion, conclusory, and equivocal, which, if it leads to any conclusion, it is that Murray treated all those who disagreed with him in the same manner, whether male or female.  *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) ("Just saying so is not enough.  A recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination.. .  [C]onclusory allegations that the male students were treated differently than similarly situated female students based on sex [is insufficient].")

Accordingly, for all the foregoing reasons, the Investigator's proposed findings of facts related to purported "pattern and practice" evidence must be stricken.

**Page 46 of 63**

B.    **Proposed Changes and Additional Proposed Findings to Non-Party Witness Section**

To the extent the Investigator does not remove the proposed findings of facts that do not relate to the specific interactions in dispute and with respect to those that do relate, Murray proposes the following changes and/or additional proposed facts:

### *Dean Suzanne Carr*

1.    On one occasion, Professor Murray moved to table all proposals, which was seconded and ~~voted~~ *approved by a majority of the Committee* with the result being everyone walked out of the meeting.  **[Reason for Proposed Change.  The reason for this change and additional fact is context and clarification.].**

2.    On two specific occasions, she recalls conduct that directly affected her department.   On one occasion, Joseph Arsenault, Program Director of Fire Science, was working on developing a new certificate program in public safety.   **[Additional Proposed Fact.  *Professor Arsenault's program in Emergency Management and Homeland Security always had very low enrollment and eventually was terminated by VPAA Costigan and Arsenault left the College*.]**

3.    As a result, the certificate initiative was not pursued at CRC.   **[Additional Proposed Fact**.  *The Chief of Police Providence Police Department Hugh Clements and Lt Zarella of the RISP, who runs the Municipal Police Academy, both told Murray that the certificate VPAA was proposing would have no value.   The CJLS department faculty unanimously voted against the proposal.   VPAA Costigan said she would no longer pursue it.   After Murray was placed on leave and was banished from campus and could therefore no longer actively oppose it, VPAA Costigan pushed the certificate through the CRC*.]**

### *Dean William Stargard*

4.    Dean Stargard started to receive long, combative emails from Professor Murray.

**[Additional Proposed Findings**.  *In March of 2023, (after Complainants filed their complaints) Dean Stargard completed an "Evaluation of Chair Murray by Dean Stargard".*

*The evaluation was very positive.  Under the category of "Exhibits Leadership" "represents the department effectively within the College "Satisfactory" was noted. "Deals with faculty fairly and equitably" "Exceeds Expectations" was noted. In the category "Communicates Effectively" "Is an effective advocate for faculty and staff" "exceeds Expectations" was noted. "Resolves conflicts fairly" "not observed" was noted. "Articulates needs of the department to dean and other College officials" "Satisfactory" was noted. In the comments Dean Stargard wrote "Steve is a strong advocate for his department He shares information with his faculty and staff colleagues and articulates the need of the department to me." In the category of "Manages the Affairs of the Division" of the 8 Questions he noted "Exceeds Expectations in response to 5 questions "Satisfactory" in response to 2 Questions and "Not Observed" to one Question. In the comments he wrote " As an experienced Chair, Steve does a very good job in managing the day to day responsibilities of payroll, grade submissions, etc. in his department." Nowhere in the evaluation by Dean Stargard is there any mention of negative or unprofessional conduct by Murray.*

*The "evaluation" of Chair Murray by Faculty" March 2023 was likewise an affirmation.  For each and every Question faculty answered that Murray "Exceeds Expectations" noted the outstanding work Murray has done at the College.*

**5.**    Dean Stargard learned of the January 20, 2023 incident between Professor Murray and  Ms. Del Sesto when she appeared upset in his office, describing Professor Murray as being angry towards her.  Concerned with the behavior, Dean Stargard scheduled a meeting with Professor Murray, along with a union representative.    **[Additional Proposed Facts.** *Dean Stargard wrote a letter to Murray saying he wanted to meet with him as a "counseling" matter and that it was a "non-disciplinary" meeting.***]**

6.    Professor Murray took exception to  a comment by Professor Killgore, describing herself as appearing to be a "bitch" sometimes, indicating before the attendees of the meeting that the language was inappropriate and that she must apologize.    [**Additional**

**Proposed Fact**: *Murray denies asking Killgore to apologize.  Alternatively, Stargard's hearsay statement should be stricken.].*

7.    Dean Stargard recalls an occasion when Professor Murray mentioned~~, in passing~~ *in an email sent to him by Murray documenting the event* that he was speaking with a woman, *Professor Cheryl Amantea of the Business department who walked into his office uninvited when he was in the middle of a project* at his office, and she placed her hand on his shoulder.  The incident occurred in early fall of 2022.  Professor Murray notified Dean Stargard and the Chair of the Business department was questioning whether such physical contact constituted sexual harassment.  **[Reason for Changes.  The reason for the changes and proposed finding is self-explanatory and necessary for context, accuracy, and to prevent the findings from being misleading in light of the factual record as a whole.].**

8.    On another occasion, in mid-February 2023, Professor Sneesby approached Dean Stargard, stating "I don't believe what just happened."  She appeared close to tears.  She indicated that Professor Murray had been very insulting towards her, complaining about her doing something wrong.  **[Comment and Request to Strike:  First, this is rank hearsay and should be stricken on that basis.  Second, it is highly prejudicial and misleading and contains no date, time, place, or circumstance and is merely a bald-faced allegation without context and therefore lacks probative value.].**

*Maya Geraldo*

9.    On another occasion, Ms. Geraldo witnessed Professor Murray*, while seated,* raise his hand towards Dean Nauman*, who was thirty (30) feet away,* in order to *signal her to* stop ~~her from~~ talking.  **[Reason for Changes.  The reason for these changes are self-explanatory.].**

10.    Ms. Geraldo stated that she has observed Professor Murray behaving in an insubordinate manner towards the former interim dean, Bruce Busby.   In one incident, which occurred possibly in late 2018, Professor Murray *had been removed as department Chair.*

~~was put on leave~~.  However, on that day, interim Dean Busby resigned.  ***Busby was caught being untruthful at a hearing involving his attempt to justify Murray's removal as department Chair and when the administration withdrew their attempt to remove Murray as Chair and reinstated Murray, Busby immediately resigned and left the College.***  Ms. Geraldo found that Professor Murray treated "men in as bad a way as women."  **[<u>Reason for Changes</u>. As stated numerous times previously and can be confirmed by Human Resources, Murray was never placed on leave until the current dispute.  The reason for the changes is to correct this error and the additional facts place the interaction in context.].**

### *Soudabeh Valicenti*

11.     ~~She recalls other specific instances in which Professor Murray treated women badly at the College, including frequent yelling at Vice President Costigan during chairs' council meetings and writing demeaning emails to union president Tara Abbascia. There were so many occasions, according to Professor Valicenti, that she could not recall many of the specifics.~~

**[<u>Comment and Request to Strike</u>.  Murray disputes this finding as written as the deleted portion constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which has no probative value with respect to the Complaint at issue.].  <u>Additional Proposed Facts for Context</u>:  Murray and Valicenti had an intimate personal relationship that he ended.  She was upset with him when he ended it.  JoAnn Albro the department assistant of the Math department can verify the relationship existed as can Valicenti's daughter, Emily Valicenti.  VPAA Costigan was also aware Murray and Valicenti were involved in a romantic relationship as she commented to people about it.**

### *VP Rosemary Costigan*

12.     Professor Murray was an opponent of the adjunct professors having a contract.

**[<u>Additional Proposed Fact</u>:  *Murray denies he opposed* Adjunct Faculty members right to Unionize.  Alternatively, Costigan's statement should be stricken.].**

13.    She recalls that Dean Allison Hanley, who previously served as a college president, was treated poorly by Professor Murray.    Dean Hanley filed a complaint with Human Resources and directly informed Professor Murray that she found him to be an ageist and sexist. [**Comment and Request to Strike or Clarify**:  **First, this is rank hearsay and should be stricken on that basis.  Second, it is highly prejudicial and just plain false and contains no date, time, place, or circumstance and is merely a bald-faced allegation without context that have no probative value nor relevance to the Complaint.  If you refuse to remove this rank hearsay comment of dubious credibility and relevance, then my client proposes the following**: **Additional Proposed Finding**.  **[*No such Complaint was ever filed, which can be verified by Human Resources.  Additionally, Dean Handley wrote a glowing evaluation of Chair Murray*.]**

14.    Dr. Costigan recalls a meeting in August of 2017 in which the topic was the creation of a master schedule.  Present for the meeting were Professor Murray*, in his capacity as Faculty Association President,* legal counsel for NEARI and legal counsel for the College. Professor Murray became upset and threw his hands up, flailing.  ~~He behaved in a demeaning manner towards Dr. Costigan.~~ [**Comment.  This finding must be deleted as it is a subjective lay opinion asserting a highly prejudicial and vague characterization without disclosing any of the underlying facts upon which the conclusion was based.]**

15.    ~~He stated, "Rosemary, everybody knows your nephew was killed."  He was flailing his arms and gesturing aggressively.  Dr. Costigan became upset and told Professor Murray that he needed to leave.  She said, "you are a despicable person."~~  [**Comment.  This entire finding must be deleted as it is out of context, does not disclose all the salient facts and circumstances of the meeting or the discussion, and contains a subjective lay opinion asserting a highly prejudicial and vague characterization without disclosing any of the underlying facts upon which the conclusion was based.]**

16.    Dean Nauman also interacted with Professor Murray in the context of the

Chairs' Council meetings.  ~~She finds that Professor Murray is "always looking for conflict."~~ ~~Likewise, during the informal "Little Chairs" meetings, Professor Murray tends to draw into~~ ~~his circle the male department chairs~~.  [**Comment.  The first part of the finding must be deleted as it constitutes a subjective lay opinion asserting a highly prejudicial and vague characterization without disclosing any of the underlying facts upon which the conclusion was based.  The second part of the finding must be deleted as it is absolutely false since the "Little Chairs Meeting" is just for department chairs without the administration present.  That is the entire purpose of it.  Accordingly, Dean Nauman never attended a "Little Chairs" meeting, since only faculty who are department chairs are invited and she was never a department chair.**].

17.    Dean Nauman attended a meeting in the President's conference room in ~~the spring of 2022,~~ ***October of 2022***, which was attended by approximately 25-30 colleagues from the College.  The meeting  was chaired by Dean Stargard.  ***At one point, when Murray had been recognized by CRC Chair Stargard to speak,*** Dean Nauman was speaking, Professor Murray raised his hand towards her and ***asked her not to interrupt him*** ~~said "I did not ask you that question~~."  [**Reason for Changes:  This is out of context, hence the reason for the additional proposed factual findings, and contains inaccurate information based on all the evidence in the record, in particular the interviews of both Dean Stargard and Murray, hence the proposed deletion**].

### *Holly Susi*

18.    She decided not to attend because she was copied on many emails from Professor Murray. ~~that were "bombastic," "insulting" and appeared to her to be "misogynistic."~~ She also had seen him raise his voice ***at*** ~~and insult~~ people at meetings. [**Comment.  The indicated factual findings must be deleted as they constitute subjective lay opinion asserting highly prejudicial and vague characterizations without disclosing any of the underlying facts upon which the conclusions were based.**].

*Alix Ogden*

19.     Professor Abbascia complained about how stressful Professor Murray can be ~~and that his behavior towards her was part of her decision to leave the College~~.  Professor Abbascia made it clear that it was not her exclusive reason, since she had a very good opportunity at her husband's business.  **Comment and Request to Strike or Clarify**:  **First, this is rank hearsay and should be stricken on that basis.  Second, it is highly prejudicial and false as Abbascia has denied this in her sworn statement to the Investigator.  If you refuse to remove this rank and false hearsay statement, then my client proposes the following**:  **Additional Proposed Finding**.  *However, Abbascia has expressly denied that Murray had anything to do with her decision to leave the college.*].

*Dr. Lauren Webb*

20.     She has observed that when he disagrees with a position, he can be ~~"beyond collegial behavior."~~ *"difficult and not collegial."*  **[Reason for Change.  The stricken quote does not exist in the Investigator's summary of his interview of Dr. Webb and must be stricken and corrected as it is prejudicial and misleading as written, because the words used have an extremely negative connotation.  The exact quote from the Investigator's summary on page 2 reads, "She has observed that when he disagrees with a position, he can be 'difficult and not collegial.'"].**

## VII.     PRESENTATION OF TESTIMONIAL AND DOCUMENTARY EVIDENCE

Murray incorporates in this Section VII. all his proposed changes and/or additions in the previous sections.

### A.     Claims by Elizabeth Del Sesto, Sandra Luzzi Sneesby and Tara Abbascia

*Del Sesto*

6.      According to Ms. Del Sesto, Professor Murray was "venting in an angry way ... and in an unexpected way when he entered my office right at me ... ."  (D)  **[Additional Undisputed Finding Material to the Complaint at Issue**:  *Delsesto testified Murray never threatened her, never used disparaging words about her, never said anything about the fact*

**Page 53 of 63**

*that she was a woman or anything made any gender related comment.  He was upset,*

*complaining about the conduct of Dean Bill Stargard, a male administrator.  (***Del Sesto**

**Trans. p. 34).].**

### *Sneesby*

29.      **Comment.**  This should be labeled (D) as Murray has expressly disputed this

previously and again herein, specifically he disputes that he "orchestrated a faction of faculty

members to 'ratchet up email attacks and just spread untruths.'"

40.      The conversation was argumentative, and Professor Murray stated that

Professor Sneesby was ***screaming at him*** ~~hollering~~ during the phone call.  ***Three witnesses***

***support Murray's statement that Sneesby was screaming at him and that he never raised his***

***voice.*  [Reason for Change.  Murray described Sneesby's conduct as "screaming" not**

**"hollering" in his statement and the added sentences is supported by the record as a**

**whole.**

50.      On February 16, at approximately 1:45 pm, Ms. Nagel was sitting at her desk

when Professor Murray walked down the hallway, talking on his phone, stating that he would

check with Professor ~~Murray.~~ ***Kilduff Chair of Psychology***.  **[Reason for Change.  The reason**

**for this change is self-explanatory, Murray was not speaking to himself.].**

55.      She did not create or prepare the bill on standardized grading. **[Comment.  This**

**sentence should be labeled (D) as Murray has expressly disputed this previously and again**

**herein, specifically two faculty members told him that Dean Nauman was the sponsor of**

**the bill on standardized grading.].**

58.      For approximately six weeks in 2019, Professor Murray and Professor Abbascia

dated.  **[Comment.  This sentence should be labeled (D) as Murray claims that they had**

**an intimate relationship over an approximately two month period.].**

63.      On January 30, 2023 Professor Abbascia informed the faculty association that

she was leaving CCRI ~~at the end of the school year~~ ***on June 17, 2023. She testified her decision***

**Page 54 of 63**

*to leave the College had nothing to do with Professor Murray.* [<u>Comment</u>. **As clarified, Murray does not dispute the statement**].

67.    [<u>**Additional Finding and Clarification**</u>. *In her sworn testimony, Abbascia admits she was referring to Murray about spreading lies, confirming his claim asserted to her in a previous private email.*].

70.    <u>**Comment.**</u>  **This sentence should be labeled (D) as Murray never threatened to distribute their email correspondence if she did not resign.  This is totally inaccurate and there is no support in the record for it.  The Investigator is erroneously and inaccurately conflating two different interactions/communications.**

71.    Professor Abbascia ~~stated~~ *testified under oath* that her decision to leave CCRI was personal, and was not prompted by her current dispute with Professor Murray *and, in fact, expressly denied it had anything to do with Professor Murray.*  [<u>Comment</u>.  **The proposed changes are necessary because, as written, this finding is misleading, particularly in light of Ogden's inaccurate hearsay statement that follows in number 72.**].

### B    <u>Claim of Pattern and Practice of Discrimination</u>

Murray objects and moves to strike all "pattern and practice of discrimination" purported evidence for the reasons previously set forth in section VI.B. above whether or not repeated below.

### C.    <u>Proposed Changes and Additional Proposed Findings to "Pattern And Practice of Discrimination" Section</u>

To the extent the Investigator does not remove the proposed findings of facts related to purported "pattern and practice of discrimination," Murray proposes the following changes and/or additional proposed facts:

*<u>Changes/Clarifications</u>*

75.    Ms. Del Sesto witnessed Professor Murray "go after" Barbara Nauman, Dean of Business, Science, Technology and Math.  Professor Murray "put his hand up to stop [Dean Nauman] talking when she speaks or answers a question."  [<u>Comment</u>:  **Murray disputes this proposed finding as it is not supported by the record as a whole.  This finding must be**

stricken as it contains no date, time, place, or circumstance and amount to nothing more than bald-faced allegations and characterizations without context that have no probative value nor relevance to the Complaint.    Murray proposes the following <u>Additional Proposed Finding,</u> that is supported by the record: *Murray did recall that on one occasion* ~~*subsequent to*~~ *at a CRC meeting in October of 2022, wherein after Murray was recognized by the Committee Chair to speak, Dean Nauman (who was sitting approximately 30 feet away at the other end of the room) interrupted him and he asked her to please not interrupt him and raised his hand to signal the same.    Professor Mazin Adam confirms Murray's recollection of this interaction.*].

79.    <u>Comment:</u>    Murray disputes this finding and proposes the alternative finding supported by the record as a whole set forth in the previous paragraph to which he has no objection.

81.    In response to a question on whether he *during the over thirty (30) years he was employed by the college he* ever raised his hand in front of someone to stop them from speaking, Professor Murray indicated that he could not recall any such behavior without being told of a specific date and context.  When asked if such conduct would stand out in his mind, he indicated that he could not answer that question *without being given more details.* [<u>Comment:</u>  **Murray disputes this finding as written and proposes the above changes to provide context and accuracy.    With these changes, Murray would not object to the finding.**].

82.    With respect to the incident involving Dean Nauman *at a meeting of the Curriculum Review Committee in October of 2022, where Murray is a member of the CRC and Nauman is not a member, Professor Murray recalls raising his hand (pursuant to Roberts Rules of Order that govern CRC meetings) and being recognized by the CRC Chair Dean Stargard to speak.*  While speaking at the time and being interrupted by Dean Nauman and he asked not to be interrupted.  He also recalls Dean Stargard asking Dean Nauman to stop

speaking.  He denies yelling but ~~also admitted~~ *stated that he was seated thirty (30) feet away*

*from Dean Nauman* and did raise his hand *to signal her to* stop ~~her from~~ speaking.    Dean

Stargard denies that he asked Dean Nauman to stop speaking at the meeting.  **[Comment:**

**Murray disputes this finding as written and proposes the above changes to provide**

**context and accuracy.  With these changes, Murray would not object to the finding,**

**provided the record is clear that he disagrees with Dean Stargard's recollection].**

83.     With respect to an incident involving Leslie Killgore, he recalls attending a CRC

meeting in which Professor Killgore referred to herself *while she was asking a question of*

*another CRC member* "as a bitch."  Professor Murray found the comment to be inappropriate.

Professor Killgore apologized for her comment.    He then notified the Vice President of the

College and asked that the minutes reflect her inappropriate language. **[Comment:  Murray**

**disputes this finding as written and proposes the above changes to provide some context**

**and accuracy.  The full context is set forth in an email Murray sent after the meeting to**

**VP Costigan dated February 3, 2023 summarizing what transpired at the meeting, a copy**

**of which is attached hereto].**

85.     Dean Carr observed ~~similar conduct towards other people, including his~~

*Murray* raising of his hand to stop Dean Barbara Nauman from speaking at a CRC meeting.

**[Comment:  Murray disputes this finding as written as the deleted portion constitutes**

**inadmissible subjective lay opinion asserting a highly prejudicial and vague**

**characterization without disclosing any of the underlying facts upon which the conclusion**

**was based.]**

91     Dean Stargard recalled that in early October of 2022, at a CRC meeting, Dean

Nauman wanted to speak but Professor Murray stopped her, possibly raising his hand towards

her, stating 'don't interrupt me.'  ~~Dean Stargard found Professor Murray's conduct to be~~

~~"insulting" and "more aggressive than he had to be," which almost appeared to "chastise"~~

~~Dean Nauman.~~ **[Comment:  Murray disputes this finding as written as the deleted portion**

**Page 57 of 63**

constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which has no probative value with respect to the Complaint at issue.].

95.     In mid-February 2023, Professor Sneesby approached Dean Stargard, stating "I don't believe what just happened." She appeared close to tears. She indicated that Professor Murray was very insulting, complaining about her doing something wrong. [**Comment and Request to Strike**: **First, this is rank hearsay and should be stricken on that basis. Second, it is highly prejudicial and misleading and contains no date, time, place, or circumstance and is merely a bald-faced allegation without context and therefore lacks probative value as to the Complaint at issue.**].

97.     ~~When the door opened, Dr. Costigan was visibly upset and said to Professor Murray that 'you need to get out of my office now.' Ms. Geraldo walked into the room to usher him out. During the tense exchange between Dr. Costigan and Professor Murray, Ms. Geraldo stood between them. Ms. Geraldo asked Dr. Costigan if she was okay and asked if she should call security. Dr. Costigan responded that she "needed a moment~~." (D)." [**Comment. This entire finding must be stricken as it is out of context, does not disclose all the salient facts and circumstances of the meeting or the discussion, and lacks probative value as to the Complaint at issue.**].

98.     [**Comment. Murray objects to this finding for the same reason above and requests it be stricken.**].

101.    Ms. Geraldo stated that she has seen Professor Murray behaving in an insubordinate manner towards former interim dean, Bruce Busby. In one incident, which occurred possibly in late 2018, Professor Murray *in January of 2019 had been removed as department Chair* ~~was put on leave~~. Ms. Geraldo observed that Professor Murray treated men as badly as women. [**Reason for Changes. As stated numerous times previously and can be confirmed by Human Resources, Murray was never placed on leave until the current dispute. The reason for the changes is to correct this error. With these changes, Murray**

would not object to the finding.].

103.    Professor Murray then ~~physically~~ confronted Professor Valicenti, shouting at her for not signing the letter of support.  Professor Murray was ~~"in my face" and~~ was texting Professor Adam to verify his accusation.  ~~He kept showing his phone to Professor Valicenti in her face, accusing her of lying.  He kept repeating, 'is this correct?'~~  Professor Valicenti left the encounter shaking and went to her car in the parking lot to compose herself.  She left the office and when she arrived home, Professor Murray texted her with Professor Adam's number. (D) [**Comment and Request to Strike.  Murray disputes this finding for multiple reasons. First, he has never been accused of any physical conduct in any of the Complaints or otherwise.  Second, it is uncertain what is meant by the use of the word "physical" in this context—does it mean he was there in person as opposed to via phone or text or email. Murray expressly denies any "physical" contact in any alleged confrontation.  Second, while Murray does not recall all the details of this encounter, he is certain he did not call her a liar.** ~~as that is not something he does and it is not a term he uses.~~

105.    Professor Murray denied that there was any altercation with Professor Valicenti.  Instead, he described it as "two people who had been in an intimate relationship." **Additional Proposed Facts for Context:  Murray and Valicenti had an intimate personal relationship that he ended.  She was upset with him when he ended it.  JoAnn Albro the department assistant of the Math department can verify the relationship existed as can Valicenti's daughter, Emily Valicenti.  VPAA Costigan was also aware Murray and Valicenti were involved in a romantic relationship as she commented to people about it.**

106.    Dr. Costigan stated that Professor Murray discredits his supervisors~~, particularly women, by both embarrassing and bullying them~~.  She recalls articles in local newspapers in or about 2018 in which Professor Murray spoke to the press ***in his capacity as Faculty Association President*** and said that there was a need for a change in leadership.  Dr. Costigan recalls that her name and President Hughes' name were specifically mentioned.  There

are news articles from that time period showing several quotes from Professor Murray that are critical of Dr. Costigan, President Hughes and, at times, Dean Thomas Sabbagh.  **[Comment: Murray disputes this finding as written as the deleted portion constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which have no probative value with respect to the Complaint at issue.  In addition, Murray has added additional language to place his conduct in proper context.  Murray objects to the entire finding, even as edited, as irrelevant to the Complaint at issue.  Murray does not dispute the finding with the proposed edit as constituting Costigan's lay opinion.].**

107.    Dr. Costigan recalls a meeting in August of 2017 *with the Faculty Association leadership* in which the topic was the creation of a master schedule.    Attendees included Professor Murray *as President of the CCRIFA*, legal counsel for NEARI and legal counsel for CCRI.  ~~Professor Murray became upset and threw his hands up, flailing them, and was very demeaning towards Dr. Costigan.~~ (D)  **[Comment:  Murray disputes the deleted portion which constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which has no probative value with respect to the Complaint at issue.  In addition, Murray has proposed additional language to place the encounter in context.].**

114.    Professor Josephs ~~recalled Professor Murray raising a hand during meetings to stop people from speaking and noted that it occurred mostly towards women but then~~ stated that her division of faculty is predominately women.  **[Comment.  The deleted portion must be stricken as it contains no date, time, place, circumstance or context and contains a bald-faced lay opinion claim without basis that has no probative value nor relevance to the Complaint.  Additionally, it is clear from the record as a whole, that Murray only raised his hand on one occasion to signal a female colleague to stop speaking.].**

118.    **Murray disputes this finding.**

120.    Professor Susi served on a negotiations committee in *2014 or 2015,* at the

request of acting Vice President Richard Tessier.  ~~Professor Murray was aggressively yelling and insulting people who were in attendance at the meeting.~~  He then turned to Professor Susi and asked a question ~~in a very loud manner~~.  Professor Susi quietly responded, "I do not have to answer your questions." Professor Murray immediately stopped, stating, "No, you're right, you don't."  Professor Susi  has had no other adverse interactions with Professor Murray since that time.    [**Comment:    Murray disputes the deleted portion which constitutes inadmissible subjective lay opinion asserting highly prejudicial and vague characterizations which has no probative value with respect to the Complaint at issue.  In addition, Murray has proposed additional language to place the encounter in context.].**

### *Proposed Additional Facts*

1.      Murray has served at the College as a professor since 1993 and interacted with thousands of female students and hundreds of female professors, staff and administrators without incident or claim of gender discrimination.

2.      Murray has worked closely with female members of his department (all of whom have provided statements and/or been interviewed), including his assistant, Maureen Papagolos (over 20 years), Professor Sheryl MacDougall (over 20 years), current assistant Tiffany Jones (1 year) and Lolita Villanueva (9 years -- she works directly outside his office door as the assistant for Social Sciences).  Each of these women stated unequivocally that Professor Murray has always been respectful and professional in his interactions with them and with all others.

3.      The deans who have supervised Professor Murray and interacted with him regularly, including Dean Stargard, Dean Cole, Dean Handley and Dean Bryan Brophy-Baermann, in their annual Performance Reviews, have all provided glowing reviews of Professor Murray.  None of the deans wrote anything in their annual Performance Review about Professor Murray discriminating against anyone, creating a hostile work environment, or the like.

4.      One of those deans, Allyson Handley, EdD, who was dean in 2020, was recently appointed as Vice President of Academic Affairs at CCRI.

5.      In 2020, Dean Handley, as Murray's supervisor, in her annual Performance Review, praised Professor Murray: "Chair Murray received an overall "outstanding" evaluation from [her] across all rating categories included in the rating scale. Chair Murray is to be commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty" within the Criminal Justice department. He manages his department with dedication and efficiency." "He is to be commended for his many years of service to faculty welfare through his leadership of the faculty union. Since stepping down from that demanding leadership role recently, he should be encouraged to utilize his considerable talents and expertise within other academic leadership roles at CCRI."

6.      Dr Lauren Webb, Director of Academic Program Review and Accreditation, who reports to V.P. Costigan, stated she had many interactions with Murray regarding assessments and other issues and that Murray never treated her inappropriately.

7.      Maya Geraldo, Manager of Academic and Faculty Initiatives, who also reports to V.P. Costigan, stated that Murray had disagreements with men and women and that Murray had spoken in a similarly critical manner to male deans including John Cole and Bruce Busby. She also states that Murray treated her with respect.

8.      Murray was critical of and has had public disagreements and disputes and interactions with numerous male colleagues in positions of authority, including, but not limited to, Dean Bruce Busby, Dean John Cole, Dean Bill Stargard, Dean Thomas Sabbagh, and Professor Parker, when he was Faculty Association President, Professor Richard Tessier, when he was Vice-President of the Faculty Association under Sneesby, and Professor Joseph Arsenault, Program Director for Homeland Security and Emergency Management.

## IX.    CONCLUSION

For all the foregoing reasons, Murray respectfully prays that the Complaint be dismissed as a matter of law on the following grounds:

**Page 62 of 63**

1.  The conduct in question constitutes concerted conduct protected from employer interference or sanction according to CCRI policy and R.I. Gen. Laws §§ 28-7-2(d) and 12;

2.  Three unrelated complaints have been improperly combined in violation of CCRI policy, federal administrative guidance, and due process of law;

3.  The conduct in question does not constitute a violation of Title IX, as there is no evidence in the record of _**any**_ gender based or motivated conduct on the part of Murray that was so severe, pervasive, and objectively offensive as to effectively deny any of the Complainants to access to any program or activity of CCRI.

> **RESPONDENT,**
> Steven D. Murray
> By his attorneys,
> **SINAPI LAW ASSOCIATES, LTD.**

**Dated:  September 21, 2023**          /s/ **Richard A. Sinapi**_____
**Richard A. Sinapi, Esq. (#2977)**
2374 Post Road, Suite 201
Warwick, R.I. 02886
Phone:(401) 739-9690; Fax: (401) 739-9040
E-mail: ras@sinapilaw.com

## CERTIFICATION OF SERVICE

I hereby certify that on the **21st** day of **September, 2023** I served this document via email on the Investigator:

**Raymond A. Marcaccio Esq.**
**Oliverio & Marcaccio, LLP**
**30 Romano Vineyard Way, Suite 109**
**North Kingstown, RI 02852-**
**Phone:  (401) 861-2900; FAX:  (401) 861-2922**
**Email:  RAM@om-rilaw.com**

/s/ **Richard A. Sinapi**_____