## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **STEVEN D. MURRAY,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **C.A. No. 23-cv-23-cv-00469-WES-LDA** |
| | : | |
| **COMMUNITY COLLEGE OF** | : | |
| **RHODE ISLAND, alias, COUNCIL ON** | : | |
| **POST SECONDARY EDUCATION, alias,** | : | |
| **and ROSEMARY COSTIGAN, alias,** | : | |
| **in her individual and official capacities,** | : | |
| **Defendants** | : | |

## PLAINTIFF'S REPLY TO DEFENDANTS' OBJECTION TO HIS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF

### I.    INTRODUCTION

Plaintiff Steven D. Murray does hereby submit this reply to Defendants' opposition to his Motion for Temporary Restraining Order and Preliminary Injunctive Relief.  In support of his motion, Plaintiff relies on his Verified Complaint, Record Appendix in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief, and his Memorandum of Law in support thereof, as well as the within Reply Memorandum of Law and Record Appendix in support thereof ("R.A.II").   Plaintiff in his above filings have posited three related but independent legal arguments, each of which justify his entitlement to preliminary injunctive relief:

1. Indefinite banishment of Plaintiff from a designated public forum--CCRI, including both its campuses and its faculty email system—that is not justified by a compelling governmental interest or narrowly tailored to that interest.
2. Initiation and prosecution of sham disciplinary proceedings the purpose and effect of which was and is to silence Plaintiff and prevent his exercise of free speech and association rights.
3. Regardless of the motivation or basis for the initiation of disciplinary proceedings, imposing during their pendency an indefinite banishment on Plaintiff as a prior restraint and form of punishment that materially impairs his rights to free speech and association.

## II.    SUMMARY

### *Banishment without Compelling Governmental Interest*

Fundamentally, this case is about whether an institution of higher learning public employer can indefinitely ban a thirty-two (32) year educator with an unblemished disciplinary record and stellar performance reviews from a public, open campus and all non-union interaction with faculty, students, and staff without any pre-deprivation determination of a compelling governmental interest to justify impairment of his free speech and association rights and without narrowly tailoring any restrictions to the compelling governmental interest justifying the restrictions.

The Defendants are not a private employer, free to banish a worker pending disciplinary action and to impose a blanket ban on contact with co-workers and students (although, even in that context, concerted action rights under state and our federal law would prohibit a blanket restriction on communications with co-workers).   Defendants are a public employer controlling numerous campuses with facilities open to the public.  Freedom of speech and association rights under state and federal law apply in full force in this context, just as they would in any other context when such rights are impaired by governmental action.  The fact that the Plaintiff is an employee of the governmental entity that controls the public forum does not eviscerate those rights.  Because the First Amendment is implicated, and the restrictions are content based, strict scrutiny applies.  Accordingly, the mere fact that there is not a total ban on Plaintiff's free speech and association activities off campus does not immunize the rest of the ban—including the total ban on campus—from the obligation of CCRI to show a compelling governmental interest for the restrictions and that the restrictions are narrowly tailored to protect that interest.  If Plaintiff succeeds on this theory, he is entitled to removal of the banishment (prayers for relief 1,2,4, and 5).

***Sham Proceedings to Punish Protected Speech is Grounds for Injunctive Relief***

Contrary to this Court's suggestion in its text Order denying Plaintiff's Motion for Expedited discovery, Defendants' initiation and maintenance of sham disciplinary proceedings against Plaintiff is material and relevant to one theory on which he seeks preliminary injunctive relief. Plaintiff contends that the largely undisputed evidence in the record shows that, based on Defendants' own policy and applicable law, two of the complaints underlying the Title IX complaint solely involved protected union communications and interactions not subject to the CCRI disciplinary process, while the third complaint, although arguably also exempt on that basis, was handled administratively and resolved a month prior to the initiation of the Title IX complaint. Additionally, the underlying complaints were not gender based, were otherwise facially deficient, and did not satisfy the elements of a Title IX claim, ***as a consequence of which the Defendants dismissed the Title IX complaint they brought.*** This is compelling, if not irrefutable, evidence that the disciplinary proceedings where a sham initiated to silence and punish Plaintiff—a black letter free speech and association violation which this Court has the power to remedy by the grant of preliminary injunctive relief.

In addition to the foregoing, Plaintiff contends that the timing and circumstances of the initiation of the disciplinary complaint further supports his contention that it was motivated by an intent to deprive him of his freedom of speech and association rights and thereby silence him. Plaintiff has pled and argued that there was no basis for initiating the complaint and the process would not have been initiated but for the desire of Defendants to place him on administrative leave and banish him during the pendency of the proceedings in order to silence him—particularly from his ongoing, vocal opposition to the pending T.A. and criticism of the lack of faculty shared governance in violation of state law. Accordingly, Plaintiff's claim for preliminary injunctive relief is also predicated on the unlawful motivation and intent behind the sham disciplinary proceedings, which seeks to both punish him for and prevent him from exercising protected speech, in part, by placing him on indefinite administrative leave. If the Court agrees based on the record at this stage of the proceedings and

Plaintiff succeeds on this theory, Plaintiff is entitled to removal of the banishment and reinstatement (all prayers for relief).

### Relief from Ongoing Interference with Freedom of Speech and Association

Contrary to the Defendants' characterization, the Plaintiff is not asking this Court to adjudicate or interfere with any pending CCRI adjudication proceedings against the Plaintiff, let alone declare victory for the Plaintiff.[1]  The Plaintiff is merely seeking relief from this Court to restrain the Defendants' ongoing interference with his rights to freedom of speech and association by his indefinite banishment from any of the four main campuses and numerous satellite locations of Defendant CCRI—for ten (10) months and counting, which has prohibited him from, among other things, in-person on campus faculty and student academic and other interactions and communications, and fully and effectively communicating with fellow CCRIFA union members or carrying out his duties as a faculty union member and Vice-President of the faculty union by, among other things, banning his participation on assigned committees. *Indeed, the impairment of his association rights are particularly egregious because the Defendants determine which committees or meetings he can participate in and which ones he cannot merely by designating that the meetings will be held on campus.*

In particular, Plaintiff has been unable to attend meetings of the Curriculum Review Committee, one of the most important and powerful committees at CCRI and the sole mechanism by which the faculty can exercise some measure of shared governance over academic matters, because the meetings are held on the Knight Campus.[2]  He has also been banned from meetings of the Seven

---

[1] Moreover, it is particularly telling that Defendants described it as a "victory" if this Court were to grant relief to Plaintiff from his oppressive pre-disciplinary determination banishment—a Freudian slip revealing that it is this interim banishment itself which is the goal of the Defendants, not the investigation and determination of a disciplinary complaint and imposition of an appropriate sanction.  Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief (ECF 14) at 8.

[2] Affidavit of Mazin Adam, December 22, 2023 ("Adam Aff.") (Plaintiff's Record Appendix in Support of His Reply to Defendants' Objection to His Motion for Temporary Restraining Order and Preliminary Injunctive Relief ["R.A. II"] Exhibit ["Ex."] Y)  ¶¶26;  Affidavit of Steven Murray, December 22, 2023 ("Murray Aff.")  ¶¶35-37 (R.A. II Ex. Z).

(7) Week Class Implementation Team committee, which is dealing with a controversial major change in curriculum format by decreasing the length of a semester from fifteen (15) weeks to a compressed seven (7) week schedule.[3]  CCRI has expressly refused CCRIFA offers to host the latter meetings at an alternate site off campus.   Verified Complaint ("Verified Compl.") ¶¶132-133.   Additionally, despite being assigned to the Faculty Stipend and Release Time committee by the CCRIFA, Professor Murray has also been barred from attending meetings of this body because it also meets in person on campus at CCRI, and Defendants have firmly and consistently prevented him from attending by refusing to allow him on campus or to have them meet off campus.  Adam Aff. ¶¶16, 20; Murray Aff. ¶26-27; Verified Compl. ¶135.   Conversely, Defendants have cooperated and permitted grievance hearings and CBA mediation hearings to be scheduled and conducted off-campus so Plaintiff can attend.  ***Defendants' unbridled and unfettered discretion to determine when and how Plaintiff may exercise his free speech and association rights is a paradigmatic constitutional violation.***

### *Scope of Administrative Leave Restrictions Not Changed by Affidavit*

In addition, one line in a Sybill Bailey self-serving affidavit declaring that "Professor Murray may contact individuals at CCRI (other than the three complainants) regarding any non-Union matters," (Affidavit of Sybill Bailey ¶5 (attached to Defendants' Objection to Motion for TRO) Exhibit B) does not alter the clear and express terms of his extended administrative leave imposed upon him by the Defendants in her October 1, 2023 letter, which unequivocally states that the Plaintiff is to "have no contact with college employees or students during the period of [his] leave, excluding those communications connected to [his] union work."  October 1, 2023, Email from Sybil F. Bailey (R.A. Ex. V).  This sweeping restriction is obviously and inarguably a violation of not only Plaintiff's First Amendment speech and associational rights, but also the speech associational rights of every other person therein restricted from communicating and/or associating with Professor Murray.

---

[3] E-mail Thread Re: 7 Week Compressed Term September 15 to October 2, 2023 ("7 Week Term Email") (Record Appendix in Support of Plaintiff's Motion Emergency Motion for Injunctive Relief ("R.A."), Exhibit ("Ex.") X.

Defendants' attempt to re-characterize by affidavit its unlawful restrictions on Plaintiff to avoid legal liability while creative, is unavailing and in the absence of a court order or a judicially enforceable stipulation does not legally alter the Plaintiff's need for a judicial remedy and legal relief.

### No Basis for Ongoing Disciplinary Proceedings

The basis for the foregoing extension and increase in scope of freedom of speech and association restrictions is the continuation of the sham disciplinary proceedings against Plaintiff. This time, according to the Defendants, as expressly stated in writing and again at the recent "interview" of Plaintiff held on December 7, is whether, based on the allegations in the dismissed Title IX Complaint, Plaintiff violated section 5.01 of the "Standards of Conduct," that requires an employee's conduct "to be worthy of the esteem of a public employee must enjoy by acting in such manner so as not to bring discredit upon his or her employer" and the "Violence in the Workplace Prevention Policy" which, in pertinent part, "prohibits a "threat of violence" defined as "any act of aggression or a statement which objectively could be perceived as intent to cause harm to an employee."[4] Sybil Bailey, Defendant CCRI's Human Resources Director, expressly told Plaintiff that this second investigation is confined to the same complaints, conduct, and individuals as the first.[5] There is nothing either in the Title IX complaint or the entire record of that investigation to support a violation of either rule. If Defendants contend otherwise, they should have cited to that evidence in their objection.

Moreover, aside from the fact that the 5.01 standard of conduct is so vague and general as to be unenforceable, in practice it obviously sets a relatively low bar since Defendant Costigan on two occasions, one time in front of a large group of CCRI faculty, screamed at Plaintiff and was not

---

[4]  Emails from Mickey Dargon. "Re: [External]: Steven D. Murray." November 21, 2023 and November 29, 2023 (R.A. II Ex. AA); Steven Murray Interview Transcript with CCRI Human Resources, December 7, 2023 ("Murray Interview") (R.A. II Ex. BB) 4:22-5:7.

[5]  Murray Interview Transcript with Community College of Rhode Island ("CCRI") Human Resources ("Murray Interview") December 7, 2023 (R.A. II Ex. BB) pp. 4:22-5:7.

subjected to any discipline.[6]  Indeed, she was eventually promoted to President of CCRI.  Similarly, Defendants, on the basis that it was an intraunion matter and not subject to their oversight, refused to address Professor's Murray complaint about another faculty member who had used profane language, screamed at him, and made threats.  November 20, 2019 Sybil Bailey re: Murray-Valicenti Complaint (R.A. Ex. Q).

Nor, contrary to Defendants' contention, does the record or anything in Plaintiff's personal file support the self-serving, subjective, and frankly incredible characterizations and assertions of the Defendants of "improper bullying, abusive mistreatment, and coercive behaviors towards others" and the "seriousness and habitual nature of [Plaintiff's alleged] mistreatment of others."  *See generally,* Murray Personnel File (R.A. II Ex. DD).  In support of the forgoing allegations, Defendants' rely solely on the Declaration of Alix Ogden, which asserts bald faced, sweeping characterizations and/or statements of opinion without disclosure of any underlying facts to support them.  They contain no dates, times, places, people, content, or description of the alleged improper conduct.  There is no context nor anything in the record to support or provide the reader the basis of such conclusions.  The use of such naked invective is unhelpful, prejudicial, establishes nothing, and cannot be relied upon by this Court except, perhaps, as evidence of improper motivation and lack of any *bona fide* basis for the egregious adverse action Defendants' have taken against the Plaintiff.  These are not "facts" supporting a complaint of misconduct or a compelling governmental interest justifying banishment. It is not the obligation of the Plaintiff to point to the absence of misconduct.  The burden is on the Defendants to cite to credible and probative facts establishing both actionable misconduct and a compelling governmental interest to banish him pending adjudication of that misconduct.

It should be emphasized that, according to the Defendants, the dismissed Title IX complaint and the pending disciplinary proceedings against Plaintiff are based solely on the complaints brought

---

[6] Letter from Peter J. Harrington to Meghan Hughes Regarding Interpretation of Violence in the Workplace Prevention Policy, July 14, 2017 ("July 14, 2017 Harrington Letter") (R.A. II Ex. CC).

by the original three complainants. There has been a previous investigation conducted by an "independent" investigator who interviewed about a dozen people, including the complainants and the Plaintiff and compiled a record of about 900 pages.[7] They have also recently re-interviewed witnesses and are about half-way through the process. Murray Interview 7:8-22. The Defendants have had almost ten (10) months, and they have yet to cite to any information in that record that supports actionable misconduct by the Plaintiff, let alone a compelling governmental interest to justify his banishment from campus.

### *Need for Judicial Relief*

Plaintiff has not been found guilty of anything and has not even been accused of causing bodily harm, unwanted touching, threatening to cause bodily harm, stealing, damaging property, stalking, using foul language, yelling or screaming at anyone, plagiarism, malfeasance or misfeasance, either as a Department Chair or a Professor, sexual harassment, and/or criminal conduct or any other type of conduct that caused or threatened to cause undue disruption and or injury of any kind. Nor has there been any preliminary determination that he has engaged in ***any wrongdoing of any kind***. And yet, he has been banned indefinitely from teaching, from his CCRI email, from his faculty office, from entering upon any of the four main campuses and numerous satellite locations of Defendant CCRI, from in-person on campus communications regarding union business, from in-person on campus faculty and student academic interactions and communications, and from in-person on campus campaigning for election as a union officer in the upcoming April 2024. His banishment has now gone on for ten (10) months and counting. During his absence, CCRI has implemented the "Law Enforcement Certificate of Readiness," which he had previously successfully opposed and defeated while Department Chair, eliminated his department, stripped him of his Department Chair, and is seeking to implement other major policy changes, chiefly utilizing the committees in which

---

[7] Confidential Investigation and Report to Community College of Rhode Island Concerning Steven D. Murray, September 21, 2023 (R.A. II Ex. II).

Plaintiff has been unable to participate because of his banishment.  It is patently obvious that without Court intervention, CCRI has neither the intention nor incentive to end the Plaintiff's banishment and will continue to do as it pleases.

### III.    FACTUAL BACKGROUND—CONTEXT MATTERS

#### *Long and Exemplary Record of Achievement*

Plaintiff is a member of the Bar and former Assistant Attorney General and a full tenured Professor who has taught courses on the law, legal studies, and criminal justice at Defendant CCRI for approximately thirty-two (32) years.   He has an unblemished disciplinary record and has served as Chair of the Criminal Justice and Legal Studies Department since 2012.  During this long tenure as a teacher and as a department Chair, Plaintiff has earned a stellar record comprised largely of "exceeds expectations" annual reviews, has never been disciplined by Defendant CCRI, recently received an overall "outstanding evaluation" as a department Chair and teacher, and was commended for setting "high standards regarding the academic and professional preparation of his full-time and adjunct faculty."

#### *Passionate Faculty and Union Advocate*

Plaintiff has also been a highly active and engaged member of the faculty union at CCRI, the CCRIFA, serving as President from April of 2016 until November of 2020 and currently serving as Vice President.  He is also one of the twelve (12) members of the important Curriculum Review Committee who are elected by the faculty to the committee and which committee is an essential element of shared governance at Defendant CCRI regarding the management of the Curriculum of the College, including setting required courses, and approving or rejecting new proposed programs, courses, degrees, and certificates.  In these roles and as a union member and engaged faculty member generally, Plaintiff is and has been a vocal and passionate advocate seeking to improve the terms and conditions of employment on behalf of his co-worker faculty union members.

### *Historical Clashes with CCRI Administration and Defendant Costigan*

As a consequence of his foregoing passionate advocacy, Plaintiff has frequently been at odds with the Defendant CCRI administration having had severe disagreements over the years with the Defendant CCRI Administration, including Defendant Costigan. These disagreements have led to, among other things, faculty "No Confidence Votes," picketing, grievances, and Unfair Labor Practice charges and, at one point, Plaintiff filing a Violence in the Workplace Charge against Defendant Costigan.  He also has had ongoing disagreements with the Administration of Defendant CCRI, including Defendant Costigan, over the failure of Defendant CCRI to act in accordance with the shared governance provisions of R.I. Gen. Laws §§16-33.1-2 and 16.33.1-3, including whistleblower activities, such as reporting these issues both to Defendants and to the Rhode Island Board of Education and Counsel on Post-Secondary Education, related to the same.  The clashes Plaintiff had with the Defendant CCRI administration, including Defendant Costigan, were numerous, often public, and were frequently reported in the mass media, occasionally as lead stories.  Similarly, over the years, Professor Murray has filed numerous grievances against Defendant CCRI, nearly all of which were successful, including one that was settled as recently as the last Fall of 2022.

### *Temporal Proximity of More Recent Conflicts with Administrations*

In the period immediately leading up to the events and actions that are at the core of Plaintiff's Complaint, Plaintiff had numerous, significant disagreements and conflicts with the Defendants. First, as stated previously, he favorably resolved a grievance in the Fall of 2022, successfully opposed Defendant Costigan's proposed "Law Enforcement Certificate of Readiness" program which was rejected in November of 2022, successfully led the opposition to the Tentative Contract Agreements ("T.A.") endorsed by the Defendant CCRI administration and then CCRIFA leadership, which were defeated by faculty vote in November of 2022 and in February of 2023, on the faculty listserv he publicly criticized the CCRI administration's manipulation of the Faculty Senate to pass polices and measures initiated and advocated by the CCRI administration and not the faculty, some of which he

claimed violated the CBA, and on February 28, 2013, he sent out an email on the faculty listserv critiquing and urging the faculty to reject the revised T.A., which was also endorsed by the Administration and faculty leadership.

### *Banishment without Notice*

On February 28, 2023, in the midst of a heated debate and imminent second vote on a revised T.A, Plaintiff was locked out of his office, denied access to his CCRI email account—which, under the existing collective bargaining agreement ("CBA"), is the agreed upon means of CCRIFA member communications, banned from campus, and directed not to communicate with the then CCRIFA and Faculty Senate Presidents. The basis of this action against Professor Murray by CCRI was a purported Title IX violation arising out of three totally separate and unrelated communications/interactions ("Title IX Complaint"). One of the interactions occurred over *one month* prior and two occurred about two weeks prior to the issuance of the Title IX Complaint and all of which *undisputedly involved faculty association ("union") business.* Such conduct is outside the purview of Defendant CCRI to regulate and police in accordance with applicable law and CCRI's own policy.

It was the concerted action of the Complainants, including CCRIFA President Tara Abbascia and President of the Faculty Senate Sandra L. Sneesby, of whose policies and positions Murray was critical, along with Defendant Costigan and the Defendant CCRI Administration (collectively "Defendants"), of which Professor Murray was a longtime and vocal critic, that succeeded in banishing him from campus and the listserv. The intent, purpose, and effect of his banishment was to silence him in the midst of the ongoing and vigorously contested debate over a new CBA as well as Professor Murray's publicly stated claims that Defendant CCRI lacked the legally mandated faculty shared governance and that the CCRI Administration was manipulating the Faculty Senate.

The Defendants accomplished this by converting a month-old non-disciplinary complaint of Elizabeth Del Sesto, Defendant Costigan's assistant, which had already been administratively addressed and resolved as a "non-disciplinary matter," into a purported Title IX complaint and then

improperly combining it with the two other union leadership complaints asserted by Abbascia and Sneesby. The combining of these unrelated complaints was done as part of a deliberate, but misguided attempt to create a pattern and practice Title IX violation, which only applies to systemic, institutional conduct—not to an individual. The Defendants have themselves since admitted that Plaintiff's conduct did not violate Title IX and dismissed the Title IX Complaint on October 2, 2023.

Defendants have nevertheless continued Plaintiff's banishment under the guise of further investigating his conduct as an apparent non-Title IX conduct violation—even though the only authority for predetermination administrative removal of a faculty member according to CCRI policies and procedures is the pendency of a Title IX Complaint. What is more, and again without hearing or any determination of necessity or need, Defendants continued and increased the scope of his banishment to include communications with **_any_** "college employee or students," except communications related to faculty union business.

Professor Murray has also incurred loss of income during his banishment. He was stripped of his paid, elected position as Chair of the Criminal Justice Department and the department itself was suddenly eliminated in his absence. He has also been barred from serving as an elected union representative on the Curriculum Review Committee, during which time Defendants forced a new Criminal Justice "Certificate of Readiness" program through that committee—a proposal that had previously been withdrawn due to the opposition of faculty and members of the criminal justice community spearheaded by Plaintiff. Currently, Plaintiff **_has not_** been scheduled to teach in the Spring semester, thereby extending his banishment from teaching and the campus to essentially three full semesters for conduct which, **at worst**, amounted to an impolite interaction with an assistant administrator and passionately zealous advocacy and criticism directed at the positions taken by two union colleagues in positions of leadership. Defendants have continued to maintain Plaintiff's banishment despite Plaintiff's repeated pleas and best efforts to bring to the Defendants' attention that

their conduct violates his rights to due process of law and freedom of speech and association, in particular his right to concerted action expressly protected under R.I.G.L. § 28-7-12. R.A.II. Ex. II.

The Defendants took this calculated and brazenly unlawful and unconstitutional action against the Plaintiff because they were desperate to silence him in order to garner faculty endorsement of the T.A. they favored and because they believed they could get away with it, since even if Plaintiff sought legal relief, they assumed that a court would be reluctant to interfere with the disciplinary processes of a public academic institution. Defendants have done the same thing in the past to faculty members they deem troublesome for one reason or another and they will do it again unless this Court issues immediate emergency injunctive relief to the Plaintiff restoring his constitutionally protected rights to free speech and association, thereby placing Defendants on clear notice that such conduct will not be tolerated.

## IV.   ARGUMENT

### A.   _Likelihood of Success on the Merits_--Defendants Have, Illegally, Imposed A Sweeping and Overbroad Array of Restrictions on Plaintiff's First Amendment Free Speech and Associational Right

#### 1.   Defendants' Imposition of a Blanket Banishment from a Public Campus Bars Plaintiff from a Designated Public Forum Without the Requisite Compelling State Interest or Narrow Tailoring.

"At the outset we note that state colleges and universities are not enclaves immune from the sweep of the First Amendment. 'It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.' " _Healy v. James_, 408 U.S. 169, 180 (1972) (quoting _Tinker v. Des Moines Independent Community School District_, 393 U.S. 503, 506 (1969)). "[T]he precedents of th[e Supreme] Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, '(t)he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American

schools.' " *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487, (1960)).

Here, CCRI has publicly, proudly, and repeatedly stated "CCRI opens its facilities for public use, sponsors programs on issues of public concern, and offers public workshops and seminars for small businesses, for government agencies, and for individuals seeking to improve their skills or enhance their lives."[8]  Indeed, CCRI is public college with an open campus where members of the public, as well as students, faculty, and staff of CCRI, are free to use the library, cafeterias, lavatories facilities, and to walk and recreate on the grounds, as well as attend any number of events held on campus including sporting events, concerts, talks, presentations, and other such events and activities. Adam Aff. ¶4; Murray Aff. ¶4.[9]  A "College campus is a designated public forum [where] the record establishes that the College opened the campus for expressive activities, such as musical performances and other activities available to the public."  *Putnam v. Keller*, 332 F.3d 541, 549 (8th Cir. 2003).[10]  "As such [Murray] has the same First Amendment right of access to the campus as does any other member of the community." *Id*.

---

[8]  NECHE 2019 Interim Fifth-year Report at 4 (R.A. II Ex. EE); CCRI NEASC 2014 Accreditation Report at 3 (R.A. II Ex. FF); CCRI 2009 Distance Education Report at 5 (R.A. II Ex. GG).

[9] Through this policy of open use "the University has created a forum generally open for use by student groups," students, faculty, staff, and the general public.  *Widmar v. Vincent*, 454 U.S. 263, 267 (1981) "Having done so, the University has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Id*.  "The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." *Id*. citing See, *Madison Joint School District v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 175, and n.8 (1976) (although a State may conduct business in private session, "[w]here the State has opened a forum for direct citizen involvement," exclusions bear a heavy burden of justification); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555–559, (1975).

[10] In *Putnam*, a case remarkably similar to the one at bar, the plaintiff, "Putnam was a music instructor and faculty member of the College's Columbus campus for twenty-nine years. He was the founder and director of the performance group "Chorale." He retired from these positions in 2000, but he maintained part-time employment as an instructor through the fall of 2000. He also enrolled *545 in an adult continuing education course for the 2000–2001 school year. Putnam was informed in January 2001, that the College was eliminating his part-time position. Around the same time, he received a letter from the College's counsel, informing him that he would be banned from campus until at least June 1, 2003, while he was under investigation for misappropriating school funds, in violation of school policy and perhaps state criminal law.2 The letter also alleged that Putnam permitted and encouraged Chorale events that had "inappropriate sexual overtones," making the group he directed appear "cult-like." Putnam denied the accusations in his written response to the College, and he asked for the ban to be lifted." 332 F.3d at 544–45.

Consequently, the Defendants are not a private employer, free to banish a worker pending disciplinary action and demand no contact with co-workers (although, even in that context, concerted action rights under state and our federal law would prohibit a blanket restriction on communications with co-workers). Defendants are a public employer controlling numerous campuses with facilities open to the public where freedom of speech and association rights under state and federal law apply in full, just as they would in any other context when such rights are impaired by governmental action. Specifically, where, as here, a public college has opened itself up as a public forum, "it must ensure that time, place, and manner restrictions are reasonable and a 'content-based prohibition must be narrowly drawn to effectuate a compelling state interest.' " *Id.* (citing *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 44 (1983). While courts "recognize a University's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education" in doing so they must still comply with the First Amendment. Efforts to bar speech, expressive conduct, and people from a college campus which has designated itself a public forum must "show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar* 454 U.S. 263, 270, 277. Similarly, "there can be doubt that . . . the denial of use of campus facilities for meeting and other appropriate purposes . . . the denial of the use of campus bulletin boards and the school newspaper [and other] means of communicating with [ ] students. . . abridges . . . associational right[s] . . .[and] such impediments cannot be viewed as insubstantial." *Haley*, 408 U.S. at 181-82.

Thus, here, "[i]n order to ban [Murray] from the campus, the College officials must show that the restrictions are narrowly drawn to serve a compelling interest." *Putnam*, 332 F.3d at 549 (citing *Perry*, 460 U.S. at 44). In the first instance, in analyzing the Defendants' proffered reasons, it must be kept in mind that First Amendment standards "must give the benefit of any doubt to protecting rather than stifling speech." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449,

469 (2007) (opinion of Roberts, C.J.)(citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 269–270 (1964)).

The interest proffered by Defendants in this case, minimizing alleged bullying and intimidating behavior on campus, while certainly a compelling government interest in a general sense as well as in certain factual scenarios, ***was in no way threatened by Plaintiff's behavior as disclosed by the actual factual record,*** and did not require or justify the sweeping and broad restrictions imposed on Plaintiff.  In the first instance, the disciplinary proceeding involved complaints by only three people, one of which is no longer on the campus.  Secondly, at least two, if not all three interactions/communications involved protected concerted action, the tone and manner of which (short of, perhaps, violence) is not subject to regulation by CCRI according to its own policies and applicable labor law.  Thirdly, none of the communications/interactions in question involved stalking, use of foul language, yelling or screaming, violence, or threats of violence.  The undisputed facts of this case, by any rational, objective measure, do not arise to a compelling governmental interest that justified banning him entirely from campus, from his email and phone, from attending a wide variety of meetings, from teaching, and indeed from communicating with anyone in the CCRI community except for union business.  Nor was it by any means narrowly tailored.  Defendants could simply have barred Plaintiff from speaking to the complaints or even anyone their investigation determined wished not to associate with Plaintiff.  Barring him from being on campus *at all for any reason* and *from communicating with any students, staff, or faculty* except for a union business is incredibly overbroad and overinclusive.

Indeed, as stated previously, one of the complaints, Abbascia, is no longer at the school. Another, Sneesby, is involved in union business communications that are already exempt from the restrictions Defendants have imposed on Plaintiff.  Any interest in limiting communication with the last complainant, Del Sesto, and with Sneesby outside of the union business carve out, could easily and just as effectively been accomplished by barring communication between Plaintiff and these

particular people, just as this Court has noted in the context of private university Title IX investigations, *David Smith v. Brown Univ.*, No. CV 1:22-00329 (D.R.I. Sept. 19, 2022); *Doe v. Brown Univ.*, No. CV 16-017 S, 2016 WL 8786771 (D.R.I. Aug. 23, 2016).

Further, the pretextual nature of Defendants' restriction on Plaintiffs' speech not only fails to come anywhere near the extremely narrow tailoring required to survive scrutiny, it also supports the contention that Defendants' actions were based on the viewpoint and content of Plaintiffs speech. First, to justify limitations on First Amendment freedoms, a " 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms."[11] The Defendants must do more than "assert[] interests [that] are important in the abstract"—they may not simply "posit the existence of the disease sought to be cured."[12] The proponents of a restriction on free expression have the burden of "demonstrat[ing] that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a material way."[13] Here, as the court in *Putnam*, in

---

[11] *U.S. v. National Treasury Employees Union*, 513 U.S. 454, 475-476 (1995) (quoting *Whitney v. California*, 274 U.S. 357, 376 (1927))(Brandeis concurring opinion)("To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced.")); *Thomas v. Collins*, 323 U.S. 516, 530 (1945)("For these reasons any attempt to restrict [First Amendment] liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger."); *Nat'l Amusements Inc. v. Town of Dedham*, 43 F.3d 731, 741 (1st Cir. 1995) "[G]overnmental interest woven exclusively out of the gossamer threads of speculation and surmise cannot be termed substantial."; *Multimedia Pub. Co. v. Greenville–Spartanburg Airport District*, 991 F.2d 154, 161–62 (4th Cir.1993) (record revealed government's asserted interests to be illusory, tenuous, and non-verified).

[12] *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (citations and internal quotations omitted); *see Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 13 (1st Cir. 2004) ("Security is not a talisman that the government may invoke to justify any burden on speech (no matter how oppressive)."); *see also Bays v. City of Fairborn*, 668 F.3d at 823; *Saieg v. City of Dearborn*, 641 F.3d 727, 737-38 (6th Cir. 2011); *Ascherl v. City of Issaquah*, 2011 WL 4404145 *4 (W.D. Wash.).

[13] *Turner Broadcasting System*, 512 U.S. at 664; *see Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 803 (1984) (Court "may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity.") (internal quotation marks omitted); ."); Casey v. City of Newport, R.I., 308 F.3d 106, 115 (1st Cir. 2002) (rejecting a no-amplification restriction and noting that merely enforcing a noise ordinance would achieve the same goal with a lesser restriction on speech; "as a matter of logic, reliance on the noise ordinance would be less restrictive than a total ban on amplification because it would permit the use of amplifiers at levels that did not exceed the decibel limit set in the noise ordinance."); *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 861 (9th Cir. 2004) ("The undeniable need for traffic regulations, and for enforcement of those regulations, does not demonstrate that there is a significant state interest in banning the protestors entirely except in a few small zones; *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) ("[A] 'regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist' ")(citation omitted); *see also Bays v. City of Fairborn*, 668 F.3d at 823 ("Government must do more . . . than 'assert interests [in reduced congestion and crowed control] that are important in the abstract.'"); *Saieg*, 641 F.3d at 738-737 ("[General] interests [in public safety and order]

a remarkably factually similar situation, described *supra* n. 2, held, where college officials seek to impose a blanket campus ban on a professor as part of an administrative suspension where the conduct at issue did not necessitate such a sweeping ban, "[t]he officials have made no such showing." *Id*. Similarly, the mere fact that there is not a total ban on such activities off campus does not immunize the rest of the ban—including the total ban on campus—from the obligation of CCRI to show a compelling governmental interest and that the restriction is narrowly tailored to protect that interest. As such, at the very least, Defendants must be enjoined from enforcing their sweeping banishment from campus, bar on Plaintiff communications with any CCRI community member othe than for union business, as well as bar from using his CCRI email and CCRI email system, for the reasons set forth in the next section.

### 2. Defendants' Ban on Plaintiff's Access to the CCRI Email System Also Improperly Bars Plaintiff From a Designated Public Forum

Mail systems and means of electronic communication can be, based on government behavior or designation, public fora. *See e.g. Ysleta Fed'n of Tchrs. v. Ysleta Indep. Sch. Dist.,* 720 F.2d 1429, 1432 (5th Cir. 1983) ("The internal mail system of a public school is not a public forum by tradition . . . It may, however, become a public forum 'by designation' if the school opens the system for use by the public, or become a limited public forum by designation if the school opens it for use by certain groups or for the discussion of certain subjects."); *Windom v. Harshbarger*, 396 F. Supp. 3d 675, 684 (N.D.W. Va. 2019) ("Social media, including Facebook, could be considered the modern-day public square, particularly during campaigns, election seasons, or, as here, legislative sessions.")' *See also Perry*, 460 U.S. at 48-49). CCRI faculty emails are one of the designated means of CCRIFA communication. CBA ("B. The Association shall have the right to use faculty mailboxes and email for communications, including mass distribution. An Association physical bulletin board, a pipeline

---

that the defendants have named are merely 'conjectural,' as opposed to 'real.'"); *Ascherl,* 2011 WL 4404145 at *3 (City's identified interest of facilitating orderly flow of pedestrians during festival based more on conjecture than reality).

electronic bulletin board and a website will be made available to the Association on all campuses of the Community College of Rhode Island.).  As such there can be no argument that, at least for the purposes of communication among union members, ***CCRI faculty <u>emails</u> and the <u>email system</u> at large are a designated public forum.***

Despite this, Defendants have barred and continue to bar Plaintiff from using his faculty email. Indeed, Defendants have instructed Plaintiff's new department chair to refuse to copy emails on department or faculty matters to his personal email, instead sending them only to his CCRI email which Defendants continue to refuse him access.  Email from Sybil Bailey dated August 10, 2023 (R.A. II Ex. HH).  Similarly, on the two occasions Plaintiff has been allowed into his office and was able to briefly view his CCRI email, he had many emails from faculty members, staff, and students that had been sent to his CCRI address and which he was not and is not able to now access.  Murray Aff. ¶¶12-13.  Thus, despite Defendants allowing Professor Murray to use his personal email on the CCRIFA listserv, he is still being restricted in use of the CCRI email system for intra-faculty and CCRIFA communications despite it being a designated public forum for that use.  Indeed, CCRIFA President Adam has also been contacted on a number of occasions by faculty/CCRIFA members who have had trouble contacting Professor Murray because of his inability to use this designated means of union communication. Adam Aff. ¶¶22-23.  The problem quite simply is that many people who want to reach the Plaintiff do not know either his personal email or mobile phone number.  Verified Compl. ¶126.  Finally, even Plaintiff's ability to access the CCRIFA listserv has been hampered by Defendants' total ban on Plaintiff using his CCRI email because, as the listserv is setup assuming everyone will be using CCRI emails, emails to and from Plaintiff's personal email through the listserv sometime bounce back or are routed to spam folders.  Accordingly, his ability to communicate with faculty about union, concerted action, and other matters via the listserv are still being impaired despite this work around.  An impairment that exists for no reason other than CCRI's unjustified banishment of the Plaintiff from his CCRI email and CCRI email system.

This restriction of access to a designated public forum must serve a compelling state interest and be narrowly tailored to that interest.  Here the sweeping bar on Plaintiff accessing his CCRI email, for the reasons outlined above, neither serves a compelling state interest in practice, nor is it narrowly tailored.  Even if Defendants could demonstrate that preventing Plaintiff from using his faculty email would prevent unprotected and harmful speech—something which they cannot based on the record before this Court, including their nine-hundred page investigative report on Plaintiff which despite its length and depth provides no such support—a simple bar on speaking to the complainants in question would appear to be both more effective and less burdensome—while having the added advantage of not impairing the Plaintiff's protected rights to free speech and association.

> **3.**    **Defendants Have Given Themselves Unfettered and Unbridled Discretion as to Whether or Not Plaintiff's Can Attend Meetings, Take Part in Committee Proceedings, Campaign or Protest on Campus, and to Access the CCRIFA Office In Violation of the First Amendment.**

Defendants have prohibited Professor Murray from, among other things, in-person on campus faculty and student academic and other interactions and communications. Adam Aff. ¶¶11-12; Murray Aff. ¶¶9-11, 22, 24.  He also is and has been prevented from fully and effectively communicating with fellow CCRIFA union members or carrying out his duties as a faculty union member and Vice-President of the faculty union due to, among other things, the ban on his participation on assigned committees.  This impairment of his speech and association rights are particularly egregious because the Defendants determine, in their unfettered discretion, which committee or meeting he can participate in and which ones he cannot merely by designating which meetings will be held on campus.

By dint of Defendants' fiat about which meetings, hearings, or committee meetings will and will not take place on campus, combined with their refusal to allow Plaintiff on campus for any purpose, Plaintiff has been unable to attend meetings of the Curriculum Review Committee, one of the most important and powerful committees at CCRI and the sole mechanism by which the faculty

can exercise some measure of shared governance over academic matters, because the meetings are held on the Knight Campus. Adam Aff. ¶¶28-29; Murray Aff. ¶¶35-37. Defendants have also banned Professor Murray from meetings of the Seven (7) Week Class Implementation Team committee, which is dealing with a controversial major change in curriculum format by decreasing the length of a semester from 15 weeks to a compressed 7 week schedule. 7 Week Term Email. CCRIFA President Adam expressly appointed Plaintiff to serve on this important committee because of his years of experience as an educator and Department Chair at CCRI. *Id*; Adam Aff. ¶¶14-16; Murray Aff. ¶¶26-27. CCRI has expressly refused CCRIFA offers to host the Seven (7) Week Class Implementation Team committee meetings at an alternate site off campus and has refused to allow Professor Murray on campus for even this limited reason. Adam Aff. ¶¶14-16; Murray Aff. ¶26 Additionally, despite being assigned to the Faculty Stipend and Release Time committee by the CCRIFA, Professor Murray has also been barred from attending meetings of this body because it also meets in person on campus at CCRI, and Defendants have firmly and consistently prevented him from attending by refusing to allow him on campus or to have them meet off campus. Adam Aff. ¶¶14-15; Murray Aff. ¶26.

Further, as a result of being banned from all CCRI campuses, Defendants have also barred Professor Murray from accessing the CCRIFA Union office located on the third floor of the CCRI Knight Campus. The CCRIFA Union office is where all of the CCRIFA records are stored, including member records, prior faculty contracts, grievance records, contract negotiation records, salary studies, and historical records of the union, which Professor Murray clearly and indisputably needs to access in order to effectively perform his work as Vice President. Adam Aff. ¶21; Murray Aff. ¶25.

Defendants argue that because Plaintiff has been able to engage in ***some*** union activity via his personal email and at meetings that Defendants, entirely in their own discretion, allow to take place off campus, the Plaintiff has not sustained an actionable violation of his free speech and association rights. Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief (ECF 14) at 2. The specific factual record above, however, indisputably

demonstrates that Defendants are actively preventing Plaintiff from taking part in union and faculty matters, from taking part in meetings and committees, and from generally communicating with his fellow faculty members or remaining abreast of happenings at CCRI.

Indeed, because Defendants have unilateral control over what committees meet on campus, what other meetings take place on campus, and what emails Plaintiff can receive in his personal email, his ability to exercise his First Amendment rights is left to the total unbridled and unfettered discretion of Defendants, another clear violation of the First Amendment. *See e.g. Driver v. Town of Richmond ex rel. Krugman*, 570 F. Supp. 2d 269, 278 (D.R.I. 2008) ("The reasoning is simple: If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion, by the licensing authority, the danger of censorship and of abridgement of our precious First Amendment freedoms is too great' to be permitted.")(internal citations omitted); *Osediacz v. City of Cranston*, 344 F.Supp.2d 799, 812 (D.R.I. 2004), *rev'd on other grounds*, 414 F.3d 136, 143 (1st Cir. 2005)(reversing on standing grounds but noting that standardless discretion in mayor to approve display on public property was constitutionally suspect and encouraging city to abandon or modify policy)(internal citations omitted).

### 4.     Defendants' Interest In Imposing These Restrictions Is Clearly in Retaliation For Plaintiff's Previous Protected Speech.

The sweeping restrictions on Professor Murray's speech in this case are so overbroad and unjustified so as to leave no other inference but that they are clearly retaliatory and have been imposed to both punish past protected First Amendment speech and to act as a prior restraint to censor protected speech going forward.   The unjustified breathe and lack of justification for these restrictions undermine any claim Defendants could make that these restrictions serve a legitimate and compelling interest other than a retaliatory interest, the motivation for which is amply supported by the factual record in this case demonstrating his years of vigorous and public advocacy on behalf of the faculty and CCRIFA.  *See, supra*, §III., pp. 9-10.  This is particularly true with respect to his successful

advocacy adverse to CCRI's positions in close temporal proximity to his banishment.[14]  *Id.* pp. 10-11.  This conclusion is buttressed by the clear evidence on the record that Defendants do not treat similarly styled complaints, involving more serious conduct, in the same draconian manner that they have in Professor Murray's situation.  July 14, 2017 Harrington Letter.  Specifically, the lack of pre-disciplinary or any sanctions imposed on Defendant Costigan when she screamed at and demeaned the Plaintiff in front of numerous other faculty members.[15]  *Id.*; Murray Aff. ¶¶48-49.  As well as the the other occasion when she screamed at him in her office.  Murray Aff. ¶50.  It is also buttressed by Defendants' previous efforts to improperly use administrative processes to silence Professor Murray when he engaged in speech critical of Defendants.[16]  Murray Aff. ¶52 ("After I led a no confidence vote against President Hughes in 2018, CCRI retaliated against me by summarily removing me as Department Chair in 2019 and attempting to permanently remove me by asserting baseless claims, which were eventually determined to be unfounded.  I was restored to my Department Chair position with back pay.  This was the Defendants' most recent previous attempt to silence me as an advocate for the faculty by removing me from a position of power and influence as a Department Chair.").

Retaliation for engaging in First Amendment protected speech and conduct is an interest that is not only neither legitimate nor compelling, but is outright prohibited by the First Amendment.

---

[14]  In a free speech retaliation case, "[t]emporal proximity alone may, in certain circumstances, support an inference of retaliation." *Gonzalez-Droz v. Gonzalez-Colon,* 660 F.3d 1, 16 (1st Cir. 2011) (citing *Philip v. Cronin,* 537 F.3d 26, 33 (1st Cir.2008)).  Indeed, when temporal proximity between retaliation and protected speech is close, courts "may neither ignore the allegation of temporal proximity, nor presume that it is a mere coincidence." *Nethersole v. Bulger,* 287 F.3d 15, 20 (1st Cir. 2002) (holding in context of a motion to dismiss that close temporal proximity between two events may give rise to an inference of causal connection and this inference must be drawn in the favor of Plaintiff*); Murray v. Town of Stratford,* 996 F.Supp.2d 90, 121-22 (D. Conn. 2014) ("Temporal proximity of the adverse action to the protected activity is a key indicator of retaliation"); *see also Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.,* 252 F.3d 545, 554 (2d Cir. 2001) ("[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.").

[15]  *See, e.g.*, *Econ. Opportunity Comm'n of Nassau Cnty., Inc. v. Cnty. of Nassau,* 106 F.Supp.2d 433, 437 (E.D.N.Y.2000) ("In addition, a plaintiff can also show retaliatory intent by establishing unequal treatment ...").

[16]  *See, e.g.*, *Shub v. Westchester Cmty. Coll.,* 556 F. Supp. 2d 227, 246 (S.D.N.Y. 2008) ("[E]vidence of an ongoing pattern of retaliatory conduct and intent can also establish a causal connection.").   )

*Hartman v. Moore*, 547 U.S. 250, 256, (2006) ("[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out."). Indeed, "[t]he rationale for the First Amendment retaliation doctrine is that 'constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental efforts that fall short of a direct prohibition against the exercise of First Amendment rights.' " *Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 300 (D. Mass. 2017) (quoting *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996)).

**B.    *Irreparable Harm*--The Vast Array of First Amendment Deprivation Visited on Plaintiff by Defendants Constitutes Irreparable Harm.**

As the litany of sweeping First Amendment restrictions detailed above make clear, Plaintiff has suffered and continues to suffer deprivation of his First Amendment Rights to speech and association.    "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Swartzwelder v. McNeilly,* 297 F.3d 228, 241 (3d Cir. 2002) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *see also Citizens for a Better Environment v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir. 1975). "When a government employer's restrictions on employee speech tread on First Amendment interests, those restrictions work irreparable injury." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 107–08 (3d Cir. 2022).  The fact that Plaintiff can exercise some First Amendments rights, at the unbridled and unfettered discretion of Defendants, is of no moment.

Every day and every minute of every day that the Plaintiff is denied his right to his constitutionally protected rights to free speech and association, the Plaintiff suffers irreparable harm as a matter of law.  This includes the Plaintiff's inability to interact and converse with faculty and students between or after classes in the cafeteria, hallways, and other sites on campus or at athletic, social, or cultural events held there.  Murray Aff. ¶11.  It includes the inability to access his CCRI email and email system and thereby freely communicate and receive communications from faculty

and students.  Murray Aff. ¶¶13-18; Adam Aff. ¶23; Verf. Compl. ¶¶40, 41, 125, 126.  It also includes his inability to attend public meetings of his employer, the Council on Post Secondary Education, and voice his opinion.  Murray Aff. ¶34.  The irreparable harm also includes his inability to attend any number of public events held on campus including sporting events, concerts, talks, presentations, and other such public events and activities.  Murray Aff. ¶4.  The irreparable harm includes his inability to maintain his visibility and presence as an engaged, active member of the CCRI community, while at the same time furthering his campaign for CCRIFA Union office, along with the concomitant damage to his personal and professional reputation that has diminished the influence and impact of his academic and union related advocacy at CCRI—damage which increases the longer the banishment is in effect.  Murray Aff. ¶10.  All of this ongoing injury to the Plaintiff's rights to free speech association as a faculty member, CCRIFA member, member of the CCRI community, and a resident of this state is irreparable.  The mere fact that the Plaintiff may not be totally prohibited from engaging in some free speech and expression conduct, as the Defendants repeatedly emphasize in their filings with this Court, does not vitiate this irreparable harm.

   **C.**   ***Balancing of the Equities and the Public Interest*—The Balancing of the Equities and the Public Interest Overwhelmingly Favor Plaintiff**

   Plaintiff is not the only one who is sustaining ongoing harm due to the Defendants' challenged conduct.  All residents and taxpayer in the State of Rhode Island are being harmed as a consequence of the Defendants paying an experienced, capable, and effective long-time professor and department head at a public college to stay home—at a cost easily in excess of $100,000.00 in salary and benefits to date.  There is ongoing injury to students, who are deprived of Plaintiff's knowledge, skill, and abilities in the classroom—not to mention the loss of a potential major at CCRI due to the dismantling of the Criminal Justice and Legal Studies Department in his absence and the reduction in courses and course loads that Department provided in the field of law.  There is also tangible injury to CCRI from the ongoing loss of an effective and longtime, experienced Professor and Department Chair, who is

an advocate safeguarding and promoting shared governance and the best interests of the faculty--who provide the education services CCRI administers and establishes and maintains its prestige as an institution.  Finally, there is the intangible harm to the public from this as yet blatant and unrestrained assault by the Defendants on protected rights to free speech and expression.  If the First Amendment means anything, it means freedom from governmental oppression, sanction, punishment, and censorship.  It is an injury to everyone everywhere when those who are critical of a public employer and/or are vigorous advocates for the rights and best interests of workers are preemptively punished, censored, and silenced.  Not only is the Plaintiff's voice being silenced, but also all the untold numbers who will be deterred from speaking out in the future if this Court does not grant relief.

Balanced against the foregoing irreparable harm to the Plaintiff and injury to the public is the unlawful motivation and benefit to the Defendants to punish, silence and censor Plaintiff and to deter those like him in the future who dare advocate on behalf of faculty and students contrary to the Defendants' desired plans and positions.  An unlawful benefit achieved by initiation of baseless disciplinary proceedings and punitive banishment during the pendency of those proceedings, without any compelling or even legitimate public interest.  Justice may be blind, but the overwhelming weight of where the equities lie in this case is clear and compelling.

### V.    CONCLUSION

**WHEREFORE**, Plaintiff respectfully prays that this Court grant his Motion for Temporary Restraining Order and Preliminary Injunctive Relief and enter an order enjoining Defendants as prayed for therein.

Plaintiff,

By his attorneys,

**Sinapi Law Associates, Ltd.**

**Date:  December 22, 2023**               /s/ **Richard A. Sinapi**

**Richard A. Sinapi, Esq**.  (#2977)
**Chloe A. Davis, Esq.** (#9334)
2374 Post Road, Suite 201
Warwick, RI 02886
Phone:  (401) 739-9690; FAX:  (401) 739-9040
Email: ras@sinapilaw.com; cad@sinapilaw.com

## CERTIFICATION OF SERVICE

I hereby certify that on the **22nd** day of **December 2023, t**his document was electronically served on the below attorney of record on the above date:

**Steven M. Richard, Esq.**
**Nixon Peabody LLP**
**One Citizens Plaza, Suite 500, Providence, RI 02903-1345**
**Email:  srichard@nixonpeabody.com**
**T/ 401.454.1020  M/ 401.580.3406  F/ 866.947.1332**

/s/ **Richard A. Sinapi, Esq,**