# EXHIBIT BB

Page 1

```
1
2
3
4
5
6
7
8
            TRANSCRIPTION FROM AUDIOTAPE
9
     IN RE: STEVEN MURRAY INTERVIEW
10
         WITH CCRI HUMAN RESOURCES
11
12
               12-7-2023
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 2

1       MICHELLE DARGON:  I did bring a copy of
2   the policies.  I know I had e-mailed them, but
3   I'm a paper person, so I didn't know if you would
4   like them in print there.
5       SPEAKER:  Yes, for sure.
6       MICHELLE DARGON:  Let me turn on the
7   microphone.
8       SPEAKER:  I just did that.
9       MICHELLE DARGON:  Yes.  You know with
10  my luck, the kids (inaudible) me in.  Okay, so we
11  can start.  Okay.  And I apologize.  This is
12  Michael --
13      SYBIL BAILEY:  Okay.
14      MICHELLE DARGON:  -- Attorney Sinapi's
15  assistant.
16      SYBIL BAILEY:  (Inaudible) Steven --
17      MICHAEL DA CRUZ:  Yes, we saw each
18  other in the hallway walking in, yeah.
19      MICHELLE DARGON:  Okay.  I always fail
20  at that part.
21      SYBIL BAILEY:  No, it's good.
22      MICHELLE DARGON:  Okay.  The first
23  thing I am just looking to clarify before we kind
24  of start off on everything is I had originally

Page 3

1   e-mailed Mazene (sic), just because I know he was
2   originally the union representative for Steve,
3   but he also is the president.  So I wanted to
4   make sure that it was clear that we weren't
5   looking for another union for Weingarten to come
6   in and join us.
7       RICHARD SINAPI:  I'm the Weingarten
8   rep.
9       MICHELLE DARGON:  Okay.
10      SYBIL BAILEY:  That is what I thought.
11      MICHELLE DARGON:  I just -- that is
12  what we thought, but I didn't want to make that
13  assumption.
14      RICHARD SINAPI:  Yes, yes.
15      MICHELLE DARGON:  Perfect.
16      RICHARD SINAPI:  No use having too many
17  people.
18      MICHELLE DARGON:  Excellent.  All
19  right.  And I am going to type as we go, if that
20  doesn't bother anybody.
21      RICHARD SINAPI:  No, but I have a
22  couple of preliminary questions, if you don't
23  mind.
24      MICHELLE DARGON:  For sure.

Page 4

1       RICHARD SINAPI:  Sure.  So I just want
2   to clarify the parse of this meeting.  Is this a
3   pre-deprivation hearing or just an investigatory
4   meeting?
5       MICHELLE DARGON:  It's just an
6   investigatory meeting, so actually part of that
7   policy -- another reason I kind of printed it is
8   just to focus and narrow in on Section 62.  I'm
9   required under this policy to separately
10  interview all persons involved, including any
11  witnesses in order to obtain accurate, written
12  accounts of the incidents.  So again, this is
13  just the investigatory stages, and should it rise
14  to further action after this level, then we would
15  go through the correct due process there.
16      RICHARD SINAPI:  Perfect.  Okay.  Next
17  question --
18      MICHELLE DARGON:  Sure.
19      RICHARD SINAPI:  -- in that regard,
20  so -- and you sent me the e-mail --
21      MICHELLE DARGON:  Um-hum.
22      RICHARD SINAPI:  -- of November 29th,
23  explaining it.  I just want to make sure I
24  understood the nature of the subject matter of



Page 5

1  the investigation.  As I understand it,
2  basically, the subject matter is the same facts
3  as the Title 9, but different policies you're
4  looking at as applied to those facts.
5        MICHELLE DARGON:  Correct.
6        SYBIL BAILEY:  Um-hum.
7        MICHELLE DARGON:  Yes.
8        RICHARD SINAPI:  All right, so I got
9  that correct, so in terms of investigatory
10  material, I take it you have access to the sworn
11  interview transcript statements of the three
12  complainants, of my client, their e-mails, their
13  complaints, and all that, so you have all that, I
14  take it?
15        MICHELLE DARGON:  Yes, so I have the
16  full report that was provided to CCRI from
17  (Inaudible), sorry, attorney, but also, the
18  supplemental that was provided as well.
19        RICHARD SINAPI:  Great and then again,
20  with all his -- he attached all his investigatory
21  material.
22        MICHELLE DARGON:  He did, yes, so --
23        RICHARD SINAPI:  Okay.
24        MICHELLE DARGON:  -- so every single

Page 6

1  transcript that he had done, all of the
2  additional exhibits that were provided.  We also
3  have your motion to dismiss and the additional
4  supplemental that was provided with that, too.
5        RICHARD SINAPI:  Great.
6        MICHELLE DARGON:  This is just, you
7  know, why I said that -- I thought an hour, if we
8  do need more time, we will just reschedule,
9  because I do want to be mindful of everybody's
10  time.  We have other obligations.  It's really
11  just to reiterate certain points that are in
12  there and to get clarifying information, too, and
13  so part of the investigatory process, I just kind
14  of wanted to narrow in scope and ask a couple of
15  questions tied to that report that might be
16  relevant, and did you have any other questions
17  before I kind of kick us off?
18        RICHARD SINAPI:  Makes sense -- so you
19  mentioned about re-interviewing all the
20  witnesses.  Are you going to re-interview them in
21  addition to all of the information you already
22  have?
23        MICHELLE DARGON:  We are, yup.  So it
24  would be obviously more narrower in scope, kind

Page 7

1  of looking and seeking clarification on
2  information that was provided.  And at this time
3  I am not sure if it's all of the witnesses, part
4  of that Title 9 investigation, because that was
5  done under the pains and penalties of perjury for
6  everybody.
7        RICHARD SINAPI:  Um-hum.
8        MICHELLE DARGON:  But just people whose
9  information may not have been as clear or
10  thorough.  The witnesses tied to the violence in
11  the workplace prevention policy are likely to be
12  the same, so we are still in kind of the
13  beginning phases of going through that
14  investigatory process under the policy.
15        RICHARD SINAPI:  So you haven't
16  interviewed anybody yet?
17        MICHELLE DARGON:  We have.  We just
18  haven't finished.  You were kind of in the middle
19  of this.
20        RICHARD SINAPI:  In the middle of the
21  process?
22        MICHELLE DARGON:  Yes.
23        RICHARD SINAPI:  You are going to
24  provide us with that information at some point, I

Page 8

1  take it.
2        MICHELLE DARGON:  Aligned with the
3  policy and within consult with our general
4  counsel -- in-house counsel, then, yes.
5        RICHARD SINAPI:  Okay.  Thank you.
6        MICHELLE DARGON:  You're welcome.
7  Anything further?
8        RICHARD SINAPI:  Now, it's the
9  investigation, pre-deprivation (inaudible).  If
10  it was a predep, you would have to provide it.
11        STEVEN MURRAY:  Okay.
12        RICHARD SINAPI:  Okay.
13        MICHELLE DARGON:  All right, so like I
14  said, my questions are a little bit more narrower
15  in scope, and they are a little subjective, so I
16  do recognize that.  So the first one is, Steve,
17  could you please describe your working
18  relationship with faculty.
19        STEVEN MURRAY:  Which faculty?
20        MICHELLE DARGON:  In general.  It's a
21  generalized question.
22        STEVEN MURRAY:  My working
23  relationship?
24        MICHELLE DARGON:  Yes.



STEVEN MURRAY
Steven Murray Interview Meeting

December 07, 2023
9–12

Page 9

1    STEVEN MURRAY: I am not sure if I
2  understand the question. I mean, I have a
3  working relationship as the department chair with
4  the faculty of my department. I get along
5  excellently with all those people. There's
6  roughly 300 full-time faculty and another 6, 700
7  adjuncts. I'm not sure what you mean by -- I
8  have a relationship with all of those roughly 900
9  people.
10    MICHELLE DARGON: And with all the
11  roughly 900 people, how would you describe that,
12  too?
13    STEVEN MURRAY: It differs from person
14  to person, of course.
15    MICHELLE DARGON: Okay. Overall,
16  though, how would you describe it? I know you
17  said "excellent" within your own department as
18  chair, but as --
19    STEVEN MURRAY: I try to get along with
20  everybody. I'm a strong advocate for the
21  faculty, students, the college. I have
22  devoted -- I think, I've been there -- I am not
23  sure if this is my 30th or 31st year. I came
24  there in 1993. I worked there part-time before

Page 10

1  that, and I've devoted my professional career to
2  the college and the students and the faculty.
3  (Inaudible) I was the union president for a
4  little more than four years and probably the
5  vice-president, and I do that out of a sense of
6  duty to the faculty and the college, the people
7  of Rhode Island. I try to do my best for
8  everybody.
9    MICHELLE DARGON: Excellent, okay. How
10  about, could you describe your working
11  relationship with your direct supervisor, your
12  current one, first.
13    STEVEN MURRAY: I am not sure who that
14  is. I mean, since they have kind of closed my
15  department, I guess it would be Dean Nauman. It
16  was Bill Stargard. There were nine deans before
17  that, in nine years, roughly, within my division.
18    MICHELLE DARGON: Nine deans?
19    STEVEN MURRAY: In nine years.
20    RICHARD SINAPI: Do you want him to go
21  through all nine?
22    MICHELLE DARGON: No, I think really
23  what I -- they're kind of open-ended questions,
24  so --

Page 11

1    RICHARD SINAPI: I am not trying to be
2  facetious, by the way.
3    MICHELLE DARGON: No, I understand.
4    RICHARD SINAPI: I am just trying to
5  see what you want to -- you know, what you want.
6    MICHELLE DARGON: No, and again, it's
7  just kind of just looking to see how Steve is
8  just -- like, feels about the overall environment
9  and his working relationships with everybody, so
10  it is a rather subjective question, but it's
11  just, you know, to see how you find the
12  environments in the workplace.
13    STEVEN MURRAY: Hang on one second.
14    MICHELLE DARGON: Sure.
15    RICHARD SINAPI: That is up to you.
16    STEVEN MURRAY: Yes, I mean, I would
17  say I have a very good professional relationship.
18  If you look at -- you have access to my
19  professional file; it's made part of this. I
20  have outstanding evaluations from my supervisors,
21  including Bill Stargard, Allison Hanley, John
22  Cole, Brian Burkley-Bearman (sic). I think those
23  are the only ones in my professional file.
24  They're all outstanding, and my faculty

Page 12

1  evaluations in the file are all outstanding as
2  well.
3    MICHELLE DARGON: Okay, perfect.
4    STEVEN MURRAY: Vice-president Costigan
5  came to my house in 2020 and gave me a gift, kind
6  of a, you know, again, you know, encouraging me
7  and whatnot, you know, saying what I was doing
8  was the right thing. I have never had a
9  supervisor come to my house and leave a gift on
10  my front doorstep, and that's part of the record,
11  and it's -- I don't think she would do that
12  unless she had a lot of respect for me.
13    MICHELLE DARGON: Okay. How about
14  outside of your supervisor; how would you
15  describe your working relationship with members
16  of the administrative team?
17    STEVEN MURRAY: Individual people? I
18  mean, the administrative team is, again, I don't
19  know how many people --
20    MICHELLE DARGON: Yes, so I think --
21  and I know you had mentioned that you had worked
22  direct -- you know, you have two immediate
23  current deans, Stargard and the transitions
24  (inaudible), and then nine deans in nine years

Page 13

1  and you talked about Vice-president Costigan, but
2  how about the rest -- the other vice-presidents,
3  other deans, that aren't maybe perhaps your
4  direct supervisors that you've worked with, and
5  then both the -- and I know you mentioned, again,
6  Vice-president Costigan, but also the former
7  president as well.
8      STEVEN MURRAY:  President Hughes?
9      MICHELLE DARGON:  Yes.  Meghan Hughes,
10  yes.
11      STEVEN MURRAY:  When she would see me,
12  she would hug me.  So again, we had a -- again, I
13  don't know.  I'm not sure of the question again,
14  but I think on a personal level, we always got
15  along very well.  On a professional level, you
16  know, again management, workers, there were
17  issues, obviously, and things like no confidence
18  votes and whatnot done by the faculty and not
19  done by me, by the faculty, and so -- but I mean,
20  again, she was always friendly to me.
21      MICHELLE DARGON:  And then how about
22  support staff.  So I understand that you had, as
23  the chair, some support staff under you, but you
24  also worked with support staff through other

Page 14

1  kinds of conversations, so if you were looking to
2  work with a dean or another chair, you would go
3  through their support staff.  Student services,
4  academic affairs, how about the -- again, an
5  overall working relationship with support staff?
6      STEVEN MURRAY:  Again, my direct
7  support staff, Maureen (Inaudible), in this
8  matter, wrote a letter.  She worked with me for
9  20 years.  It just shows an outstanding
10  relationship, professional and personal.  My
11  current support person (Inaudible), you got a
12  letter from (Inaudible).  The person who sat
13  right outside my door (inaudible), again, has put
14  a letter in.  Again, it's just complimentary to
15  me, without a doubt.  If you spoke to the other
16  people, again, in my area, at the night campus,
17  Joanne Albro, Lauren -- I'm not sure of --
18  (Inaudible).  My 19 hour person, Leslie
19  (Inaudible) sister Lauren, you know, (inaudible)
20  professional relationship, and many others at the
21  college.  I mean, I have been there 30 years, you
22  know, people in other people departments, Gail
23  (Inaudible) in the English Department, and again,
24  I don't know, you know, again, I'm not --

Page 15

1      MICHELLE DARGON:  All right.  How do
2  you respond and handle opinions and processes
3  that you disagree with in the workplace?
4      STEVEN MURRAY:  Could you repeat that.
5      MICHELLE DARGON:  Sure.  How do you
6  respond and handle opinions and processes you
7  disagree with in the workplace?
8      STEVEN MURRAY:  Professionally.  I
9  mean, I always listen to other people.  I really
10  do.  I realize that other people could have other
11  opinions.  It's never personal.  People are
12  passionate about issues that are important to our
13  students, the college and the state, as I am, and
14  I always respect other people's opinions, even
15  when I disagree with them.  I have never swore at
16  anybody, you know, used foul language.  I have
17  never threatened anyone, physically or otherwise.
18  We've had professional disagreements.  That's
19  normal in the workplace.  And again, I always try
20  to keep it professional and not personal.
21      MICHELLE DARGON:  All right, so
22  another -- this is another kind of multi-part
23  question.  Have you ever been told your behavior
24  is unacceptable by somebody in the workplace?

Page 16

1      STEVEN MURRAY:  Told by anyone?
2      MICHELLE DARGON:  Yes.
3      STEVEN MURRAY:  And what do you mean by
4  unacceptable?
5      MICHELLE DARGON:  Just has anybody
6  stopped you and said, you know, Steve, I find A,
7  B, C is very unprofessional or unacceptable.
8      STEVEN MURRAY:  Last fall Dean Stargard
9  said he didn't like the tone of my e-mails, and I
10  expressed back to him; what do you mean by the
11  tone?  I think his Assistant Liz Del Sesto made a
12  comment that I sent them at night, so I just
13  said, is there a time period?  They said, they
14  were too long, and I politely said, well, what is
15  the length that I can or cannot do; what is
16  excessive?  What is unexcessive?  They never
17  answered those questions.  I don't know how you
18  kind of police tone in an e-mail.
19      MICHELLE DARGON:  Sure.
20      STEVEN MURRAY:  And I don't put things
21  in all caps.  I don't bold print things.  I just,
22  you know, laid out whatever the issue is as
23  factually and concisely as I can, and I ask for a
24  response.  Again, if they had a different



Page 17

1  opinion, again, things, like, go for overload
2  contract provisions and whatnot, sometimes the
3  administer would have one position, faculty
4  member or a department chair might have another.
5  I always kept that professional, and I never
6  understood why that was a problem, just to raise
7  those issues.
8          MICHELLE DARGON:  Okay.  And in, I
9  guess, this example, did he ever elaborate on why
10  it might be an issue?  I know you said he was not
11  responsive to the hours and the length, when it
12  was sent, but in terms of the subject matter?
13          STEVEN MURRAY:  No, I really don't
14  think he was.  And again, I think if you look at
15  his evaluation of me, there's really nothing in
16  his evaluation about that.  There are sections on
17  communication and whatnot in the evaluation.  I
18  don't think I'm faulted for any of that.  Any of
19  my evaluations going back, through all of these
20  deans, I have never been criticized with any of
21  that, and I think that's, again, where that type
22  of evaluation would take place.
23          MICHELLE DARGON:  Okay.  All right.
24  How about, have you ever been told your behavior

Page 18

1  is rude?
2          STEVEN MURRAY:  Rude?
3          MICHELLE DARGON:  Rude.
4          STEVEN MURRAY:  By whom?  By, like --
5          MICHELLE DARGON:  Just anybody in the
6  workplace.
7          STEVEN DARGON:  I don't have a memory
8  at this moment --
9          MICHELLE DARGON:  Sure.
10          STEVEN DARGON:  -- of any individual or
11  specific person saying, you are rude.  Again, I
12  have been there 32 years.  I have been a leader
13  there, you know, and I have been on different
14  committees, again, and whatnot.  I was the
15  president of the union, and again, you have
16  professional disagreements.  They are never
17  personal.  I always make that very clear.  It's
18  never an attack on anyone, individually.  It's
19  just you may have one opinion and I have another,
20  and I think in any type of work setting you
21  should be able to have a professional discussion
22  about that.  Sometimes when people don't like
23  your response, they react as they're going to
24  react.  I have had people scream at me.  I've had

Page 19

1  people use foul language toward me, including
2  administrators.  And I have made the college
3  aware of that.
4          MICHELLE DARGON:  How about, have you
5  been -- excuse me, have you ever been informed
6  that your behavior is insulting?
7          STEVEN MURRAY:  Again, I don't -- I
8  have had disagreements, for instance, with -- she
9  was Vice-president Costigan at the time.  I mean,
10  it's -- and again, that is all documented.  I
11  don't know if she used the word insulting.
12          MICHELLE DARGON:  And then how about
13  inappropriate?
14          STEVEN MURRAY:  Again, if you cited
15  some specific examples, I would be happy to
16  comment, but you are asking in 32 years.
17          RICHARD SINAPI:  Can I just get some
18  clarification.  Is there some suggestion that any
19  of the many administrators or 300 faculty, who
20  subjectively took something personal or read into
21  language -- something that is a violation of
22  policy 5.01; is that the position of CCRI?
23          MICHELLE DARGON:  So 5.01 is standards
24  of conduct, just in the overall scope of

Page 20

1  representation, and how we act as state
2  employees, and how we act as faculty amongst the
3  college, and within that, it's just kind of
4  focusing on the way we kind of handle inner
5  conflict, inner discussions or discourse.  And
6  making sure that we're holding the college to the
7  best esteem possible.
8          RICHARD SINAPI:  I understand that, but
9  unfortunately or fortunately, it's a public
10  college.
11          MICHELLE DARGON:  Sure.
12          RICHARD SINAPI:  And the First
13  Amendment tolerates robust, critical, sometimes
14  harsh communications --
15          MICHELLE DARGON:  Sure.
16          RICHARD SINAPI:  -- regarding matters.
17  And additionally, you know, attacking the issue,
18  and somebody taking it personal, doesn't -- is
19  not sanctionable either -- in any professional
20  setting or certainly under the First Amendment,
21  and just -- again, I'm just following your line
22  of questioning, and I don't -- I want to make
23  sure we are not going there.
24          SYBIL BAILEY:  I had struggled with



Page 21

1  that as well.
2      RICHARD SINAPI:  H'm.
3      SYBIL BAILEY:  Especially when it's
4  union business and negotiating.  I mean, I've sat
5  behind the table with many aggressive, assertive
6  people.  At some point, though, we are not always
7  wearing our union hat, if you will, and if I tell
8  you or let you know or several people say, ooh,
9  ow, it's never going to be productive, and that
10  is the message we're kind of getting; people do
11  feel all the things that we're kind of trying to
12  ask your perspective; do you realize that?  "It
13  isn't helping, so I don't think you're a very
14  good lawyer.  I don't -- you don't know your
15  job."  Like, it's things like that, that people
16  take insulting.  Whether or not it's your
17  personal opinion, not everyone wants it, and that
18  is what we're struggling with.  To be honest,
19  it's, like, okay, we have got to find a better
20  way to be more effective professional colleagues,
21  and I get your point.  Listen, I'm passionate.  I
22  want to do this; I want to do that, but some of
23  the comments, things like that, are just --
24  people feel -- I'm used to it, so -- and I don't

Page 22

1  take it personally, but I have worked in this
2  setting.  I mean, we can argue, fight, whatever,
3  and go out for coffee later.
4      STEVEN MURRAY:  Sure.
5      SYBIL BAILEY:  So -- but not everyone
6  feels that, and I guess it's a different position
7  as well for me.
8      RICHARD SINAPI:  Sybil, I understand
9  what you're saying, but I have to follow-up on
10  it.  When the discourse does not involve
11  vulgarity, threats of violence, threats of bodily
12  harm, when the discourse is about ideas, not
13  about people --
14      SYBIL BAILEY:  Right.
15      RICHARD SINAPI:  -- not about their
16  character.
17      SYBIL BAILEY:  Right.
18      RICHARD SINAPI:  But it's about ideas
19  and positions and what is going on; there is no
20  sanction for that.  There is no way to police
21  that.
22      SYBIL BAILEY:  Um-hum.
23      RICHARD SINAPI:  There has to be,
24  particularly, in the public setting or where it

Page 23

1  involves -- in the private setting, where it
2  involves union business, there is no policing
3  that, and that is just -- that is just a fact.  I
4  mean, I reviewed all of the transcripts,
5  everything.  I have reviewed people's, you know,
6  honest interviews with the investigator, and you
7  know, nobody attacked them.  They attacked their
8  positions.
9      SYBIL BAILEY:  (Inaudible).  I'm sorry.
10      RICHARD SINAPI:  So they were -- there
11  was a -- there was disagreement over their
12  positions, over their -- the position that they
13  were trying to advocate for.  There was nothing
14  personal.  It just -- that is all it is.  And the
15  First Amendment and the Labor Relations Act
16  doesn't tolerate trying to police, you know, the
17  tone that you use, when you are doing that,
18  again, short of vulgarity, or you know, what have
19  you.
20      SYBIL BAILEY:  Even threats, if you
21  would say -- and I'm not saying you are
22  threatening to hurt someone like that.
23      RICHARD SINAPI:  I understand.
24      SYBIL BAILEY:  But a threat made, "you

Page 24

1  are going to be sorry that -- you know what,
2  fine; you're not going to give me that; you're
3  going to be sorry about that or this isn't the
4  end of that."  That's just giving you an example
5  of not necessarily somebody (inaudible) it, but
6  my paraphrasing in conversations, again, that --
7  and it's your right.  You have a right, but also,
8  don't we want to work more collaboratively
9  (inaudible).  We don't always have to be -- and
10  that is our -- that's our issue.  We are trying
11  to get it to a point where, can we at least work
12  more professionally together, if you don't mean
13  to do that, but I'm telling you, you're doing it
14  to me.  This is just me.  Maybe I might say, all
15  right, I won't be so whatever; I don't know.
16  Just examples.
17      STEVEN MURRAY:  People scream at me,
18  that used vulgarity against me.  The college
19  doesn't (inaudible) anything about that.
20      SYBIL BAILEY:  And what if we were to
21  say that it's in response to you, not making it
22  right.  I am not.  And I am saying that could be
23  just as well, but I get it.  I just wish that
24  there would be some acknowledgment on both sides,



Page 25

1  that going forward, could we maybe figure this
2  out, but this is just me.  I am not even one of
3  the --
4         STEVEN MURRAY:  I never want to insult
5  anybody.  I have never had a personal attack on
6  anybody.  As Dick said, it's about positions.
7         SYBIL BAILEY:  But even if you -- like,
8  I am not qualified.  You are telling me, "you're
9  not even qualified for your job.  I don't think
10  you're doing a good job."  Like, do I really care
11  about your opinion, and I am being facetious.
12        STEVEN MURRAY:  Everybody is entitled
13  to an opinion.
14        SYBIL BAILEY:  What is that?  Not
15  everybody --
16        STEVEN MURRAY:  Everybody is
17  entitled --
18        SYBIL BAILEY:  -- wants to hear your
19  opinion.  "It's embarrassing me, and as my -- as
20  a professional, I don't really appreciate you
21  embarrassing me in front of this group, so take
22  it or leave it, okay."  I'm just saying to you
23  that -- and I get it, but --
24        RICHARD SINAPI:  The workplace is wide

Page 26

1  open, robust communication.  It's a rough and
2  tumbled place.  It's not kindergarten, okay.
3         SYBIL BAILEY:  H'm.
4         RICHARD SINAPI:  And that is just the
5  way it is.  If you look -- and context matters,
6  okay.  I read every single piece of material that
7  the investigators dug up, the -- whatever
8  witnesses, about Mr. Murray's conduct over 32
9  years, okay.  There was nothing personal about
10  it.  It was always arguing about issues, ideas.
11        SYBIL BAILEY:  But personal --
12        RICHARD SINAPI:  Mr. Murray is very
13  vigorous.  He is very passionate.  He is very
14  persistent about his positions and what he
15  believes in, and he picks apart arguments that
16  are weak.  People don't like it.  They get upset.
17  They take it personal.  He is picking apart the
18  weakness in their arguments, and what they're
19  doing wrong, and why he disagrees, and they feel
20  threatened.  They feel, "ooh, ooh, he is
21  attacking my belief structure.  He is undermining
22  me.  Oh, oh, I feel -- I feel I am not in my safe
23  place."  That is the way the workplace is.  You
24  cannot police that, okay, and my client will tell

Page 27

1  you, and you can ask him.  Put it on the record,
2  okay.  If somebody tells him, "gee, you know, I'm
3  a little, you know, I'm a little upset about
4  this."  My client is not going to push the
5  envelope of his First Amendment privilege --
6  rights, if he knows somebody is really in
7  distress, you know, and anxious.  And I got to
8  tell you, the debate about, for instance --
9  again, context matters, Tara Abbascia being a
10  lame duck.  This is a significant issue with
11  strong differences of opinion on that, and it's
12  very important, and my client and others felt
13  very strongly about that.  And if Ms. Abbascia
14  felt, "ooh, ooh, I am being attacked."  We're
15  attacking the decision.  It's bad for the union.
16  I'm sorry you don't feel good about it, okay, and
17  if you look at the discourse, the discourse was
18  about the fact -- not that she was a bad person,
19  not that she was not doing a good job, but that
20  it was perceived that, as a lame duck, she would
21  not be effective.  Even the union mediator said
22  that.  So it was a perception, and it was a
23  strong concern that many people had, but it
24  wasn't personal, and I understand.

Page 28

1         SYBIL BAILEY:  (Inaudible)
2         RICHARD SINAPI:  And let me finish.  I
3  want to continue on that.
4         SYBIL BAILEY:  Yes, sorry, sorry.
5         RICHARD SINAPI:  I can understand how
6  Ms. Abbascia thought, oh, gee --
7         SYBIL BAILEY:  Yup.
8         RICHARD SINAPI:  -- But that is -- that
9  is a debate over an issue.  You made a decision.
10  People disagree with it, so you're arguing about
11  the position.  Nobody is attacking her.  Nobody
12  is saying she is a bad person.  Nobody is saying
13  she didn't try to be a good president and do the
14  best she can.  It is about a decision.  There is
15  no policing that.  Again, sort of vulgarity, what
16  have you.  I want to comment on one other thing
17  about threats, okay.  People can threaten things
18  politically, argumentatively, as long as, again,
19  it does not imply some threat of physical harm or
20  physical negativity, and let me say something
21  else.  I am going to give an example, because
22  it's in the record.  My client had a disagreement
23  with -- a concern with Ms. Abbascia, in
24  particular, that she went on the faculty e-mail



Page 29

1  and said, "people are --
2      SPEAKER:  Spreading lies.
3      RICHARD SINAPI:  -- spreading lies."
4  Okay.  Now, you know at that time the debatable
5  TA, Steve, was one of the most outspoken
6  advocates, not the only one engaged in this group
7  debate, you know, on the Listserv, but he was,
8  you know, the most outspoken, and leading the
9  position against it or one of the positions
10  against it.  And he was concerned that she meant
11  him, and they had, as you know, you saw the
12  e-mails going back and forth on it, and at one
13  point he said, "well, if it is not me, then just
14  say it's not me.  I am not pointing a finger."
15  She goes, "oh, I am not going to say that."  He
16  goes, "well, I'll release the e-mails, which show
17  that you -- it's not me.  That you agree it's not
18  me."  Now, is that a threat?  I guess -- I don't
19  know if it's a threat.  It's a condition, but
20  that is -- there's nothing wrong with that.  It's
21  a discourse.  It's a discourse back and forth,
22  and it's an issue about his reputation, and he
23  has got a right to say -- or he could have just
24  published it.  Hey, here is all the e-mail

Page 30

1  chains.  Is that better?  I don't know.  We are
2  not -- it's not something you can police.
3      SYBIL BAILEY:  Right.
4      RICHARD SINAPI:  It's not something you
5  can police.  And again, I'm using that as an
6  example.
7      SYBIL BAILEY:  No, I get that, no.
8      RICHARD SINAPI:  You know what I am
9  saying?
10      SYBIL BAILEY:  Yup, I do.
11      RICHARD SINAPI:  So you know, again --
12      SYBIL BAILEY:  I --
13      RICHARD SINAPI:  You know, all the
14  discourse that my client had with Ms. Sneesby,
15  again, read all the material.  He never said that
16  she was not -- did not try her best as senate
17  president, didn't try her best at what she
18  (inaudible), you know, was a big participant, and
19  the founding of the union and the founding of the
20  constitution for the senate.  What he said is, if
21  there was a weakness in the documents, establish
22  it with respect to share governance, which she
23  frankly agreed with, but when Steve advocated
24  about it, particularly, on the Listserv or --

Page 31

1      STEVEN MURRAY:  Yes.
2      RICHARD SINAPI:  -- she took it
3  personal.  Like, oh, oh, you are attacking me,
4  like, I did something wrong.  He wasn't.  He was
5  trying to point out that there was a weakness in
6  it, and we need to fix it, okay.  When he pointed
7  out he thought that the faculty -- that the
8  Senate was being manipulated by the faculty to
9  put forth some of their proposals and --
10      STEVEN MURRAY:  The administration.
11      RICHARD SINAPI:  The administration, I
12  am sorry, the administration and not the faculty,
13  pointing that out, how they were, you know, using
14  it to do that, again, she took it personal.  He
15  was not attacking her.  He was just making his
16  opinion on what he saw going on.  He also had
17  facts to support that.  That is just his opinion.
18  That is his position.  He was not attacking her.
19  He was not attacking her or her abilities or her
20  good intentions.  It was what he saw happening in
21  terms of how it was functioning, at least in
22  part.  That is it.  I mean, that is a totally
23  protected First Amendment activity.  If it's not
24  in a public college setting, where ideas clash,

Page 32

1  where opinions clash, where world views clash,
2  there's going to be all kinds of stuff.  I mean,
3  somebody argues with you and attacks your world
4  view, attacks your, you know, your culture or
5  your religious beliefs and is contrary, like, oh,
6  does that feel threatening?  It might, but that
7  is part of debate, and that is what I'm trying to
8  get at.  Sorry.
9      SYBIL BAILEY:  I have a question,
10  though.  No, (inaudible).  First of all, I get it
11  in the union matters, how you discuss or debate
12  with (inaudible) of the world in your -- that is
13  your world.  That is -- I mean, we're struggling
14  with -- or my lens, because it's looking like we
15  are not helping our team in terms of people
16  coming in and saying, HR, this is unacceptable,
17  and you're right, some of it is their political
18  points, and some of it is that -- fine, you are
19  going to be miserable.  You are going to be sorry
20  you didn't do that for me; that is not a physical
21  threat, at all.  Well, it could be, but it's -- I
22  don't -- I am not taking it as that, but it does
23  feel like I am going to make your life miserable.
24  The end of the day, the policy for overload is



STEVEN MURRAY                                    December 07, 2023
Steven Murray Interview Meeting                          33–36

Page 33

1  what it is.  And I'll be -- I know you know that
2  backwards, forwards, inside out.  I kind of know
3  the gist of it.  You get so much.  You get
4  (inaudible) the exception, so in the end, the
5  exceptions (inaudible) because of the quote,
6  unquote assertive beat down, relentless attack on
7  it, my word, please, in terms of Stargard says --
8  go ahead.
9       STEVEN MURRAY:  May I just address
10  that, because again, we've got a grievance
11  hearing next Monday with Rebecca Heimel on that.
12       SYBIL BAILEY:  Okay, good.
13       STEVEN MURRAY:  And I just --
14       SYBIL BAILEY:  I am sorry.
15       STEVEN MURRAY:  No, you were -- I don't
16  think you were at the college yet, but when I was
17  the president of the union, when we did the last
18  contract 2018 to 2021, we -- I sat across the
19  table from Rosemary (Inaudible), Ann Marie
20  Coleman and one of the issues we resolved was on
21  overload.  At that time three credit courses, you
22  could only do seven over the course of the year,
23  so we increased it to eight.  We put the language
24  in, and it was very clear.

Page 34

1       SYBIL BAILEY:  Um-hum.
2       STEVEN MURRAY:  And then moving beyond
3  that, the administration did not follow the
4  contract, I mean, clearly.
5       SYBIL BAILEY:  And I am not debating
6  that piece.
7       STEVEN MURRAY:  No, but I am just
8  saying, so Sybil, there's nothing I did wrong, in
9  the sense of, well, wait a minute, you know, all
10  we want is what the contract says.  We --
11       SYBIL BAILEY:  And I get that.
12       STEVEN MURRAY:  Last fall, though, Dean
13  Stargard -- this is where it gets wrong, he
14  communicated to me; oh, myself and the other two
15  deans have decided that instead of being able to
16  do eight, as the contract says, or seven, like it
17  used to be, we have decided it's six, so again,
18  my only response to him was -- it wasn't a
19  personal attack on him.  Dean, you are wrong.  I
20  can't just sit there and say, oh, okay.
21       SYBIL BAILEY:  Um-hum, um-hum.
22       STEVEN MURRAY:  Right, I mean, this is
23  the faculty's rights to make money, so I mean,
24  again, he ignored that.  I didn't personally

Page 35

1  attack him.  I never swore at him.  I just said,
2  you're wrong.
3       SYBIL BAILEY:  Um-hum.
4       STEVEN MURRAY:  And I hope I'm allowed
5  to say that, and I filed a grievance.
6       SYBIL BAILEY:  Um-hum, okay.
7       STEVEN MURRAY:  That's the process.  I
8  mean, again --
9       SYBIL BAILEY:  And I get that.  We
10  don't agree on --
11       STEVEN MURRAY:  Rosemary (inaudible),
12  just please read this again.
13       SYBIL BAILEY:  No, I already know about
14  it, because --
15       STEVEN MURRAY:  Yes, I mean, it says,
16  this is the president of the college.  It takes
17  guts to do our jobs, and I would say, we have
18  them -- we, me and her.  She -- this is --
19       SYBIL BAILEY:  And you have, but if
20  you --
21       STEVEN MURRAY:  This is her.
22       SYBIL BAILEY:  (Inaudible)
23       STEVEN MURRAY:  Yes, but Sybil, this is
24  her coming to my house.

Page 36

1       SYBIL BAILEY:  I know, because I
2  remember the gift.
3       STEVEN MURRAY:  She called me the day
4  before.  I bought you a gift.  Can I come to your
5  house.  I was shocked, to be honest.
6       SYBIL BAILEY:  I know.
7       STEVEN MURRAY:  I said, sure.
8       SYBIL BAILEY:  Well, you know,
9  relationships do go up and down --
10       STEVEN MURRAY:  Yes.
11       SYBIL BAILEY:  -- overnight.  I'm sure
12  there's other times that there's been discussions
13  that --
14       STEVEN MURRAY:  I have had all kinds of
15  discussions --
16       SYBIL BAILEY:  Right.
17       STEVEN MURRAY:  -- with Rosemary over
18  the years, with all kinds of things, where,
19  again --
20       SYBIL BAILEY:  And it's gotten heated a
21  few times.
22       STEVEN MURRAY:  Yes, but it's --
23       SYBIL BAILEY:  Especially when it got
24  personal with her nephew and all of that.

STEVEN MURRAY
Steven Murray Interview Meeting

December 07, 2023
37–40

Page 37
1    STEVEN MURRAY: That was a complete
2    misunderstanding on her part.
3    SYBIL BAILEY: Oh, okay.
4    STEVEN MURRAY: No, I mean, that, in
5    the sense that --
6    SYBIL BAILEY: You didn't mean it --
7    STEVEN MURRAY: My brother had just
8    died.
9    SYBIL BAILEY: Um-hum.
10    STEVEN MURRAY: Okay. And she said to
11    me, we both had a rough year last year, and I
12    thought what she meant by that was her nephew
13    dying, as well, because she had been very
14    empathetic toward my brother passing. And all I
15    said was, yes, my brother died; your nephew died.
16    And she looked at me and she said, what? My
17    nephew? I said it out of pure empathy.
18    RICHARD SINAPI: He thought it was
19    following up on what she said.
20    STEVEN MURRAY: And she started to
21    scream at me -- actually, screaming at me.
22    SYBIL BAILEY: Yes.
23    STEVEN MURRAY: She started to scream;
24    you are despicable. I was shocked, to be honest.

Page 38
1    I just got up and left. (Inaudible)
2    SYBIL BAILEY: (Inaudible)
3    STEVEN MURRAY: (Inaudible) put my hand
4    on a Bible.
5    SYBIL BAILEY: No.
6    STEVEN MURRAY: I mean, I never tried
7    to hurt her with that.
8    SYBIL BAILEY: Um-hum.
9    STEVEN MURRAY: I mean, are you kidding
10    me? The worst thing that's happened in my life
11    is my brother passing, and I was discussing that.
12    And I assumed her nephew passing was a very
13    heart-felt thing for her.
14    SYBIL BAILEY: Um-hum.
15    STEVEN MURRAY: I wasn't saying it any
16    other way. She had started the conversation by
17    attacking me, by saying, oh, you won your
18    election, but you didn't get a majority of the
19    vote. You know, other people are not perfect. I
20    think you understand that.
21    SYBIL BAILEY: I do.
22    STEVEN MURRAY: And plenty of people
23    have come after me.
24    SYBIL BAILEY: Um-hum.

Page 39
1    RICHARD SINAPI: And Sybil, I got to
2    follow-up on that, because --
3    SYBIL BAILEY: I get it, though.
4    RICHARD SINAPI: First of all, I don't
5    think you could do what you are doing. Second of
6    all, if you try, what's good for the goose --
7    SYBIL BAILEY: Doing what I'm doing,
8    what do you mean?
9    RICHARD SINAPI: Trying to police, you
10    know.
11    SYBIL BAILEY: Oh, okay, good. I
12    though you meant something (inaudible).
13    RICHARD SINAPI: This kind of wide
14    open, robust, sometimes harsh discussion in the
15    workplace and under the First Amendment, what's
16    good for the goose is good for the gander.
17    Rosemary Costigan should be substantially
18    disciplined for screaming at him.
19    STEVEN MURRAY: She screamed at me in
20    front of 30 people at the strategic planning
21    committee meeting, when I filed my violence in
22    the workplace. There were vice-presidents there,
23    just, (inaudible). Dave Patten was there. Sara
24    Enright was there. All kinds of people were

Page 40
1    there. All I said was, again, a statement
2    (inaudible), and the person running the meeting
3    said, does anybody have any comments? I waited
4    politely. I raised my hand. He said, go ahead,
5    and I said, you know -- this is paraphrasing,
6    something in the document, where all students are
7    capable. I said, I have devoted my life to
8    students. I said, I wish that was true a hundred
9    percent of the time. We get some students,
10    unfortunately, who are unmotivated, who aren't
11    here for the right reasons, and Rosemary is
12    sitting across the table from me and just went --
13    explosive. I don't know if you have seen
14    (inaudible). You have been at plenty of
15    meetings.
16    SYBIL BAILEY: I was not there, but I
17    know what you're talking about.
18    STEVEN MURRAY: You've done plenty of
19    meetings with Rosemary, right, and again, we
20    could bring in Dean Cole, Dean (Inaudible),
21    plenty of other people --
22    SYBIL BAILEY: (Inaudible), but go
23    ahead.
24    STEVEN MURRAY: The people in her area,



STEVEN MURRAY
Steven Murray Interview Meeting

December 07, 2023
41—44

Page 41

1  where she has screamed at multiple people --
2      SYBIL BAILEY:  Um-hum.
3      STEVEN MURRAY:  -- over the years.
4  Multiple people.
5      SYBIL BAILEY:  Um-hum.
6      STEVEN MURRAY:  If she wants to go down
7  that road, that is, you know --
8      SYBIL BAILEY:  Um-hum.
9      STEVEN MURRAY:  -- I mean, so then,
10  again, what is good for the goose is good for the
11  gander.
12      SYBIL BAILEY:  And I respect that.
13      RICHARD SINAPI:  And he has had, you
14  know, Professor (Inaudible) scream at him, okay,
15  witnesses.  He has had a co-worker scream at him.
16      STEVEN MURRAY:  Soudebeh Valicenti,
17  right up in my face, and I am not going to repeat
18  the words she used.  You tell that, blah, blah,
19  blah, blah, blah.  I just stood there.  I had a
20  witness to that.
21      SYBIL BAILEY:  I remember that.
22      STEVEN MURRAY:  Nobody had said I have
23  used language like that, because I haven't in 32
24  years.

Page 42

1      SYBIL BAILEY:  Then why do so many
2  people --
3      RICHARD SINAPI:  He has -- pardon me?
4      STEVEN MURRAY:  Why do people not like
5  me?  I don't know.  Plenty of people love me.
6      SYBIL BAILEY:  I didn't mean not like
7  you.  What I meant --
8      STEVEN MURRAY:  A lot of people love
9  me.
10      RICHARD SINAPI:  I'll make a
11  suggestion --
12      SYBIL BAILEY:  Sorry.
13      RICHARD SINAPI:  -- on this floor,
14  okay.  I just want to put a fine point on it.  My
15  client has never screamed at anybody.
16      SYBIL BAILEY:  Um-hum.
17      RICHARD SINAPI:  My client has never
18  used foul language.  By that, my client has never
19  used vulgarity.  My client his never attacked
20  anybody.  He has attacked ideas, and he will
21  continue to do so, okay.
22      SYBIL BAILEY:  Um-hum.
23      RICHARD SINAPI:  I'll say something
24  else.  There's nothing this college is going to

Page 43

1  do about it, okay, if I have to go to the Supreme
2  Court.  All right, so --
3      SYBIL BAILEY:  Are you getting -- it's
4  okay, like --
5      RICHARD SINAPI:  I get excited --
6      SYBIL BAILEY:  I know.  I am, like --
7      RICHARD SINAPI:  -- just like -- and I
8  get -- so does Steve.  Steve gets --
9      SYBIL BAILEY:  But I am just making
10  sure, because I'm being candid with you, just
11  because --
12      RICHARD SINAPI:  I get it and I want to
13  show an example.
14      SYBIL BAILEY:  Yes.
15      RICHARD SINAPI:  Steve gets passionate,
16  too.
17      SYBIL BAILEY:  Right.
18      STEVEN MURRAY:  That's a good thing.
19      RICHARD SINAPI:  Passion is a good
20  thing.
21      SYBIL BAILEY:  And I do, too and I've
22  been --
23      RICHARD SINAPI:  But when you scream --
24  but when you scream -- when you get passionate

Page 44

1  about your argument and your ideas, it's not a
2  bad thing.  When you get -- when you scream at
3  people, that's a bad thing.  Those are
4  fundamentally, objectively different things,
5  okay, and that is what you can police.  You
6  cannot police --
7      SYBIL BAILEY:  Did you scream at Del
8  Sesto, when you went in that day about --
9      STEVEN MURRAY:  Absolutely not.
10      SYBIL BAILEY:  Okay.
11      STEVEN MURRAY:  Again --
12      RICHARD SINAPI:  And she never said he
13  did.
14      SYBIL BAILEY:  Okay.  I am asking.
15      STEVEN MURRAY:  The first time you and
16  I met -- you may not recall; I remember you
17  saying to me when we first met; oh, you are the
18  guy who yells at people.
19      SYBIL BAILEY:  I did not.  It doesn't
20  matter.  I don't mean to debate that.  I am
21  sorry.
22      STEVEN MURRAY:  But I mean --
23      SYBIL BAILEY:  Yeah.
24      STEVEN MURRAY:  I can get loud.



STEVEN MURRAY                                    December 07, 2023
Steven Murray Interview Meeting                        45–48

Page 45

1  Everybody has a different volume level. I --
2  again, I don't scream. I am not going to scream
3  in here. I've never screamed at anyone at the
4  college. I really have not.
5          SYBIL BAILEY: Um-hum.
6          STEVEN MURRAY: Can I get a little
7  louder -- and that is exactly what Liz said in
8  her transcript. She said he got a bit louder
9  than normal. That is not screaming.
10          SYBIL BAILEY: True.
11          STEVEN MURRAY: A bit louder, that's
12  her words under oath.
13          SYBIL BAILEY: Um-hum.
14          STEVEN MURRAY: A bit louder than
15  normal. I don't think that is a bad thing.
16  Plenty of other people have done that, too.
17          SYBIL BAILEY: It does get -- your
18  emotion -- I get that.
19          RICHARD SINAPI: And he was passionate
20  about his concern and about the urgency of what
21  the matter was.
22          STEVEN MURRAY: Yes, this was --
23          RICHARD SINAPI: And again, it
24  wasn't -- it wasn't about her. It was about the

Page 46

1  situation he was in with the interpretation of
2  the contract, and how they had to calculate
3  budgets and whatnot.
4          SYBIL BAILEY: Whatever, yes, yes.
5          RICHARD SINAPI: Yes, all that stuff.
6  You know what I mean?
7          STEVEN MURRAY: It was the work day
8  before the beginning of the semester, the Friday,
9  where payroll is due; the schedules were due. We
10  hadn't even finalized which courses were running,
11  let alone who was assigned to it. All I did was
12  go up to see my dean. He wasn't there. I had
13  gone to Liz and (Inaudible) office a million
14  times. When they say I went unannounced, I never
15  made an appointment. They were in there. I
16  heard them talking. I stood in the door.
17          SYBIL BAILEY: Um-hum.
18          STEVEN MURRAY: Hey, you know,
19  ladies -- whatever I said, and then I just said
20  to Liz, basically, you know, it's causing chaos.
21  I had other chairs coming to me. This is chaos.
22  We can't get payroll in. We can't get the
23  schedules done. Liz just kind of stared at me,
24  right. I was not there to offend her. I was

Page 47

1  there just to convey; we need to get this work
2  done.
3          SYBIL BAILEY: Um-hum, um-hum, um-hum.
4          STEVEN MURRAY: I didn't go up there to
5  pick a fight with anybody, but I mean, I would
6  not --
7          SYBIL BAILEY: But then it was brought
8  to your attention --
9          STEVEN MURRAY: What is that?
10          SYBIL BAILEY: When it was brought to
11  your attention the way she interpreted that or
12  took it.
13          STEVEN MURRAY: Do you know how it was
14  brought to my attention?
15          SYBIL BAILEY: Yes -- no, I am asking.
16          MICHAEL DA CRUZ: Can I ask a quick
17  clarifying question before we go on with this?
18  When you were saying, so many people. Are we
19  talking about anything besides the three
20  complainants in this matter? I am just trying to
21  be clear about what we're all discussing here,
22  because we are kind of -- it's gone far afield, I
23  think.
24          SYBIL BAILEY: All right.

Page 48

1          MICHAEL DA CRUZ: Which is fine, but
2  no, I am just curious. I just want to know; are
3  we talking about just Ms. Abbascia and Ms.
4  (Inaudible) and Ms. Del Sesto?
5          MICHELLE DARGON: Let me clarify,
6  because I think we've gone way off topic.
7          SYBIL BAILEY: I did, and it's only
8  because I was trying to -- I apologize.
9  (Inaudible).
10          MICHELLE DARGON: So I'm working under
11  the policy in conducting the investigation, so
12  let me just lay it flat out. Brand new to the
13  college. I don't know any of the players.
14  Attempting to do as much as a neutral
15  investigation as I can, and so this is a fact
16  finding mission. I am sticking within the
17  confines of the three complainants.
18          MICHAEL DA CRUZ: Okay.
19          SYBIL BAILEY: Yes.
20          MICHELLE DARGON: There are witnesses
21  to that, which under the policy, I'm allowed to
22  interview.
23          MICHAEL DA CRUZ: Of course.
24          MICHELLE DARGON: And I am going to



Page 49

1  work within the scope of that policy, and so even
2  with additional information, there is information
3  that I will obviously exclude, if it's not
4  relevant, and if matters come forward where there
5  is additional steps that we need to take, post my
6  investigation, obviously, that would be shared
7  with you and in accordance with policy and then
8  of course, the advice of our general counsel at
9  CCRI, but I think we need to get back on task.
10      SYBIL BAILEY:  Sorry.
11      STEVEN MURRAY:  Can I just, though,
12  Mickey --
13      MICHELLE DARGON:  Sure.
14      STEVEN MURRAY:  -- with Mike's question
15  again --
16      MICHELLE DARGON:  Yup.
17      STEVEN MURRAY:  -- when you say, have I
18  ever been inappropriate; again, I thought we were
19  here to focus on these three complainants, not
20  going back 10 years, 20 years, 30 years.  When
21  you ask these open-ended questions, have you
22  ever --
23      MICHELLE DARGON:  Sure.
24      STEVEN MURRAY:  -- I'm happy to address

Page 50

1  the three complainants, but I think it's unfair
2  to me to go back to things that I don't even know
3  what you're talking about in the last 30 years.
4      MICHELLE DARGON:  So that is a fair
5  argument, and I will note that.  I didn't put a
6  time frame on anything.  And clearly, I was not
7  clear on that.  I am looking -- the allegations
8  are stemming from '21 -- the end of '21, but
9  predominantly '22, and early '23.
10      STEVEN MURRAY:  These complaints are
11  all in 2023.
12      MICHELLE DARGON:  Well, yes, January
13  and February.
14      STEVEN MURRAY:  They don't go back
15  to --
16      MICHELLE DARGON:  There is -- the fact
17  finding mission is how are you perceiving --
18  because they are perceiving their working
19  relationship with you in a particular manner --
20      SPEAKER:  Who's they?
21      RICHARD SINAPI:  Who is they?
22      MICHELLE DARGON:  -- in accordance with
23  this policy.  The three complainants.
24      RICHARD SINAPI:  Who is they?

Page 51

1      MICHELLE DARGON:  The three
2  complainants, Del Sesto, (inaudible).
3      RICHARD SINAPI:  Sneesby, who screams
4  at him, sent e-mails to him that are derogatory,
5  personally, about his character.  That person
6  has -- is concerned about his discourse?
7      MICHELLE DARGON:  And again, I'm not
8  hear to make arguments over that either.  I am
9  here really just to kind of focus and see how,
10  Steven, you've perceived your working
11  relationships.  I think the information you've
12  provided has been really helpful in determining,
13  you know, what they're perceiving your mannerism
14  to be one way; what you're perceiving your
15  mannerism to be another way.  That is part of the
16  fact finding mission.  Additionally, I'm looking
17  to look at that workplace conflict language that
18  is in the policy, and fine, you know, you've
19  expressed, as has the notes, that, you know, you
20  got a little bit loud.  I'm a Bostonian by
21  nature.  I am always loud.  And so people might
22  perceive that as screaming and yelling, when I
23  just really can't tone my volume down.  So I
24  think a lot of that is explanations, and if

Page 52

1  somebody has stopped Steve and said, hey, you
2  know, you are being very rude and then Steve
3  says, oh, I'm so sorry.  Let me, you know, lower
4  my voice or things like that.  That's something I
5  think is really important to note.  Do people
6  have to express and say, hey, you know, I don't
7  like how you're acting?  Unnecessarily, but it is
8  a lot more helpful to understand the context of
9  the situation from Steve's perspective, I feel.
10  And so yes, the questions are very objective
11  (sic), but again, I am looking to see how Steve
12  has felt his working relationships with these
13  individuals are.
14      STEVEN MURRAY:  You mean they're
15  subjective, not objective.
16      MICHELLE DARGON:  Correct, sorry, yes.
17      STEVEN MURRAY:  Yup.
18      RICHARD SINAPI:  If I just may
19  interject real briefly.
20      MICHELLE DARGON:  Sure.
21      RICHARD SINAPI:  And I'll let you
22  continue.  I apologize, but --
23      MICHELLE DARGON:  I only have one more
24  question.



Page 53

1    RICHARD SINAPI:  But Ms. Del Sesto
2  never indicated that she was concerned about
3  Steve's passionate, you know, expression of
4  concern about what was going on, and -- number
5  one, and number two, both the Sneesby complaints,
6  which are all e-mails and the Abbascia
7  complaints, which are all e-mails are about union
8  business.  That is not a subject you can
9  regulate.  That is off the table.  You can do
10  what you want, because we may disagree, okay,
11  about these things, and I may be passionate about
12  it, okay.  We may disagree.  I am just telling
13  you, okay, and I think Ms. -- should I call you
14  Sybil?
15    SYBIL BAILEY:  Sybil, yeah.
16    RICHARD SINAPI:  You can call me
17  Dick --
18    SYBIL BAILEY:  Yes, yes.
19    RICHARD SINAPI:  -- if you don't mind.
20  It's fine.  Richard, Dick that's fine, but has
21  admitted that when it comes to union business,
22  when it comes to whether you are a lame duck
23  president, and it's not good for the union,
24  whether you are talking about, you know, the

Page 54

1  faculty doesn't have appropriate governance
2  power, and it's being manipulated, that is wide
3  open and robust.  You can't regulate that, okay,
4  unless vulgarity, okay, physical threat, okay,
5  actions like that.
6    SYBIL BAILEY:  Well, what about the
7  (inaudible) that is not physical?  I'm just
8  curious.  Please know I mean this with sincerity.
9  I'm really trying to --
10    STEVEN MURRAY:  I never made a threat.
11    RICHARD SINAPI:  Sybil, let me answer
12  your question, because it's -- we're talking in
13  the abstract, but it's a good discussion.
14    SYBIL BAILEY:  Um-hum.
15    RICHARD SINAPI:  Okay.  I am telling
16  you, in that context, the union, wide open debate
17  under the First Amendment and under the
18  Liberations Act, I'm telling you, okay, short of
19  physical violence, okay, or threat of physical
20  violence, you can't police that, and if you try,
21  it's a big mistake.  You're getting into an area
22  you shouldn't be in, and you have got the wrong
23  person.  This person may be passionate, as I was,
24  and I got a little excited, and you told me.

Page 55

1    SYBIL BAILEY:  I was just making sure I
2  wasn't --
3    RICHARD SINAPI:  But that is a good
4  point, but just because you're passionate, okay,
5  and you are persistent, vigorous, and a good
6  advocate, okay, one thing that bothers people
7  subjectively and unconsciously is if you are a
8  good advocate and you start picking apart and
9  citing facts about what happened, okay, and you
10  get upset.  You get -- you feel personally
11  attacked, because you don't have the better of
12  the argument.  Your world view is being attacked
13  and I'll use Ms. Sneesby as an example.  He said
14  that the fact that the setup was being
15  manipulated, was his opinion.  He explained why.
16  She said, oh, that is not the case.  He went and
17  spoke to the actual people involved, and he
18  presented to her that, yes, in fact, this was an
19  administration proposal, not a faculty proposal.
20  She got all upset about it.  Why?  Because he
21  brought the facts out that attacked her world
22  belief and her position, and it made it seem like
23  she was not doing her job, and she felt like she
24  was being personally attacked.  It wasn't.  It

Page 56

1  was an attack about the process, and that is what
2  I'm getting at, and that is what you can't
3  police, and I'll shut up.
4    MICHELLE DARGON:  Okay.
5    SYBIL BAILEY:  Me, too.
6    MICHELLE DARGON:  I just have one final
7  question.  Have you ever participated in
8  counseling or training relevant to professional
9  conduct?
10    STEVEN MURRAY:  Say that again, please.
11    MICHELLE DARGON:  Have you ever
12  participated in counseling or training relevant
13  to professional conduct?
14    STEVEN MURRAY:  As a lawyer, I have
15  taken continuing legal education seminars.
16    MICHELLE DARGON:  So I think pertaining
17  to CCRI.
18    STEVEN MURRAY:  I have taken all kinds
19  of -- we have professional development day, all
20  kinds of programs.  I can't cite them all to you,
21  but I mean, we've had -- again, I have been
22  there -- maybe during COVID, we met for
23  professional development day, but I think every
24  other year, we've had it, and there was always a



STEVEN MURRAY                                    December 07, 2023
Steven Murray Interview Meeting                  57—60

1   nice sequence of events you could go to on, you
2   know, a plethora of issues, so I mean, I attended
3   those.
4           MICHELLE DARGON:  Anything specific,
5   though, to professionalism or working --
6   sometimes there's trainings on -- again, from
7   another job I had, multi generational workplace
8   or handling conflict or customer service,
9   anything alike to that?
10          STEVEN MURRAY:  I am not sure.
11          MICHELLE DARGON:  Okay.
12          STEVEN MURRAY:  We had one on sexual
13  harassment I remember, when President (Inaudible)
14  was president.  The college brought someone in, a
15  professional with that; everybody had to go to.
16  We've got policies that we sometimes have to do
17  on-line things for, but I don't have an
18  exhaustive list of 30 years worth of seminars
19  that I have attended.
20          MICHELLE DARGON:  And then how about
21  any kind of counseling on mannerisms or conduct
22  or the way we work with people?
23          STEVEN MURRAY:  I am not sure what you
24  are asking.  I know the college, for other

1   people, which will go unnamed, have gone to
2   things like anger management counseling.  I have
3   never done that.  I mean, I have never been
4   requested to do that, nor have I done it, if that
5   is the road you are going down.  I know other
6   people have at the college.  I know -- I'll stop
7   there.
8           MICHELLE DARGON:  Okay, so that really
9   is all of my questions.  Like I said, again, I am
10  kind of on that fact finding mission.  People
11  have relayed their opinions and some with
12  witnesses and others without, on how they feel
13  and how they've perceived Professor Murray's
14  conduct.  In turn, what I'm looking for today is
15  how Professor Murray is perceiving his overall
16  interactions and relationships with everybody.  I
17  am working within the scope of the Violence In
18  The Workplace Prevention Policy.  In particular,
19  the workplace conflict language there, and the
20  standards of conduct, which apply in any
21  investigation as well, and how we uphold
22  ourselves.  I do have several other witnesses to
23  still meet with and then I have to put my report
24  together.  I don't have a time frame for you at

1   this time.  I am working with a sense of urgency.
2   I do know that we're sensitive to Professor
3   Murray being out on administrative paid leave.
4   That is a cost to the college -- excuse me, and
5   so I am working quicker on this matter, but
6   again, I just wanted to put it out there that I
7   do not have a time line to provide you.  With
8   that being said, that is all of my questions.  If
9   I do come within the scope of looking for
10  clarification information, I will reach out to
11  you to maybe schedule another time just to
12  clarify that, but much like the doctor's office,
13  not hearing from me is kind of good news.
14          RICHARD SINAPI:  Yes, I understand,
15  and Violence In The Workplace Policy does not
16  apply in this context.  There's nothing here that
17  applies.  It has to be a threat of violence or
18  would lead to violence.  That is the law.  I can
19  give you interpretations of it.  You go down that
20  road, there's nothing there.  There's nothing
21  there, and that is just the law.  It's not what I
22  say.  It's the way it's interpreted and the way
23  it was intended.  There was nothing that was
24  going to lead that violence or threat of

1   violence, certainly, not by Steve, and I don't
2   think Ms. Sneesby was going to turn around and
3   punch him in the nose, okay, so I don't think
4   there is any threat of violence there.  Being a
5   little facetious, but you get my point.
6           STEVEN MURRAY:  And Liz says the same
7   thing.  There was never any threat to Liz.
8           RICHARD SINAPI:  And this thing -- this
9   vague thing about, you know, (inaudible) or
10  herself, "inside or outside the workplace, worthy
11  of (inaudible) public employee must enjoy by
12  acting in such a manner as not to bring discredit
13  upon his or her employer."  Steve is a
14  passionate, persistent, intelligent advocate for
15  many causes, for the faculty, for the school, for
16  students and he does it with facts.  He doesn't
17  engage in ad hominem attacks.  He attacks the
18  facts.  He attacks the issue.  And you know what,
19  as long as you do that, this world is a better
20  place.  I wish our politics could be like that.
21          STEVEN MURRAY:  Yes, I think, to be
22  fair to me, you know, again, please just stay
23  focused on the three complainants.  I mean, you
24  can dig up -- anybody in this room, we could dig



Page 61

1  up people who don't like us. I mean, who cares.
2        SYBIL BAILEY: Absolutely, yeah.
3        STEVEN MURRAY: Who cares. I mean, you
4  know.
5        MICHELLE DARGON: We work in HR. We
6  understand.
7        STEVEN MURRAY: Sybil was
8  unprofessional to (inaudible) that day.
9        SYBIL BAILEY: I know.
10       STEVEN MURRAY: (Inaudible) didn't like
11  me at that meeting. Who cares. That is just
12  irrelevant.
13       SYBIL BAILEY: And please, when I was
14  going off tangent, if you will, I believe in,
15  like, putting it all out there.
16       STEVEN MURRAY: Yes.
17       SYBIL BAILEY: This is what we are up
18  against. You are up against. I know you have
19  specific concerns with this piece, but in terms
20  of moving forward, the goal is to correct this
21  and make it amicable for both, so that is why,
22  please, don't think I'm trying to dig up other
23  people. I was really trying to get you to a
24  place to know what we are up against.

Page 62

1        STEVEN MURRAY: Sybil, I want the same.
2  We met. The union met on Monday or Tuesday of
3  this week --
4        SYBIL BAILEY: Right.
5        STEVEN MURRAY: -- for the (inaudible)
6  and Rebecca (Inaudible) and Allison, all right,
7  and when you and I met on that -- and I think
8  Mickey was there, on the grievance involving the,
9  you know, the Beth Anders thing, right, we had a
10  great discussion --
11       SYBIL BAILEY: Right.
12       STEVEN MURRAY: -- without a doubt and
13  then we get to this meeting on Monday or Tuesday
14  with (Inaudible) and she is, like, we are not
15  here to discuss any of that. And then she brings
16  up that Allison has a vice-president -- a dean's
17  job coming up or assistant dean, and she is,
18  like, we are going to get the faculty involved,
19  so I said, well, that is great. Now, we can
20  build a bridge here and whatnot. I said, why
21  don't we just do an MOA and (inaudible) shut it
22  down instantly. I was, like, I'm trying to work
23  things in a better way here, so again, you've got
24  to realize there are people on your side of the

Page 63

1  table who have a different interest or at least
2  not showing the same.
3        SYBIL BAILEY: Or different styles.
4        STEVEN MURRAY: Yes, just not showing
5  the same --
6        SYBIL BAILEY: Yes --
7        STEVEN MURRAY: And so to demonize me
8  all the time is just unfair to me. It really is.
9        RICHARD SINAPI: I have just got to
10  follow up on it. I think all your comments were
11  great. I think our back and forth was helpful.
12  I think I understand what you are struggling
13  with, and I hope you know what my answer is, and
14  it's pretty clear. I've got to tell you
15  something. When you are debating an idea, not a
16  personal attack, but when you're debating an
17  idea, okay, back and forth, and somebody
18  factually, logically is undermining that, okay,
19  you are not in a safe place. You leave your safe
20  place. You don't -- you know, you feel -- you
21  feel threatened, okay, that my belief structure
22  is being attacked by a very passionate, logical,
23  you know, argument. That happens. People are
24  going to be taken out of their safe place, when

Page 64

1  there is argumentation and undermining factually
2  and logically their position.
3        SYBIL BAILEY: Don't you think that
4  sometimes it does get personal, though, the more
5  passionate we are, whatever it maybe? I might
6  not agree with you. I mean, I have been there.
7  If you have got -- off record now, this -- my
8  previous life in the city -- I don't know if you
9  know Donald Iannazzi. He worked for 1033 as a
10  business agent for years, and he was a big
11  proponent of that. He beat the pulp out of me,
12  seriously, and -- 20 years ago (inaudible) and
13  went there and we argued. I learned a ton from
14  him.
15       STEVEN MURRAY: Right.
16       SYBIL BAILEY: And some of it was,
17  like, you know, don't take it personally and all
18  that good stuff.
19       STEVEN MURRAY: Right, relevant.
20       SYBIL BAILEY: But more importantly,
21  there were times -- and I remember him saying to
22  me, Sybil, I get to be more -- I don't have to
23  follow the same rules as you. I go, in order for
24  us to work together, though, there has got to be



STEVEN MURRAY
Steven Murray Interview Meeting

December 07, 2023
65–68

Page 65

1  a level -- there's got to be some boundaries.  I
2  am not going to let you attack me over and over.
3  I am going to walk out, and we got there.  Trust
4  me, good friends right now, but I was young.  I
5  was right -- coming right to the city, and he
6  knew every move (inaudible).  He knew the
7  contract upside down, I mean, so --
8        STEVEN MURRAY:  Yes.
9        RICHARD SINAPI:  But I am sure --
10       SYBIL BAILEY:  And it's a different
11  relationship, because he is -- I don't report to
12  him.  I had to remind him of that, so -- and that
13  was the difference, but when he was working with
14  department directors and that kind of a thing,
15  it's, like, in order to -- help me, to help you,
16  so we can get this done.  Just -- and that is
17  what I struggled with.  I'm trying.  I swear to
18  you.
19       RICHARD SINAPI:  But Sybil, he -- I'm
20  sure that Mr. Iannazzi didn't attack you
21  personally.  He attacked your ideas.  He attacked
22  your position, and you felt unsafe.  Ms. Sneesby
23  and Ms. Abbascia felt unsafe, because he was
24  undermining their belief structures, and he was

Page 66

1  making logical arguments in the public debate to
2  faculty, okay, about their positions.  They felt
3  out of their safe place.  They said, oh, oh, he
4  is attacking me.  He wasn't and you know it.
5        SYBIL BAILEY:  It was the union.
6        RICHARD SINAPI:  You have got the
7  e-mails.
8        MICHAEL DA CRUZ:  And that is -- it's a
9  fight on the Listserv about --
10       RICHARD SINAPI:  They were attacking
11  (inaudible).  There is a big different.  This
12  isn't Donald Trump, okay, this is not the current
13  political rhetoric, where people attack each
14  other.  He was attacking ideas, and that is a
15  good thing, okay, and you know what the policy
16  should be, you tell Sneesby and Abbascia, he is
17  arguing ideas.  You are in the public sphere.
18  You accepted the position, when you took a senate
19  president and leadership position, and when you
20  took the position, and he will -- anybody can
21  attack ideas and attack your positions.  If you
22  don't feel comfortable, resign.
23       MICHAEL DA CRUZ:  Yes, I think, I --
24       RICHARD SINAPI:  If they attack you

Page 67

1  personally, if they threaten you in some way, and
2  they are making an ad hominem attack, and you
3  know what ad hominem is, right?  It's Latin.
4  That is a different situation.  That may be a
5  different context, maybe, okay.  That is not what
6  we're dealing with here, okay.  That's not what
7  we're dealing with here.
8        MICHAEL DA CRUZ:  I think the key
9  thing, right, is like, at some point if -- the
10  way it's going to get framed is you can't be
11  critical of the positions of a union president
12  and a faculty senate leader as a member of the
13  faculty union and the faculty.  Like, how --
14  you're just not allowed to be critical of people
15  in leadership.
16       SYBIL BAILEY:  What about what
17  (inaudible), because Stargard is not in the
18  union?
19       MICHAEL DA CRUZ:  Well, but he is
20  not -- but he is not complaining, though.  First
21  of all, he is not -- he is not a complainant,
22  right, as far as I know.
23       SYBIL BAILEY:  No, I am talking about
24  that -- I'm just saying, generally speaking in

Page 68

1  terms of --
2        MICHAEL DA CRUZ:  Sure.
3        SYBIL BAILEY:  (Inaudible)
4        MICHAEL DA CRUZ:  Sure.
5        SYBIL BAILEY:  Like, he is your boss.
6  Yeah, he is your boss and he is bringing to you
7  some attention of it and the dialog that went
8  back and forth, sometimes that does feel
9  personal.  I mean, at the end of the day --
10       STEVEN MURRAY:  It never was.
11       SYBIL BAILEY:  Okay.
12       STEVEN MURRAY:  I don't know him,
13  personally, in the sense of just, like, I don't
14  know --
15       SYBIL BAILEY:  Us.
16       STEVEN MURRAY:  I don't know any of
17  you.  I mean, I've gotten to know these guys
18  more, but I don't know you personally.
19       SYBIL BAILEY:  Right.
20       STEVEN MURRAY:  It's never personal.
21  He has a job to do.  I have a job to do.  I
22  respected him.  The fact that he thought my
23  e-mails were too long or the tone --
24       SYBIL BAILEY:  H'm.

Page 69

1    STEVEN MURRAY: -- the tone, again, was
2    agreement with his position; I am pointing out,
3    with overload, Bill, it's clear in the contract,
4    and he's coming back at me with something that
5    was illogical. Oh, no, we decided that the other
6    deans, that we were going to go with this policy.
7    I said, you cannot do that. That is not
8    personal. That is just --
9        SYBIL BAILEY: You don't know your job,
10   either.
11       STEVEN MURRAY: I didn't say --
12       SYBIL BAILEY: I'm playing you.
13       STEVEN MURRAY: Yes, but no, I didn't
14   say that. I kept saying politely; let's read the
15   contract. Let's go through it, and that's where,
16   again, he was out of his safe place. He was
17   making it up as he was going along and nobody
18   should just go along with that.
19       MICHAEL DA CRUZ: Yes, I mean, also, it
20   has to be --
21       SYBIL BAILEY: Okay.
22       MICHAEL DA CRUZ: It has to be
23   reasonable to, like -- like, for example, if --
24   Dick is my boss, right? If he told me, you know,

Page 70

1    Mike, you have to work over 40 hours a week and I
2    am not going to pay you overtime and I'm telling
3    you that's what we, the leadership, decided we
4    are going to do. I would be, like, Dick, that's
5    illegal, and if you do that, you are breaking the
6    law, and you are bad at your job, which is true,
7    and of course, I can say that, right, because you
8    can't say, well, I'm your boss -- you can't say
9    that to me. Like, of course, I can say that. In
10   fact, I am probably really obligated to say it.
11   I mean, I was a whistle blower, I think, at that
12   point, right? You can't tell someone I am going
13   to do --
14       SYBIL BAILEY: What they can't say.
15       MICHAEL DA CRUZ: And also, I am going
16   to do something that I'm not allowed to do, but I
17   am your boss, so you just have to do it. It's,
18   like, ut-oh.
19       SYBIL BAILEY: I wish we could video
20   it.
21       RICHARD SINAPI: His example would be
22   protective speech.
23       SYBIL BAILEY: Of course.
24       RICHARD SINAPI: Other than the Whistle

Page 71

1    Blower Act.
2        MICHAEL DA CRUZ: Yes.
3        RICHARD SINAPI: Not the First
4    Amendment. Steve's communications are protected
5    under the First Amendment.
6        SYBIL BAILEY: I get it. I know. I
7    know we could go on. I'm --
8        MICHAEL DA CRUZ: Yes, of course.
9        RICHARD SINAPI: I hope we have been
10   helpful and moved this forward, because Steve
11   really wants to get back to teaching and --
12       STEVEN MURRAY: I want to get back to
13   work. I mean, it's -- I love doing what I am
14   doing, and I feel really hurt that they've taken
15   that away from me. It's not just the financial
16   end. There is a lot of stress.
17       SYBIL BAILEY: Um-hum.
18       STEVEN MURRAY: It's unfair. I have
19   done nothing wrong. I really haven't. I have
20   been an advocate for the college, the students,
21   the faculty, and in that sense, the
22   administration as well, as Dick said.
23       SYBIL BAILEY: Is there any piece --
24   off record.

Page 72

1        STEVEN MURRAY: Sure.
2        SYBIL BAILEY: Any piece of you that,
3    you know, when you go home -- I do -- (inaudible)
4    could I have done differently on that piece of
5    it? You don't have to admit it to me. I am just
6    wondering --
7        STEVEN MURRAY: Yes, we all look back,
8    could have, would have, should have.
9        SYBIL BAILEY: Right, right, that is
10   what I'm saying, yes.
11       STEVEN MURRAY: In all honesty, Sybil,
12   I mean, I'm proud of what I've done. When
13   Rosemary came to my house, I thought it was a
14   little strange with the card, but I said, wow,
15   here's someone who is a forceful advocate as
16   well. She has a very different style than I do,
17   very different, but I said, you know, I respect
18   her vigor, let's say, and again, I have the same.
19   I wish more people at CCRI had this. Again, one
20   last quick -- you know, my first week at CCRI --
21   I'm embarrassed to say this story. I am in the
22   cafeteria with the chair of the then Psychology
23   Department, and a student comes over while we're
24   eating, and he brushes the student off. He is



Page 73

1   really rude to the guy and then this chair of the
2   department says to me, you know, you have your
3   time here. Don't let them interrupt it. I said,
4   I would do anything for a student. I don't care
5   if I've got a sandwich in my mouth, and then the
6   guy goes to me, you know where you work, right?
7   And I go, yes, CCRI and he goes, yes, you know
8   what it means. I said, yes, community college --
9   he goes, no, cash check, remain invisible, and we
10  have a lot of people at the college who just cash
11  their check and remain invisible, and I am
12  ashamed of those people, and I would never be one
13  of them, so to be faulted for just the opposite,
14  no, we need more people like me. We need more
15  people in the union like me. We need more
16  faculty. We need more administrators. We need
17  fewer people running out the door at 4:00, right,
18  and the passionate people should get that.
19  Rosemary should get that. I would expect you to
20  both get that, and not to say, oh, he's a bad
21  guy -- just the opposite. While maybe his style
22  isn't what we like, the substance we do like. We
23  wish every faculty member would participate in as
24  many committees, the unions stuff. Again, I get

Page 74

1   a 175 dollars a month to be a union
2   vice-president. It's a joke.
3        SYBIL BAILEY: That is it?
4        STEVEN MURRAY: It's a joke, but I do
5   it. I spend tons of time representing faculty
6   and doing the best I can, and that is -- I should
7   be applauded for that, not, like, oh, he is a bad
8   guy.
9        SYBIL BAILEY: You catch more bees with
10  honey, though, my theory.
11       STEVEN MURRAY: Well --
12       SYBIL BAILEY: Sorry, Dick.
13       STEVEN MURRAY: (Inaudible) Leslie
14  Florio. She's successful, but she has got a
15  different style.
16       SYBIL BAILEY: She does. She does.
17       STEVEN MURRAY: She has got a different
18  style, but she can be as tough as anybody.
19       SYBIL BAILEY: She can.
20       STEVEN MURRAY: Yes.
21       SYBIL BAILEY: And she got -- I respect
22  that.
23       STEVEN MURRAY: People should be
24  faulted for style?

Page 75

1        SYBIL BAILEY: Touche.
2        STEVEN MURRAY: You know.
3        SYBIL BAILEY: They shouldn't. I get
4   it.
5        STEVEN MURRAY: I wish more people
6   would get it. If people got it, we won't be at
7   this table. I hate to say it.
8        RICHARD SINAPI: Under a conflict of
9   ideas and positions, we move forward to a better
10  idea. Without that debate in the workplace,
11  without this give and take, without people being
12  taken out of their safe space, because I have
13  logically and factually undermined your argument,
14  okay, that person may not change their position.
15  Now, if the people think about it and say, okay,
16  I am going to bring a complaint against him,
17  because I'm in an unsafe place, instead of
18  thinking about and reflecting, gee, maybe my
19  position has some weaknesses, maybe there's
20  something I should self reflect on, instead of
21  saying, oh, I am out of my safe place. He is
22  attacking my ideas. I mean --
23       SYBIL BAILEY: And I have had that
24  conversation, trust and belief, because I would

Page 76

1   have to go to these meetings knowing I was going
2   to -- not yours, in my previous life. People
3   wouldn't want to go, and I am, like, we don't
4   have a choice.
5        STEVEN MURRAY: Yes.
6        SYBIL BAILEY: They're not going to
7   kill us.
8        STEVEN MURRAY: No.
9        SYBIL BAILEY: I mean, but it's -- my
10  role is different. It's, I mean, I am here to
11  try to help us figure this out.
12       RICHARD SINAPI: Part of the workplace
13  people disagree.
14       MICHAEL DA CRUZ: Yeah, I mean, just to
15  sum it up, just for, like, (inaudible). It's,
16  like, look, it's some frustration and e-mails
17  about overload issues and scheduling, when it's,
18  like, you have to submit this stuff today, and I
19  don't know how to do it, because there are things
20  you are telling me to do and the contracts are
21  not in alignment, and I actually can't do the
22  thing you're asking me to do and I don't really
23  know what to do. What should I do, right? That
24  is one. The other one is, you're the president



Page 77

1  of the union and you are leaving the school. I
2  think probably you shouldn't negotiate our
3  upcoming contract, because you are leaving, and
4  the rest of us have to be here with it. That is
5  just a union position, right? I think we all
6  agree on that.
7       SYBIL BAILEY: And I have nothing to
8  say on the union --
9       MICHAEL DA CRUZ: Right, exactly, and
10 then, you know, student faculty -- senate --
11 faculty senate, I am concerned about the
12 structure of this senate and how much -- like,
13 how it distributes power between the faculty and
14 the administration, and also the way the
15 administration is relating with it. Those are
16 the three issues here. That is it. That's what
17 we're talking about, like, and this is, like,
18 almost a year of investigation about that. That
19 is kind of silly. I am just saying. Like, those
20 are three very normal things to say and they are
21 protected things to say.
22      SYBIL BAILEY: I'm sorry you think they
23 are silly, but --
24      STEVEN MURRAY: But you've got to look

Page 78

1  at their motivation as well. They wanted to
2  silence me. And I'm talking about Tara and
3  Sandy. Sandy told me, she wants to run for
4  president, you know, in April.
5       RICHARD SINAPI: They said it right in
6  their complaints.
7       STEVEN MURRAY: They said it in
8  their --
9       RICHARD SINAPI: Oh, yes, he should go
10 on administrative leave and not have access to
11 Listserv, so he can logically and passionately
12 attack our positions, and we will be in our
13 unsafe place, because these arguments are very
14 persuasive.
15      STEVEN MURRAY: That's so unAmerican.
16      RICHARD SINAPI: That is exactly what
17 happened.
18      STEVEN MURRAY: That is so unAmerican
19 to silence someone.
20      RICHARD SINAPI: (Inaudible) what
21 happened.
22      MICHELLE DARGON: Parking?
23      RICHARD SINAPI: Thank you for your
24 time.

Page 79

1       STEVEN MURRAY: Oh, yes, parking.
2       RICHARD SINAPI: Parking, oh, oh.
3       SYBIL BAILEY: Oh.
4       MICHELLE DARGON: I don't how to do it,
5  so --
6       SYBIL BAILEY: Wait. What do I have to
7  do. Oh, give them the ticket.
8       MICHELLE DARGON: Yes, they asked me to
9  take photos of all the tickets (inaudible).
10      SYBIL BAILEY: (Inaudible) that's why.
11 I carry those receipts around and they get
12 crumpled up six months later.
13      MICHAEL DA CRUZ: Yes, right.
14      SYBIL BAILEY: Steven, it was nice
15 meeting you. I mean, Steve -- Dick, sorry.
16      RICHARD SINAPI: Sybil, pleasure
17 meeting you.
18      SYBIL BAILEY: It was.
19      RICHARD SINAPI: I may be passionate,
20 but we are really on the same side. I just hope
21 you know that.
22      SPEAKER: That's the reality.
23      SYBIL BAILEY: (Inaudible) I get it. I
24 mean --

Page 80

1       STEVEN MURRAY: No, you wouldn't be
2  doing what you are doing if you didn't believe
3  this. I truly believe that.
4       SYBIL BAILEY: I get it. I get it.
5  I'm just -- I believe in --
6       STEVEN MURRAY: Sure, yes, of course.
7       RICHARD SINAPI: There is a clash of
8  ideas. It's part of the process.
9       SYBIL BAILEY: Don't hate the player.
10 Hate the game.
11      RICHARD SINAPI: That is what the First
12 Amendment says. This country was built on the
13 clash of ideas. The problem with the current
14 political rhetoric, it's an attack on people.
15 Let's clash on ideas and beliefs.
16      SYBIL BAILEY: I still say, you catch
17 more bees with honey.
18      STEVEN MURRAY: Sometimes.
19      SYBIL BAILEY: I'm sorry. He hates
20 that.
21      RICHARD SINAPI: No, Sybil, Sybil, I am
22 not necessarily disagreeing with you, but in this
23 context, I keep coming back to this context; look
24 at the e-mails. Look at the discourse. He is



Page 81

1  attacking the ideas and he is not using
2  invectives. He is not using vulgarity. He is
3  not -- he is just saying, look at it; it doesn't
4  make sense. You've got no skin in the game.
5  You're a lame duck. You shouldn't be doing this.
6  It's not in the best interest of the faculty. I
7  think you should resign.
8      SYBIL BAILEY: But I think that is
9  still different. That is still you.
10     RICHARD SINAPI: But that is what --
11     MICHAEL DA CRUZ: But that is what
12  we're here for, though.
13     SYBIL BAILEY: But that is (inaudible),
14  but that was you and Tara. To me, that is your
15  world.
16     RICHARD SINAPI: It's not him and Tara.
17  That is him and the faculty, and what is best for
18  the faculty. It's not personal, okay. The same
19  thing with Professor Sneesby, even more so. He
20  never said anything about -- about her or her
21  role. He said about the way it was functioning
22  and the way it had been established and we need
23  to fix this. I'm sorry you are out of your safe
24  place, but if we don't talk about it and think

Page 82

1  about it and logically process it, we can't make
2  it better.
3      SYBIL BAILEY: Right, and both sides --
4      RICHARD SINAPI: And the fact that
5  you --
6      SYBIL BAILEY: -- in my opinion, have
7  to -- all right, I need to put thicker skin on,
8  let's just say, me and you need to be mindful
9  that when you do get in my face with your --
10  listen, I'm not cool with that, and that is my
11  general -- general observation. I am not
12  speaking on this piece. I am just saying to you,
13  all right, both sides, come on. It's not going
14  to be productive. We're going to argue over the
15  fact that I think that you are coming for me, and
16  whether or not -- your point, there's a process
17  for it.
18     RICHARD SINAPI: Right, but there's no
19  tapping out in the First Amendment. There is no
20  tapping out on the fact of the Listserv, when you
21  are logically arguing a position.
22     MICHELLE DARGON: All set. That is it,
23  so good luck. May the odds be ever in your
24  favor.

Page 83

1      RICHARD SINAPI: When you are logically
2  arguing a position and you're advocating for it,
3  there is no tapping out. There's no, like,
4  saying, okay, I had enough discourse on this
5  subject about whether or not the faculty senate
6  is being manipulated or there's not shared
7  governance, so I am tapping out. I feel
8  threatened. I feel upset about it. Stop it.
9      MICHAEL DA CRUZ: Right, you don't have
10  to keep arguing.
11     RICHARD SINAPI: It doesn't work that
12  way.
13     MICHAEL DA CRUZ: But you can't tell
14  someone else they have to shut up.
15     RICHARD SINAPI: It doesn't work that
16  way.
17     SYBIL BAILEY: (Inaudible), but we
18  don't have to keep arguing. We'll come back.
19     MICHAEL DA CRUZ: Right, I mean, you
20  don't -- yeah, you don't have to keep talking
21  about it, but that is the issue, is it's not that
22  they had to keep talking about it. It's that
23  they told Steve he couldn't keep talking about
24  it. It was the issue, right?

Page 84

1      SYBIL BAILEY: (Inaudible)
2      MICHAEL DA CRUZ: Yes.
3      RICHARD SINAPI: In what manner, Sybil?
4  In what manner? Look at the e-mails. In what
5  manner?
6      SYBIL BAILEY: And I have to be honest,
7  I mean, it's not -- that is your perception and
8  they have theirs. Now, whether or not -- and
9  that is what this will get to.
10     RICHARD SINAPI: Vulgarity, okay,
11  vulgarity. No vulgarity. Threats of violence or
12  threats that would lead to violence, none. This
13  is the law. That is the objective test. It's
14  not somebody's, oh, I am out of my safe place,
15  and he is very persistent and logical and
16  persuasive and (inaudible) his argument. I want
17  him -- I want him sanctioned and off the
18  Listserv. It doesn't work that way.
19     STEVEN MURRAY: Thank you, guys.
20     SYBIL BAILEY: Thank you.
21     MICHELLE DARGON: Thank you.
22     SYBIL BAILEY: All right. Take care.
23  All right, talk soon.
24



STEVEN MURRAY                                          December 07, 2023
Steven Murray Interview Meeting                                      85

Page 85

```
 1
 2
 3
 4            C E R T I F I C A T E
 5
 6        I, Jeannette M. Criscione, hereby
 7   certify that the foregoing is a true, accurate
 8   and complete transcript to the best of my ability
 9   taken from the tape recordings supplied to the
10   offices of Esquire Deposition Solutions.
11
12
13   IN WITNESS WHEREOF, I have hereunto set my hand
     this 18th day of December, 2023.
14
15
16
17
18
19
     JEANNETTE M. CRISCIONE
20
21   CERTIFIED COURT REPORTER
     NOTARY PUBLIC/COMMISSION
22   EXPIRES 12-17-24
23
24
```

