# EXHIBIT CC

July 14, 2017

President Meghan Hughes
Community College of Rhode Island

Dear President Hughes:

At your request, and on your behalf, I have conducted, and have now concluded, an investigation into the matter described below, concerning allegations (made by the Complainant, Steven Murray) of violations (allegedly committed by the Respondent, Rosemary Costigan) of certain provisions of the Rhode Island Board of Education's "Violence in the Workplace Prevention Policy" (the "Policy").

This report is intended to set forth the Complainant's allegations, the Respondent's responses to those allegations, relevant information obtained from witnesses, and the relevant policy provisions, as well as my findings and conclusions resulting from my investigation.

In conducting my investigation, and preparing this report, I have endeavored to adhere, to the full extent possible, with practices and procedures I understand are normally followed by CCRI investigators when investigating similar complaints, including with respect to interview procedures, policy interpretations and report formatting.

Below is the relevant language from the Policy as it pertains to the complaint at hand, with the most significant points underscored, followed by a discussion of the relevant facts. In the final section ("Conclusion"), this report will provide a determination as to whether or not there has been a violation of the Policy.

**1. Relevant Provisions of the Rhode Island Board of Education's "Violence in the Workplace Prevention Policy"**

*I. Policy*

The Board of Education complies with and supports the language and spirit of applicable laws as they relate to employee security and safety. Therefore, the Board has adopted a statewide zero tolerance policy for workplace violence.

1. <u>This policy is committed to working with non-classified employees to maintain a work environment free from threats of violence, harassment, and intimidation.</u> This policy includes an absolute prohibition against employees carrying any firearms or personal weapons onto any Board/State property, except as may be specifically authorized by law and as required in the employee's official responsibilities as a non-classified employee.

2. Employees who have knowledge of violent acts or threats of violence in the workplace must report such acts or threats through the proper chain of command. Employees who make such reports have the right to have those complaints investigated.

1

3. Employees, who engage in violent or threatening acts against other employees or the public, shall be subject to appropriate sanctions, depending upon the circumstances, up to and including termination of employment, as well as possible criminal charges. The Board will work with appropriate law enforcement agencies to aid in the investigation and prosecution of anyone who commits a violent act in the workplace.

## II. Definitions

Harassment – Verbal statements or physical acts which, while neither an assault nor a battery, nevertheless are likely to create tension or hostility, and therefore, may lead to conflict.

Threat of Violence – A threat of violence is any act of aggression or a statement which objectively could be perceived as intent to cause harm to an employee. Threatening behavior includes any behavior that could be interpreted by a reasonable person as intent to cause physical harm to another individual. Threatening behavior may, or may not, include the actual act of physical force, with or without a weapon, toward another individual. Threatening behavior may be verbal or non-verbal.

Violent Act – Any act that is an assault, a battery, or the destruction/ damage of physical property.

Work Place Conflict – Conduct or communication that is not clearly discrimination based on age, gender, sexual orientation, race, religion, national origin, or disability but which contributes to a hostile work environment, constitutes workplace conflict that must be dealt with swiftly so as to avoid the matter becoming the source of violent acts.

## III. Implementation

In order to effectively implement the policy, all non-classified employees must refrain from:

1. Committing any violent or physical act in the workplace against another employee or member of the public.

2. Making verbal or non-verbal threats that are disruptive, provoking, harassing, or unsafe behavior. Further employees shall not harass or discriminate against each other nor shall employees harass or discriminate against members of the public with whom they come in contact.

**2. Involved Parties and Witnesses:**

| | |
|---|---|
| Complainant: | Steven Murray, Faculty Member and Chairperson of the Criminal Studies Department, CCRI; and President of the CCRI Faculty Union |
| Respondent: | Rosemary Costigan, Vice President for Academic Affairs |
| Witnesses: | Other Members of the CCRI Strategic Planning Committee ("SPC) In attendance at SPC Meeting of May 12, 2017: |

        Ruth Barrington, Business Manager, Business Affairs
        John Cole, Dean of Arts, Humanities and Social Sciences
        Isabel DeAraujo, Associate Vice President, Institutional Advancement

        Sara Enright, VP, Student Affairs & Chief Outcomes Officer
        Leslie Florio, Technical Staff Assistant, Art Department
        Pamela Hallene, Professor, English Department
        Zdenko Juskuv, Adjunct Faculty, English Department
        Geraldine Levitre, Assistant Professor, English Department
        Kenneth McCabe, Director of Facilities, Maintenance & Engineering
        Jaime Nash, Director of Training & Development, CWCE - Tr. & Dev.
        Sheri Norton, Director of Human Resources
        Michelle O'Brien, Associate Director, Human Resources
        Anthony Parziale, Chief Information Officer
        David Patten, Vice President for Business Affairs
        Thomas Procaccini, Counselor, College Counseling Center
        Cecile Roberti, Associate Professor, Business Department
        Ruth Sullivan, Dean of Learning Resources
        Deborah Watson, Associate Director, Enrollment Services

Date of Reported Incident:    May 12, 2017

### 3. Background of the Case:

The second meeting of the recently formed CCRI Strategic Planning Committee ("SPC") was held on May 12, 2017. The Complainant, Respondent, and the 18 above listed Witnesses, all SPC members, were in attendance at the meeting, with one of the SPC members (Isabel DeAraujo) joining the meeting by telephone. The meeting was chaired by David Patten. The second item on the meeting agenda was a discussion of a document entitled "Draft Strategic Goals for SPC Review" (hereinafter "Draft Statement") which had been prepared on behalf of the College by the Frank Markley of the consulting firm Paulien and Associates, and which was informed by input from various CCRI stakeholders and interested parties. The first sentence of the Draft Statement, listed under the heading "Strategic Direction: Enhancing Student Success and Completion," read as follows: "We believe all students are motivated, capable and committed to attaining academic achievement."

When the SPC members were asked to provide comments on the Draft Statement, Steven Murray was the first to raise his hand and provide comments. He made the basic point that he did not believe the words "all students" in that first sentence was accurate or appropriate, saying essentially that, in his long experience at CCRI, he had found some students were not in fact "motivated, capable or committed" to learning or succeeding, or words to that effect. Rosemary Costigan spoke next, and responded to Mr. Murray's comment. She indicated that she strongly disagreed with Mr. Murray's comment, and felt essentially that it was important that all educators at CCRI believe that all students are, or can be, "motivated, capable and committed" of learning and succeeding, and that it was the educator's job to help all students become motivated, capable and committed.

At this point, by nearly all accounts, the exchange between Mr. Murray and Ms. Costigan became "heated," and the two attempted to "speak over each other" a few times, for example by asking to be "allowed to finish" what they were saying. After a few minutes, David Patten interjected and asked them to halt their exchange, which they did. At that point, Pam Hallene spoke, saying that she was in agreement with Mr. Murray's basic point about the document language, and suggesting that the word "all" be stricken from the first sentence. The Committee members were polled, and agreed with Ms. Hallene's proposal, and the word "all" was stricken from the first sentence of the Draft Statement.

3

The rest of the meeting proceeded without incident, with both the Complainant and Respondent participating, and without any further disagreement or argument between them.

Subsequently, on May 15, 2017, Mr. Murray filed a "formal complaint," alleging (among other things) that Ms. Costigan, through her words and behavior toward him in the SPC Meeting, had violated the Board of Education's Violence in the Work Place Prevention Policy. [It should be noted that Mr. Murray's complaint also alleged that the Respondent had "created a hostile work environment" for him, but Mr. Murray has not at any time indicated what applicable law or policy, other than the Violence in the Workplace Policy, such alleged behavior (if found to be true) would have violated. While a claim of "unlawful harassment" can be made under Council and CCRI **general non-discrimination policies**, in order for such a claim to be successful, a Complainant must show **not only** that the Respondent's conduct toward him/her was so severe or pervasive that it created a "hostile work environment" for him/her, **but also** that the improper conduct, and the hostile environment it creates, were based on the Complainant's gender, race, ethnicity, or membership in some other "protected class or category". No such claim has been made by the Complainant, and thus, this report will only address whether, if the respondent did create a hostile work environment for the Complainant (**but not** based on his membership in any protected class), such conduct was a violation of the Board of Education's Violence in the Work Place Prevention Policy].

### 4. Interview with Complainant:

Following a few earlier, but unsuccessful, attempts to interview the Complainant, I was eventually able to make arrangements to meet with him on 7/11/17 at CCRI, and had a discussion with him at that time. At that meeting, I reviewed his written complaint with him, allowed him the opportunity to add any additional facts or allegations that he considered relevant to his complaint, and asked him a number of specific questions.

The main points and arguments made by Mr. Murray during the interview that are relevant to his allegations of policy violations, can be summarized as follows: Mr. Murray stated that he believed that Ms. Costigan verbally attacked and assaulted him, made verbal threats against him which he considered to include threats of violence, and harassed and intimidated him. Specifically, he felt that she responded very wrongly and unprofessionally to his comments about "not all students being motivated to learn" by "launching into a tirade" against him, insulting him, and disrespecting him. Mr. Murray related that Ms. Costigan stated that she "was repulsed by" what he had said, and that he "did not belong working at the College" and "was a poor fit" at the College. He said he took these to be not only attempts to harass and intimidate him, but also as threats against his "livelihood". Mr. Murray further said he thought her words "threatened violence" against him, but when pressed on what specifically led him to believe Ms. Costigan would become physically violent toward him, only said that her words were so vehement that he feared she might become violent. He conceded, however, that she made no gestures, and took no other physical actions, which would objectively indicate that it was likely, or even that it was possible, that she would become violent. In response to questions, Mr. Murray stated that, in his current position, he does not have any regular interaction with Ms. Costigan, and the two have little reason to speak with other on job related matters. He said she also has no involvement in his hiring or termination, or in determining the terms or conditions of his job. He also was not able to identify any way in which the incident has affected his ability to do his job or perform his normal duties, other than to say generally that the incident has contributed to a generally more tense and negative atmosphere between him and some members of the college's senior leadership, including Ms. Costigan. He believes Ms. Costigan's

behavior constituted threats of violence, threatening acts, harassment and intimidation, and creation of a hostile work environment for him, all of which he argues are prohibited by the Board of Education's Violence in the Work Place Prevention Policy.

### 5. Interview with Respondent:

I interviewed the Respondent by phone on 6/21/17. Ms. Costigan conceded that she did "express her strong disagreement" with Mr. Murray's comments which she thought were "questioning" the "desire and capability to learn" of some CCRI students, but she stated that her words were merely "expressions of her personal disappointment" and "sadness" and "unhappiness" with Mr. Murray's comments about some CCRI students, and the negative attitudes they seemed to reflect, and were never in any way meant by her as a threat against Mr. Murray. She admitted saying something to the effect that Mr. Murray's words "might indicate that he was unhappy" working at CCRI, and that "if he truly felt that way" Mr. Murray "may be a better fit at another kind of college". But she stressed that she did not ever indicate she thought "he should leave the College... or anything like that" and never made any threat against Mr. Murray or his job or livelihood. She further stated that she did not begin speaking until Mr. Murray had finished, but that Mr. Murray tried many times to "cut her off" while she was trying to speak. She added that, after their disagreement was over, and the committee moved on to other agenda items, Mr. Murray attempted to provoke her, and "heckled" her a number of times, by making statements to another SPC member sitting next to him that she thought were deliberately intended to make her angry, and that she ignored and did not respond to them. She flatly denies that any of her statements threatened Mr. Murray in any way, or constituted (or could reasonably and objectively be seen by anyone as) threats of violence, threatening acts, harassment, intimidation or the creation of a hostile work environment.

### 6. Interviews with the Witnesses:

The eighteen (18) witnesses, all of whom are members of the SPC who were present (with one joining by phone) at the SPC meeting on May 12, 2017, were all interviewed by phone, sometime between 6/19/17 and 7/11/17. Each was asked to describe the incident, based on their memory of it, and each were asked essentially the same relevant questions intended to help determine whether Ms. Costigan may have committed a policy violation. Each recounted or confirmed the same basic facts, as set forth in the background section above, to describe the events and circumstances leading up to the incident. Significantly, all 18 witnesses uniformly expressed consistent opinions: That Ms. Costigan never made any "verbal threats" against Mr. Murray (although a few witnesses stated the view that Mr. Murray "might have taken," or "could possibly have taken" Ms. Costigan's statements questioning his "fit" at the college as a veiled threat against his job); That Ms. Costigan never engaged in any violent acts or physically threatening acts against Mr. Murray; That they were never concerned for the safety of Mr. Murray or anyone else at the meeting, and; That they never felt concerned that the conflict might lead to physical violence.

While there were a range of descriptions provided by the witnesses to "characterize the interaction" between Ms. Costigan and Mr. Murray ---- with some on the one hand saying that the exchange was "just a disagreement" or simply an "expression of opposing views," and some on the other hand saying it was "hostile and adversarial" or a "combative," "uncivil" or "unfriendly" exchange ---- most witnesses described it as simply a "heated exchange" of strongly opposing viewpoints. Furthermore, while a number of witnesses expressed views that Ms. Costigan's words were "out of turn," "unprofessional" or "aggressive," that she "could have "handled the situation better," and that the SPC meeting was "not

5

the proper venue" for her expression of her particular views on the matter, a number of other witnesses thought that the incident was partly the result of a number of prior disagreements between Ms. Costigan and Mr. Murray, and that, in this case, Ms. Costigan was just "honestly," "passionately" or even "tearfully" stating her "heartfelt" and "sincere" personal views, that were based in part on her personal experience as a former CCRI student, and that she did not do or say anything wrong. Finally, with only one or two exceptions, none of the 18 witnesses thought that Ms. Costigan had "harassed" or "intimidated" Mr. Murray, or that her actions and words had created a "hostile work environment" for him. The witnesses also uniformly noted that, after the incident, the meeting went on normally, without problem or disruption.

### 7. Conclusion:

The Violence in the Workplace Prevention Policy adopted by the Board of Education on August 20, 2007, states that it is committed to maintaining a work environment free from threats of violence, harassment, and intimidation. "Harassment" is defined as, "verbal statements or physical acts which, while neither an assault nor a battery, nevertheless are likely to create tension or hostility, and therefore, may lead to conflict." The policy further declares that "in order to effectively implement the policy, all non-classified employees must refrain from…", "…..making verbal or non-verbal threats that are disruptive, provoking, harassing, or unsafe behavior." "Work Place Conflict" is defined as "conduct or communication…that must be dealt with swiftly so as to avoid the matter becoming the source of violent acts."

The complaint was thoroughly investigated. Based on the information obtained pursuant to this investigation, I have concluded that a violation of the Violence in the Work Place Prevention Policy did not occur. This conclusion is based on my findings that (1) In keeping with the stated beliefs of all 18 witnesses, there was virtually no risk or likelihood that the Respondent's behavior would escalate to become the source of a violent act by her, or lead to conflict that could become violent; and (2) In keeping with the stated beliefs of all 18 witnesses (or in some cases at least 16 or 17 of the 18 witnesses), the Respondent's conduct and behavior toward the Complainant did not constitute verbal threats, threats of violence, threatening acts, harassment or intimidation.

I have also concluded that --- even if the creation by a Respondent of a "hostile work environment" which is **not based** on the Complainant's gender, race or membership in any other protected class would constitute a violation of the Violence in the Work Place Prevention Policy (which I do not believe it would) --- there would have been no policy violation here because the Respondent's conduct and behavior in this case did not (for multiple reasons including that the behavior complained of was a single incident involving conduct by a senior employee who was not the Complainant's supervisor and with whom the Complainant has no regular interaction, and the behavior was clearly not so severe as to have any significant or lasting effect on the Complainant, his work conditions, or his ability to fully perform his job) create a "hostile work environment" for the Complainant.

Sincerely,

Peter J. Harrington
Assistant Legal Counsel
University of Rhode Island
[Acting as an Investigator on behalf of, and at the request of, CCRI and its President]

6